UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  7:13-CR-70-12 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| JORGE GARZA, | ) | Tuesday, July 30, 2013 |
| | ) | |
| Defendant. | ) | (1:32 p.m. to 3:37 p.m.) |

TESTIMONY OF FERNANDO GUERRA, JR. DURING JURY TRIAL DAY 1

BEFORE THE HONORABLE RANDY CRANE,
UNITED STATES DISTRICT JUDGE

**Appearances:**          See next page

Court Interpreter:        Elena Medrano

Court Recorder:           Richard Cortez

Transcribed By:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, Texas 78480-8668
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**


Plaintiff:                    JAMES STURGIS, ESQ.
                              ANIBAL ALANIZ, ESQ.
                              Assistant United States Attorney
                              1701 W. Business Hwy. 83
                              Suite 600
                              McAllen, Texas 78501

Defendant:                    LILLY ANN GUTIERREZ, ESQ.
                              4901 S. Jackson Rd.
                              Edinburg, Texas 78539

3

1                              INDEX

2   GOVERNMENT'S WITNESS        DIRECT    CROSS     REDIRECT    RECROSS

3   FERNANDO GUERRA, JR.          5        33          84          88

4

5   GOVERNMENT'S EXHIBITS                                      RECEIVED

6   1 THROUGH 6                                                   21

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **McAllen, Texas; Tuesday, July 30, 2013; 1:32 p.m.**

2      **(Partial transcript; testimony of Fernando Guerra, Jr)**

3          **(Interpreter Utilized for Translation)**

4                        **(Call to Order)**

5          **THE CLERK:**  All rise for the jury.

6      **(Jurors enter courtroom at 1:32 p.m.)**

7          **THE COURT:**  Good afternoon.  Please be seated.  All

8  right.  The Government is still calling its witnesses.  We

9  concluded with the first witness.  I'll ask the jury to call --

10  I mean the Government to call its next witness.

11          **MR. STURGIS:**  At this time, your Honor. the

12  Government would call Fernando Guerra, Jr. to the stand.

13          **THE COURT:**  Junior, all right.

14      **(Pause)**

15          Good afternoon, Mr. Guerra.  If I could have you step

16  forward to your left.  Come around the table here.  If you

17  would come up to one of the microphones, I need to have the

18  oath administered to you before you testify.  So if you would

19  raise your right hand to be administered the oath.

20      **FERNANDO GUERRA, JR., GOVERNMENT'S WITNESS, SWORN**

21          All right.  Mr. Guerra, if you could be seated over

22  here in the witness chair.

23          All right.  Mr. Sturgis, could I get you to rotate

24  the microphone a little closer to you so we can pick up your

25  audio better?

**EXCEPTIONAL REPORTING SERVICES, INC**

1          **MR. STURGIS:**  Is that better?

2          **THE COURT:**  Yes.  You may proceed.

3                      **DIRECT EXAMINATION**

4    BY MR. STURGIS:

5    Q    Please state your name.

6    A    Fernando Guerra, Jr.

7    Q    And how old are you, sir?

8    A    Twenty-four.

9    Q    And where do you live?

10   A    In McAllen.

11   Q    Where did you live prior to McAllen?

12   A    In Edinburg, Texas.

13   Q    And is your father Fernando Guerra, Sr.?

14   A    Yes, sir.

15   Q    Okay.  And he's the person that owns Astro Trucking?

16   A    Yes, sir.

17   Q    Mr. Guerra, have you pled guilty to some criminal charges?

18   A    Yes, I have.

19   Q    Okay.  And what charges did you plead guilty to?

20   A    Conspiracy of cocaine and marijuana.

21   Q    When did you first get started in the narcotics business?

22   A    2011.

23   Q    2011.  How did you get started?

24   A    Through my dad and other people that I was involved with.

25   Q    Okay.  How did you first get started?  What did you first

1    do, if you remember?

2    A     Well, we would actually rip off dope.  We would rip them

3    off and we would use the help of officers to -- in the process

4    to get it -- well, get it done.

5    Q     Okay.  Did you ever actually transport narcotics from the

6    Rio Grande Valley to anywhere else?

7    A     No.  It was just here locally.

8    Q     How was it that you were able to obtain the narcotics?

9    A     Through people that wanted transportation, supposedly up

10   north but really it wasn't going anywhere.

11   Q     Okay.  So how would you convince them to give you the

12   narcotics?  What would you do?

13   A     Well, I would talk to them, meet up with them at my place

14   and just talk to them.  And they would come up with the drugs

15   or whatever they wanted to move.  And after that it was -- it

16   was a make believe traffic stop that everything -- that the

17   dope was actually seized, but in reality we'd stay with it.

18   Q     Okay.  So you would pose as someone wanting to transport

19   narcotics for other people.

20   A     Yes.

21   Q     Okay.  And would you come up with prices and such so that

22   they would leave their --

23   A     Yes, we would come up with prices, warehouses,

24   destinations, time, dates, and everything else.

25   Q     Okay.  You wanted them to give you the narcotics.

1  A    Yes.

2  Q    Okay.  In reality, as you've said, you never intended to

3  transport them northbound.

4  A    Northbound, exactly.

5  Q    Okay.  Your intent was to do what with them?

6  A    Stay with the dope, sell it and get a profit off of it.

7  Q    And you said your dad is the one that got you started in

8  this?

9  A    Well, yes.

10  Q    Okay.  How did he get you started?

11  A    Well, I mean after seeing what was being done, it was easy

12  for me to get involved with the whole thing and do it on my own

13  way, too.

14  Q    Okay.  So you decided to do it on your own way as well.

15  A    Yes.

16  Q    Okay.  What did that involve?

17  A    Police officers.

18  Q     Okay.  What did -- did you have access to people that

19  could supply drugs to you?

20  A    Yeah, yes, I did.

21  Q    Okay.  So you knew people that could --

22  A    I knew people that wanted transportation of the narcotics

23  and up north -- and I took advantage of the situation, and we

24  would make all this make believe story.

25  Q    Now, you discussed these dirty police officers.  Did you

1    associate with the dirty police officers or was that your

2    father?

3    A    That was my father.

4    Q    So you didn't have any association with it.

5    A    Not directly.

6    Q    Not directly, okay.  At what point -- or how did you

7    approach your father on leading these officers?

8            MS. GUTIERREZ:  Objection, your Honor.  Leading.

9            THE COURT:  It was two questions.  Do you want to

10   know at what point?

11           MR. STURGIS:  Yes.  At what point did you approach

12   your father?

13           MS. GUTIERREZ:  Your Honor, and the fact that he

14   approached his father.  I think that that's the leading part on

15   that part of the question.

16           THE COURT:  As opposed to his father approaching him.

17   Correct, okay.

18           MR. STURGIS:  I believe he's testified to that but...

19   BY MR. STURGIS:

20   Q    How did it get started -- Mr. Guerra, how did -- did you

21   approach your father or did your father approach you?

22   A    Well, when I had my own thing done, I would approach him

23   and let him know, you know what, this is going -- this is

24   what's going to happen; I mean is there any way we could do it,

25   I mean and --

1  Q    When you say "any way we can do it," what do you mean by

2  that?

3  A    Well, the transportation and using the corrupt officers to

4  do the seize, supposedly seizure we're going to do.

5  Q    Okay.  And did he agree with that?

6  A    Yes.  Most of the time he did.

7  Q    Okay.  Were there times when he said no?

8  A    Not really.

9  Q    Now, you didn't have any connection to the police

10  officers; you didn't talk to them.

11  A    Just to J.P.

12  Q    Okay.  And when you say "J.P.," do you know J.P.'s last

13  name?

14  A    Flores.

15  Q    Okay.  You met with Mr. Flores.

16  A    Yes.

17  Q    Where were you when you met Mr. Flores?

18  A    There at the shop, at Astro Transport, I believe.

19  Q    Okay.  And what did you know Mr. Flores to do as a job?

20  A    Well, he was a deputy at the Sheriff's Department.

21  Q    And how did you know that?

22  A    Through my dad.

23  Q    When you met Mr. Flores at that time were you aware --

24  were you aware what his relationship was with your father?

25  A    Yes.

1   Q    Okay.  And what did you understand at that time?

2   A    Well, at that time I -- it was just we were -- it was

3   discussed what we were doing at this point.

4   Q    Okay.  And what was discussed?

5   A    About the whole fake traffic stops and actually getting

6   dope from other people and staying it -- I mean getting dope

7   from other people and actually just keeping it for us.

8   Q    Did you discuss this with Mr. Flores?

9   A    Yes.

10  Q    Okay.  Now, when you would do your own thing, did you talk

11  to Mr. Flores?

12  A    Yes, I have.

13  Q    Why did you talk to him?

14  A    So he could organize how everything was going to be done.

15  Q    Did you talk to him every time, or were there times when

16  other people talked to him?

17  A    Well, if I didn't talk to him -- well, it was always

18  through my dad; so I mean he was always present.  I was always

19  there, so I mean...

20  Q    So the three of you would talk.

21  A    Yes.

22  Q    And to your understanding what was Mr. Flores' role?  What

23  did he do for you?

24  A    Well, he organized whether doing it with Panama or doing

25  it with -- well, I didn't know Jorge at that time, but he had

Guerra - Direct / By Mr. Sturgis                              11

1    another way of doing it with another officer.

2    Q    Okay.  So the way it was done with Panama was different

3    than it was done with this other officer?

4    A    Yes.

5    Q    Okay.  So there was a variety of ways that you stole

6    narcotics.

7    A    Exactly.

8    Q    When -- you said you started this around 2011?

9    A    More or less.

10   Q    When you started doing your own thing, how was it done?

11   How did you do it?

12   A    Well, when it first started, it started with Davila, with

13   Julio Davila and Aida.  They would do fake paperwork for us.

14   Q    Okay.  And what would the fake paperwork show?

15   A    They would show -- it was actually a booking sheet of the

16   driver supposedly that had been arrested somewhere up north.

17   Q    Okay.  And that the load had been seized?

18   A    Exactly.

19   Q    Okay.  So you did it that way.

20   A    At that time, yes.

21   Q    Okay.  And then you've already discussed Panama.

22   A    Uh-huh.

23   Q    Now, when you started doing the fake traffic stops, how

24   did that happen?

25   A    Well, it happened because it was a little bit harder to

1   make believe the owners that it had actually gotten seized by

2   giving them fake paperwork.  So we started doing the traffic

3   stops making them see everything that was going on.

4   Q    Okay.  And how did it work?  How did the fake traffic

5   stops work?

6   A    I would meet up with the owners.  They would deliver the

7   actual dope, marijuana, whatever it was.  And I would keep it.

8   We would store it away and after that we would set a time when

9   we're going to be loading a truck.  And at the process when we

10  would leave my place to the destination where the truck was

11  going to be loaded, there was a traffic stop before getting

12  there.

13  Q    So the marijuana was supposed to be at your house.

14  A    Yes.  Well, not at my house.  But I mean it was delivered

15  there but stored away at a different place.

16  Q    Okay.  That's what the owners believed.

17  A    Exactly.

18  Q    And then how did it work from there to where the traffic

19  stop would occur?  How would it work?

20  A    We would just set up a certain like a -- we would get -- I

21  would talk to the driver that was driving the vehicle to the

22  destination where we were supposed to load the truck.  And we

23  would just time it and we would just follow behind it.  And

24  there was a certain spot on Monte Cristo that the deputy would

25  come in and turn on the lights on him and they would just blaze

1    down on the road.

2    Q    Are you familiar with Jesus Flores Road?

3    A    Yes.

4    Q    Okay.  Is that where these fake stops occurred?

5    A    Yes.

6    Q    Is your house on -- your house is on 83rd Street, correct?

7    A    Yes.

8    Q    Is that east or west of Jesus Flores?

9    A    Jesus Flores is actually west from Jesus Flores [sic].

10             **THE COURT:**  We already have a map in evidence.

11             **MR. STURGIS:**  Correct.  But can I ask a couple of

12   questions --

13             **THE COURT:**  You may.

14   **BY MR. STURGIS:**

15   Q    Your house is west of Jesus Flores.

16   A    Yes.

17   Q    Okay.  How many miles is it from 83rd to Jesus Flores?

18   A    About five, more or less.

19             **MR. STURGIS:**  May I approach, your Honor?

20             **THE COURT:**  Yes, please.

