UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  7:13-CR-70-12 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| JORGE GARZA, | ) | Tuesday, July 30, 2013 |
| | ) | |
| Defendant. | ) | (10:37 a.m. to 12:01 p.m.) |

TESTIMONY OF DAVID OLIVAREZ DURING JURY TRIAL DAY 1

BEFORE THE HONORABLE RANDY CRANE,
UNITED STATES DISTRICT JUDGE

**Appearances:**            See next page

Court Interpreter:       Elena Medrano

Court Recorder:          Richard Cortez

Transcribed By:          Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, Texas 78480-8668
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>


**Plaintiff:**                    **JAMES STURGIS, ESQ.**
                                 **ANIBAL ALANIZ, ESQ.**
                                 **Assistant United States Attorney**
                                 **1701 W. Business Hwy. 83**
                                 **Suite 600**
                                 **McAllen, Texas 78501**

**Defendant:**                    **LILLY ANN GUTIERREZ, ESQ.**
                                 **4901 S. Jackson Rd.**
                                 **Edinburg, Texas 78539**

```
 1                            INDEX

 2   GOVERNMENT'S WITNESS       DIRECT    CROSS     REDIRECT    RECROSS

 3   DAVID OLIVAREZ               5       23/39       54          66

 4

 5   GOVERNMENT'S EXHIBITS                                     RECEIVED

 6   7, 8, 9, 10                                                  60

 7   13                                                           60

 8

 9   DEFENDANT'S EXHIBITS                                      RECEIVED

10   2                                                            42

11   3                                                            46

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1          **McAllen, TX; Tuesday, July 30, 2013; 10:37 a.m.**

2          **(Partial transcript; testimony of David Olivarez)**

3        **(Jurors present)**

4            **THE COURT:**  All right.  The Government gets to

5   proceed first with its evidence.  I'll ask Mr. Sturgis to call

6   the Government's first witness.

7            **MR. STURGIS:**  Yes, your Honor.  At this time, the

8   Government would call David Olivarez to the stand.

9            **THE COURT:**  All right.

10           **MR. STURGIS:**  I believe the Marshal is going to get

11  him.

12           **THE COURT:**  And does Mr. Olivarez need an

13  interpreter?

14           **MR. STURGIS:**  No, he does not, your Honor.

15           **THE COURT:**  All right, thank you.

16           **MR. STURGIS:**  The only witness that the Government

17  intends to call that may need an interpreter is Mr. Fernando

18  Guerra, Sr.

19           **THE COURT:**  All right, thank you.

20           Good morning, Mr. Olivarez.  If you could step

21  forward up here near one of the microphones.  I need to have

22  the oath administered to you before you begin your testimony.

23  If you would just raise your right hand at this time.

24  //

25  //

1          **DAVID OLIVAREZ, GOVERNMENT'S WITNESS, SWORN**

2          **THE COURT:**  All right.  Please be seated.  All right.

3    And Mr. Olivarez, you may need to slide the microphone a little

4    bit closer to you so we can hear you.  Perfect.

5          All right.  Mr. Sturgis, you may begin your

6    examination.

7          **MR. STURGIS:**  Thank you, your Honor.

8                    **DIRECT EXAMINATION**

9    **BY MR. STURGIS:**

10   Q    Please state your name.

11   A    My name is David Olivarez.

12   Q    And how old are you, sir?

13   A    Thirty-six.

14   Q    And where are you from?

15   A    From Hargill.

16   Q    Now, where are you currently being held these days?

17   A    La Villa.

18   Q    Okay.  And how long have you been in jail?

19   A    Going on eight months.

20   Q    Okay.  And why are you in jail?

21   A    For a conspiracy charge.

22   Q    Conspiracy to do what, sir?

23   A    Intent to distribute.

24   Q    Distribute what kind of narcotics?

25   A    Marijuana.

Olivarez - Direct / By Mr. Sturgis                    6

1    Q    Marijuana.  And have you pled guilty in that case?

2    A    Yes, sir.

3    Q    And you're awaiting sentencing?

4    A    Yes, sir.

5    Q    Prior to being held in custody, did you have an

6    occupation, a job?

7    A    Yes, sir.

8    Q    And what did you do, sir?

9    A    Landscaping.

10   Q    Okay.  Now, the charge that you are currently in custody

11   for, who are the others that were involved with you in that

12   case?

13   A    Miguel Angel Romo, Rene Garcia, Julio Davila, and Armando

14   Davila, if I'm not confused.

15   Q    Okay.  And Mr. Armando Davila, Julio Davila, Rene Garcia,

16   are they all from the Hargill area?

17   A    Yes, sir.

18   Q    Is that where you know them from?

19   A    Yes, sir.

20   Q    Okay.  And how long have you known Mr. Rene Garcia?

21   A    We went to elementary school since we were kids.  It's all

22   my life.

23   Q    Okay.  And in that case that you have pled guilty to, what

24   was the general premise of the case?  Why -- what were you

25   going to do with the marijuana?

Olivarez - Direct / By Mr. Sturgis                    7

1   A    Well, we were going to steal the marijuana first.

2   Q    Okay.  And who is "we"?

3   A    The -- the -- the men that are with me in my case -- in

4   the conspiracy case, Rene Garcia, Armando Garcia, Julia Davila

5   -- no, I'm sorry.  Armando Davila, Arnoldo Davila, Julio

6   Armando Davila, and Rene Garcia, and Miguel Angel Romo.

7   Q    In that case, do you know who that marijuana belonged to?

8   A    No, sir.

9   Q    Who was the individual that first talked to you about

10  stealing that marijuana?

11  A    Rene Garcia.

12  Q    Okay.  And do you remember when this was, sir?

13  A    It was a day or two before -- if I'm not confused, it's

14  July the 3rd before the -- the agent got shot.

15  Q    Okay.  This is July the 3rd of 2012?

16  A    Yes, sir.

17  Q    Okay.  So last summer?

18  A    Yes, sir.

19  Q    Okay.  So Mr. Garcia approached you and what did he want

20  to do?

21  A    He told me if wanted to make a couple of thousand dollars

22  and I told him yes.  And he told me he had a job for me.  And I

23  -- I told him "what kind" and he said for me to go to

24  civilian's area where there was going to be marijuana.

25  Q    Okay.  And just -- is this area in Hargill?

Olivarez - Direct / By Mr. Sturgis                    8

1   A     Yes, sir.

2   Q     Okay.  And did you do that?

3   A     Yes, sir.

4   Q     In the end, were you able to steal that marijuana?

5   A     No, sir.

6   Q     Is that the only time that you have been involved with

7   Mr. Garcia in the theft of marijuana?

8   A     No, sir.

9   Q     Was the other time prior to that or after that?

10  A     It was before -- before that.

11  Q     Okay.  Do you know roughly how long before?

12  A     To -- no, sir.

13  Q     Okay, are -- are we talking years or months or days?

14  A     Months.  Months.

15  Q     Months before, okay.  So how did this other time come

16  about that Mr. Garcia and you were going to assist in stealing

17  marijuana or steal marijuana?

18  A     Well, I was in at my house and he called me that he was

19  going to go over there and pick me up.  And I told him that it

20  was okay, so he went, and picked me up.  He talked to me about

21  he was going to get some marijuana from some guy.  I don't know

22  the guy.  And said that he was going to talk to some guy named

23  "Fernando" and was going to ask him to provide a -- a deputy

24  too -- so and told me what I was going to do, that I was going

25  to get a vehicle that they were going to give me --

Olivarez - Direct / By Mr. Sturgis                    9

1          **MS. GUTIERREZ:**  Objection, your Honor.

2   A    -- to -- to drive.

3          **THE COURT:**  If we could break this up into more

4   question and answer format.

5          **MS. GUTIERREZ:**  Well, your Honor, I also believe that

6   this is hearsay.  This is not the same conspiracy that is being

7   alleged in this case so I believe these statements are hearsay.

8          **THE COURT:**  Well --

9          **MR. STURGIS:**  That's incorrect.  These are

10  co-conspirator's statements, your Honor --

11          **THE COURT:**  Is he talking about --

12          **MR. STURGIS:**  -- in this conspiracy.

13          **THE COURT:**  -- I'm sorry, I thought you were still

14  talking about Mr. Garcia and his plans.

15          **MR. STURGIS:**  He is and this is Mr. Garcia's

16  connection with the Defendant and the theft of Fernando Guerra,

17  Sr., not the original one that we've discussed which was how we

18  started with him and Mr. Garcia.  Now we're talking about the

19  theft that involved Mr. Guerra, Jr. and the Defendant.

20          **THE COURT:**  All right.

21          **MR. STURGIS:**  So these are co-conspirator statements

22  (indiscernible).

23          **THE COURT:**  All right.  So we're going to talk about

24  what Mr. Guerra's involvement in -- in one of these loads.

25          **MR. STURGIS:**  Correct.

1          **THE COURT:**  Okay.  Restate your question.