21             **MR. STURGIS:**  May I have the witness...

22             **THE COURT:**  Yeah.  Do you have a pointer for him?

23             **MR. STURGIS:**  Mr. Guerra, would you please come

24   down -- and for the record, your Honor, I'm showing him what's

25   marked as Government's Exhibit -- admitted as Government's

 1   Exhibit Number 13.

 2              **THE COURT:**  Mr. Guerra, Mr. Alaniz has a pointer for

 3   you so you can just point up on the screen.  Maybe if you could

 4   stand over here near the witness stand so that everybody can

 5   see you.  I'm afraid you're blocking the view of some of the

 6   jurors.

 7              **MR. STURGIS:**  Come over here, please.

 8              **THE COURT:**  Right there.

 9        **(Witness steps down from witness stand)**

10   **BY MR. STURGIS:**

11   Q    I'm going to point -- that shows North 83rd, and there,

12   (indicating), is Monte Cristo.

13   A    Yes.

14   Q    Okay.  Here.  Would you please --

15              **MR. STURGIS:**  Thank you, Judge.

16   Q    Would you please use that and push that button and then

17   you can...

18              Where on 83rd Street is your house located?

19   A    Somewhere around here, (indicating).

20   Q    Okay.  And I'm going to --

21   A    Well, actually -- this is 17 -- so it's probably somewhere

22   around here, (indicating).

23   Q    It's right in that area.

24   A    It's right in this area here, (indicating).

25   Q    Between 17 1/2 and 17?

1  A    Yes.

2  Q    Now, I'm going to zoom out just a little bit here.  And

3  you can see Monte Cristo, correct?

4  A    Yes.

5  Q    Okay.  And how far is it from your house down on 83rd up

6  to Monte Cristo?

7  A    Maybe, I would say two miles, a mile and a half.

8  Q    Okay.  And the vehicles would travel from your house to

9  Monte Cristo.

10  A    The vehicles in order to do the actual stops they would

11  come somewhere from over here, (indicating).  And I'll be

12  waiting with the owner outside my place.  And then they would

13  just -- the vehicles would -- the loaded vehicle would just --

14  I would drive behind the loaded vehicle.

15  Q    Okay.  Using the pointer there, your house is on 83rd,

16  correct?

17  A    Yes.

18  Q    Okay.  That's the --

19  A    Oh, I'm sorry, yes.

20  Q    Okay.  There's 83rd Street.  The vehicles would travel up

21  83rd Street?

22  A    They would travel up 83rd going north.

23  Q    Okay.  How many vehicles would there normally be?

24  A    Just one, depending on the amount and stuff.

25  Q    Okay.  Well, just one -- when you say "just one" do you

 1  mean just one vehicle that supposedly contained narcotics?

 2  A    And us behind it.

 3  Q    Okay.  So there's two vehicles.

 4  A    Yes.

 5  Q    Were there any other vehicles associated with the --

 6  A    Other than J.P. and my father.  They were in another

 7  vehicle.

 8  Q    So there's three vehicles.

 9  A    There's three of them.

10  Q    Okay.  Which vehicle would leave first?

11  A    The one with the actual dope.

12  Q    Okay.  Now, normally did it have narcotics in it at that

13  point?

14  A    No, normally it never did.

15  Q    Okay.  All right.  So it would travel --

16  A    North.

17  Q    -- north and who would be behind it?

18  A    Me and the other.

19  Q    Okay.  Believing that the narcotics --

20  A    Believing that the narcotics were in the vehicle but

21  really there was nothing in there.

22  Q    Okay.  And then where would that vehicle travel to?

23  A    It would travel east on Monte Cristo.

24  Q    Okay.  And it would travel towards where?

25  A    Towards Filegonia.

1    Q    Okay.  And Filegonia is the same street as Jesus Flores?

2    A    Jesus Flores, yes.

3    Q    Okay.  Now, somewhere in there would the traffic stop

4    begin?

5    A    We would go down Monte Cristo and J.P. was -- he set it

6    up, everything to be just passing the -- a store called Grano

7    de Oro.

8    Q    Okay.

9    A    He would -- sometimes the officer was waiting there, and

10   sometimes he was waiting at the park after 493.

11   Q    Okay.  The lead vehicle would pass by, the one that was

12   supposedly loaded?

13   A    They would pass by.

14   Q    Okay.  And would -- this vehicle that was performing the

15   traffic stop, what kind of vehicle was it?

16   A    It depends what -- it was sometimes a pickup or a

17   Suburban.  It depends what vehicle it was.

18   Q    Which vehicle?

19   A    The one with the loaded --

20   Q    Right.

21   A    The one with the narcotics.

22   Q    The one with the narcotics --

23   A    Yes.

24   Q    -- that vehicle changed.

25   A    Yes, that vehicle changed.

1   Q    Okay.  The vehicle that was making the traffic stop, the

2   law enforcement vehicle, what type of vehicle?

3   A    It was an Expedition.

4   Q    It was an Expedition?

5   A    Yes.  With the Sheriff's Department logos on it.

6   Q    Okay.  And what color was it?

7   A    White.

8   Q    Okay.  And the load vehicle would go by first?

9   A    The load vehicle would go by first.

10  Q    And what would happen?

11  A    And we would -- me and the owner would get a little bit of

12  space.  So the deputy would get in and make the traffic stop

13  later on on Filegonia.

14  Q    Okay.  And how far was it from the point where the traffic

15  stop would begin where the Expedition pulled out, how far is

16  that from Jesus Flores Road?

17  A    Maybe he would light it up maybe an eighth of a mile

18  before we get into Jesus Flores.

19  Q    Okay.  Pretty close.

20  A    Yes.

21  Q    Okay.  And what would the vehicle with the driver do once

22  the lights came on?

23  A    Speed up, just turn on the first street, speed up.  There

24  was a hill.  Jump over the hill and there was the --

25  Q    Okay.  So he would turn north on Jesus Flores.

1   A    Yes.

2   Q    Okay.  Where would you -- you were driving the other

3   vehicle, correct?

4   A    Yes.

5   Q    Where would you go?

6   A    I would keep going straight.

7   Q    Okay.  When you were doing these, were you able to see the

8   overhead lights on from the Expedition?

9   A    I would -- yes, because I was behind it and then I would

10  get on the shoulder, and you could still see the lights on.

11  And when it jumped the hill, you couldn't see them any more, so

12  that's was it.

13  Q    Okay.  Please take a seat...

14       **(Pause / Witness returns to witness stand)**

15            **MR. STURGIS:**  May I approach, your Honor?

16            **THE COURT:**  You may.

17            **MR. STURGIS:**  And for the record I'm showing counsel

18  what's been marked as Government's Exhibit 1, 2, 3, 4, 5 and 6.

19       May I approach the witness?

20            **THE COURT:**  You may.

21  **BY MR. STURGIS:**

22  Q    Mr. Guerra, please look at what's been marked as

23  Government's Exhibit 1, 2, 3, 4, 5 and 6.  Do you recognize

24  what's in those pictures?

25  A    Yes.

1  Q    And are those accurate pictures of what's in the picture?

2  A    Yes.

3            **MR. STURGIS:**  Your Honor, the Government would ask

4  that Government's Exhibit 1 through 6 be admitted.

5            **THE COURT:**  Any objections?

6            **MS. GUTIERREZ:**  Your Honor, he hasn't identified what

7  is in the picture in that.

8            **THE COURT:**  Well, they're accurate depictions of what

9  they purport to be.  I mean that's the test.  I mean I can look

10 at them if there's a relevancy issue.

11           **MS. GUTIERREZ:**  Well, I'm not sure what it is so I

12 don't know whether it's relevant or not.

13           **THE COURT:**  Well, have you been --

14           **MR. STURGIS:**  I did present it to counsel.  I can

15 present it again.

16           **MS. GUTIERREZ:**  Well, I expected there would be an

17 explanation, because there's some --

18     **(Voices overlapping)**

19           **MR. STURGIS:**  -- well, there would be but if he

20 testifies to the picture before it's admitted --

21           **THE COURT:**  All right.  I'm going to assume they're

22 relevant.  We can always strike them later if it turns out

23 they're pictures of irrelevant streets.

24           **MR. STURGIS:**  Are they admitted, your Honor?

25 //

Guerra - Direct / By Mr. Sturgis                                21

1          **THE COURT:**  All right.  The Court admits 1 through 6.

2          **(Government's Exhibits Numbers 1, 2, 3, 4, 5 and 6 were**

3   **received in evidence)**

4          **MR. STURGIS:**  May they be published, your Honor?

5          **THE COURT:**  Yes, they may.

6          **MR. STURGIS:**  Can we turn the lights on a little bit,

7   your Honor?

8   **BY MR. STURGIS:**

9   Q    Are you familiar with that location?

10  A    Yes.

11  Q    And where is that?

12  A    That's Jesus Flores.

13  Q    Which one is Jesus Flores?

14  A    Uh.

15  Q    Is it easier for you to sit down and point to it with a

16  pointer?

17  A    Well, now.  I mean -- I mean, well, it's this one.  Jesus

18  Flores is right here, (indicating).

19  Q    Oh, okay.  Which road is this vehicle on right now?

20  A    Right now it's on Monte Cristo.

21  Q    Okay.

22         **THE COURT:**  Pointing what direction?

23         **THE WITNESS:**  Pointing west.

24  **BY MR. STURGIS:**

25  Q    Okay.  It's pointing westbound on Monte Cristo?

1   A     Yes.

2   Q     So where is Jesus Flores Road on that picture?

3   A     Jesus Flores is only -- it's on -- it only drives north.

4   Q     Okay.  And on that picture it's on the right-hand side?

5   A     It's on the right-hand side, yes.

6   Q     Okay.  And are you familiar with this location?

7   A     Yes.

8   Q     And where is that?

9   A     That's driving east.

10  Q     Okay.

11  A     On Monte Cristo.

12  Q     Okay.  That's eastbound on Monte Cristo.  The other one

13  was westbound.

14  A     Yes.

15  Q     And is that the intersection of Jesus Flores off of Monte

16  Cristo?

17  A     Yes.

18  Q     Are you familiar with what's in that picture?

19  A     Yes.

20  Q     Okay.  And what's in that picture?

21  A     It's Grano de Oro.

22  Q     Okay.  And that's a bakery?

23  A     That's a bakery.

24  Q     Okay.  And which side of Monte Cristo is that on?

25  A     On the north side.

1   Q    That's on the north side.  And are you familiar with

2   what's in that picture?

3   A    Yes.

4   Q    And what is in that picture?

5   A    That's a bar.

6   Q    Okay.  And is that on Monte Cristo as well?

7   A    It's on Monte Cristo to the south side.

8   Q    Okay.  So the bar is on the south side; the bakery is on

9   the north side.

10  A    Yes.

11            **THE COURT:**  Are they across from each other?

12            **THE WITNESS:**  No.

13            **THE COURT:**  And they're separated.

14  **BY MR. STURGIS:**

15  Q    When you say they're separated, which one is further to

16  the west?

17  A    To the west, Grano de Oro.

18  Q    Okay.  So further to the east is going to be the bakery.

19  A    Yes.  No, the bar.

20  Q    Excuse me, the bar.  Excuse me.  The bar is to the east;

21  the bakery is to the west.

22  A    Yes.

23  Q    How far apart would you say they are east and west-wise

24  from each other?  I know they're on the opposite side of the

25  roads, but how far apart are they?

1  A    About half a mile.

2  Q    Okay.  And since the bar on the south side is the further

3  one east, how far is the bar from Jesus Flores Road?

4  A    Another -- maybe another -- maybe a half a mile, maybe a

5  little bit more than a quarter of a mile.

6  Q    Now, these two locations are these the locations you

7  described earlier where the white Expedition was waiting?

8  A    Exactly.

9  Q    Okay.  And so the lead vehicle, the one that was closer,

10 would go past these first.

11 A    Yes.

12        **(Voices heard off the record)**

13            **THE COURT:**  Do you still have some more?

14          **MR. STURGIS:**  Yes, your Honor.

15 **BY MR. STURGIS:**

16 Q    I'm showing you what's admitted as Government's Exhibit

17 Number 6.  Are you familiar with this location?

18 A    Yes.

19 Q    Okay.  And what is that?

20 A    That's the hill that the other -- it's on Jesus Flores.

21 Q    Okay.  That's on Jesus Flores.

22 A    Yes.

23 Q    North of Monte Cristo.

24 A    North of Monte Cristo.

25 Q    Okay.  How far is it from Monte Cristo where it goes past

1    the intersection of Jesus Flores is this hill?