2          **MR. STURGIS:**  The -- the question is what did

3  Mr. Garcia tell him in furtherance of the conspiracy as to what

4  he wanted to do with stealing this marijuana.

5          **THE COURT:**  Can you-all approach?

6      **(Begin bench conference)**

7          **THE COURT:**  I thought they were having a predicate

8  established that they had a conspiracy with Mr. Guerra.  I'm

9  sorry, I'm doing other things while up here on the Bench.

10          **MR. STURGIS:**  He's -- he's testified that what

11  happens the first load was the shooting the case.

12          **THE COURT:**  Sure.

13          **MR. STURGIS:**  And the -- the -- (indiscernible)

14          **THE COURT:**  Okay.  So before that, a few runs.

15          **MR. STURGIS:**  Right.  And then he said "if you want

16  to be (indiscernible)".  This was the first time he had worked

17  with Mr. Garcia.  And he said "no, a few months before I worked

18  with Mr. Garcia and that Mr. Garcia was going to get a load of

19  marijuana."  That he was going to approach Fernando Guerra

20  about getting help and he was going in to stealing the

21  marijuana.

22          **MS. GUTIERREZ:**  And my issue, your Honor, is that

23  regardless of his statements, he's not a co-conspirator.

24          **MR. STURGIS:**  That is a co-conspirator.  They're all

25  co-conspirators if they're assisting each other stealing the

1  marijuana, how could you say they're not co-conspirators?

2          THE COURT:  Yeah, but it needs to be in this

3  conspiracy.

4          MS. GUTIERREZ:  (indiscernible)

5          MR. STURGIS:  It is in this conspiracy.

6          THE COURT:  Well, you haven't established even a

7  predicate of that yet.

8          MR. STURGIS:  He -- he's -- he's establishing it

9  right now, your Honor.

10          THE COURT:  So he's going to say "well, Mr. Garcia

11  told me that" --

12          MR. STURGIS:  He's going --

13          THE COURT:  -- "that Mr. Guerra was involved"?

14          MR. STURGIS:  Yes, he just said that.

15          THE COURT:  I know but we're -- to establish the

16  conspiracy, you're -- you're relying upon him telling me that

17  Mr. Garcia told him --

18          MS. GUTIERREZ:  Uh-huh.

19          THE COURT:  -- that Mr. --

20          MR. STURGIS:  That's all --

21          THE COURT:  -- that Mr. Garcia was going to have --

22          MR. STURGIS:  -- that's all we're going to have.

23  That's all front-end to the conspiracy.

24          THE COURT:  But don't you have -- you have double.

25  You say he --

Olivarez - Direct / By Mr. Sturgis                    12

1        MR. STURGIS:  If -- if he testifies --

2        THE COURT:  -- what if Garcia said -- but you're

3   having him say "tell me what Guerra told him" --

4        MR. STURGIS:  No --

5        MS. GUTIERREZ:  Yes.

6        MR. STURGIS:  -- no, no, that's not what he testified

7   to.  He testified that Garcia told him --

8        MS. GUTIERREZ:  Told him what to say.

9        THE COURT:  Yeah.

10       MR. STURGIS:  -- told him --

11       THE COURT:  Yeah.

12       MR. STURGIS:  -- that Guerra was going to get a

13  deputy.  That Garcia --

14       THE COURT:  Okay.  So he's not going to -- as long as

15  he's not --

16       MR. STURGIS:  He's not testifying to what Guerra

17  said.

18       MS. GUTIERREZ:  That's what it sounded like to me.

19       THE COURT:  Okay.

20       MR. STURGIS:  No, as -- as long --

21       THE COURT:  Okay.  That's what I wanted to make sure

22  that he wasn't --

23       MR. STURGIS:  And of -- of --

24       THE COURT:  -- doing.  All right.

25       MR. STURGIS:  Yeah.

1       **(End bench conference)**

2           **THE COURT:**  Okay.  So if you could clarify that,

3   please.

4   **BY MR. STURGIS:**

5   Q    Mr. Olivarez?

6   A    Yes, sir.

7   Q    What did Mr. Garcia tell you was the plan on stealing this

8   marijuana?

9   A    He told me that he was going to get in contact with one of

10  his friends and the only thing I was going to do was go pick up

11  that -- that marijuana.  And the owner of the marijuana was

12  going to be in the vehicle with Rene Garcia.  I was going to

13  get stopped by a deputy on -- on Jesus Flores (phonetic),

14  Filagonia Road (phonetic).

15  Q    And this is what Mr. Garcia told you --

16  A    Yes.

17  Q    -- prior to him --

18  A    And -- and -- well, I told him, "Am I going to get pulled

19  over and get arrested?  Should I run?"  He was all like "You

20  ain't (sic) going to get arrested or nothing.  All that he is

21  going to do is going to make a fake stop like to make the owner

22  of the weed think 'oh, he got stopped and we lost the -- the

23  weed' -- the -- "

24  Q    And this is what Mr. Garcia told you prior to doing this?

25  This was the plan?

Olivarez - Direct / By Mr. Sturgis                    14

1   A    Yes, sir.

2   Q    Okay.  And you wanted to make sure you weren't going to

3   get arrested?

4   A    Yes, sir.

5   Q    At this time, did Mr. Garcia give you any information as

6   to who the deputy might be?

7   A    No, sir.

8   Q    Did you agree to do this?

9   A    Yes, sir.

10  Q    So what happened?

11  A    So Mr. Garcia takes me to -- to a ranch on 83rd Street.

12  Q    Okay.  Had you ever been to this ranch prior to that?

13  A    Yes, but never got off the vehicle.

14  Q    Okay, you had been by the location previous but you had

15  never seen the house inside or anything?

16  A    Yes.

17  Q    That's correct?

18  A    Yes.

19  Q    Okay.  Did you know who lived there?

20  A    No, sir.

21  Q    So Mr. Garcia took you to this location?

22  A    Yes, sir.

23  Q    And what happened at this location on North 83rd?

24  A    So they tell -- they tell me to jump in a vehicle that's

25  stopped at a -- a little warehouse that's beside that ranch on

EXCEPTIONAL REPORTING SERVICES, INC

1    that same property.  So I jump in that vehicle and --

2    Q    Do you remember what kind of vehicle it was?

3    A    If I'm not mistaken, it was a Grand Prix -- a -- a little

4    red maroon car.

5    Q    Okay.  And is this an older vehicle or newer vehicle?

6    A    An older vehicle.

7    Q    Okay.  So Mr. Garcia tells you to take that car?

8    A    Yes, to follow him where --

9    Q    Okay.

10   A    -- to where the -- to the location where -- where I was

11   going to pick up the weed.

12   Q    Okay.  At that --

13        MS. GUTIERREZ:  Objection, your Honor.  I'd like to

14   just to clarify.  He didn't testify that Mr. Garcia told him to

15   get in the car, he said "they".  So I would like that

16   clarification otherwise, my client --

17        MR. STURGIS:  I -- I believe --

18        THE COURT:  Okay.

19        MR. STURGIS:  -- he did.

20   BY MR. STURGIS:

21   Q    But who -- who asked you to get in the car?

22   A    Rene Garcia.

23   Q    And you did get in that car?

24   A    Yes, sir.

25   Q    And you -- did you take that car somewhere?

1   A    Yes, I followed Mr. Garcia to the location where the weed

2   was at.

3   Q    Okay.  So when you first got in the vehicle and drove it,

4   there was no marijuana in it?

5   A    No, sir.

6   Q    Okay.  And did you go to a location where marijuana was

7   placed in the vehicle?

8   A    Yes, sir.

9   Q    Okay.  Did you place the marijuana in the vehicle?

10  A    No, sir.

11  Q    Okay.  Other individuals did that?

12  A    Yes, sir.

13  Q    Were you there when they did that?

14  A    Yes, sir.

15  Q    Okay.  And had you seen marijuana before?

16  A    Yes, sir.

17  Q    Okay.  And how was this marijuana wrapped?

18  A    In bundles.

19  Q    Okay, how big?  Can you show us?

20  A    Twenty-pound, thirty-pound bundles.

21  Q    Okay.  And how much are we -- how big are we talking

22  about?

23  A    I'd say about three feet wide, two feet wide.

24  Q    And how many bundles were there, do you remember; roughly?

25  A    About seven.

1   Q    Okay.  And do you know where they were placed?

2   A    They were placed in the -- in the trunk, in the back seat,

3   and one in the front seat.

4   Q    Once you had the marijuana -- once it was placed in the

5   car, what happened?

6   A    Well, I take off east on Monte Cristo (phonetic) going

7   towards 493.  And I pass 493 and keep on going farther down

8   towards 88.

9   Q    Okay.  As you get in that location, do you know -- are you

10  were of where anybody else is?

11  A    But -- but --

12  Q    Well, hold on to that.

13  A    Okay.

14  Q    Before -- at that time, when you're traveling down Monte

15  Cristo, are you aware of where anybody else is at?

16  A    No, sir.  Just Mr. Garcia is in front of me.  I'm

17  following him.

18  Q    Okay.  All right.  And so as you travel eastbound on -- on

19  Monte Cristo, FM 1925, you pass 493, you said.

20  A    Yes.

21  Q    What happened?

22  A    He -- he signals me to make a -- to follow him and take a

23  left on Filagonia and on Jesus Flores, I take a left.

24  Q    Okay.

25  A    Going north.

1    Q    Okay.  And what happens as you travel north?

2    A    So I'm going north and the deputy was supposed to be

3    waiting for us on a -- it's like a ditch -- a canal, he was