2    A    Less than a quarter of a mile.

3    Q    Okay.  So it's pretty close.

4    A    Yes.

5    Q    Okay.  You've traveled through this route many times?

6    A    Yes.

7    Q    Okay.  If you're driving on Monte Cristo and you look

8    north on Jesus Flores Road towards this, (indicating),

9    direction, can you see what's on the other side of the hill?

10   A    No, you can't.

11   Q    Okay.  Is this the hill --

12            **MR. STURGIS:**  That's it, your Honor.

13   Q    Is this the hill that was used to conduct these fake

14   traffic stops?

15   A    Exactly.

16   Q    Now, aside from this location were there ever any other

17   locations?

18   A    There was just once on 88.

19   Q    Okay.  When you say "88" do you mean FM 88?

20   A    Yes.

21   Q    Okay.  Once on 88 and anywhere else other than the hill on

22   Jesus Flores?

23   A    I think that was -- on 88 and Jesus Flores where the --

24   yeah.

25   Q    Okay, 88 and Jesus Flores were where it was done, correct?

1   A    Yes.

2   Q    And the vehicles that were the load vehicles, they would

3   change.

4   A    They would change, exactly.

5   Q    The one that was on 88, why was that one done on 88?

6   A    It was done on 88 because it was just planned to do it on

7   88.  It wasn't -- there wasn't really any reason why to do it

8   on 88.

9   Q    Did you arrange for the driver of the vehicle of the car

10  that was supposedly loaded, did you arrange for that one or did

11  other people --

12  A    Other people, yes.

13  Q    Okay.  And did you arrange for the Expedition or anything

14  to be there or did other people take care of that?

15  A    There was actually -- what was the question?

16  Q    Excuse me.  Did you arrange -- you personally arrange for

17  the Expedition, the sheriff's Expedition, to be there or did

18  other people arrange for that?

19  A    No, it was always J.P. who arranged everything.

20  Q    Okay.  So you didn't -- you didn't talk to the person in

21  the Expedition.

22  A    No, never.

23  Q    Most of the time you said that the vehicle -- that the

24  marijuana wasn't in the vehicle at that time.

25  A    Yes.

1   Q    Was there ever a time when there was marijuana in the

2   vehicle?

3   A    There was only one time.

4   Q    Okay.  And what happened that one time?

5   A    Well, it wasn't -- it was done by Rene Garcia and --

6   Q    Do you know Mr. Garcia?

7   A    I know him.

8   Q    Okay.  How do you know Mr. Garcia?

9   A    He used to work in our trucking company.

10  Q    Okay.  You said it was arranged by Mr. Garcia.  Did

11  Mr. Garcia contact you?

12  A    Yes, he did.

13  Q    And what did he want?

14  A    To rip off the load.

15  Q    Okay.  What did he want for you to do?

16  A    Well, get J.P. and to do the fake traffic stop.

17  Q    Okay.  Who did you contact?

18  A    My father.  And my father contacted J.P.

19  Q    On that incident you said that there was actually

20  marijuana; is that correct?

21  A    Yes, there was.

22  Q    Okay.  Why on that instance was there marijuana, if you

23  know why that one actually had marijuana?

24  A    I believe the owner really didn't -- he didn't trust Rene

25  Garcia, and he wanted to make sure his load was going where it

1   supposedly was going to be loaded at.

2   Q    How did that one get started?  How did the actual traffic

3   stop get started?

4   A    That one was -- I think it was arranged by -- on Jesus

5   Flores for the marked deputy vehicle to be already on Jesus

6   Flores.  So I guess the guy that was -- I wasn't there on that

7   one.  But I mean the vehicle that was driving was the one on

8   Jesus Flores, and then the deputy tagged along behind him.

9   Q    Okay.  Well, let me -- when you say you -- and pardon my

10  bad question.  When I asked how did it get started, when that

11  event started where were you?

12  A    I was at my ranch.

13  Q    You were at your ranch.

14  A    Yes.

15  Q    Did anybody come to your ranch?

16  A    Rene Garcia.

17  Q    Okay.  Was there a vehicle used that was at your ranch?

18  A    Yes, there was.

19  Q    Okay.  At the time that the vehicle was first at your

20  ranch did it have any marijuana in it?

21  A    At the moment it didn't.

22  Q    Okay.  Did the vehicle leave?

23  A    The vehicle left the ranch to go load up the marijuana.

24  Q    Okay.  Did you know the driver at that time?

25  A    I didn't -- I know who he was but I never spoke to -- like

1    dealt anything -- any deals with him or anything.  Everything

2    was through Rene Garcia.

3    Q    Okay.  I mean you said "hi" to him, basically?

4    A    What was that?

5    Q    Did you say "hi" to him, basically?  I mean you said

6    "hello" or saw him --

7    A    Oh, yes.

8    Q    But you didn't talk to him about what was going on.

9    A    Exactly.

10   Q    Okay.  The vehicle left to get the marijuana.  Did you

11   leave your ranch or did you stay at your ranch?

12   A    I stayed at the ranch.

13   Q    Okay.  So your only part in that at that point was to talk

14   to your father about getting the stop done.

15   A    Exactly.

16   Q    Okay.  So you don't know what happened out during the

17   stop.

18   A    Exactly.

19   Q    Okay.  At some point in time did the vehicle come back to

20   your place?

21   A    It did.

22   Q    Okay.  When it came back to you place, did it have the

23   marijuana?

24   A    It did.

25   Q    Okay.  Did you help unload the marijuana?

1  A    I did.

2  Q    Okay.  And how much marijuana are we talking about?

3  A    About 300 pounds.

4  Q    Okay.  After the marijuana was delivered to you at your

5  location at your ranch, what did you do with it?

6  A    We took it back and then hid it -- I mean we took -- and

7  then it was sold afterwards.

8  Q    Okay.  SO it was sold later.

9  A    Yes.

10 Q    Now, during all these traffic stops did you have anything

11 to do with the payment of anybody?

12 A    Well, just -- not directly.  I would -- my dad would take

13 care of everything.

14 Q    Okay.  Did you pay your dad --

15 A    Yes.

16 Q    -- when you sold the marijuana?

17 A    Yes.

18 Q    Okay.  And then whoever he paid he dealt with.

19 A    Exactly.

20 Q    Now, during these stops you described the vehicle, you saw

21 the vehicle.  Did you see -- and when I'm talking about "the

22 vehicle" I'm talking about the white Expedition.  Did you see

23 who was in the white Expedition?

24 A    Never I did.

25 Q    Okay.  You didn't know who it was.

Guerra - Direct / By Mr. Sturgis                        31

1   A    I didn't know who it -- I mean I knew -- I knew -- I never

2   saw him, but I knew who they were talking about.

3   Q    Okay.  Now, when you say you never saw him, you never saw

4   the person -- person's face.

5   A    Exactly.

6   Q    Okay.  Did -- while these events were going on did you

7   ever hear anybody say to anybody about that's who it was?

8   While they're happening.

9   A    Yes.

10  Q    Okay.  Who was saying this?

11  A    J.P.

12  Q    Mr. Guerra, how many times would you say that these events

13  took place?

14  A    I wouldn't -- maybe about ten times.  I mean -- I mean I

15  don't really -- it's not a -- I mean this happened a series of

16  times that I don't really know.  But about ten times it did.

17  Q    Okay.  And that's an estimate.

18  A    Yes, that's an estimate.

19  Q    And each time this happened this was marijuana, correct?

20  A    Yes.

21  Q    Okay.  This didn't happen with cocaine, it didn't

22  happen --

23  A    No, it was always marijuana.

24  Q    Okay.  And what would you say the average load was that

25  you did this with?

Guerra - Direct / By Mr. Sturgis                    32

1    A    The average load maybe 500 pounds.

2    Q    Now, was there one event in which the vehicle that

3    supposedly had the marijuana was taking a trailer along with

4    it, transporting a trailer?

5    A    Yes, it was.

6    Q    Okay.  And why on that one was a trailer used?

7    A    Because it was a larger amount and it -- since the owner

8    was the one following it, it wasn't -- it wasn't -- it looked

9    better with it to be in a U-haul than rather to be just in a

10   truck it wouldn't fit.

11   Q    Did you remember the exact amount of that load?

12   A    It was about 2,000 pounds.

13   Q    About 2,000 pounds?

14   A    Yes.

15   Q    Okay.  When you say 2,000 pounds or 500 pounds, do you

16   remember the exact amount of each load?

17   A    What was that?

18   Q    Each load, each individual time this happened, do you

19   remember each individual amount for each load?

20   A    Exactly I don't remember.  But I mean I -- it wasn't

21   never -- I mean we try and make it no less than 500 pounds.

22   Q    And why is that?

23   A    Well, so we could all get -- I mean when it was time to

24   get paid, everyone would be, I guess, happy and I mean

25   everyone...

Guerra - Cross / By Ms. Gutierrez                    33

1   Q    You made more money.

2   A    Exactly.

3   Q    When you were setting up the deals with the person who

4   believed that you were actually going to transport this north,

5   would you try to talk to them about the amounts, try to get the

6   amounts up?

7   A    Exactly.

8   Q    Okay.  So you could make more money.

9   A    Exactly.

10  Q    On the one where the marijuana came back to your house.

11  A    Okay.

12  Q    The vehicle left and then came back with the marijuana.

13  A    Okay.

14  Q    Do you remember what kind of vehicle it was?

15  A    That was a red vehicle.  It was a four-door I think like a

16  Grand Prix if I remember, I believe.  Grand Prix or Grand -- I

17  think it was a Grand Prix.

18          **MR. STURGIS:**  We'll pass the witness at this time,

19  your Honor.

20          **THE COURT:**  All right.  Cross examination?

21          **MS. GUTIERREZ:**  Yes, your Honor.

22                        **CROSS EXAMINATION**

23  **BY MS. GUTIERREZ:**

24  Q    Mr. Guerra, you testified that your association was

25  limited with arranging these stops, correct?

1   A    What was that again?

2   Q    You said that your actual participation in getting these

3   stops planned was very limited, correct?

4   A    Well, I had a -- just a certain thing to do there.  But by

5   limited, what do you mean by "limited"?

6   Q    Well, in other words, you aren't the one who said, "This

7   is the location," you're not the one that said, "This is the

8   vehicle," you're not the one that said, "This is where the

9   deputies are going to stop and this is where it's going to

10  follow"; is that correct?

11  A    Exactly, yes.

12  Q    Okay.  So as far as that goes, you were completely in the

13  dark about that, correct?

14  A    What do you mean by "completely in the dark"?

15  Q    Well, in other words, you didn't plan that.

16  A    I mean everything was planned by J.P.

17  Q    Okay.  So you didn't plan it, correct?

18  A    Exactly.

19  Q    Okay.  So basically the way that those events unfolded

20  were in the hands of J.P. Flores --

21  A    Exactly.

22  Q    -- and only J.P. Flores, correct?

23  A    Exactly.

24  Q    Now, you talked about how you met -- well, how did you

25  meet J.P. Flores?

1   A     Through my dad.

2   Q     And isn't it true that the relationship between J.P.

3   Flores and your father began by an introduction from Julio

4   Davila?

5   A     Exactly.

6   Q     And at the time your father and Julio Davila were engaged

7   in drug trafficking together, correct?

8   A     Yes.

9   Q     Okay.  And at the time that J.P. Flores was introduced to

10  your father it was understood or it was known that J.P. Flores

11  was running registration and plates for Julio Davila, correct?

12  A     I wouldn't be able to answer that.  I mean I wouldn't

13  know.

14  Q     Didn't J.P. Flores run some plates for your father?

15  A     I wouldn't know.

16  Q     Okay.  So you have -- as far as you know, J.P. Flores

17  never ran any --

18  A     Well, I wouldn't be able to answer that.  I mean --

19  Q     Well, if you can listen to my question, maybe you can

20  answer my question.

21        As far as you know, you can't -- you don't have any

22  knowledge of J.P. Flores having run any plates for your father;

23  is that correct?

24  A     I mean I wouldn't -- if he did or he didn't, I mean I

25  wasn't -- I didn't talk to J.P. fully like my dad did, so I

1    wouldn't know.