4    supposed to be there.  I was looking forward to that but he

5    wasn't.  He was coming on -- on Mile 19.

6    Q    Okay.  Traveling which direction?

7    A    Going north.

8    Q    Okay.  You're going north on Jesus Flores?

9    A    Yes.

10   Q    If you're going north, is he going the same direction as

11   you?

12   A    No, he's coming from the east side, going west.

13   Q    Okay.  So you -- you see this vehicle going west bound?

14   A    Yes.

15   Q    And you're going to east bound?

16   A    But he -- he has to stop.  I think it's a four way stop on

17   Mile 19, if I'm -- if I'm not confused.

18   Q    And -- so he stops at the stop sign and Mr. Garcia is in

19   front of me.  And -- and a officer that was supposed to stop

20   me, he -- he -- he knew that I -- I heard Mr. Garcia saying

21   that he -- as soon as he -- that he knew what car it was

22   because of the Escalade that was going to be in front.  The car

23   in the back was going to be the one that was going to get

24   stopped.  That was the one I was driving.

25   Q    Okay.  So what happens as you approach this intersection?

1  A    So we approach, Mr. Garcia passes, and -- and I'm in back

2  of him and I pass him.

3  Q    You -- you pass Mr. Garcia's --

4  A    Yeah.  I -- I acted like I panicked.  So -- so the guy --

5  Q    When you say -- when you say you "acted like you

6  panicked", what did you actually do?

7  A    I -- I -- I speeded a little bit to the front to -- to

8  pass Mr. Garcia.  And the -- the deputy passes and stops and --

9  and turns on the light on -- on -- on me.  And that's when

10  Mr. Garcia and the owner of the -- of the marijuana takes --

11  they take off.  Like he made it seem like "oh shit, he got

12  busted".  Excuse me about my language.  He makes it -- he makes

13  it seem like that I -- that I had gotten stopped.

14  Q    Okay.  So you -- just -- so you pass Mr. Garcia as he goes

15  through the intersection?

16  A    Yes.

17  Q    And then the vehicle -- what kind of vehicle is it that

18  you say the -- the deputy is in?

19  A    An Expedition.

20  Q    Okay.  Is this vehicle that evening -- what -- in the --

21  in way of explanation, what time of day is it roughly?

22  A    It's around 9:30 -- a little bit after 9:30.

23  Q    So is it dark at that time?

24  A    Yeah, it's dark.

25  Q    Okay.  So how are you able to see this vehicle, this

Olivarez - Direct / By Mr. Sturgis                    20

1    vehicle you described?

2    A    When it approached the -- on Mile 19 and a half, I -- I

3    passed right in front of him.

4    Q    Okay.  And this vehicle is what kind of vehicle?

5    A    An -- a Ford Expedition.

6    Q    And what kind of color?

7    A    White.

8    Q    Okay.  Does it have blue and red overhead lights on it?

9    A    Yes, sir.

10   Q    Okay.  And when you pass Mr. Garcia, what does that

11   vehicle do?

12   A    Passes Mr. Garcia and gets behind me and turns the -- the

13   -- the lights on.

14   Q    So at this time, all of you are traveling northbound on --

15   A    Going north between Mile 19 and Mile 20.

16   Q    On which road?

17   A    On Filagonia and Jesus Flores.

18   Q    Where do you go once the vehicle turns on his lights or

19   the vehicle, it's lights are turned on, and it's behind you,

20   where do you go?

21   A    I -- I -- I get to Mile 20 and I take a left on Mile 20.

22   And I -- I speed it up a little bit and it's behind me with the

23   lights on.  And then he cuts them off, so I'm good to go.

24   Q    Okay.

25   A    That -- that's what I was told.  That once he would cut

1    the lights off, he was going to go somewhere else, and that for

2    me to go back to that ranch where I picked up that car.

3    Q    Okay.  Back to the North 83rd location?

4    A    Yes, sir.

5    Q    Okay.  And did you travel back to the North 83rd location?

6    A    Yes, sir.

7    Q    And when you got there, what did you do with the

8    marijuana?

9    A    I unloaded it.

10   Q    Okay, and where did you unload it into?

11   A    In the warehouse.

12   Q    Okay.  Were there other individuals there when the

13   marijuana was returned back?

14   A    There is -- there was one individual there that -- that

15   helped me unload the -- the -- the bundles but I don't -- I

16   don't -- I didn't know the guy and Mr. Garcia helped me too.

17   Q    So did Mr. Garcia come back to the 83rd location?

18   A    Yeah.  And he was already there waiting for me.

19   Q    Okay.

20   A    He had already go -- dropped off the -- the guy that

21   was -- that was with him and he had gone back to the -- to the

22   ranch.

23   Q    The guy that was with him was the?

24   A    The owner of the weed.

25   Q    Okay.  So he had already gotten rid of him --

Olivarez - Direct / By Mr. Sturgis                    22

1   A    Yes.

2   Q    -- and came back over that way for you?

3   A    Yes.

4   Q    Okay.  Now, at any time during this incident, did you ever

5   see who was driving the Expedition?

6   A    No, sir.

7   Q    So you didn't have any idea who was in it?

8   A    No, sir.

9   Q    Is this the only time that you did this type of deal with

10  Mr. Garcia or had any connection to the 83rd property?

11  A    No, sir.

12  Q    Okay.  There were other times?

13  A    Yes, sir.

14  Q    With Mr. Garcia and this other individual?

15  A    Yes, sir.  Oh, the owner of the -- of the marijuana

16  you're --

17  Q    The -- the person -- did -- did you ever meet the person

18  that lived or resided or had that property on 83rd?

19  A    I -- I never exchanged words with him but I did -- I -- I

20  did meet the guy.

21  Q    Okay, you saw him?

22  A    Yes.

23  Q    Okay.  Is this the only time that Mr. Garcia approached

24  you or you ever did anything with Mr. Garcia in relation to

25  that person?

1    A    No, sir.

2    Q    Okay.  There were other times?

3    A    Yes, sir.

4         **MR. STURGIS:**  I'll pass the witness, your Honor.

5         **THE COURT:**  All right.  Cross-examination?

6                    **CROSS EXAMINATION**

7    **BY MS. GUTIERREZ:**

8    Q    Mr. Olivarez, before I forget, I just want to touch on

9    what you just left off on.  You said that you had done other

10   things with the owner of that property, correct?

11   A    No.  Not with him.

12   Q    Okay.  You -- you testified that you exchanged words with

13   the owner of the property --

14   A    No, sir -- no, ma'am.  I -- I just -- I met him and the

15   only word that was exchanged was a -- a handshake and that was

16   it.

17   Q    Okay.  And my understanding is that you were asked whether

18   that was the only time that you had done anything with that

19   individual from that property and you said "no"; is that

20   correct?

21   A    Yes.

22   Q    Okay.  So I want to know about the other times that you

23   did anything with the individual of that property.

24   A    Well, the other time that was -- it was almost the same

25   but it -- I never exchanged words with him and -- and

Olivarez - Cross / By Ms. Gutierrez                24

1    Mr. Garcia just told me the -- the same thing that -- that I

2    was going to do like the first time.

3    Q    Okay.  So then you were in the same Grand Prix?

4    A    No, ma'am.

5    Q    Okay.  So then it wasn't the same?

6    A    No.

7    Q    Okay.  So why don't you tell me about it?

8    A    Well, there was around the same time when it -- when it

9    happened that I was driving a U-Haul with some money.  And I --

10   I abandoned it at a -- at a location through Mile 19 and -- and

11   Mr. Garcia got in contact -- I'm not going to say that it was

12   the same individual that -- that -- that -- that we're talking

13   about but more than likely, I think it was.  And --

14   Q    Okay.  Well, hold on a second.  You don't know that it was

15   the same individual, correct?

16   A    The same individual that -- yes, exactly.

17   Q    You don't know?

18   A    Well, I heard him tell me -- well, it was because he told

19   me he was going to call him and where at.

20   Q    But you don't -- you don't know who, in fact, Garcia

21   called, correct?

22   A    No, I do.

23   Q    Okay.  Well, were you -- so this is a three-way call?

24   A    No, ma'am.  I was with him in the vehicle --

25   Q    Okay.

1    A    -- when -- when he -- when he told me he was going to

2    call.

3    Q    Okay.  I understand that he told you he was going to call;

4    however, you were not part of the conversation, so you don't

5    know who it was --

6    A    Well, I was part of -- of the conversation because I was

7    next to him but I wasn't on the phone with him.

8    Q    But nobody was talking to you, correct?

9    A    No.

10   Q    Okay.  And you weren't able to hear who was on the

11   other -- who was in -- on -- on the phone --

12   A    No, ma'am.

13   Q    -- in the truck?

14   A    No, ma'am.

15   Q    Okay.  So, in fact, you don't know who Garcia called,

16   correct?

17   A    No, ma'am.

18   Q    Is that correct?

19   A    Yes.

20   Q    Okay.  All right.  So you were saying that Garcia

21   contacted someone.  Continue.