2    Q    So would you say that your communication with J.P. was

3    also limited?

4    A    It was limited, yes.

5    Q    Isn't it true that J.P. Flores would collect

6    sponsorship -- sponsorships or political contributions for the

7    Sheriff's Department from you and your father?

8    A    Yes.

9    Q    And isn't it true that on various occasions you donated

10   money?

11   A    Yes.  But through my dad.

12   Q    But you gave some of your own money.

13   A    Yes.

14   Q    That you understood was going to J.P. Flores, which would

15   then be going to the County.

16   A    Yes.

17           THE COURT:  I'm sorry.  Can you rephrase that?  To

18   the County?

19           MS. GUTIERREZ:  Well, to the Hidalgo County Sheriff's

20   Office.

21           THE WITNESS:  Yes.

22           THE COURT:  To the Sheriff's Office?

23           MS. GUTIERREZ:  Well, I'm going to kind of narrow

24   that down, your Honor.

25           THE COURT:  All right.  Is there a charity or

 1  something?

 2           **MS. GUTIERREZ:**  Well.

 3           **THE COURT:**  Okay.  Please if you could --

 4  **BY MS. GUTIERREZ:**

 5  Q    There were different times that you were approached to

 6  contribute or donate; isn't that correct?

 7  A    What was that again?

 8  Q    There were different times that you were approached about

 9  contributing or donating money to the --

10  A    It wasn't all the time.  It was maybe once or twice.

11  Q    Oh, okay.  And how much would you say that you donated?

12  A    I don't really remember exactly, but I mean maybe a

13  thousand, two thousand dollars I did give.

14  Q    And it was your understanding that that money was going

15  towards Sheriff Lupe Trevino's re-election campaign, correct?

16  A    Exactly.

17  Q    And you said that only happened once?

18  A    Well, I mean I'm not too sure, but I know it did happen.

19  But maybe once or twice.

20  Q    Isn't it true that you donated some money for Sheriff

21  Trevino to get a boat?

22  A    I helped my dad out so, yes.

23  Q    So together you and your father donated money for Sheriff

24  Trevino to get a boat, correct?

25  A    Yes.

Guerra - Cross / By Ms. Gutierrez                    38

1   Q    And how much would you say you donated?

2   A    I don't really remember.  Maybe -- I really wouldn't know.

3   But it wasn't more than $5,000 I believe.

4   Q    Okay.  But it was your money, correct?

5   A    Yes.

6   Q    Okay.  So you don't know how much of your own money you

7   contributed?

8   A    Well, I mean it was a long time ago so I wouldn't know.  I

9   mean it wasn't yesterday, so I wouldn't know exactly how much I

10  gave.

11  Q    And there was a lot of money going back and forth between

12  hands, correct?  At different times throughout this entire

13  conspiracy?

14  A    Yes.

15  Q    So that would be another reason why you might not be able

16  to remember exactly how much money you gave at that time.

17  A    A lot of things were done that I don't -- I mean exactly

18  like you said, it was going back and forth that I don't

19  really --

20          THE COURT:  Well, was this cash or did you have a

21  check?

22          THE WITNESS:  Cash.

23          THE COURT:  This was cash.

24  //

25  //

Guerra - Cross / By Ms. Gutierrez                    39

1   **BY MS. GUTIERREZ:**

2   Q    And so you would agree with me that J.P.'s relationship

3   with your father started in a political way as far as trying to

4   collect these donations and contributions, correct?

5   A    I believe so.

6   Q    And so at some point that relationship changed in a way

7   that it wasn't just political, now Flores was engaged in drug

8   trafficking with you guys, right?

9   A    Yes.

10  Q    What would you consider yourself, a thief or a drug

11  trafficker, or both?

12  A    Probably both.

13  Q    You talked to the Government on three occasions; is that

14  correct?

15  A    Yes.

16  Q    Do you recall when that happened?

17  A    On what occasions?  These traffic stops that we're talking

18  about or --

19  Q    I'm talking about you having spoken with either an agent

20  from the Government or the attorneys for the Government.

21  A    I don't understand your question.

22          **THE COURT:**  After you were arrested.

23          **MS. GUTIERREZ:**  Yes.

24  //

25  //

Guerra - Cross / By Ms. Gutierrez                    40

1    **BY MS. GUTIERREZ:**

2    Q    After you were arrested --

3    A    Okay.

4    Q    -- on this case do you agree that you spoke with either

5    agents or the attorneys, the Government's attorneys about this

6    case?

7    A    Yes.

8    Q    And can you tell me when that happened?

9    A    Maybe a month after I got arrested -- I mean that I

10   actually spoke to them was maybe a month after I got arrested.

11   Q    Okay.  And how many times did you talk to them?

12   A    I wouldn't remember.  Two times, three times.  I mean I

13   wouldn't -- four time -- I mean...

14   Q    And when were you arrested?

15   A    February the 7th.

16   Q    Of this year?

17   A    Yes.

18   Q    You testified that in 2011 is when you first started in

19   the narcotics business ripping off dope.

20   A    Yes.

21   Q    Do you recall that?  But isn't it true that in early 2010

22   you through some individuals called Flaco and El Aguila and

23   some Argentinean man were trying to make a deal to move 2,000

24   pounds of marijuana inside an aluminum trailer?

25   A    Yes.

Guerra - Cross / By Ms. Gutierrez                    41

1    Q    So, in reality, you started in the drug trafficking

2    business as far back as 2010, correct?

3    A    Exactly.

4    Q    And also in 2010, you stole 1,500 pounds of marijuana that

5    was to be transported to Tennessee for some individual in

6    La Villa, Texas; is that correct?

7    A    Yes.

8    Q    And on that incident you had Aida Palacios and Julio

9    Davila provide fake paperwork to show that the marijuana was

10   seized.

11   A    Yes.

12   Q    And that also was in 2010, correct?

13   A    Oh, yes.

14   Q    You have no personal knowledge yourself that Jorge Garza

15   was at any time in the Expedition that was stopped --

16   A    Exactly.  I never knew he was the one driving.

17   Q    And is it your testimony that on the incident where there

18   was the red Grand Prix that was taken from your house in order

19   to steal some marijuana, the deal with Rene Garcia, do you

20   recall that?

21   A    Yes.

22   Q    Okay.  Is it your testimony that that was also 500 pounds

23   because you never did less than 500?

24   A    No, it was 300.  Because I didn't do that one.  It was --

25   it was about 300.  That was the only -- since I didn't do it, I

Guerra - Cross / By Ms. Gutierrez                    42

1    mean it was -- and it was one of the first traffic stops.  I

2    mean we weren't -- that was the one -- that was actually about

3    300 pounds.

4    Q    Okay.  And are you saying that was one of the first

5    traffic stops or that was the first traffic stop?

6    A    One of the first.

7    Q    Okay.  Well, how many would you say happened before that?

8    A    I wouldn't know.  I mean I wouldn't be able to tell you.

9    Q    And so that traffic stop was -- I'm sorry -- that deal was

10   Rene Garcia's deal, correct?

11   A    Exactly.

12   Q    And your role in this was what?

13   A    Just putting them together for the traffic stop.

14   Q    Okay.  And what was it that you got out of it?

15   A    Well, we all got a share from those 300 pounds.

16   Q    Okay.  Well, how much did you get?

17   A    I wouldn't remember.

18   Q    Well, was it an even split?

19   A    Well, I believe -- I think Rene took half and we split the

20   other half, the other half of the 150 pounds.

21   Q    So Rene took 150 pounds and you and Rene split 150?

22   A    No.  Me and my dad, J.P., and whoever the -- there was a

23   man named Jorge that was driving the vehicle.

24   Q    And where did you hear that?

25   A    By J.P.

Guerra - Cross / By Ms. Gutierrez                    43

1    Q    And how did you hear that from J.P.?

2    A    Every time he would set it up and organize it, he would

3    say who was -- the driver was going to be.

4    Q    And so then because you testified that you were kind of in

5    the dark -- well, that wasn't your language; that was mine.

6    But you testified that you didn't really know the logistics of

7    it, that was J.P. who handled it.

8    A    Exactly.

9    Q    However, now you're saying that you knew or that J.P.

10   would say who it was that was doing this.

11   A    Exactly.

12   Q    And so did you know or didn't you?

13   A    I mean I knew what they were going to do about organizing

14   and doing where the traffic was stopped; that was up to J.P.

15   letting me know it was going to happen and who the actual

16   deputy officer was going to be.

17   Q    Okay.  And you testified also that you were always with

18   the driver, correct?

19   A    Yes.

20   Q    Except on the Rene Garcia deal.

21   A    Exactly.

22   Q    Okay.

23          MR. STURGIS:  Excuse me, your Honor.  I think that's

24   a misstatement.  With the driver or with the owner?

25   //

Guerra - Cross / By Ms. Gutierrez                    44

1    **BY MS. GUTIERREZ:**

2    Q    I'm sorry, with the owner.

3    A    Yes, with the owner.

4    Q    Yes.  And you testified that as the deputy turned his

5    lights on and went onto Jesus Flores Road that you continued

6    east on Monte Cristo or west?

7    A    Driving east on Monte Cristo.

8    Q    That you continued east on Monte Cristo.  And you were

9    with the owner of the marijuana, right?

10   A    Yes.

11   Q    Can you explain to me or show me how it is that you acted

12   when you saw that deputy stopping that vehicle when you were

13   right next to the owner, and how did you act like --

14   A    Surprised.

15   Q    Okay.

16   A    That it all happened.

17   Q    Can you show me how you would do it?

18   A    Well, I mean I wouldn't be able to show you, but I mean

19   just part -- going along with it just being surprised that my

20   driver he's about to get caught.

21   Q    But at that time you knew that he wasn't going to get

22   caught, correct?

23   A    I knew he wasn't going to get caught.

24   Q    So at that time you were acting surprised, right?

25   A    Exactly.

Guerra - Cross / By Ms. Gutierrez                 45

1   Q    Well, can you act surprised for me now?

2   A    Well, I mean just I couldn't -- I wouldn't be able to -- I

3   mean it's just -- I mean when my driver was going to get -- I

4   mean he's just got his lights on and they're following him, so

5   I mean --

6   Q    Well, what would you tell the owner?

7   A    Well, he would see it himself.

8   Q    I understand that.  But you also have to play the role

9   don't you?

10  A    Exactly.

11  Q    So how would you play the role?

12  A    Well, I would just tell -- I mean he would see and --

13  actually I wouldn't -- I mean just -- he was the one just

14  saying everything.

15  Q    So you were just driving --

16  A    I kept driving acting surprised while he was the one

17  scared, and I would just go along with him.

18  Q    But you can't act surprised for me now.

19  A    Well, I mean I wouldn't -- I wouldn't know what I -- I

20  mean I would just go along with the whole thing.

21  Q    But you agree that you were acting at the time.

22  A    What was that?

23  Q    You agree that you were acting at the time.

24  A    Acting?

25  Q    Uh-huh.  Acting surprised.

Guerra - Cross / By Ms. Gutierrez                    46

1   A     Exactly.  Because supposedly I didn't know anything.

2   Q     So in early 2011 you testified -- actually, you testified

3   that you started your drug trafficking venture in 2011 but, of

4   course, it really was in 2010.

5   A     Yes.

6   Q     In 2011, you did a series of drug deals with -- together

7   with Davila -- Julio Davila conspiracy, correct?

8   A     No, I wasn't exactly with them.  But through my dad I

9   would end up with Julio Davila.

10  Q     Can you explain that?  How is it that you were doing

11  something but you ended up with that conspiracy but not for

12  yourself but for your dad?

13  A     Well, what are you talking about?  How I was related to

14  Julio Davila?

15  Q     Well, how is it that you ended up with either Julio Davila

16  or Aida Palacios assisting you in --

17  A     They would do fake paperwork for us.

18  Q     Didn't you also get them to go and raid a pink mobile home

19  when you believed that there was some stolen cocaine stashed?

20  A     Exactly.

21  Q     Okay.  So it wasn't just fake paperwork that you used

22  Julio Davila.

23  A     There was also like that one that you just mentioned.

24          **THE COURT:**  And for whom did Julio Davila work during

25  this time?  I'm missing a connection how this fake paperwork

1   was created.  Do you know?

2            THE WITNESS:  What was the question?

3            THE COURT:  For whom did Julio Davila work at this

4   time that he was able to obtain fake paperwork?