22   A    And said that where I -- I abandon -- where I was going to

23   abandon that -- that vehicle that had the money, that -- that

24   the money was supposed to be in.  He was going to call a deputy

25   and -- from Hidalgo County and make a show and call the owner

Olivarez - Cross / By Ms. Gutierrez                    26

1   of the -- of that same vehicle I was driving and tell him to go

2   through there so he could see that I had gotten pulled over and

3   I had to take off running or got -- or say that he didn't know

4   where I was at but that vehicle was there and make it look like

5   if it was a bust and it wasn't.

6   Q    Okay.

7   A    A real bust.

8   Q    Okay.  Let's break up what you just said because I want to

9   understand how much of that was what Garcia told you and how

10  much of that you believe was told to Garcia, okay?  Okay.  So

11  you say that you were told that you were going to abandon the

12  vehicle, correct?

13  A    Yes.

14  Q    Okay.  And who told you that?

15  A    Garcia.

16  Q    Okay.  So is it fair to say that every -- all the

17  instructions you received, you received them from Garcia?

18  A    Yes.

19  Q    Okay.  Okay.  And isn't it also true -- well, let me ask

20  you, is this the incident when -- where you driving the Penske

21  truck?

22  A    Yes.

23  Q    Okay.  And isn't it correct that the -- the Penske truck

24  was a truck that was -- had been provided to you by an African-

25  American individual from up north somewhere?

Olivarez - Cross / By Ms. Gutierrez                    27

1   A    Yes.

2   Q    Okay.  And this individual -- this African-American

3   individual, was an individual who Rene Garcia had already sold

4   1,000 pounds of marijuana to, correct?

5   A    Yes.

6   Q    Okay.  So Garcia had already made a deal with this -- with

7   this African-American individual --

8   A    Yes, ma'am.

9   Q    -- correct?  Okay.  And so isn't it also true that on this

10  particular deal, Rene Garcia's intention was to steal money

11  from this African-American individual?

12  A    Yes, ma'am.

13  Q    Okay.  And -- and in -- in an attempt to steal the money,

14  he -- Garcia -- made a deal with the -- another deal with the

15  African-American individual for another 1,000 pounds of

16  marijuana, correct?

17  A    Yes, ma'am.

18  Q    Okay.  And the African-American individual provided the

19  Penske truck, correct?

20  A    Yes, ma'am.

21  Q    And he -- and -- and the purpose for that -- providing

22  that truck was so that it can be loaded with the drugs that he

23  was purchasing from Garcia, correct?

24  A    Yes, ma'am.

25  Q    Okay.  And Garcia's intent was that the money that the

Olivarez - Cross / By Ms. Gutierrez                    28

1    African-American individual was to pay for the drugs would be

2    stolen by Garcia and you, correct?

3    A    Yes, ma'am.

4    Q    Okay.  When you received this truck, the African-American

5    individual indicated where in the truck the money was hidden,

6    correct?

7    A    Yes, ma'am.

8    Q    Okay.  And so you didn't abandon the truck with the money

9    in there, correct?

10   A    No, ma'am.

11   Q    Okay.  So why don't you tell me where you went or how is

12   that you withdrew the money from the truck?

13   A    Well, Mr. Garcia told me to leave it in front of -- in

14   front of his brother's house.  And I left the -- I left the --

15   the truck there and I got on with Mr. Garcia and we went back

16   to Hargill.  And he dropped me off and told me that he was

17   going to go do -- he didn't tell me exactly what he was going

18   to go do but he told me he was going to go get the money and

19   that he would give me whatever he was going to pay me for doing

20   that later on that day.  So he goes, gets the money, comes and

21   -- and pays me and tells me "I'm going to go drop you off --

22   back where that truck is at and you're going to go abandon it

23   on -- on -- through Mile 19 and I have somebody that's going to

24   up to where it's at and it's going to be a sheriff deputy."

25   Q    Okay.  And this was told to you by Garcia, correct?

Olivarez - Cross / By Ms. Gutierrez                    29

1    A    Yes.

2    Q    Okay.  Do you recall being interviewed by someone from the

3    FBI?

4    A    Excuse me?

5    Q    Do you recall being interviewed by somebody from the FBI?

6    A    Like?

7    Q    Well, around sometime in March of this year?

8    A    Yes.

9    Q    Okay.  And do you recall giving a statement about what

10   you're talking about now to the FBI agent?

11   A    Yes.

12   Q    And do you recall -- well, how much were you paid for

13   that?

14   A    $12,000.

15   Q    And isn't it true that you told the agent that you met

16   with Garcia and you both found the money?

17   A    Well, why I -- well, I took -- we took it to his brother's

18   house and we left there -- we left the -- the truck there.  And

19   we -- we -- I -- he took me back.  And he -- he was going to go

20   do his thing to -- Garcia always wanted him -- he -- he really

21   used us when he needed us.  And he said he didn't -- that he

22   was going to go back to the truck by himself or God knows

23   who -- who else wanted to go with him but he got the money from

24   there.

25   Q    Okay.  So then it's not accurate when you told the agent

Olivarez - Cross / By Ms. Gutierrez                    30

1   that you and Garcia found the money, correct?

2   A    No.  Well, I knew where it was at because we had checked

3   where the -- the -- the -- the African-American said where the

4   money was at.

5   Q    Okay.  Well, he said where the money was at but it was in

6   a hidden compartment, correct?

7   A    It was in some metal pipes.

8   Q    Okay.  And so you didn't actually ever touch the money,

9   correct?

10  A    No.

11  Q    Okay.  And you never actually saw the money, correct?

12  A    No.

13  Q    Okay.  So then you never found the money, correct?

14  A    Well, no, I saw the money once when he went to go pay me.

15  He had it in a five-gallon bucket.

16  Q    Right.  But I'm talking about within the truck that was

17  provided to you.  You never saw the money in the Penske truck,

18  correct?

19  A    I saw -- I saw the -- the -- the where he had said it was

20  going to -- where they -- the black -- black -- African-

21  American said that -- where the money was going to be at.

22  Q    Well, right, but you also said that it was inside a pipe,

23  correct?

24  A    Yes.

25  Q    Okay.  So you --

Olivarez - Cross / By Ms. Gutierrez                    31

1          **MR. STURGIS:**  Your Honor, I'm going to object.  This

2    is improper impeachment.

3          **MS. GUTIERREZ:**  Your Honor, I believe it goes to his

4    credibility.

5          **THE COURT:**  Right.  But -- but -- but --

6          **MR. STURGIS:**  This is improper.  This is --

7          **THE COURT:**  But right.  There's -- nobody has

8    testified that he said anything to them.  Sustained.

9          **MS. GUTIERREZ:**  Very well.

10   **BY MS. GUTIERREZ:**

11   Q    Let's talk a little bit about the incident that -- where

12   you're talking that there was a deputy that stopped you or what

13   appeared to be a deputy, correct?

14   A    Yes, ma'am.

15   Q    Because you testified that you didn't see anyone inside

16   that vehicle, correct?

17   A    Well, I saw somebody in there.  Somebody was driving it

18   but I can't say who the individual is -- who --

19   Q    Okay.  And I apologize, my question was you couldn't make

20   out who was the vehicle, correct?

21   A    Yes, ma'am.

22   Q    Okay.  Do you recognize my client who's sitting here to my

23   right?

24   A    No, ma'am.

25   Q    Have you ever seen him before?

1   A     No, ma'am.

2   Q     And you can't testify today that Mr. Garza, my client

3   who's sitting to my right, was the individual driving that

4   deputy's truck, correct?

5   A     To be honest, no.

6   Q     Okay.  And to your knowledge, is there only one Ford

7   Expedition within the Hidalgo County Sheriff's Office?

8   A     No, ma'am.

9   Q     So there's numerous Ford Expeditions, correct?

10  A     Yes, ma'am.

11  Q     So it could be anybody, is that correct?

12  A     Yes, ma'am.

13  Q     And it's possible that it's also -- it could have also

14  been somebody who wasn't a deputy driving that vehicle,

15  correct?

16  A     Well, I -- I can't say that -- that it would be just

17  anybody.  It had to be a deputy in there.

18  Q     Okay.  But because you didn't see that, the possibilities

19  are endless as to who could have been driving that vehicle,

20  correct?

21  A     Well, I didn't see the -- the -- the face of the

22  individual but I saw he was wearing a -- a sheriff --

23  sheriff --

24  Q     There was no stop ever made, correct?

25  A     No, I didn't make a stop.

Olivarez - Cross / By Ms. Gutierrez                    33

1  Q    Well, no.  The deputy never made a stop, correct?

2  A    Yes, because he was waiting for me to pass.

3  Q    Okay.  And it was, you said, 9:30 at night?

4  A    It was after 9:00 -- 9:30.

5  Q    After?  And it was dark at the time, correct?