5            THE WITNESS:  He was a bails bondsman.

6            THE COURT:  All right.  And Ms. Palacios, for whom

7   did she work?

8            THE WITNESS:  She worked for -- I really don't know

9   who -- I really don't -- I know she worked as a police officer

10  but I don't remember with who.

11           THE COURT:  All right.  You may proceed.

12  BY MS. GUTIERREZ:

13  Q    And J.P. Flores and Julio Davila knew each other, correct?

14  A    Exactly.

15  Q    So now we've got two police officers, being J.P. Flores

16  and Aida Palacios, who were connected with Julio Davila and

17  you, correct?

18  A    Yes.

19  Q    And your father.

20  A    Exactly.

21  Q    You also had Julio Davila either get Aida Palacios or

22  together with Aida Palacios get -- show up at a meeting that

23  you had a grocery store, I think Junior's Grocery Store

24  (phonetic), to scare some individuals that were having a

25  problem with you because --

1    A    Exactly.

2    Q    Okay.  And the problem that you were having was that they

3    were upset because you -- maybe they didn't believe that the

4    stuff was seized.

5    A    Exactly.  Because we were using the fake paperwork at that

6    time and that was a big issue.

7    Q    Okay.  And so who is the creative one that came up with

8    the fake stops?

9    A    With the fake stops --

10   Q    Yes.

11   A    -- or the paperwork?

12   Q    Fake stops.

13   A    Well, it was just J.P.

14   Q    Okay.  So you're saying that J.P. was the master mind with

15   respect to the fake traffic stops.

16   A    Yes.

17   Q    Okay.  And so are you saying that J.P. came to you and

18   said, "Hey, Junior, I have an idea of how we can avoid these

19   problems that you're having; we can do fake traffic stops"?

20   A    No.

21   Q    Okay.

22   A    He went through my dad.

23   Q    Okay.

24   A    And I don't know.  Somehow they did that, starting doing

25   these traffic stops, but through my dad.

Guerra - Cross / By Ms. Gutierrez                    49

1   Q    Okay.  So is it possible that your dad was the master

2   mind?

3   A    I mean I wouldn't -- I know it was J.P. organizing

4   everything.  But I mean I don't know if my dad was the one

5   talking to him and setting all this up.

6   Q    Well, I mean you were drug dealing with your dad weren't

7   you?

8   A    In some occasion I was.

9   Q    Okay.  Didn't you have any communication with your dad?

10  A    I did but he would do his own things on his own, too.  So

11  I mean I wasn't always there to see what he was doing.

12  Q    Well, right.  But some of this stuff you did, too,

13  correct?

14  A    Yes.

15  Q    Okay.  And so in the stuff that you all did together,

16  didn't you have any communication with your dad with respect to

17  what was happening and how that came about?

18  A    I mean I would talk to him and let him know what I had to

19  bring up, I mean whatever type of work it was.  But after doing

20  decisions or doing -- telling me what to do, it was just up to

21  J.P. and my dad.

22  Q    How old are you, again?

23  A    Twenty-four.

24  Q    And so you started this about 20, 21?

25  A    Yes, about -- I mean 2010.

Guerra - Cross / By Ms. Gutierrez                    50

1   Q    Isn't it true that you started stealing dope because you

2   were too young, people weren't trusting you with their dope?

3   A    I mean, yeah, I believe so.

4   Q    Is that a yes?

5   A    I mean -- well, I mean if they didn't trust me to do this,

6   they wouldn't be -- I wouldn't be -- I wouldn't have the weight

7   of stealing it if they wouldn't trust me.

8   Q    Well, your dad was drug trafficking before you guys were,

9   correct?

10  A    Yes.

11  Q    And isn't it true that your dad was partly one of the

12  people who didn't trust you in letting you drug traffic with

13  him?

14  A    I don't understand that.

15  Q    Well, you weren't drug trafficking with your father,

16  correct?

17  A    Exactly.  I wasn't.

18  Q    You started doing your own thing.

19  A    On my own, yes.

20  Q    Okay.  And that's because your father didn't trust you,

21  you were too young for you to be involved with his drug deals,

22  correct?

23  A    Exactly.

24  Q    So it was actually your father who didn't trust you; is

25  that right?

Guerra - Cross / By Ms. Gutierrez                    51

1   A    Well, not that he didn't trust me.  I guess he didn't want

2   me to get involved with them.

3   Q    He didn't want you to get involved with him or he didn't

4   want you to get involved with drug dealing?

5   A    Well, probably both.  I mean --

6   Q    Yet when you --

7   A    -- I was younger at that time, so once I started doing my

8   own thing, I mean he had nothing else to -- I mean what else

9   can he...

10  Q    So when you started doing your own thing instead of trying

11  to keep you away from it, he profited from it, right?

12  A    Exactly.

13  Q    And as a matter of fact, you testified about not having

14  transported any drugs up north; but, in fact, you stole drugs

15  that were already up north, correct?

16  A    Exactly.

17  Q    And that was in Ohio?

18  A    I believe so.

19  Q    Fourteen kilos of cocaine?

20  A    Yes.

21  Q    And the owner of those -- of the cocaine was from here in

22  the Valley, correct?

23  A    Yes.

24  Q    And you had problems with them, too.

25  A    Exactly.

1   Q    And you hired Davila and Palacios to scare them away,

2   correct?

3   A    Exactly.

4   Q    On the deals that you say J.P. would set up where there

5   would be a fake traffic stop, how much money would you pay?

6   A    We would -- we would just -- mainly we would -- the way --

7   we would split it equally.

8   Q    You would split what equally?

9   A    The profit of the drugs.

10  Q    Okay.  So you would sell the drugs and from the money that

11  was made -- well, hold on, let me back up.  Because I'm having

12  a problem with the word "profit," because profit indicates that

13  there was some cost.

14       In reality, there was no cost to you, right?

15  A    Exactly.  Yes, there was no cost.

16  Q    So then everything was profit in this case.

17  A    Everything was profit.

18  Q    For every -- all the drug proceeds were profit.

19  A    Exactly.

20  Q    And so when you would sell these drugs, at that point the

21  amount that you got for the drugs is what was split between you

22  and your father and J.P.?

23  A    Exactly.

24  Q    Okay.  So then you never gave a chunk of money to J.P. for

25  his services.

Guerra - Cross / By Ms. Gutierrez                    53

1    A    It was always through my dad.

2    Q    Okay.

3    A    So directly me and J.P. here -- I mean no, it was always

4    through my dad.

5    Q    Okay.  So then you did get a chunk of money and give it to

6    your dad to give it to J.P.; is that correct?

7    A    Yes.

8    Q    Okay.  And was that chunk of money payment for his

9    services or was that chunk of money the split out of the

10   proceeds?

11   A    Well, it was for his work and what his -- the split also

12   of the proceeds.

13   Q    Okay.  For example, in early 2012, you and Rene Garcia

14   stole 14 kilograms of cocaine from some individual in

15   Brownsville, Texas, correct?

16   A    Exactly.

17   Q    Okay.  And during that time you utilized J.P. Flores to

18   set up a traffic stop, correct?

19   A    Yes.

20   Q    Okay.  And for that incident -- well, let me ask you.

21        How much -- what's the value of 14 kilograms of

22   cocaine?

23   A    I mean maybe it's kilos at 20,000.

24   Q    Okay.  So help me do the math here.  That's 200 -- about

25   $280,000?

Guerra - Cross / By Ms. Gutierrez                    54

1   A     Yes.

2   Q     Okay.  And so how did you divvy that up?

3   A     What was that?

4   Q     How did you divide that, 280,000?

5   A     Well, that one J.P. didn't have anything to do with it

6   until the very end, which we were kind of in trouble; we were

7   stuck in a situation and we -- I went to my dad and told him

8   what was going on, so he actually used J.P. to scare this man

9   away that was actually putting a lot of pressure.

10  Q     Okay.

11  A     So it wasn't never that -- he was never involved from the

12  very beginning for me to go split it -- I mean split everything

13  evenly.

14  Q     Okay.  So then -- just so I'm getting a clear picture

15  now -- it sounds to me like initially with J.P. you were using

16  him for services that weren't really connected with the drug

17  dealing; it was more about protecting you.

18  A     Exactly.

19  Q     Or keeping the bad guys away when, in reality, you were

20  also a bad guy, right?

21  A     Exactly.

22  Q     But at some point later on you -- well, J.P.'s role in all

23  this became a drug trafficker as you were, correct?

24  A     Yes.

25  Q     Okay.  And that's the time when the proceeds of the drugs

Guerra - Cross / By Ms. Gutierrez                    55

1    were split evenly.

2    A    Exactly.

3    Q    Okay.  Okay.  So then this incident with the $280,000 he

4    was not an equal participant at that time.

5    A    Exactly.  Because he wasn't involved since the very

6    beginning.

7    Q    So how much did you pay him for --

8    A    I don't remember how much I paid him.

9    Q    Okay.  Well, do you recall telling agents that you paid

10   him -- that you gave your father $40,000?

11   A    Yes, I did.

12   Q    Okay.  So then you gave your father $40,000, which was

13   split amongst J.P. Flores and from what you understand, Garza

14   was the deputy.

15   A    Yeah, exactly.

16   Q    But you don't know that.

17   A    I knew he was going to do the stop, but I didn't know who

18   he was.

19   Q    Well, you knew that someone by the name of Garza was

20   allegedly going to do the stop.

21   A    Not Garza, but Jorge.

22   Q    Oh, Jorge.

23   A    Yes.

24   Q    Okay.  And you knew that -- oh, so you didn't know the

25   last name; it was just Jorge?

Guerra - Cross / By Ms. Gutierrez                    56

1   A    Jorge, yes.

2   Q    Okay.  So you knew that someone by the name of Jorge was

3   going to do the stop, but personal knowledge you had none,

4   correct?

5   A    What was that?

6   Q    You didn't have personal knowledge; you didn't see it for

7   yourself.

8   A    The traffic stop?

9   Q    Right.

10  A    I mean I saw it because they pulled him over out leaving

11  my ranch.

12  Q    Well, you didn't see the -- I'm sorry.  You didn't see the

13  person who did the stop.

14  A    No.

15  Q    Okay.

16  A    I saw the -- no, I didn't.

17  Q    Okay.  So the $40,000 how was that going to be split?

18  A    I mean I gave them to my dad and he took care of all the

19  costs.  So I mean I wouldn't know how much he gave J.P.  I mean

20  I wouldn't know anything.

21  Q    And so for -- who gave you the price?

22  A    What was that?

23  A    Who gave you the price?

24  Q    Well, my dad.  I mean we talked about it and it's only --

25  I mean that was fine and he said "yes."  So he took care of all

 1   the costs.

 2   Q    Who said that that was fine?

 3   A    My father.

 4   Q    Your father asked who, you if that was fine?

 5   A    No, he -- I asked him if that was fine, and he said that

 6   was okay.

 7   Q    Okay.  So you came up with a number that you felt you

 8   could do away with.  Okay, you know, I'm okay giving up

 9   $40,000.

10   A    Exactly.

11   Q    Okay.  And so that's what you gave your father.

12   A    Yes.

13   Q    And from there you know nothing.

14   A    Well, not that I know nothing but I know he paid J.P.

15   Q    Okay.  Do you know how much?

16   A    I don't know how much exactly.

17   Q    Okay.  So, in fact, you don't really know if he paid

18   anything to J.P., correct?

19   A    No.  I know he did because we kept working.  So I mean I

20   don't think if he didn't pay him anything, we would have kept

21   doing things.

22   Q    But at the same time you're the one that's calling the

23   shots and you're the one that's setting the price and you're

24   the one that's setting the numbers.  So it doesn't seem like

25   J.P. had much say in this; isn't that correct?

1   A    That was because he wasn't involved at the very beginning.

2   Q    And that's -- I'm just talking about this incident.  I'm

3   not talking about anything else.

4   A    Okay.

5   Q    And so you're the one that said, "I choose to give

6   $40,000," right?

7   A    Well, I mean it was -- we talked about it and we came up

8   with that was fine.

9   Q    Well, I know.  But you testified that you told your

10  father.  And so "we talked about it" is you and your dad,

11  correct?

12  A    Yes.  Yeah, exactly.

13  Q    Okay.  So you and your father were the ones that were

14  calling the shots as far as how much money you were going to

15  give your father, correct?