6  A    Yes.

7  Q    And isn't that true that in that area where you're

8  describing, which is the area of Jesus Flores Road going north

9  and close to mile -- well, between Mile 19 and 20, it's dark

10 out there, correct?

11 A    Yes.

12 Q    Okay.  As a matter of fact, doesn't Mile 19 cross Jesus

13 Flores Road right before it becomes a dirt road?

14 A    Well, it -- it -- they're both -- the both streets are --

15 mile -- Mile 19 and -- and Jesus Flores Filagonia are dirt

16 roads right there where it crosses.

17 Q    Okay.  And so -- so at that point, and you're saying that

18 you were following Rene Garcia, correct?

19 A    Yes.

20 Q    Okay.  So you -- you're traveling on a dirt road and

21 you're following the vehicle, correct?

22 A    Yes.

23 Q    Okay.  And as we all know, when we drive on dirt roads,

24 that vehicles pick up a lot of dust, correct?

25 A    Yes.  But we were going slow because we were waiting

EXCEPTIONAL REPORTING SERVICES, INC

                    Olivarez - Cross / By Ms. Gutierrez            34

1    for -- for the deputy to show up.

2    Q    Well, but even if you're driving slow, you still pick

3    up --

4    A    Yes, ma'am.

5    Q    -- dirt, correct?

6    A    Yes, ma'am.

7    Q    Okay.  And so as you approached the deputy vehicle, what

8    you're telling the jury is that you were able to see that there

9    was an individual inside the truck wearing a uniform?

10   A    Yes, ma'am.

11   Q    Were you able to make out what kind of uniform?

12   A    The brown ones they wear.

13   Q    Okay.  And those uniforms -- you -- you were able to see

14   the uniform; however, you weren't able to see the individual,

15   correct?

16   A    No, ma'am.

17   Q    Okay.  So it could have been anyone wearing a deputy --

18   A    Yes, ma'am.

19   Q    -- uniform?

20   A    Yes, ma'am.

21   Q    Okay.  You also stated that you drove all the way to Mile

22   20, correct?

23   A    Yes.

24   Q    Okay.  And you testified that at that point is when you

25   turned off -- took off to your right, correct?

Olivarez - Cross / By Ms. Gutierrez                    35

1   A    To your left.

2   Q    Oh, to -- you took off to your left?

3   A    I took -- I took a left going towards 493.

4   Q    And I'm not familiar with that area, so to the left would

5   be west?

6   A    West.

7   Q    Okay.  And -- and that -- and at that point is where this

8   deputy's vehicle or the Ford Expedition stopped following you,

9   correct?

10  A    It cut the lights, yes, and I took off.  And I left him

11  behind and I don't know where he turned, if he turned left or

12  right, or was still in back of me.

13  Q    Okay.  Now, you testified that Rene Garcia, when the

14  deputy turns on his lights, takes off, correct?

15  A    No, no.  He takes off when the -- when he put the lights

16  on me.

17  Q    Right.

18  A    Yes.

19  Q    So when -- when the Ford Expedition turns on its light

20  behind you, that's when Rene Garcia takes off, correct?

21  A    Yes.

22  Q    But you weren't able to see that, were you?

23  A    To see what?

24  Q    Rene Garcia take off.

25  A    Yes, because he passed us.  He was -- he was on the same

1   street.  He passed the -- he -- he went around the deputy and

2   me and took off straight.

3   Q    Oh, so are you saying that you actually stopped?

4   A    I didn't stop.  I was going and he -- he passed us at --

5   at -- at a high -- at a little higher speed because he -- he

6   made it -- he made it look like that I was -- I was busted by

7   the sheriff and he -- he -- so the guy couldn't say "Oh, he got

8   busted.  I lost the weed and he took off."

9   Q    Who was the guy Garcia was with?

10  A    I don't know.

11  Q    You're telling me that as the Ford Expedition turns its

12  lights behind you that Rene Garcia increases his speed and

13  speeds past both of you and takes off?

14  A    Yes.

15  Q    Okay.  And at that point, where did Garcia go?

16  A    He -- he -- he took -- if I'm not confused, he took a left

17  on that same -- on Mile 20 and went back to that place where I

18  picked up the car.

19  Q    Okay.  And so you weren't stopped at all, correct?

20  A    No, I didn't stop at all.

21  Q    Okay.  And so then there was not a lot of time that was --

22  that was between the time that Garcia takes off to the left on

23  Mile 20 and you take off to the left on Mile 20.

24  A    Yes, because -- because I speed up that -- that much.  I

25  just -- I just didn't stop.  I was going on a -- like a cruise

Olivarez - Cross / By Ms. Gutierrez                37

1  speed.

2  Q    Okay.  So you kept moving?

3  A    Yes, I kept moving.

4  Q    Okay.  And so -- but still, I mean, you didn't stop so

5  there wasn't a lot of time and distance between Garcia when he

6  left and your vehicle, correct?

7  A    No.

8  Q    Okay.  And so you testified, though, that by the time you

9  got back to the ranch on 83rd, that Garcia was already there

10  and had dropped off the -- the owner, correct?

11  A    Yes.

12  Q    Okay.  So if you were practically behind him on Mile 20 --

13  A    Not practically -- not practically behind him.

14  Q    But you weren't that far from him.

15  A    I stayed behind.  There was -- there was enough time for

16  him to drop the guy off and get to the ranch by the time I

17  would get back because I wasn't speeding, I was going a normal

18  speed so I wouldn't get stopped by a -- by a deputy that didn't

19  know what's -- what's going on.

20  Q    Okay.  What -- where did Garcia drop off the owner?

21  A    On Monte Cristo.

22  Q    Monte Cristo what?

23  A    And -- on the corner of Monte Cristo or Ester Road

24  (phonetic) on the way back to 83rd Street.

25  Q    Did he drop him off at a vehicle or at a home?

Olivarez - Cross / By Ms. Gutierrez                    38

1   A    I wasn't -- I wasn't right behind him.  Like I tell you, I

2   don't -- he dropped him off at a -- at a house.

3   Q    Well, how do you know that if you weren't behind him?

4   A    Because I picked -- he was supposed to get dropped off

5   where I picked up the -- the marijuana.

6   Q    Oh, so you picked up the marijuana at that house -- the

7   owner's house?

8   A    Yes.

9   Q    Okay.  And the only person involved during the stop was

10  Garcia, the owner, the alleged deputy --

11  A    Me.

12  Q    -- and yourself?

13  A    Yes.

14  Q    Okay.  There was no one else?

15  A    No.

16       THE COURT:  We're going to take a brief recess for

17  the jury.  This will be about a five to ten-minute recess and

18  we'll resume shortly thereafter.

19       THE BAILIFF:  All rise.

20       THE COURT:  We're in recess.

21   (Jurors exit courtroom at 11:14 a.m.)

22   (Jurors enter courtroom at 11:15 a.m.)

23   (Recess taken from 11:14 to 11:28 a.m.)

24       THE BAILIFF:  All rise.

25       THE COURT:  All right, thank you.  Good morning

1    again, please be seated.

2              All right, Ms. Gutierrez, you may resume your

3    examination.

4              **MS. GUTIERREZ:**  Thank you, your Honor.

5                        **CROSS EXAMINATION (CONTINUED)**

6    **BY MS. GUTIERREZ:**

7    Q    Mr. Garcia, you said -- Mr. Olivarez, you stated that as

8    you were following Rene Garcia, that he signaled for you to

9    follow -- that you were on Monte Cristo and that he signaled

10   for you to go to Jesus Flores.  How did he signal you?  Do you

11   mean --

12   A    With a blinker to follow him.

13   Q    Okay.

14   A    He was in front of me.

15   Q    So it wasn't like an arm signal?

16   A    No.

17   Q    It was with the signal from his vehicle, okay.  And if you

18   were following Garcia, were you -- did you follow him to the

19   owner's house to pick up the owner or did you-all both leave

20   after you loaded the vehicle?

21   A    To pick -- I was going to pick up -- they were going to

22   load me with the marijuana and the owner was going to jump with

23   him in the -- in -- in Garcia's vehicle.

24   Q    Okay.  So Rene Garcia was present when your vehicle was

25   loaded?

Olivarez - Cross / By Ms. Gutierrez                    40

1   A    Excuse me?

2   Q    Rene Garcia was present when your vehicle was loaded?

3   A    He was on -- on his truck and -- and the owner jumped in

4   the truck and some of the guys that were there loaded the --

5   the marijuana in the car.

6   Q    But only Garcia and the owner left in Garcia's vehicle?

7   A    Yes, ma'am.

8   Q    And only you left in your vehicle?

9   A    Yes, ma'am.

10  Q    What was Garcia driving?

11  A    An Escalade 2008.

12  Q    What color?

13  A    It's like a bone color, like a beige.

14  Q    Does that belong to him?

15  A    That I know of, yes.

16  Q    Do you still have any money left from your drug dealing?

17  A    No, ma'am.

18  Q    And in reality, in this situation, your money can't help

19  you other than to hire a lawyer, correct?

20  A    Yes, ma'am.

21  Q    And isn't it true that you're testifying today because

22  that's really the only way that you can help yourself in this

23  situation?

24  A    Yes, ma'am.

25  Q    And -- and what is the agreement?  What are you getting in