16  A    Exactly.

17  Q    Okay.  So you, in fact, didn't know whether J.P. even did

18  this for money, correct?

19  A    He was going to get a profit, but I mean I wouldn't -- I

20  couldn't say yes or no because I mean it was actually my father

21  who dealt with J.P. in that particular incident.

22  Q    So the answer is you don't know.

23  A    Exactly.

24  Q    Okay.  And you don't know if J.P. Flores was actually

25  paid, correct?

Guerra - Cross / By Ms. Gutierrez                    59

1   A    Well, I didn't see it but I know he did get paid.  So I

2   mean I don't --

3   Q    Well, you don't know how much he got paid, right?

4   A    Exactly.  I don't know how much he got paid, but I know he

5   got paid.

6   Q    Okay.  So then how do you know he got paid?

7   A    Well, because we kept doing things.  We kept working and

8   everything was fine.

9   Q    Okay.  And we're kind of going in a circle.

10       I understand that you believe that because you kept

11  working that indicates to you that J.P. Flores was paid

12  something, correct?

13  A    Exactly.

14  Q    However, if J.P. was just doing your father a favor and

15  not asking for any money, isn't it possible that J.P. Flores

16  didn't get any money?

17  A    Well, I mean it may be possible.

18  Q    Okay.  All right.  Now, in January of 2012, there was an

19  issue with an individual from Expertee Sound who had introduced

20  you to a guy, an individual -- I don't know if it's a guy, but

21  an individual named Gio.

22  A    Yes.

23  Q    Out of -- and one other individual from Michoacan, Mexico?

24  A    Yes.

25  Q    Okay.  And these individuals wanted to transport 2,000

Guerra - Cross / By Ms. Gutierrez                    60

1   pounds of marijuana to North Carolina, correct?

2   A    Yes.

3   Q    Okay.  And they contracted you for that transport; is that

4   right?

5   A    Yes.

6   Q    And you stole this marijuana claiming that it had been

7   seized in Atlanta, right?

8   A    Exactly.

9   Q    And you had problems with the owner of the drugs, correct?

10  A    Exactly.

11  Q    Okay.  And here we go again with the same incident that

12  happened before, which is that you were getting some heat or

13  some aggression from the owners who were upset with you,

14  correct?

15  A    Exactly.

16  Q    Okay.  In this incident you also hired or someone hired

17  Aida Palacios to provide driver and tractor-trailer

18  information; is that correct?

19  A    Yes.

20  Q    The driver and the tractor-trailer --

21  A    It was actually Julio.

22  Q    Okay.

23  A    Yes.  Julio and Aida.

24  Q    And in this case you gave your father 30 to $40,000.

25  A    Yes.

Guerra - Cross / By Ms. Gutierrez                    61

1    Q     Okay.  Do you remember what the exact number was?

2    A     I don't remember.

3    Q     You don't.  And again, your involvement with giving that

4    money ended once you gave the money to your father, correct?

5    A     Exactly.

6    Q     So beyond that you don't have any information about that.

7    A     About what?

8    Q     You don't know what happened with that money after you

9    gave it to your dad.

10   A     Not with the money, but I know they -- they do the traffic

11   stop with that guy that was putting that pressure.

12   Q     Okay.  You also would get paid to allow people to use your

13   ranch to either unload or load marijuana, correct?

14   A     Exactly.

15   Q     How much would you get paid for that?

16   A     About -- it depends on the location, it would depend on

17   how much work it was -- I mean dope it was.

18   Q     You worked with the Panama Unit, also; is that correct?

19   A     Yes.

20   Q     And together with the Panama Unit you would rip off drugs,

21   correct?

22   A     Exactly.

23   Q     And that usually worked by way of you all getting -- "you

24   all" meaning you and your father getting -- or maybe just you

25   getting information as to where there were drugs, and then you

Guerra - Cross / By Ms. Gutierrez                    62

1  all would have the Panama Unit go out there and raid it, steal

2  the drugs, and bring them back to you, correct?

3  A    Exactly.

4  Q    How much would you pay the Panama Unit?

5  A    They would take half of whatever they would seize.

6  Q    And the contact person with the Panama Unit was Fabian

7  Rodriguez, right?

8  A    It was J.P. and J.P. to Fabian.

9  Q    Okay.  And so J.P. Flores had a connection with the Panama

10 Unit, correct?

11 A    Yes.

12 Q    And you have no information or no evidence that this Jorge

13 guy that was driving the deputy vehicle had any connection with

14 the Panama Unit, correct?

15 A    I wouldn't -- I wouldn't tell you -- I wouldn't be able to

16 tell you that.

17 Q    Well.

18 A    I wouldn't know.  Personally I wouldn't know.

19 Q    And you wouldn't know because you never heard it, correct?

20 A    Exactly.

21 Q    And so J.P. Flores was the contact person on your end in

22 order to get the Panama Unit?

23 A    No, my dad.

24 Q    Oh, your dad.

25 A    Yes.

Guerra - Cross / By Ms. Gutierrez                    63

1   Q    Okay.  There was also an El Gordo I believe that you guys

2   used to drive a vehicle with the fake dope in it?

3   A    Uh-huh.

4   Q    What is that individual's name?

5   A    Rick Garza.

6   Q    And this Rick Garza drove for you several times, correct?

7   A    Yes.  He was the one.  Yes, he drove several times.

8   Q    Okay.  And so he worked for you?

9   A    Yeah.  I mean...

10  Q    And he's not included in this Indictment is he?

11  A    I'm not sure.

12  Q    Well.

13  A    I mean --

14  Q    You know who the Co-Defendants are in your case don't you?

15  A    Yes.

16  Q    Okay.  And he's not one of them?

17  A    No.

18  Q    And you provided the information on El Gordo to the

19  Government when you spoke with them; is that correct?

20  A    I mean we brought it up exactly, yes.

21  Q    So the Government knows about El Gordo is what I'm saying.

22  A    Yes.

23  Q    However, he's not in this Indictment.

24  A    Yes.

25  Q    And as far as you know is he out free in the world?

Guerra - Cross / By Ms. Gutierrez                    64

1   A    I mean -- well, I mean he's not here I'm pretty sure.  I

2   haven't seen him since then.

3   Q    Because you are free, right?  I mean you're on bond.

4   A    Yes.

5   Q    You're out on bond but you're out living in the outdoor

6   world, correct?

7   A    Yes.

8        **(Pause)**

9   Q    There was an incident in November of 2012 where you

10  introduced an individual by the name of La Fresa to Porky or

11  Porky to La Fresa.

12  A    Yes.

13  Q    Do you recall that incident?  Okay.  How did that go?

14  A    They wanted to move 22 kilograms --

15  Q    But you introduced who to who?

16  A    No, they introduced La Fresa to me.

17  Q    And what is Porky's role in this?

18  A    Chenio La Fresa (phonetic).

19  Q    And so Porky is the one who introduced you to La Fresa?

20  A    Yes.

21  Q    Okay.  And the deal was to transport 22 kilograms of

22  cocaine to --

23  A    To Tennessee.

24  Q    To Tennessee, okay.  And those 22 kilograms belonged to

25  Larky, correct?

Guerra - Cross / By Ms. Gutierrez                           65

1    A     I believe so.

2    Q     Okay.  And La Fresa, what's his name?

3    A     I don't know his name.

4    Q     What about Porky?

5    A     I don't remember his name.

6    Q     Okay.  Did you know it at some point?

7    A     I mean I don't remember it, but I mean we just go by

8    Porky.

9    Q     Okay.  But if you don't remember his name, that implies

10   that you knew his name.

11   A     I mean I'm pretty sure he told me what was his name at one

12   time, but I mean...

13   Q     What about Larky?

14   A     I don't know who he is.

15   Q     Okay.  And on that -- in that incident you basically stole

16   the 22 kilograms of cocaine and then you created 22 kilograms

17   of fake bricks of cocaine and you covered them with 20 grams of

18   actual cocaine so that it would test positive for cocaine when

19   the cops tested it, right?

20   A     Exactly.

21   Q     Tell me how you did that.

22   A     I did what?

23   Q     How did you make those fake bricks?

24   A     Well, we just -- well, I made them and just put 20 grams

25   of cocaine on top and 20 on the bottom.

Guerra - Cross / By Ms. Gutierrez                    66

1   Q    Well, I know.  But what are they made of?  It's not

2   cocaine.

3   A    Well, it's like protein or something like that.

4   Q    Okay.  SO what is it?

5   A    Protein.

6   Q    Okay.  So then you go out to a health food store and --

7   A    Exactly.

8   Q    -- buy protein?

9   A    Exactly.

10  Q    And then how do you make them appear as bricks?

11  A    Well, I used -- what's it called -- a machine that shapes

12  it as a brick and just put 20 grams on top and 20 grams and

13  just wrap it and make them look like bricks, or try and make

14  them look like bricks.

15  Q    Is that machine specifically for drug trafficking?

16  A    No.

17  Q    Oh, no?  Okay.  Is it something like a food processor?

18  A    Well, I actually made -- I made it myself.  I just welded

19  up some plates and just compressed it within the plates and

20  wrapped it back to make them look like bricks.

21  Q    And as far as the 20 grams of actual cocaine that you put

22  on top of it, I don't know what 20 kilograms looks like.  But

23  20 grams was able to cover 20 bricks?

24  A    No, it was 20 -- it was 20 grams on top, 20 grams on the

25  bottom, which is 40 grams.  In a kilogram there's 1,000

1   kilograms.  So I used 40 grams for each brick times the 22,

2   which would be somewhere close to 800 grams.

3   Q    Oh, okay.  So it wasn't a total of 20 grams for

4   everything.

5   A    No.

6   Q    Okay.  Okay.  And so then the purpose for this was that

7   you were going to leave the fake cocaine bricks in a 1998 Chevy

8   and you leave it to a pier abandoned with a flat tire and then

9   have a cop, someone, law enforcement, pick it up and bam, you

10  have the seizure.

11  A    Exactly.

12  Q    Okay.  And so, in effect, you were trying at this point to

13  deceive not only the owner but also the cops, correct?

14  A    What do you mean by "deceiving"?

15  Q    Well, tricking them, lying to them.

16  A    Not lying to them, because J.P. was the one that organized

17  everything.

18  Q    You're not talking about the owners.  Let's talk about the

19  owners.

20  A    Oh, the owners.  Okay.

21  Q    Okay.  So --

22  A    I cleaned myself up with that information J.P. gave me

23  about those bricks that had been seized.

24  Q    Right.

25  A    Which tested positive for cocaine.

Guerra - Cross / By Ms. Gutierrez                    68

1    Q    Right.  So the whole purpose of this was so that at the

2    County when it was seized, it was tested, the people that

3    were -- the cops that were testing it were also believing that

4    it was cocaine, right?

5    A    Exactly.

6    Q    Otherwise it would -- yeah, okay.  So they also were

7    tricked, correct?

8    A    Well, I believe so.

9    Q    Okay.  And so then the purpose for that was so that the

10   owner would believe that they were seized when, in fact, you

11   kept the majority of the cocaine.

12   A    Exactly.

13   Q    Okay.  And in that instance there was a deputy that went

14   out to the truck, to the car, correct?  I'm sorry, to the 1998

15   Chevy.

16   A    There were deputies that went, yeah.

17   Q    And they found the drugs.  Did they haul the Chevy back to

18   the County?

19   A    They -- I think they put it on a wrecker and took it back

20   to the -- yes.

21   Q    And in this incident J.P. Flores worked with a deputy by

22   the last name of Del Angel, correct?

23   A    I'm not too sure of who it was.  His last name was Del

24   Angel.  I don't remember him saying that last name.

25   Q    Okay.  Well, I'm sorry.  Did you say his last name was

Guerra - Cross / By Ms. Gutierrez                    69

1    Del Angel as though you knew it or you're just repeating what I

2    said?

3    A    No, I didn't know.  I mean if there was one, I don't

4    remember hearing anyone from Del Angel.

5    Q    Okay.  And so then in this incident all you knew was that

6    J.P. was the one that was in charge of getting the cops out to

7    that vehicle.

8    A    Exactly.

9    Q    So you created the fake bricks and you placed them in the

10   1998 Chevy.  And did you drive it out to leave it appear

11   abandoned?

12   A    Yes, I did.

13   Q    You drove it.  And what about the flat tire?  Did you

14   flatten the tire?