1    exchange for testimony?

2    A    Truthfully, to reduce my sentence.

3    Q    By how much?

4    A    I haven't talked to my lawyer yet about that but it's --

5    Q    Okay.  Would you agree that it's anywhere between 30 to 50

6    percent?

7    A    No, ma'am.

8    Q    You don't --

9    A    It's one-third that I've heard.

10   Q    Okay.  So you -- you know that it's going to be about one-

11   third about your sentence reduced?

12   A    Yes, ma'am.

13   Q    Okay.

14        **MS. GUTIERREZ:**  Your Honor, may I approach the

15   witness?

16        **THE COURT:**  You may.  Do you have an exhibit you want

17   him to identify?

18   Q    I'm going to show you -- Mr. Olivarez, I'm going to show

19   you what I have marked as the Defendant's Exhibit Number 1 and

20   it is the Superseding Indictment in Cause Number M12-1136-S2.

21   Can you take a look at that, please?  Do you recognize that?

22   A    Yes, ma'am.

23   Q    What is it?

24   A    It's what the -- it's the conspiracy charge that I got

25   charged with.

1  Q    Okay.  Is that the Superseding Indictment in your case in

2  Criminal Number M12-1136-S2?

3  A    It's, if I'm not mistaken, Count Four --

4  Q    Right.

5  A    -- that I've been charged with.

6  Q    Okay.  And do you see that in Count Four, your name is

7  listed there?

8  A    Yes, ma'am.

9  Q    Okay.  And in Count Four, you are listed as --

10        MR. STURGIS:  Your Honor?  I don't have any objection

11 to this but I think the document needs to be entered into

12 evidence if he's going to testify from it.

13        THE COURT:  He's identified the document.  Do you

14 want it to admit?

15        MR. STURGIS:  I don't have any objection.

16        MS. GUTIERREZ:  I'd -- I'd ask that it be admitted

17 but I have some questions for him as well.

18        THE COURT:  All right.  The Court admits defense

19 Exhibit Number 2, the Superseding Indictment in M12-1136,

20 without objection.  You may publish it and ask him from the

21 projector.

22     **(Defendant's Exhibit Number 2 was received in evidence)**

23        MS. GUTIERREZ:  Thank you.  Can you see that?

24        THE COURT:  It will be on your monitor to your left

25 as well.

1          **MS. GUTIERREZ:**  Your Honor, I affixed Exhibit Number

2     1 -- is it 2?

3          **THE COURT:**  You had marked it Number 2 in your --

4          **MS. GUTIERREZ:**  Oh, that is correct, your Honor.

5     That is correct.

6          **THE COURT:**  You can just mark it as a 2.

7          **MS. GUTIERREZ:**  (indiscernible)

8     **BY MS.GUTIERREZ:**

9     Q    Okay.  So you see there how your name is the second-to-

10    the-last name on the Defendant's side; is that correct?

11    A    Yes, ma'am.

12    Q    Okay.  And in this Indictment, you are indicted together

13    with Julio Armando Davila and Rene Garcia and Ida Palacios?

14    A    Yes, ma'am.

15    Q    Among other individuals, correct?

16    A    Yes, ma'am.

17    Q    Oh, and Arnoldo Davila happens to be Julio Davila's

18    brother, correct?

19    A    Yes, ma'am.

20    Q    Okay.  And you agree that the first three counts have

21    nothing to do with you, correct?

22    A    Yes, ma'am.

23    Q    And those have to do with the shooting of the ICE agent;

24    is that correct?

25    A    Yes, ma'am.

Olivarez - Cross / By Ms. Gutierrez                    44

1   Q    Okay.  And here we have Count Four, where you are named,

2   "that on or about July 3rd of 2012, in the Southern District of

3   Texas, and within the jurisdiction of the Court, that all one,

4   two, three, four, five, six of you did knowingly and

5   intentionally conspire and agree together, and with other

6   persons known and unknown to the Grand Jurors, to knowingly and

7   intentionally possess with intent to distribute a controlled

8   substance.  And that controlled substance involved was 1,000

9   kilograms or more of a mixture or substance containing a

10  detectable amount of marijuana."  Do you agree with that?

11  A    Yes, ma'am.

12  Q    Okay.  Isn't it true that that is what you pled guilty to?

13  A    Yes, ma'am.

14  Q    The charge that -- that you -- what you were charged

15  with --

16  A    Excuse me, what did you just tell me?  That I was charged

17  with what?

18  Q    You were charged with -- would you like to see it again?

19  A    Yes.

20  Q    Okay.  That you were charged with knowingly and

21  intentionally conspiring together with other persons to

22  intentionally possess with intent to distribute a controlled

23  substance, and that controlled substance involved was 1,000

24  Kilograms or more of a mixture or substance containing a

25  detectable amount of marijuana.  Do you -- do you agree that

Olivarez - Cross / By Ms. Gutierrez                          45

1   that's what the Indictment says?

2   A    I agree to that but if I'm not mistaken, I didn't plead

3   guilty to that.  I plead guilty to no less than 100 -- 100

4   pounds and no more than 1,000 pounds.

5   Q    Okay.  And -- and I'm going there, okay?  Do you agree

6   with me that the way that it's stated in the Indictment would

7   give you a mandatory minimum sentence of ten years and a

8   maximum of life sentence?

9   A    Yes, ma'am.

10  Q    Okay.  And isn't it true that when you pled guilty that

11  the Government agreed to you entering a guilty plea to a lesser

12  amount of marijuana, less than 1,000 Kilograms?

13  A    Yes, ma'am.

14  Q    Okay.  And that change resulted in your punishment

15  changing from a mandatory minimum of ten to life to a mandatory

16  minimum of five years to forty years, correct?

17  A    Yes, ma'am.

18  Q    Okay.

19         **MS. GUTIERREZ:**  Your Honor, may I approach the

20  witness?

21         **THE COURT:**  You may.

22  Q    I am going to show you, Mr. Olivarez, what I have marked

23  Defendant's Exhibit Number 3.  And this is a Notice of Plea

24  Agreement.  Can you look on the second page, please?  Can you

25  identify that document?

1   A    Yes, ma'am.

2   Q    Is that your signature?

3   A    Yes, ma'am.

4          **MS. GUTIERREZ:**  Your Honor, may I approach the

5   witness?

6          **THE COURT:**  You may.

7          **MR. STURGIS:**  Judge, I'm assuming she's going to

8   offer this document.  The Government has no objection.

9          **THE COURT:**  Would you like to have it admitted?

10         **MS. GUTIERREZ:**  Yes, your Honor, I would.

11         **THE COURT:**  Exhibit 3 -- Defendant's Exhibit 3 is

12  admitted without objection, the Plea Agreement in 12-cr-1136.

13         **(Defendant's Exhibit Number 3 was received in evidence)**

14  **BY MS. GUTIERREZ:**

15  Q    Mr. Olivarez?

16  A    Yes.

17  Q    Do you see that signature there?  Is that your signature?

18  A    Yes, ma'am.

19  Q    Okay.  And this Plea Agreement is what essentially

20  effectuated that guilty plea that reduced your sentence --

21  well, your punishment range from five to forty years, correct?

22  A    Yes, ma'am.

23  Q    Okay.  And along with that, the Government is going to

24  decrease two levels for acceptance of responsibility?

25  A    Yes, ma'am.

1   Q    Okay.  And that also will reduce your sentence, correct?

2   A    Yes, ma'am.

3   Q    Okay.  And together with that, they were -- they would be

4   dismissing the Superseding Indictment at the time of

5   sentencing, correct?

6   A    Yes, ma'am.

7   Q    Okay.  Mr. Olivarez, you were charged with the marijuana

8   that you discussed right now -- we were talking about the

9   deputy having stopped you on Jesus Flores Road, correct?

10  A    No.  No, ma'am.

11  Q    No, you weren't charged with that?

12  A    No.

13  Q    Okay.  So wouldn't you say that that's another benefit

14  that you've received from the Government?

15  A    Yes.  Truthfully, yes.

16  Q    Okay.  And -- and up to now, apart from the one-third --

17  one-third off of your sentence, I mean, you've gotten a pretty

18  good deal, correct?

19  A    Yes, ma'am.

20  Q    Okay.  Do you know about how much time you're looking at?

21  A    Well, I haven't discussed right with my lawyer, so I can't

22  tell you.

23  Q    Are you doing more than five years?

24  A    I don't know.

25  Q    You actually have a criminal history, don't you?

Olivarez - Cross / By Ms. Gutierrez                    48

1   A    Yes, ma'am.

2   Q    And you have some aggravated robbery convictions; is that

3   correct?

4   A    No, ma'am.

5   Q    No?  Aggravated assault?

6   A    Yes, ma'am.

7   Q    Okay.  And you have a robbery, not aggravated, correct?

8   A    No, ma'am.

9   Q    You have no robbery?

10  A    No, ma'am.

11  Q    Okay.  You have a possession of marijuana; is that

12  correct?

13  A    Yes, ma'am.

14  Q    Actually, you have two possessions of marijuana; is that

15  correct?

16  A    No, ma'am.

17  Q    No?

18  A    With this one, yes.

19  Q    Okay.  You have a driving while intoxicated -- actually

20  several.  You have two; is that correct?

21  A    Yes, ma'am.

22  Q    You have a driving while license suspended; is that

23  correct?

24  A    Yes, ma'am.

25  Q    You have an evading arrest; is that correct?