15   A    I flattened the tire itself.

16   Q    Okay.  Did you ever go pick up that truck or was it

17   just --

18   A    It was just a throw away car.

19   Q    It was a throw away car?  How many throw away cars did you

20   say you had?

21   A    That one and another one I believe.

22   Q    And the other one was what?  Can you describe it?

23   A    It was a 1990, 1992 pickup, Chevy pickup.

24   Q    In that incident how much did you pay J.P. Flores?

25   A    J.P. was -- everything had to be done through J.P. and

1  since he started from the very beginning, half of the proceeds

2  were given to Porky, who introduced us to La Fresa; and the

3  other half were spread among us.

4  Q    Okay.  Well, let me see.  Out of the 22 kilograms of

5  cocaine that you stole, how much were you left with after you

6  used some of the real cocaine to put into the fake bricks?

7  A    I wouldn't -- I mean how much was the --

8  Q    How much was left over?  Would you say you had 21 --

9  A    Well, I mean I wouldn't just -- I mean if there's a

10  kilogram, it's 1,000 grams.  I'd have to -- I mean this

11  happened -- exactly I don't really remember.  But I mean if you

12  do the math of 40 times 22, which what would that be?  I

13  mean...

14  Q    I can't do that --

15         **THE COURT:**  Eight hundred and eighty grams.  It's

16  less than 1 kilo; we've already established that.

17         **THE WITNESS:**  Exactly.  So I was left with 21 kilos.

18  **BY MS. GUTIERREZ:**

19  Q    Okay, all right.  So then out of the 21 kilos, about

20  10.5 went to Porky.

21  A    Exactly.

22  Q    And 10.5 remained with you; that was that split.

23  A    Exactly.

24  Q    Let me ask you this.  Did you split the cocaine or did you

25  sell it and split the money?

Guerra - Cross / By Ms. Gutierrez                    71

1   A    Sell it and split the money.

2   Q    Okay.  How much was 10.5 kilos of cocaine worth?

3   A    One -- I mean if a kilo is worth 20,000, at five it's a

4   hundred; at ten it's two hundred.  Like two ten, two fifteen.

5   Q    Okay.  Well, let's go with two ten.  And so how was that

6   split?

7   A    We split it among us.

8   Q    Well, I understand that.  Let me ask you this.  Who is

9   "among us"?  Who is "us"?

10  A    Me, my dad and J.P.

11  Q    Okay.  So then it's three people.  And was it an even

12  split?

13  A    I mean, yeah.

14  Q    Yeah?

15  A    I mean...

16  Q    And who would handle the splitting of the money?

17  A    My dad.  Well, I mean we would -- what do you mean by

18  "splitting of the money"?

19  Q    Yeah, like who would be the one that handled the money,

20  that counted it, that said "This is one-third, this is one-

21  third, this is one-third" and then --

22  A    Well, in that one we agreed that everything -- that was

23  the way it was going to work, and it worked out that way.

24  Q    Well, no, I understand stand.  What I'm asking is who was

25  the one that did the actual counting of -- who sold the

1  cocaine?

2  A    I did.

3  Q    Okay.  And so then you got paid.

4  A    Exactly.

5  Q    What did you do with the money?

6  A    Well, I split it between the three of us.

7  Q    Okay.  So you're the person that counted all the money,

8  split it into three and then distributed --

9  A    Exactly.

10 Q    Okay.  So then you had personal knowledge that J.P. Flores

11 received a third of that.

12 A    Well, I -- yes.  In a certain way, yes, because it was

13 through my dad.  So I knew he got paid for that, too.

14 Q    So then are you saying that you kept your one-third and

15 you gave your father two-thirds and that he was then supposed

16 to give J.P.'s part to J.P.?

17 A    Well, I mean it's because this -- I mean I don't really

18 remember how that one worked, but I mean I know we split it

19 three ways and we all got paid.

20 Q    Okay.

21 A    I mean I don't really remember.  I mean so, yeah.

22 Q    Well, I mean it happened less than a year ago, right?

23 A    Exactly.

24 Q    But as far as what you testified about this incident, that

25 you know and that you know to be correct about the selling of

1   the --

2   A    Yeah, selling and everything.

3   Q    Okay.  And splitting it three ways.

4   A    Yes.

5   Q    On November of 2012, you had some information from an

6   individual named El Tigere.

7   A    Uh-huh.

8   Q    Who allegedly had 18,000 pounds of marijuana in Guerrero,

9   Mexico and he had 10,000 pounds of marijuana in a stash house

10  in Zapata, Texas.  Do you recall that incident?

11  A    Yes.

12  Q    Okay.  And in that incident you were contracted to

13  transport 2,000 pounds of marijuana to Houston, Texas, correct?

14  A    Yes.

15  Q    Okay.  And the shake of the marijuana was done at the

16  Family Dollar Store on Highway 107 and Beldare (phonetic) Road

17  in --

18  A    Yes.

19  Q    Okay.  And the marijuana was delivered in a brown Escalade

20  and a Jeep Cherokee?

21  A    Yes.

22  Q    Okay.  And in this case the marijuana was taken to a stash

23  house north of Donna, Texas; it wasn't taken to a ranch,

24  correct?

25  A    It was taken to the store and from there it was -- it was

Guerra - Cross / By Ms. Gutierrez                74

1    taken to where the place it was stored at.

2    Q    You say it was "taken to the store."

3    A    To the -- this was a Dollar Store.

4    Q    Okay.  And so you took -- it was taken to the store and

5    from the store it was taken to a stash house in Donna, Texas,

6    right?

7    A    Yes.

8    Q    Okay.  And so that stash house in Donna was a stash house

9    that was set up by El Tigere, not you, correct?

10   A    No, it was set up by this other man that -- El Gordo.

11   Q    It was set up by El Gordo?

12   A    The stash house it was.

13   Q    And Gordo was working with you, correct?

14   A    Yes.

15   Q    The next day there's an individual named Neto.  Who is

16   Neto?

17   A    El Tigere's nephew.

18   Q    And other workers of El Tigere arrived at your ranch to

19   load the marijuana into the gray Suburban.  Do you recall that?

20   A    That was another incident, the gray Suburban.  I was

21   driving the -- that was the one with the U-haul pulling the

22   truck.

23   Q    Well, right.  But in your statement you say that --

24            THE COURT:  Just ask him the question.  The statement

25   is not in evidence.

1   **BY MS. GUTIERREZ:**

2   Q    You state that it was loaded into a gray Suburban or that

3   it was going to be loaded into a gray Suburban.

4   A    It was 2,000 pounds and it wouldn't fit in a Suburban.

5   And I mean so the best thing we came up with was with that

6   U-haul trailer that was pulled by -- with the truck, with the

7   pickup truck that Mr. Sturgis brought up earlier.

8   Q    Okay.  So let's talk about what was in that U-haul.  You

9   call it grass pallets.

10  A    Uh-huh.

11  Q    Okay.  Can you describe that for us?

12  A    It was -- I went over and bought $100 of grass.  It was a

13  pallet of grass which weighs about 2,000 pounds so it's just --

14  I mean so when the actual people that were going to help me

15  load up the truck, they would see the truck not only at a

16  level -- at a certain level but actually look with some weight

17  in it.

18  Q    Okay.  So then the people who owned the drugs only got to

19  see the vehicle weighed down.  They never got to see what was

20  inside it?

21  A    Exactly.  This was after -- I mean this was after they

22  gave us the dope, so it wasn't that same day.

23  Q    Right.

24  A    Yeah.

25  Q    That's correct.  And in that case you were successful in

Guerra - Cross / By Ms. Gutierrez                76

1  stealing the marijuana, correct?

2  A    Yes.

3  Q    And did you say it was 2,000 pounds?

4  A    Yes.

5  Q    And how was that split?

6  A    What was split what?

7  Q    How were the proceeds of that --

8  A    I mean El Tigere he was the one that brought up the work,

9  so he took half.  And the other half was split among us.

10  Q    And who is "among us"?

11  A    Me, my dad, J.P. and the deputy that J.P. used to make the

12  traffic stop.

13  Q    Okay.  So then that means that you kept 1,000 pounds,

14  right?

15  A    Yes.

16  Q    Okay.  And did you sell it?

17  A    Yes.

18  Q    Okay.  How much did you get for it?

19  A    Like 100,000 I believe.

20  Q    And so how was the split?

21  A    Well, we just split it in how many people we were.

22  Q    And how many people were you?

23  A    Well, we were at three and we all -- and J.P. paid this

24  other deputy he used to make the traffic stop.

25  Q    Okay.  So would it be fair to say that the $100,000 was

Guerra - Cross / By Ms. Gutierrez                    77

1  split into three parts, you, your father and J.P.; and J.P. was

2  in charge of paying the deputy he used?

3  A    Well, I mean we were all -- we all had knowledge; we

4  actually paid this other man.

5  Q    Okay.

6  A    So I don't really remember if we all gave something above

7  the third split or I really don't remember this.  But I knew we

8  gave him money to pay for this other officer.

9  Q    But this other officer -- this other officer other than

10 J.P. was not an equal partner with you guys, right?  It

11 wasn't -- $100,000 wasn't split equally between all four of

12 you, correct?

13 A    Right.

14 Q    Okay.  Are you saying that that's correct?

15 A    Exactly.

16 Q    Okay.  So then you didn't get 20, your father didn't

17 get 20, J.P. didn't get 20 and that other officer get 20,

18 correct?

19 A    Exactly.

20 Q    So then it was more along the lines of you, your father

21 and J.P. got a certain amount, and then all three of you

22 pitched in to pay something to that individual.

23 A    Exactly.

24 Q    Okay.  Do you recall telling agents that the marijuana

25 proceeds were split three ways between you, Guerra Sr. and

1  El Tigere?

2  A    What was that again?

3  Q    Do you recall telling the agents that that marijuana, the

4  2,000 pounds, was split -- the proceeds of the marijuana was

5  split three ways between you, your father and El Tigere?

6  A    I mean I don't really -- I mean since this happened

7  months -- almost we're going to a year, I really don't -- but

8  it was always -- we would always do it a three-way thing.

9  Q    Okay.

10 A    Yes.

11 Q    So is it possible that you split the proceeds of the 2,000

12 pounds of marijuana between you, your dad and El Tigere?

13 A    No.  El Tigere took half.

14 Q    Okay.

15 A    So the other 1,000 pounds were split among us three.

16 Q    Okay.  So then if your statement says that you split the

17 proceeds three ways between you --

18         MR. STURGIS:  Objection, your Honor.  Again, this --

19         THE COURT:  Sustained.  It's not in evidence.

20 There's no testimony to that effect.  Remember, questions by

21 themselves are not evidence.

22 BY MS. GUTIERREZ:

23 Q    There was also an incident in November 2012 where you were

24 to transport 20 kilos of cocaine for Porky.  You set up a plan

25 where the shop that held the money was going to be raided.  Do

Guerra - Cross / By Ms. Gutierrez                    79

1   you recall that?

2   A    Yes.

3   Q    Okay.  And who were you going to use --

4   A    Well, they were going to use Panama.  J.P. was going to

5   use Panama for that one.

6   Q    So would you say that it was J.P. that was the go-to

7   person who either would use -- get Panama or get his own plan

8   and the deputy?

9   A    Exactly.

10  Q    Okay.  And when it came to the fake documentation, was

11  J.P. involved in that, too?

12  A    That was -- back then, which it was only Aida and Davila

13  involved.

14  Q    Okay.  So when you were dealing with the fake

15  documentation, that would only be Julio Davila --

16  A    Exactly.

17  Q    -- conspiracy.

18  A    Uh-huh.

19          THE COURT:  Let us know when you're at a breaking

20  point.

21          MS. GUTIERREZ:  I should be close, your Honor.

22  BY MS. GUTIERREZ:

23  Q    In December of 2012, again there was an incident where you

24  stole 5 kilos of cocaine that you were supposed to have

25  transported to North Carolina.

1   A    Yes.

2   Q    And do you recall that incident where it was supposed to

3   be cocaine and ICE, but you said no to the ICE?

4   A    Exactly.

5   Q    Okay.  And that cocaine was picked up in a blue backpack

6   and again you made fake cocaine packages.  Do you recall that?

7   A    Yes.

8   Q    Okay.  And in that incident the backpack was placed in a

9   1990 Chevy pickup.  Is that one of the other throw away

10  vehicles?