```
 1   A     No, ma'am.

 2   Q     Was that dismissed?

 3   A     Yes, ma'am.

 4   Q     What about aggravated assault with a deadly weapon?

 5   A     Yes, ma'am.

 6   Q     That was a conviction, correct?

 7   A     Yes.

 8   Q     Did you go to the prison for that?

 9   A     Back in -- if it's the one back in 2000, yes.

10   Q     How long did you do?

11   A     Two years.

12   Q     TDC?

13   A     Yes, ma'am.

14   Q     And by TDC, Texas Department of Corrections?

15   A     Yes, ma'am.

16   Q     You have an assault causing bodily injury to a family

17   member?

18   A     No, ma'am.

19   Q     Was that dismissed?

20   A     Yes.

21   Q     Okay.  You actually have a third DWI, correct?

22   A     Yes, ma'am.

23   Q     Did you get arrested twice for an aggravated assault with

24   a deadly weapon?

25   A     Yes.
```

Olivarez - Cross / By Ms. Gutierrez                50

1   Q    Okay.  And did you do time only on one?

2   A    Well, I think I'm on probation in one.

3   Q    Okay.  And you went to -- to prison on one?

4   A    No.  I have only been to prison one time.

5   Q    And that's on which one?

6   A    On the -- on 2000.

7   Q    The aggravated assault?

8   A    Yes, the aggravated assault.

9   Q    Right.  So on one, you went to prison; on the other, you

10  have probation?

11  A    Yes.

12  Q    You have an aggravated assault causing bodily -- serious

13  bodily injury?

14  A    Yes.

15  Q    Okay.  Did you go to prison for that?

16  A    That's the one I'm on probation for.

17  Q    Okay.  But that one didn't involve the deadly weapon?

18  A    No.

19  Q    So you don't have two aggravated assaults with deadly

20  weapon?

21  A    No.

22  Q    You only have one with a deadly weapon?

23  A    Yes.

24  Q    And wouldn't you agree with me that with all your

25  convictions, your sentence would be very high in the sentence

1   in the guideline range?

2          **MR. STURGIS:**  Objection, your Honor.  That's for the

3   Court to determine what his sentence might be.

4          **THE COURT:**  Well, I think she asked if it's guideline

5   range.

6          **MS. GUTIERREZ:**  Right.

7          **THE COURT:**  Well, can you --

8          **MS. GUTIERREZ:**  I'll ask it better.

9          **THE COURT:**  -- be more precise in your question?

10  **BY MS. GUTIERREZ:**

11  Q    Are you familiar with how you can gauge what your sentence

12  could fall in?

13  A    Well, in a way, yes.

14  Q    Okay.  Are you familiar with the Sentencing Guideline

15  ranges?

16  A    Not really but -- well, it -- sometimes it falls in

17  different categories.

18  Q    Okay.  But do you -- do you -- would you agree with me

19  that the more convictions that you have in your past --

20  A    The higher --

21  Q    -- the higher you're going to be --

22  A    Yes, ma'am.

23  Q    -- sentenced at?  Okay.  You testified that on the night

24  of the shooting of the ICE agent, you -- your part in this --

25  well, you pled guilty to it -- was that you were intending to

Olivarez - Cross / By Ms. Gutierrez                    52

1   steal some marijuana, correct?

2   A    Yes.

3   Q    And that was together with Julio Davila and his brother

4   and Rene Garcia, correct?

5   A    Yes.

6   Q    How often did you participate in Julio Davila's

7   conspiracy?

8   A    That was the first time.

9   Q    Okay.  Okay.  And then -- and then you did some after,

10  correct?

11  A    No, ma'am.  Because I -- I turned myself in on January the

12  2nd so --

13  Q    Okay.  But prior to that, you had done some things --

14  A    With him, no.

15  Q    What about with Mr. Fernando Guerra, Sr.?

16  A    No.

17  Q    Isn't it true that at some point, you went by Julio

18  Davila's house to pick up some cocaine?

19  A    No, ma'am.

20  Q    You've never transported cocaine from one house to

21  another?

22  A    No, ma'am.

23  Q    You've never been instructed by Julio Davila to do that?

24  A    No, ma'am.

25  Q    You've never stored cocaine in your house?

1  A    No, ma'am.

2  Q    What about marijuana?

3  A    No, ma'am.

4  Q    Have you ever worked with Fernando Guerra, Sr.?

5  A    No, ma'am.

6  Q    Was Rene Garcia more involved in Julio Davila's

7  conspiracy?

8  A    Yes, ma'am, I could tell you that.

9  Q    Would you say that out of all of them, Rene Garcia was the

10  one you were closest with?

11  A    Yes, ma'am.

12  Q    And is that how you got involved with Julio Davila's

13  conspiracy?

14  A    Yes, ma'am.

15  Q    And one last question.  You testified about how the -- the

16  deal with the deputy stopping you had happened prior to the

17  shooting of the ICE agent?

18  A    No, ma'am.

19  Q    Did it happen after?

20  A    Excuse me?

21  Q    I think you testified that the -- the incident where the

22  deputy stopped you on Jesus Flores Road, or attempted to stop

23  you, or fake stopped you --

24  A    It was -- it was before the shooting.

25  Q    It was before the shooting?

Olivarez - Redirect / By Mr. Sturgis                    54

1   A    Yes.

2   Q    And so I want to know if we can, as closely as possible,

3   find out how -- was it eight months before, was it six months

4   before?

5   A    To be honest, it wasn't more than -- than six -- six

6   months.  It was in between six months but I can't be -- exactly

7   what day or --

8   Q    Okay.  And so then it would be fair to say that it could

9   have been January of 2012?

10  A    No, not really.  It was -- yeah, you could say that, just

11  like I tell you, but I'm not sure of what day it was.

12  Q    Because the shooting happened in July of 2012, right?

13  A    Yes.

14  Q    So that would have been, you know, not more than six

15  months -- January; is that correct?

16  A    Yeah.

17  Q    About?  Okay.

18          MS. GUTIERREZ:  I pass the witness, your Honor.

19          THE COURT:  All right.  Redirect?

20          MR. STURGIS:  Yes, your Honor.

21                    REDIRECT EXAMINATION

22  BY MR. STURGIS:

23  Q    Mr. Olivarez, first off, just so everybody understands,

24  you didn't shoot any -- anybody, right?

25  A    No, sir.

Olivarez - Redirect / By Mr. Sturgis                           55

1   Q    Okay.  I mean, you don't have anything with the shooting

2   of the agent?

3   A    No, sir.

4   Q    Now, that evening that you were involved with the trying

5   to steal that marijuana with Rene Garcia, did you have any idea

6   how much marijuana may have been involved?

7   A    No, sir.

8   Q    Okay.  Did Mr. Garcia give you any -- ever tell you it

9   might this much, or that much, or what he thought?

10  A    Yes.

11  Q    Okay.  And what -- what did he tell you?

12  A    2,000 pounds.

13  Q    Okay.  2,000 pounds, okay.  And so 2,000 pounds is

14  actually less than 1,000 kilos, did you know that?

15  A    No, sir.

16  Q    Okay.  You're -- you're not aware of that?

17  A    I'm not aware with what pounds or stuff.  Just like, I was

18  just doing what I was doing, I really --

19  Q    Right.  But your understanding was it was somewhere around

20  2,000 pounds?

21  A    Yes.

22  Q    Okay.  And that's what he told you that evening?

23  A    Yes.

24  Q    And what was -- did you or Mr. Garcia -- was anybody

25  successful in stealing that marijuana?

Olivarez - Redirect / By Mr. Sturgis                    56

1    A    No.

2    Q    So no marijuana was stolen?

3    A    No.

4    Q    And you pled guilty to conspiracy?  In Count Four?

5    A    Yes.

6    Q    You pled conspiracy -- agreeing with Mr. Garcia and the

7    others to steal the marijuana?

8    A    Yes.

9    Q    But it -- it wasn't actually stolen?

10   A    No, sir.

11   Q    Okay.  And what did you actually do to assist Mr. Garcia?

12   A    I was -- how do you say it -- I was looking at the place

13   where there was going to be any movement or if -- if -- once

14   everybody would leave the -- the property, I would call or let

15   Rene Garcia know and they would come and see -- try to steal

16   the marijuana from the property.

17   Q    Okay.  So all you did was agree with Mr. Garcia that you

18   would keep an eye on it from a distance?

19   A    Yes, sir.

20   Q    And then call him and let him know and they could go and

21   steal the marijuana.

22   A    Yes, sir.

23   Q    Okay.  But it -- it never happened?

24   A    It never happened.

25   Q    Okay.  But you pled guilty?

1    A    Yes, sir.

2    Q    Okay.  And you're willing to accept that responsibility?

3    A    Yes, sir.

4    Q    And you signed that document that Ms. Gutierrez brought to

5    you saying "I accept responsibility for that".

6    A    Yes, sir.

7    Q    And she asked you what you were getting in exchange for

8    your testimony today and you told her that you were hoping to

9    get one-third --

10         **MS. GUTIERREZ:**  Objection.

11   Q    -- reduction, correct?

12         **MS. GUTIERREZ:**  That's misstating the evidence.  I

13   don't believe he said he was hoping.

14         **THE COURT:**  The jury will remember what the witness

15   has stated.

16   Q    What are you -- why are you testifying today?

17   A    Truthfully, to reduce my sentence.

18   Q    Okay.  And you stated that you thought or hoped, whatever

19   it was, that it would be one-third?

20   A    Yes -- yes, sir, or less.

21   Q    Okay.  And who do -- to your knowledge, who decides how

22   much credit you get?  Do you know?

23   A    The Judge or -- or you, the prosecutor?

24   Q    Okay.  So do you know?

25   A    No -- no, sir.

  
1   Q    Okay.  And in order to get any credit, Mr. Olivarez, what

2   have -- what do you have to do?

3   A    Excuse me?

4   Q    In order to get any credit -- she asked you what the deal

5   was -- what your deal was with the Government.  In order to get

6   any credit, what do you have to do?  What is your

7   understanding?

8   A    Saying the truth.

9   Q    Okay.  Have you been instructed that if you don't tell the

10  truth, that you won't get any credit?

11  A    Yes.

12  Q    You were asked earlier by Ms. Gutierrez about an incident

13  with money in a Penske truck, do you remember that?

14  A    Yes, sir.

15  Q    Okay.  Did that incident have any connection to the lights

16  being on, the fake traffic stop with the marijuana -- did that

17  money have any relation to the time on Jesus Flores with the

18  Defendant?

19  A    No, sir.

20  Q    So that's a separate incident --

21  A    A separate -- yes, it's separate.

22  Q    -- that you did with Mr. Garcia?

23  A    Yes, sir.

24  Q    Okay.

25       **MR. STURGIS:**  May I approach, your Honor?

1          **THE COURT:**  You may.

2          **MR. STURGIS:**  And for the record, your Honor, I'm

3    going to be showing the witness what has been labeled as

4    Government's Exhibit 7, 8, 9, 10, and 13.  And I have shown

5    these to counsel prior.  May I approach the witness?

6          **THE COURT:**  You may.

7    **BY MR. STURGIS:**