11  A    Yeah, exactly.

12  Q    And that throw away vehicle was driven to Tower Road and

13  Curve (phonetic) Road by Deputy Del Angel and J.P. Flores.  Do

14  you recall that?

15  A    I recall J.P.; but once again, I don't -- Del Angel I

16  don't know anyone -- I know someone that I mentioned that he

17  spoke to a person named Jerry, but I don't know if his last

18  name is Del Angel.

19  Q    Okay.  So J.P. did speak about somebody named Jerry?

20  A    Exactly.

21  Q    Who he was -- who was working with him in that incident?

22  A    Exactly.

23  Q    Okay.

24  A    That one and the other one with the '98 pickup.

25  Q    Okay.  So the two times that we're dealing with you making

Guerra - Cross / By Ms. Gutierrez                              81

1    fake cocaine bricks, J.P. was involved and he mentioned a

2    Jerry.

3    A    Yes.

4    Q    Okay.  And so in this incident where we're talking about

5    the Tower Road and Curve Road, did you hand the cocaine in the

6    vehicle to J.P.?

7    A    What was that again?

8    Q    How is it that J.P. got a hold of the vehicle?

9    A    He got a hold of the vehicle because he picked me up when

10   I dropped off the vehicle.

11   Q    Oh, so you're the one that delivered the vehicle to Tower

12   Road and Curve Road.

13   A    With the actual dope in there, yes.  I mean it was

14   delivered there.

15   Q    The actual dope or the fake --

16   A    Well, the dope -- the fake one with the truck in there

17   abandoned.

18   Q    Okay.  Okay.  And so then you yourself personally drove

19   the truck, left it there and J.P. picked you up.

20   A    Exactly.

21   Q    Okay.  And in this case how much did you pay J.P.?

22   A    Well, we -- we split everything -- it's because

23   everything -- I already -- it was mostly just split equally.

24   So I mean I wouldn't remember how much.

25   Q    At this point J.P. is a full on drug trafficker, correct?

Guerra - Cross / By Ms. Gutierrez                    82

1    A    Exactly.

2    Q    Okay.  So at this point you're splitting proceeds equally.

3    A    Exactly.

4    Q    And so you're saying that the 20 -- it was 5 kilos of

5    cocaine and you must have used less for payment in this case --

6    A    Exactly.

7    Q    You made the fake bricks.  So let's say, what --

8    A    Four-and-a-half?

9    Q    Four-and-a-half?  So the 4 1/2 kilos was split half and

10   half between you and J.P.

11   A    No.

12   Q    How was it --

13   A    My dad was involved, too.

14   Q    Oh.

15   A    Yeah.

16   Q    So then it would be split three ways?

17   A    Yes.

18   Q    And how is it that your dad ended up getting a part of

19   this when it was you and J.P. who did all the --

20   A    No, because I mean it was always like he would go through

21   him and -- I mean actually go through my dad to get to J.P.

22   Q    Okay.  So then your dad was the contact person for J.P.?

23   A    Yes.

24   Q    Did you ever contact J.P. directly?

25   A    Not -- I had his number but I didn't never call him

Guerra - Cross / By Ms. Gutierrez                              83

1   directly and come up with something.

2   Q    So your dad ended up getting a third of all of this stuff

3   for just making a phone call.

4   A    Exactly.

5   Q    And do you know how much Jerry received?

6   A    No, I don't know.

7   Q    Do you believe -- do you know if he was paid?

8   A    I don't know.

9   Q    Do you think he was going to be paid?

10  A    No, I don't know.

11             **MS. GUTIERREZ:**  I pass the witness at this time, your

12  Honor.

13             **THE COURT:**  All right.  We're going to take our mid

14  afternoon recess, so it will be about a 20-minute recess.

15  We'll get started as shortly thereafter as possible.

16             If you could take your notepads with you while you

17  retire to the jury room.  All right, you're excused at this

18  time.

19             **THE MARSHAL:**  All rise for the jury.

20        **(Jurors exit courtroom at 3:00 p.m.)**

21             **THE COURT:**  All right.  Everybody associated with

22  this case is excused for 20 minutes.  You may retire.  I have

23  other cases I'm going to hear during this recess, so I'll ask

24  you to exit.

25        **(Recess taken from 3:00 p.m. to 3:19 p.m. / Parties**

1   **present / Jurors not present)**

2            **THE COURT:**  All right.  The jury is ready.  Do you

3   all need to address anything before I bring them in?

4            **MR. STURGIS:**  I don't think so.

5            **THE COURT:**  All right.  Let's bring in the jury.

6            **THE MARSHAL:**  All rise for the jury.

7        **(Jurors enter courtroom at 3:19 p.m.)**

8            **THE COURT:**  All right.  Good afternoon.  Please be

9   seated.  All right.  You'll recall we finished the cross

10  examination.  The Government now may redirect its examination

11  of Mr. Guerra.  I'll ask Mr. Sturgis to proceed.

12           **MR. STURGIS:**  Thank you, your Honor.

13                    **REDIRECT EXAMINATION**

14  BY MR. STURGIS:

15  Q   Mr. Guerra, you were testifying when Ms. Gutierrez was

16  cross examining you about some cocaine deals that you did,

17  correct?

18  A   Yes.

19  Q   Okay.  And you did do some cocaine deals, as you stated,

20  with Mr. Flores involved.

21  A   Yes.

22  Q   Okay.  None of the cocaine deals that were mentioned or

23  any other to your knowledge involved a deputy named Jorge; was

24  that correct?

25  A   Exactly.

Guerra - Redirect / By Mr. Sturgis                    85

1   Q    Okay.  Those were just marijuana deals.

2   A    Exactly.

3   Q    And you were explaining how the split occurred, and you

4   said that you couldn't remember how much each person was paid.

5   A    Exactly.

6   Q    When you say --

7            THE COURT:  Hang on one second.  Can you pull the

8   microphone a little closer to you so we can make sure we're

9   recording the audio?  All right.

10  BY MR. STURGIS:

11  Q    When you say that it was split three ways, did you pay

12  Mr. Flores?  Even if it was split three ways, did you actually

13  pay Mr. Flores?

14  A    Some of -- I mean, well, I was sometimes there when this

15  happened and sometimes I wasn't.

16  Q    Okay.  So sometimes the money, whatever, was being split,

17  would be there and you would see Mr. Flores get some money.

18  A    Yes.

19  Q    Okay.  And other times even though it was to be split

20  three ways, did your dad pay Mr. Flores?

21  A    I'm pretty sure he did.

22  Q    Okay.  You weren't in charge on those times of paying

23  Mr. Flores.

24  A    Exactly.

25  Q    Okay.  And when you were testifying earlier you said that

1    you knew from Mr. Flores that the deputy's name that helped on

2    the marijuana deals, not the cocaine deals, but on the

3    marijuana deals, you knew this person's name to be Jorge.

4    A    Yes.

5    Q    But you didn't know that person by identity.

6    A    Exactly.

7    Q    Okay.  So you wouldn't have been able to pick him out if

8    you walked by him or saw a picture of him.

9    A    I wouldn't know who he was.

10   Q    Okay.  But you knew the person's name as far as

11   Mr. Palacios was telling you was Jorge.

12   A    Exactly.

13   Q    Okay.  Ms. Gutierrez asked you about some times where

14   Mr. Flores was called and then the Deputy Jorge was called in

15   to assist with people that were harassing you, that you had

16   stolen from.

17   A    Exactly.

18   Q    Okay.  And talked with Ms. Gutierrez about a few of those

19   occasions.

20   A    Yes.

21   Q    Okay.  During those occasions did you go to observe to see

22   who Jorge was?

23   A    Not really, no.

24   Q    Okay.  So you didn't observe a face.

25   A    Exactly.  But I know they had done the traffic stop,

Guerra - Redirect / By Mr. Sturgis                    87

 1  because the actual orders were telling me that they had just

 2  gotten pulled over.

 3  Q    The people that you were dealing with that were upset.

 4  A    Exactly.

 5  Q    Okay.  So they would come back and confer with you and

 6  say, "We just got pulled over."

 7  A    Exactly.

 8  Q    You were detailing the one time this happened as the

 9  people were leaving your house?

10  A    In Centaras (phonetic), yes.

11  Q    Okay.  And on 83rd?

12  A    On 83rd, yes.

13  Q    Okay.  And did you see that traffic stop occur?

14  A    I didn't see it occur but I know it happened.

15  Q    How do you know it happened if you didn't see it?

16  A    The actual owner called me and told me what had happened.

17  Q    Okay.  Now, you were asked by Ms. Gutierrez about when you

18  first started, because we stated -- or you had stated, excuse

19  me, that you first started in 2011; but then you detailed to

20  Ms. Gutierrez that you actually started in 2010 --

21  A    Yes.

22  Q    -- with fake documents.

23  A    Yes, exactly.

24  Q    Okay.  And that, as you detailed, was -- involved Julio

25  Davila and Aida Palacios.

1  A    And Aida Palacios, exactly.

2  Q    The 2010 did not involve Mr. Flores to your knowledge.

3  A    Not at that time.

4  Q    And it would then, of course, not involve the Deputy

5  Jorge.

6  A    Exactly.

7  Q    So it's not until 2011 --

8  A    Exactly.

9  Q    -- that the fake traffic stop started occurring, and

10  that's when all those people become involved.

11  A    Exactly.

12          **MR. STURGIS:**  I'll pass the witness, your Honor.

13          **THE COURT:**  All right.  Any recross limited to

14  redirect?

15                      **RECROSS EXAMINATION**

16  **BY MS. GUTIERREZ:**

17  Q    You stated that the owners told you that they were pulled

18  over, correct?

19  A    Yes.

20  Q    Okay.  And the owners didn't have any drugs with them,

21  right?

22  A    No.

23  Q    So there was no issue of drugs ever being around that

24  vehicle, correct?

25  A    Exactly.

1   Q    Okay.  Similarly to the fake stops, there was no drugs in

2   the fake stops, correct?

3   A    Exactly.

4   Q    Okay.

5   A    Other than to that one with the Grand Prix.

6   Q    But that wasn't your deal, correct?

7   A    Exactly.

8   Q    And as a matter of fact, you weren't even around when you

9   saw that stop, correct?

10  A    I was waiting for the actual dope to get to my place, but

11  I wasn't there seeing it, watching it happen though.

12  Q    But you stated that every time that you -- in your deals

13  every time you were there with the owner watching --

14  A    Exactly.

15  Q    -- the stop, correct?

16  A    Yes.

17  Q    Okay.  And in this case, the one with the Grand Prix, it

18  wasn't your deal and you were nowhere around the fake stop,

19  correct?

20  A    Exactly.

21  Q    So as far as you know, you don't know that it even

22  happened, correct?

23  A    No, I know it did happen.  Because the actual -- the

24  driver actually explained how it had happened, J.P. told us how

25  it had happened.  The guy following David, which was Rene

Guerra - Recross / By Ms. Gutierrez                    90

1  Garcia, told me what had happened.  So I didn't see it happen

2  but I know it happened.

3  Q    Okay.  But personally you didn't see it.

4  A    Exactly.

5  Q    So as you sit here today you can't tell this jury that

6  Mr. Jorge Garza was involved in any of your dealings, correct?

7  A    What was the question again?

8  Q    As you sit here today --

9  A    Okay.

10 Q    -- you can't tell the jury that this individual, Jorge

11 Garza, sitting to my right was involved in any of your

12 dealings, correct?

13 A    Well, now I know who he is.  But at that time when we were

14 doing all this, I never had seen him, just by the name of

15 Jorge, Jorge.

16 Q    Well, right.  But you're assuming that this is the same

17 person they were talking about because he has the same first

18 name, correct?

19 A    Exactly.

20 Q    And so what I'm saying is that you can't tell the jury

21 that this individual sitting to my right who was involved with

22 your dealings, correct?

23 A    Exactly.  I never saw him.

24         MS. GUTIERREZ:  No more questions, your Honor.

25         THE COURT:  All right.  Mr. Guerra, that concludes

1    your testimony here this afternoon.  You're excused at this

2    time.

3              **THE WITNESS:**  All right.

4         **(Witness excused)**

5         **(Transcription concluded at 3:27 p.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATION**</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____          <u>September 12, 2013</u>

           Signed                                    Dated



*TONI HUDSON, TRANSCRIBER*