8    Q    Mr. Olivarez, would you please look at what's been --

9    what's pictured in Government's Exhibit Number 7, Number 8,

10   Number 9, Number 10, and Number 13?  Do you recognize what's in

11   those pictures?  And Number 13 is a map.  Do you recognize that

12   area?

13   A    Yes.  I'm very familiar with it.

14   Q    Okay.  And are those pictures accurate?

15   A    Yes.

16         **MR. STURGIS:**  Your Honor, the Government would ask

17   that Government's Exhibit Number 7, 8, 9, 10, and 13 be

18   admitted into evidence.

19         **THE COURT:**  Any objections?

20         **MS. GUTIERREZ:**  Your Honor, I have no objections to

21   the photographs; however, the map, I don't know that the

22   witness can testify to the accuracy of a map.

23              //

24              //

25              //

1            THE COURT:  All right.  So the Court admits 7, 8, 9,

2    and 10, without objection.  May I see the map?

3         **(Government's Exhibits Numbers 7, 8, 9, and 10 were**

4    **received in evidence)**

5            MR. STURGIS:  Yes, sir.

6            THE COURT:  Is this near La Villa?  What -- what --

7    are you familiar with these roads?  Monte Cristo --

8            THE WITNESS:  I'm from Hargill but --

9            THE COURT:  Valverde --

10           THE WITNESS:  -- the outskirts of Elsa and --

11           THE COURT:  Does this map depict the area that were

12   involved in the events that you've described as involving a

13   sheriff's vehicle?

14           THE WITNESS:  Yes.

15           THE COURT:  All right.  The Court admits Exhibit

16   Number 13.

17        **(Government's Exhibit Number 13 was received in evidence)**

18           MR. STURGIS:  Thank you, your Honor.  May I publish

19   these to the jury?

20           THE COURT:  Yes, you may.

21   **BY MR. STURGIS:**

22   Q    Mr. Olivarez, I'm showing you what's in Government's

23   Exhibit Number 9.  Do you recognize what's in that picture?

24   A    Yes.

25   Q    What is that?

Olivarez - Redirect / By Mr. Sturgis                    61

1   A    Excuse me?

2   Q    What is that?

3   A    It's a house.

4   Q    Where is that house --

5   A    Oh, on --

6   Q    -- or how is it referenced?

7   A    -- on 83rd Street.

8   Q    Okay.  Is that the house that's at the location where you

9   picked up the car?

10  A    Yes, sir.

11  Q    Okay.  Prior to the marijuana being loaded into it?

12  A    Yes, sir.

13  Q    And are you familiar with what's in Government's Exhibit

14  10?

15  A    Yes, sir.

16  Q    And what is that a picture of?

17  A    Of the back of the property and the house, where the house

18  is at.

19  Q    The same property at North 83rd?

20  A    Yes, sir.

21  Q    And is that the location where you picked up the vehicle?

22  A    Yes, sir.

23  Q    Okay.  Is this the location you came back to as you

24  testified when you brought the vehicle back with the marijuana

25  in it?

Olivarez - Redirect / By Mr. Sturgis                              62

1    A    Yes, sir.

2    Q    And you unloaded it?

3    A    Yes, sir.

4    Q    Now, you've detailed that Jesus Flores, you -- you told

5    Ms. Gutierrez that Jesus Flores Road, Filagonia Road is the --

6    the same road up by Mile 19, and that area is Caliche, is that

7    correct?

8    A    Yes.

9    Q    Okay.  I'm going to show what's marked as Government's

10   Exhibit Number 7.  Do you recognize what's on -- in that

11   picture?

12   A    Yes, sir.

13   Q    What is that a picture of?

14   A    It's of Filagonia Road and Jesus Flores.

15   Q    Okay.  And is -- it starts off paved, obviously, at the

16   beginning.  And then it turns to Caliche up farther north; is

17   that correct?

18   A    Yes.

19   Q    Okay.  Which direction is Mile 19 and Mile 20, if you're

20   looking at this picture?

21   A    Farther ahead north.

22   Q    Okay.  And you testified earlier that where there -- you

23   can see where it turns to Caliche closer up there, that there

24   was a canal that you believed that the deputy was going to be

25   at.  Is this that canal?

Olivarez - Redirect / By Mr. Sturgis                    63

1   A    Yes, right there.

2   Q    But he was not at that location?

3   A    He wasn't.

4   Q    Or that person was not at that location?

5   A    Yes.

6          **MR. STURGIS:**  Judge, will he have the ability to

7   touch the screen and follow?  I have -- I have a laser if that

8   would --

9          May he -- may he step down --

10          **THE COURT:**  Yes.

11          **MR. STURGIS:**  -- your Honor?

12   Q    Mr. Olivarez, I've got a laser pointed here, and could you

13   come over here.  Are you -- you stated that you're familiar

14   with this area, right?

15   A    Yes.

16   Q    Okay.  Would you point to Monte Cristo, please?

17   A    Right there.

18   Q    Okay.  And is that the same road that's FM 1925?

19   A    Yes.

20   Q    Okay.  And I'm going to zoom in a little bit here so that

21   you can see the wording a little bit better.  On this map, do

22   you see where Filagonia Road is?  Which is, you've said, is the

23   same as Jesus Flores.

24   A    Right here.

25   Q    Okay.  So it's right there and Monte Cristo is just south

Olivarez - Redirect / By Mr. Sturgis                    64

1   of -- of that.

2   A     Yes.

3   Q     And Jesus Flores Road there does not go all the way

4   across, it just goes northbound?

5   A     Yes.  It's Mile 6 that's the other street that goes south

6   bound.

7   Q     South bound.

8   A     Yes.  And Jesus Flores goes north.

9   Q     Okay.  I'm going to zoom back out a little bit here so we

10  can see it a little bit better.  Where is the 83rd location in

11  reference to this map?

12  A     Right here.

13  Q     Okay.  So where is that house where you stated -- and in

14  relation to that, do you see -- what is that, Rogers Road?

15  A     It's on the area outside Carlos.

16  Q     Okay.  So it's in -- it's on 83rd.  And where from there

17  then did you go with -- can you show us where you drove that

18  vehicle and -- and where this happened?

19  A     I drove --

20  Q     Okay.  Can you go slow over here.

21  A     Oh.

22  Q     You're starting at 83rd because that's where you picked up

23  the vehicle.

24  A     I went all the way to 83rd, made a stop on Monte Cristo,

25  drove this way, and if I'm not mistaken, the house where --

1  where I picked up the marijuana, it's on the corner of Valverde

2  and I think this is -- and there's a little street around here

3  they call "Rieste" (phonetic).  It's in the corner of Valverdo

4  or Rieste Road where I -- I picked up the marijuana.  I got out

5  of there, went through Monte Cristo going east until I hit

6  Filagonia, or that's Engle (phonetic) -- the Filagonia Road

7  right here.

8  Q    Uh-huh.

9  A    It's called Jesus Flores now.  I went -- I took a left,

10 went all the way to Mile 19, and the deputy was waiting for --

11 for -- for me to pass Mile 19 and he followed me between Mile

12 19 and Mile 20.

13 Q    Okay.  And then you testified you took a left on Mile 20?

14 A    Yes, I took -- I took a left on Mile 20 to go hit 493,

15 that is La Blanca Road.

16 Q    Okay.  And then from there, you traveled back to the 83rd

17 location with the marijuana?

18 A    Yes.  I -- I -- I took a left on -- on -- on 493 and

19 turned on Mile 19 and went back to the ranch in Salgados

20 (phonetic).

21 Q    Okay.  The -- the one on North 83rd?

22 A    Yes.  On -- the one on north -- North 83rd.

23 Q    Okay.  Thank you.

24        **MR. STURGIS:**  I pass the witness, your Honor.

25        **THE COURT:**  All right.  Final recross?

Olivarez - Recross / By Ms. Gutierrez                 66

1        **MS. GUTIERREZ:**  Yes, your Honor.

2                    **RECROSS EXAMINATION**

3    **BY MS. GUTIERREZ:**

4    Q    Mr. Olivarez, everything that we've talked about today

5    regarding this -- the -- the driving of the -- riding with the

6    marijuana, the deputy stopping you, this map right now that you

7    were talking about, the -- the path that you took, where you

8    picked up the marijuana, the ranch that you came back to --

9    you're not here today to testify that any of that had to do

10   with George Garza, correct?

11   A    Well, I guess, yes, because he's -- he's here.  That's

12   your client.

13   Q    Well, right.  But what I'm saying is, based on your

14   experience, your testimony -- well, let me ask you this way.

15   There was a picture of a house --

16        **MS. GUTIERREZ:**  May I approach -- may I approach,

17   your Honor?

18        **THE COURT:**  Of course.

19   Q    Let me show you this house here.  You already identified

20   that this was the house on 83rd Road, right?

21   A    Yes, ma'am.

22   Q    You're -- you're not testifying here that Mr. Garza owns

23   this house, correct?

24   A    No, ma'am.

25   Q    And you're not testifying that you -- that Mr. Garza was

1   there at that house when you were --

2   A    No.

3   Q    -- picking up the vehicle --

4   A    No.

5   Q    -- or unloading the marijuana, correct?

6   A    No, ma'am.  That's correct.

7   Q    That's correct, okay.  And so you're not here to testify

8   that Mr. Garza has any connection with that house, correct?

9   A    Correct.

10  Q    And your answers would be the same to this part of the

11  property; is that correct?

12  A    Correct.

13  Q    Okay.  Mr. Garza was -- you never saw him there; is that

14  correct?

15  A    Correct.

16  Q    And you're not testifying that he owns it, was there, or

17  was present, correct?

18  A    Correct.

19  Q    Okay.  And with respect to this road, that is Jesus Flores

20  Road, you're not testifying -- you're not here to testify that

21  Mr. Garza was on that road on that night, correct?

22  A    Correct.

23  Q    Okay.  Is that -- is your answer the same for this

24  picture?

25  A    Correct.

Olivarez - Recross / By Ms. Gutierrez                    68

1    Q    Okay.  And finally, this map where you showed the jury

2    your path -- the path where you picked up the -- the car, the

3    marijuana, the deputy's fake stop, and you returned to the

4    ranch -- at no time in any of that period of time, was -- did

5    you see Mr. Garza present, correct?

6    A    Correct.

7    Q    Okay.  And you're not here to testify that he had anything

8    to do with that testimony?

9    A    Correct.

10   Q    That incident?

11        MS. GUTIERREZ:  I have nothing further, your Honor.

12        THE COURT:  All right.  Mr. Olivarez, that concludes

13   your testimony.  You may be excused at this time.

14        DAVID OLIVAREZ, GOVERNMENT'S WITNESS, EXCUSED

15        THE WITNESS:  Thank you.

16        (Transcription concluded at 12:01 p.m.)

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATION**</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>September 12, 2013</u>

          Signed                                             Dated

*TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**