UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 7:13-CR-070-12 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| JORGE GARZA, | ) | Friday, August 2, 2013 |
| | ) | (11:22 a.m. to 11:52 a.m.) |
| Defendant. | ) | ( 1:37 p.m. to  2:54 p.m.) |
| | ) | ( 3:13 p.m. to  4:04 p.m.) |

TESTIMONY OF GUADALUPE TREVINO DURING JURY TRIAL - DAY 4

BEFORE THE HONORABLE RANDY CRANE,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

| | |
|---|---|
| For Plaintiff: | JAMES STURGIS, ESQ. |
| | ANIBAL ALANIZ, ESQ. |
| | Assistant United States Attorney |
| | 1701 W. Business Hwy. 83 |
| | Suite 600 |
| | McAllen, Texas 78501 |
| | |
| For Defendant: | LILLY A. GUTIERREZ, ESQ. |
| | 4901 S. Jackson Rd. |
| | Edinburg, TX 78539 |
| | |
| Court Recorder: | Richard Cortez |
| | |
| Transcribed By: | Exceptional Reporting Services, Inc. |
| | P.O. Box 18668 |
| | Corpus Christi, Texas 78480-8668 |
| | 361 949-2988 |


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>INDEX</u>

| <u>DEFENSE WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| GUADALUPE TREVINO | 3/22/39/80 | | | |
| VOIR DIRE | 38 | | | |

1          **McAllen, Texas; Friday, August 2, 2013; 11:22 a.m.**

2          **(Partial transcript; testimony of Guadalupe Trevino)**

3          **(Jurors present)**

4              **THE COURT:**  All right.  Good morning again.  Please

5     be seated.  All right.  Mr.  Trevino, if you'd please raise

6     your right to be administered the oath.

7              **GUADALUPE TREVINO, DEFENDANT'S WITNESS, SWORN**

8              **THE COURT:**  All right.  If you would please be

9     seated.  All right.  Ms.  Gutierrez, whenever you're ready.

10             **MS. GUTIERREZ:**  Thank you, your Honor.  Good morning,

11    Mr.  Trevino.

12             **THE WITNESS:**  Good morning.

13             **MS. GUTIERREZ:**  Mr.  Trevino --

14             **THE COURT:**  Let's begin with his name for the record.

15                        **DIRECT EXAMINATION**

16    BY MS. GUTIERREZ:

17    Q    Can you please state your full name?

18    A    My full name is Guadalupe Lupe Trevino, Junior.

19    Q    Sheriff Trevino, you are at this time the Sheriff of

20    Hidalgo County, correct?

21    A    I'm the current elected Sheriff of Hidalgo County.

22    Q    And in -- within the Hidalgo County Sheriff's Office, you

23    have a system by where all your policies and your rules are

24    enforced, correct?

25    A    Oh, yes.  And -- but I don't understand.  What do you mean

Trevino - Direct / By Ms. Gutierrez                4

1   by a "system?"  What do you mean -- understand --

2   Q    Well, and I'll get there.  You aren't the one that on a

3   daily basis can enforce every single policy and rule within the

4   Hidalgo County Sheriff's Office and, therefore, you delegate

5   that, correct?

6   A    I am the final say-so on the rules and regulations, but

7   we're such a large organization, probably the seventh largest

8   sheriff's Office in the State of Texas, and I do have a command

9   structure and a delegation system, yes.

10  Q    And within that command structure, you have what are

11  called commanders that are -- that would fall at the next level

12  after yourself, correct?

13  A    For -- well, yes, partially correct.  Commanders are

14  actually administrative and field operation supervisors.  But

15  then there is a whole slew of supervisors under them.  Between

16  them and the Sheriff's Office, there's a chief of staff, but

17  the chief of staff has no supervisory capabilities over the

18  commanders rather than just as an advisor and somebody that

19  makes sure that things run seamlessly between all four bureaus.

20  Q    Okay.  And so then what you stated so far is yourself,

21  your commanders, and then supervisors.  Correct?

22  A    If you want the -- you asked me about -- if you want the

23  command structure, it is the Sheriff, we have a chief of staff

24  off to the side, then we have commanders, we have captains --

25  commanders are in charge of bureaus; captains are in charge of

Trevino - Direct / By Ms. Gutierrez                     5

1   divisions; lieutenants are in charge of sections; sergeants are

2   in charge of units.  And that is the way we delegate.

3   Q    And currently you have as the commander Jose Padilla,

4   correct?

5   A    That's correct.

6   Q    And Jose Padilla is currently in charge of the special

7   services; is that right?

8   A    Well, at one time he was in charge of special services,

9   but we have reorganized and he is now in charge of support

10  services, which support services as -- is not a law enforcement

11  function as far as arrests and seizures and that sort of thing.

12  Support services takes care of civil warrants, the county

13  courthouse security detail, and other areas like that.  There

14  may be a couple more.  The -- our training staff, our academy.

15  They support the law enforcement function.

16  Q    Okay.  And is that the only thing he oversees, the support

17  services?

18  A    That's right.

19  Q    Okay.

20  A    That's -- well, it's the Support Services Bureau.

21  Q    Bureau, okay.  Well, when was that -- you mentioned that

22  there was a change implemented (indiscernible).

23  A    Yes.  We reorganized after everything was brought out

24  after the Panama Unit arrest.  I reorganized everything after

25  that.

Trevino - Direct / By Ms. Gutierrez                    6

1  Q    Okay.  Well, since December of last year, there's been

2  some changes, correct?

3  A    I think it's -- I think we organized -- even though the

4  Panama Unit thing busted out the 12th of December of '12, we

5  organized in -- I'm not really sure.  I'd have to look at the

6  paperwork.  And I -- but I would say it was between February

7  and March when we reorganized.  I would have to look at the

8  documents exactly when we had those meetings and we

9  reorganized.

10 Q    Okay.  But for certain, it was implemented in 2013,

11 correct?

12 A    Absolutely, yes.

13 Q    So let's focus on the period of time that this case is

14 dealing with, which is January of 2009 through December of

15 2012.

16 A    Okay.

17 Q    Okay?  And at that time, Jose Padilla was not only in

18 charge of support services, but he was in charge of others,

19 correct?

20 A    At that time, that bureau was known as the Special

21 Services Bureau.  And if I remember correctly -- and, again,

22 I'd have to refer to documents -- and you're going to have to

23 give me some leeway here because I don't have our

24 organizational documents in front of me, and I certainly did

25 not study them before I came on the stand -- but back then, the

1   Special Services Bureau was in charge of all tactical

2   operations, which meant all our SWAT teams, our tactical patrol

3   teams, our K9s, the courthouse security, civil and warrants,

4   academy, and some other areas.  Again, I don't want -- I don't

5   have all -- but it was -- that's -- and the gist of it is, it

6   was more tactical operations than it was support.

7   Q    Okay.  Where did Crime Stoppers Division fall in?

8   A    Crime Stoppers fell under Commander Joe Padilla's bureau.

9   Q    Okay.  And was that -- is it support service?

10  A    It was -- well, again, you know, we're still talking time

11  period of '09, then that -- back then, you have to keep in mind

12  that was called Special Services.  It is now called Support

13  Services.  "Special" because of the tactical part.  That's been

14  removed into another bureau.  So just -- you know, I'm just

15  trying to be as accurate as I can here.

16  Q    So really Special Services became Support Services,

17  correct?

18  A    With some deletions, yeah.

19  Q    Okay.

20  A    With some changes.

21  Q    Okay.  So then I will refer to it as "special services"

22  because that was what it was during that period of time,

23  correct?

24  A    That's fine with me.

25  Q    But is that accurate?

Trevino - Direct / By Ms. Gutierrez                    8

1   A    It is accurate if you are describing the time period --

2   let's say '09.

3   Q    Uh-huh.

4   A    And in '10 and '11 up to the first part of this year,

5   you'd be correct.

6   Q    Okay.  And so during the period of 2009 through the end of

7   December of 2012, Joe Padilla was in charge of the Crime

8   Stoppers Division, correct?

9   A    That's correct.  They fell under him, that's correct.

10  Q    And just so I'm accurate, was it -- is it called Crime

11  Stoppers Division or Crime Stoppers Department?

12  A    It's called -- well, it was called Crime Stoppers Unit,

13  and that would fall under the direction or supervision of a

14  sergeant.  But we were so shorthanded -- and, besides, the unit

15  was only at the maximum two people -- I could not waste a

16  sergeant to supervise two individuals.  It just wouldn't make

17  sense with the size of our organization.  So the Crime Stoppers

18  Unit, I think it was a two-man unit at the time, fell directly

19  under Commander Joe Padilla.

20  Q    So because you couldn't have a man supervising two men

21  under the Crime Stoppers Unit, basically Joe Padilla was their

22  supervisor, correct?

23  A    That's correct.

24  Q    Okay.  And Joe Padilla reports to you; isn't that true?

25  A    He reports directly to me, that's correct.

1   Q    And you are in constant communication with Joe Padilla

2   with respect to the daily activities that go on in your -- the

3   Hidalgo County Sheriff's Office?

4   A    I'm in constant communication with all my commanders and

5   captains with the executive and command staff, on a daily

6   basis.

7   Q    And so -- and part of their -- the commander's

8   responsibilities is to keep you informed of what's going on,

9   correct?

10  A    Well, you would seem to think so, yes.  That's part of

11  their function is to keep me apprised of what the units are

12  doing.  As a matter of fact, I have a practice, every morning I

13  have a five, ten minute briefing with every commander and every

14  captain in the entire organization, whether they have something

15  to report or not.  Anything significant that happened the night

16  before or the morning of the briefing, or whatever plans they

17  have for the day or what they've got for tomorrow, they do

18  brief me every morning.

19  Q    Okay.  So you're pretty much in the know about what's

20  going on in your office, the Sheriff's Office, correct?

21  A    That's not -- no.  That's not really true.  It's

22  impossible.  It is virtually impossible for any head of any law

23  enforcement agency, especially one the size of ours -- and,

24  again, we're the -- like the seventh or eighth largest

25  sheriff's office in the State of Texas -- to know what

1    everybody is doing all the time.  It is virtually impossible.

2    It would be impossible even for the commanders to know what the

3    people under them are doing.  I mean, it's just -- it's not --

4    that -- it's not expected, it's not logical.  And I think any

5    sheriff or any chief would sit here and tell you exactly the

6    same thing, of any organization of that size --

7    Q    And --

8    A    -- whether you were law enforcement or not.

9    Q    Okay.  And maybe I should rephrase my question.

10   A    All right.

11   Q    You are in the know about everything of significance that

12   goes on in your department, in your office, correct?

13   A    I think a better way to answer -- or, I mean, to ask that

14   question, I'm in the know of things that I am told.  If I am

15   not told of something and if I am not made aware of a

16   situation, then I have absolutely no knowledge of it.  But if I

17   am briefed on the particulars of, for example, a home invasion

18   that occurred last night, then I would know.  But if the

19   commander or the captain decide that they're not going to give

20   me all the details, or maybe they don't know all the details

21   either, and one of our lower rank and file people did

22   something, then I would absolutely have absolutely no knowledge

23   of that whatsoever.  I mean, that'd be impossible.  Again, this

24   is not just parochial to law enforcement.  This is any

25   organization.  I don't care what type of organization you're

Trevino - Direct / By Ms.  Gutierrez                11

1    talking about.

2    Q    Okay.  However, giving the example that you just gave me -

3    -

4    A    Yeah.

5    Q    -- if there was a home invasion that occurred and your

6    office responded to it --

7    A    Yeah.

8    Q    -- at the very least, you would know that your officers

9    responded to a home invasion, correct?

10   A    If I was informed of it or if I watch it on the news, then

11   I would know.

12   Q    Okay.  So are you saying that -- or are you telling the

13   jury that you, like a lot of us, for the first time hear stuff

14   that goes on in your department on the news?

15   A    As a matter of fact, it has happened.

16   Q    Okay.

17   A    You know, you have -- again, you have to understand that

18   on a yearly basis the Hidalgo County Sheriff's Office receives

19   on the average 130,000 calls of assistance a year.  That's --

20   if you break it down, that's like maybe four to a minute -- or,

21   I'm sorry, one -- I'm sorry, one every four minutes.  I think

22   it kind of breaks down that way.  So it's impossible for me to

23   know about 130,000 things that have happened that year, unless

24   somebody tells me about it.  And there has been times when I

25   hear it on the news first before I am briefed the next morning.

Trevino - Direct / By Ms.  Gutierrez           12

1   I mean, that -- because, you know, we have a very active news

2   media contingency in Hidalgo County, and sometimes they make

3   the crime scene before we do.

4   Q   Okay.

5   A   And we hear it on the news and then I'll get briefed on it

6   the next morning.

7   Q   Okay.  But isn't it part of the commanders'

8   responsibilities and duties that when you brief, that they

9   inform you of this information.  Not every single detail.  I'm

10  not talking about that.  I'm just talking about the significant

11  things that occur within the Sheriff's Office.

12  Q   Well, you would seem to think so.  Yes, logically you

13  would seem to think that, yes, if something significant

14  occurred the night prior to the briefing, then either a captain

15  or a commander would brief me on it.  I mean, yeah, that's the

16  whole idea of the briefing --

17  Q   Well --

18  A   -- to keep me appraised (sic) of what is going on.

19  Q   Okay.  But you're confident that Joe Padilla, as one of

20  your commanders, briefs you and informs you about anything of

21  significance that occurs within your office that he knows

22  about, correct?

23  A   I would expect him and any other member of my command

24  staff to brief me on anything that is significant that I should

25  know about.

Trevino - Direct / By Ms. Gutierrez          13

1    Q    And I understand that you expect it.  What I'm asking you

2    is that you are confident that he actually does it.

3    A    You can only have confidence in an individual until he

4    lies to you.  And I would have to say, yes, I have confidence

5    that he was telling me everything that I should know.  I mean,

6    you can only trust somebody -- you have to have that trust in

7    order to delegate.  Because if you don't trust that person,

8    regardless of what position he's in or whatever rank he's in,

9    if you can't trust him, then you wouldn't put him there to

10   start off with.  So I would expect to be told of everything

11   that is significant and that I should know about.

12   Q    So what you're telling the jury is that you trust

13   Commander Padilla, that he is telling you everything of

14   significance that you need to know, correct?

15   A    That's correct.  I trust him to tell me what I need to

16   know.

17   Q    And you believe that up until this point, he has done

18   that, correct?

19   A    I have not caught him in any lies.  He's -- his purview

20   over those units are not as significant as, for example, the

21   commander over the Law Enforcement Bureau.  Law Enforcement

22   Bureau takes care of things like murders, home invasions,

23   robberies.  Now, those guys give me complete briefings.  For

24   example, Joe Padilla, as commander of Support Service -- I'm

25   sorry, going back to Special Services, he would show up in the

1    morning, say, "Sheriff, there's nothing significant to report

2    this morning.  Nothing happened last night within my bureau, so

3    we're okay."  I'd say, "All right.  Next?"  And I would go to

4    the next one.  I don't waste time with them.

5    Q    Okay.  And that also comes from the trust and competence

6    that you have in him that he's telling you the truth, correct?

7    A    I have to trust the commanders and the captains, that

8    they're doing their job, until it is proven to me otherwise.

9    Q    Very well.  You're familiar with the common perception

10   that Joe Padilla, Commander Joe Padilla, is a very hard man in

11   running his -- well, responsibilities, in doing his

12   responsibilities, correct?

13   A    I don't understand what you're -- I guess you have to

14   define what a "hard man" is.

15   Q    Well, he's tough, he's mean, he's intimidating.

16   A    Well, look, perceptions are like noses, you know,

17   everybody's got one.  Okay?  If you are -- if you perceive him

18   to be that way, well, I mean, that is your perception.  I

19   perceive Commander Padilla as somebody that will get the job

20   done.  Okay?

21   Q    Okay.

22   A    Now, if you perceive him as being an intimidating, mean

23   person, well, that's your perception of him.  I mean, he

24   doesn't have a license or certificate to be mean or

25   intimidating.  That's just the way he is.  Now, is that -- if

1    that is your perception of him.

2    Q    Okay.

3    A    All right.

4    Q    And I don't have any knowledge of Mr.  Padilla, so I don't

5    have a perception --

6    A    All right.

7    Q    -- of him.  But what I'm asking you is not about how you

8    perceive Padilla.  I'm asking you about the fact that you are

9    aware that within your office, the deputies or -- that

10   Commander Padilla has a reputation for being a mean commander,

11   or a scary commander, or intimidating.

12   A    Well, again, nobody has ever filed an official complaint

13   or affidavit with the Internal Affairs to investigate Joe

14   Padilla for being mean or intimidating.  Okay?  Now, does he

15   have that perception by some members of the department?  Maybe

16   he does, but nobody officially has come to me and said, "I want

17   to file a complaint for official oppression" or whatever you

18   may want to call it "against Commander Padilla."  He's got his,

19   you know, his own personality.  And that's his personality.

20   Q    And so are you telling the jury that you have absolutely

21   no knowledge that Commander Padilla is perceived by the

22   deputies to be a mean, intimidating, fearful commander?

23   A    No.  I didn't say that.

24   Q    Okay.  Well then --

25   A    No.  What I said was --

Trevino - Direct / By Ms. Gutierrez                16

 1          **THE COURT:**  Answer the question.

 2          **THE WITNESS:**  Yeah.

 3          **THE COURT:**  Answer the question.

 4          **THE WITNESS:**  What I said was that there are some

 5   deputies that may perceive him that way.  And if I've heard

 6   this, you know, it's possible that some say, yeah, you know,

 7   "Joe Padilla, you know, really treated me bad or said

 8   something."  Said, "Well, do you want to do something about

 9   it?"  Says, "No."  Yeah, the perception may be there by some

10   deputies, but I don't know that you would call it a widespread

11   perception of him.  I don't know.  I don't think so.  He's

12   authoritative and he gets the job done.  That I can tell you.

13   **BY MS. GUTIERREZ:**

14   Q    Again, I'm going to ask you the question --

15   A    Okay.

16   Q    -- if you are telling the jury that you have no knowledge

17   of Commander Padilla being a scary, intimidating, fearful

18   commander?

19   A    Okay.  Now we're going from mean to scary.

20   Q    Well --

21   A    Okay.  I have a -- I have heard that Commander Padilla is

22   an authoritative-type figure.  I don't think everybody --

23   anybody's described Joe Padilla as a mean, scary individual.

24   Authoritative, yes, and that's what I'm telling the jury.  He

25   is an authoritative individual.

1  Q    Isn't it also true that the -- it would be pretty -- that

2  a deputy would be hesitant to come to the sheriff and tell the

3  sheriff that their commander scares them?

4  A    Well, yes.  You could say that.  But as every one of my

5  employee knows, I have an open-door policy.  And a lot of them

6  take advantage of it.  A lot of them do take advantage of my

7  open-door policy, and they'll walk in and we'll talk about

8  whatever they want to talk about.  And one of the prerequisites

9  on this, conditions is, that the first thing they've got to do

10  is tell their supervisor they want to see me.  But they don't

11  have to tell the supervisor what they want to see me about.

12  And the supervisor has no right to ask the employee, "Why do

13  you want to see the Sheriff personally?"  So anybody can walk

14  into my office at any time they want, or set up an appointment,

15  whichever way it can work out, and I can hear out whatever

16  their concerns are.  And a lot of them do take that position.

17  Q    But if that were to occur, wouldn't you then have to

18  follow up with the commander that they're complaining about?

19  A    Absolutely.

20  Q    And so then it would be made known to the commander?

21  A    It's what?

22  Q    It would be made known to the commander or supervisor,

23  even though you just said that the supervisor can't ask that

24  individual that question.

25  A    Well, I guess it would -- you would have to take it on a

1  case-by-case basis, because everyone on his own merits.  If an

2  employee walked in my office and made an allegation against a -

3  - any member of that -- of my department, especially a command

4  staff member, and the allegation was the nature where it was a

5  violation of one of our policies, then I think I would be

6  obligated as the Sheriff and as the lead of that organization

7  to bring in that commander or captain or whoever and

8  investigate and take corrective action.  I mean, that would be

9  the right thing to do.

10  Q    Okay.  Mr. Trevino, you're also aware of the common

11  knowledge around the Hidalgo County Sheriff's Office that Joe

12  Padilla is your right-hand man, correct?

13  A    That's a perception, but I don't have a right-hand man.  I

14  have four commanders and a chief of staff that help me run the

15  department.  I do not have a chief deputy, which would

16  traditionally be your right-hand man.  I can testify right now

17  in all truthfulness that Joe Padilla is not my right-hand man.

18  Joe Padilla takes care of Special Services, now Support

19  Services.

20  Q    Sheriff Trevino, who are your -- apart from Joe Padilla,

21  who are your other three commanders?

22  A    Commander John Montemayor, he is in charge of the Law

23  Enforcement Bureau; Commander Daniel Garcia, he's in charge of

24  our Detention Bureau; and Commander Gabriel Castaneda, in

25  charge of our Financial Bureau; and, of course, Commander Joe

1   Padilla, now in charge of Support Bureau.

2   Q    Isn't it true that Joe Padilla is in charge of anything

3   having to do with your campaigning for Sheriff?

4   A    No.  That is not true.

5   Q    So if there was an indication that Joe Padilla was

6   representing that he was taking action with respect to

7   campaigning, that would be false?

8   A    Well, I think that needs a little bit of explanation.  Our

9   fundraising activities for the Sheriff's Office is done by

10  committees.  Every fundraiser has a committee chairperson.  For

11  example, the skeet shoot -- our annual skeet shoot, we have

12  Commander Montemayor is in charge of the skeet shoots.  He's

13  the chairperson, he takes care of everything.  I believe

14  Commander Padilla was -- is in charge of a golf tournament.

15  And Commander Garcia was in charge of some -- I think some

16  barbecue ticket drive.  See, our fundraisers are done by

17  committees, and every committee has a chairperson.  And it

18  rotates.  It's different.  There's not one person that -- and

19  runs my campaign.  I am the campaign manager myself.  There's

20  not one person that does it, except I do not involve myself in

21  any campaigning -- I mean, campaign fundraising.  It's very,

22  very limited that I do that.  Only to my very close friends

23  would I solicit donations from.  But in general, it is handled

24  by the chairperson and whoever is working with him.

25  Q    Well, hold on.  You do solicit campaign contributions from

1    everyone; isn't that correct?

2    A    Not personally.

3    Q    Well, right, but you do solicit --

4    A    Well, absolutely.  I mean, I have hundreds of people, and

5    then that is evident by our campaign reports.  I have hundreds

6    of people that contribute to our campaign; and, for the most

7    part, I have no idea who they are.  A lot of people I have no

8    idea who they are.

9    Q    And the individuals that are charged with campaigning for

10   you are representing you; isn't that correct?

11   A    Oh, absolutely, yes.

12   Q    Okay.  And so you can't separate you're -- the man or the

13   Sheriff, Lupe Trevino, from the campaigning?

14   A    Well, of course not, because I'm the candidate.

15   Q    Okay.

16   A    I am the face of the candidacy, of the campaign.

17   Q    And so it sounds to me like you're telling me that you

18   delegate the campaigning to other people and then you --

19   A    No.

20   Q    You're not saying that?

21   A    No.

22   Q    Okay.

23   A    I delegate the fundraising to other people.  My job is to

24   get out in the community, shake hands, get to know people, and

25   deliver my message.  We're talking about campaigning here.

Trevino - Direct / By Ms. Gutierrez                21

1   Q    Uh-huh.

2   A    Okay?  That's my job, to go out in the community, shake

3   hands, meet people, deliver my message.  I don't -- and I don't

4   want to have to deal -- to be asking for money.  I don't do

5   that, except for my very close friends and contributors.  That

6   I do because they're very close friends of mine.  But the

7   committees take care of the fundraising.

8   Q    Okay.  And just to --

9            THE COURT:  We're going to take a break here.  I have

10  a noon docket I need to call.  All right.  We're going to take

11  our noon recess now.  I'm going to give you an hour and a half.

12  Since it's about ten until noon, if you could be back at 1:20,

13  we'll get started at 1:20.  It doesn't appear we're going to

14  finish today because we still have the jury charge and closing

15  arguments.  So during this recess, reach out to your families

16  or whatever, employers, and we need to consider whether we're

17  going to proceed on Saturday or Monday.  So I'm going to kind

18  of -- I will consider -- ultimately I'll make the decision

19  based on a lot of factors, but one of them would be what the

20  jury's sentiment is.  So think about that and we'll visit about

21  it later this afternoon.  All right.  The jury is excused until

22  1:20.

23            THE CLERK:  All rise for the jury.

24       (Jurors exit at 11:51 a.m.)

25            THE COURT:  All right.  Is you all -- anything you

 1   all need to address with me at this time --

 2           **MS. GUTIERREZ:** No.

 3           **THE COURT:** -- before I recess you all? No. Okay.

 4   And you're excused until 1:20 as well, Mr. Trevino. Be back

 5   at 1:20. All right. Then you're excused. I have a docket to

 6   call. I'm going to proceed with the Court's normal --

 7           **(A lunch recess was taken from 11:52 a.m. until 1:35 p.m.)**

 8           **(Portion omitted from 1:35 p.m. to 1:37 p.m.)**

 9           **THE CLERK:** All rise for the jury.

10           **(Jurors enter at 1:37 p.m.)**

11           **THE COURT:** Good afternoon. Again, please be seated.

12   You may be seated. All right. Ms. Gutierrez, you may resume

13   your examination.

14                     **DIRECT EXAMINATION (CONTINUED)**

15   **BY MS. GUTIERREZ:**

16   Q   Sheriff Trevino, when we broke for lunch, you -- we were

17   talking about the campaign. Do you recall that?

18   A   (No audible response)

19   Q   And I just want to understand that there were two types of

20   fundraising that was going on there at the Hidalgo County

21   Sheriff's Office. One has to do with fundraising for the

22   county and the benefits that the citizens would receive, for

23   example, toy drives and turkey drives, correct?

24   A   No. That's wrong.

25   Q   Okay.

Trevino - Direct / By Ms.  Gutierrez                23

A     The only campaign fund drive was for my reelection.  Okay?
Now, if there's any other fundraising or any other initiatives
that went toward items for toys or stuff like that, that's
going -- has nothing to do with the campaign.  That's two
complete different functions, two complete -- one's political
and the other one is work.

Q     And maybe I misspoke.  I meant --

A     Okay.

Q     -- fundraising events that were occurring were, one, for
the county, which was for -- like toy drives and turkey drives
and the events such as -- generating either money or items in
order to distribute to the community?

A     I was -- I have never have been made aware of any
fundraising, I mean, cash, money, to donate to the community.
Now, we have had donations of turkeys and toys and that sort of
thing that we give out to the National Night Outs and to
historic programs and regular toy drives for Christmas, like
almost any other law enforcement agency.  But to say that there
is a fund, a money drive for that, I never -- I have no
knowledge of that whatsoever.

Q     Okay.  And maybe you're confusing that -- put the two --
my last two questions together.  Let me clarify.  I'm not
necessarily talking about -- well, I'm talking about
fundraising events.  Would you agree that there were
fundraising events for the purpose of distributing items to the

1   community, and then there were fundraising events that were,

2   like you say, political in nature that were for the purpose of

3   generating campaign funds?

4   A    I think I answered that.  I have no knowledge whatsoever

5   of any fundraising, money raising events to raise money for

6   distribution to the community when you buy whatever items you

7   buy for.  I'm not confused.  I understand exactly what you're

8   saying.

9   Q    Okay.

10  A    I just don't think you understand my answer.

11  Q    Okay.

12  A    All right.  Now, there's a fundraising for campaigns.

13  That's strictly off duty and away from work.  That -- I guess

14  the best way I can explain it.

15  Q    Well, then, let's go fundraiser by fundraiser.  This --

16  the annual skeet shoot --

17  A    Okay.

18  Q    -- is that political in nature?

19  A    Absolutely.

20  Q    And so that was a political fundraiser in order to collect

21  funds for your campaign, correct?

22  A    That's correct.

23  Q    And which commander was in charge of that?

24  A    Commander John Montemayor.

25  Q    And what were his responsibilities with respect to that

1   fundraising event?

2   A    He's the chairman of the committee and he just took care

3   of everything.  I have no knowledge of the details of how those

4   things are run because I don't mix myself up in any way with

5   those type of fundraisers.  I just don't do it.  You know, like

6   I said, I show up, I thank the people for donations, I maybe

7   give awards for the skeet shoot, first, second, third place, I

8   give some little speech, shake hands, and I'm there throughout

9   the entire event.  But I really don't have anything to do with

10  the organization of the event.  There's a committee that

11  Commander John Montemayor puts together for that.

12  Q    And you're not saying that you don't have a say in it, are

13  you?

14  A    Actually, that's what I'm saying.  I mean, it's -- I don't

15  involve myself with the -- I don't even know where to start

16  organizing a skeet shoot.

17  Q    Well --

18  A    But John has that expertise.  He's got that experience.

19  He's done, I don't know, maybe two or three of them for me.  So

20  I just -- I lay back and they do everything.  I just show up on

21  the day of the event.

22  Q    Okay.  So are you telling the jury that you are completely

23  in the dark about the annual skeet shoot up until the time and

24  date that you have to show up?

25  A    No, no, no, no.  That's -- I didn't say that.

Trevino - Direct / By Ms.  Gutierrez                26

1    Q    Well --

2    A    Okay.  What I'm saying is I do not participate in the

3    organization of the event.  They'll show me a flyer, says, "Do

4    you approve the flyer?"  You know, they get the wording right,

5    the spelling, and the picture and the photo and all that.

6    "Yeah, fine, that looks good."  Then they'll ask me, "Do you

7    approve where we're going to have it?"  I said, "Yeah, that --

8    the location is fine, too."  Things like that.  But for me to

9    get into the everyday making decisions, that's up to that

10   committee.  And they have a -- they've got a, I don't know,

11   seven, eight, ten-man committee that meets regularly and they

12   organize that thing.  It's a very large event.

13   Q    So -- but you do have a say-so in some of the things that

14   occur in preparation for these events?

15   A    Well, yeah -- well, yes, of course, yeah.

16   Q    And you do have a say-so as far as, "No, I don't like this

17   idea," "I don't agree with that," or "Why don't you add this?"

18   A    I guess you could say that.  And that really just is

19   restricted to the flyer, you know.  I may not like the picture,

20   I may not like the photo they're using, I may not like the

21   design that they're using.  But as far as how they arrange the

22   stations and who's going to cook and who's not and who's -- I

23   have nothing to do with that.

24   Q    Okay.  And you sell tickets for that event, don't you?

25   A    The committee sells tickets, that's right.

Trevino - Direct / By Ms. Gutierrez          27

1    Q    And how much are those tickets?

2    A    I have no idea.  They -- it varies.  Like all fundraisers,

3    regardless of what jurisdictional level you're talking about,

4    everything has different levels.  And I don't know what the

5    levels are.  A team may cost so much, a sponsorship may cost so

6    much.  I have no idea what it is.

7    Q    Have you ever seen a ticket to the skeet shoot?

8    A    I'm sure that I have.

9    Q    Okay.  And what is the maximum amount for each

10   (indiscernible)

11   A    That's what I'm saying.  I don't -- I couldn't tell you.

12   I'd be guessing, and I don't want to guess.  I just -- I don't

13   know -- now I don't know if they are tickets really.  I don't

14   think they are tickets, coming to think of it.  They're flyers,

15   and you give the individual the flyer and then he fills out

16   whatever he wants to donate.  They're not -- I'm -- they're not

17   tickets.  They're actually flyers.

18   Q    And you are made aware of who donates money to you,

19   correct?

20   A    Oh, absolutely, yeah.

21        **(Pause)**

22   Q    And you said Mr. Montemayor, what are his duties within

23   the committee in order to get these events (indiscernible).

24   A    He's a chairperson and he runs the committee.

25   Q    I would imagine that it takes a lot of his time in order

**EXCEPTIONAL REPORTING SERVICES, INC**

1   to get these events planned and executed, correct?

2   A    I would imagine so, yeah.  There's -- the entire committee

3   spends a lot of time in organizing the events.

4   Q    And how are -- how is the committee chosen?

5   A    That is up to the commander.  I don't choose committees.

6   I have nothing to do with that.

7   Q    And the committees are made up of other deputies or

8   other --

9   A    It could be citizens.  It could be employees.  I really

10  don't know.  You'd have to ask John Montemayor that.

11  Q    Well, but if a citizen wanted to join one of those

12  committees, I mean, what would they do in order to get

13  considered for one of these committees?

14  A    I guess ask.

15  Q    Well, I'm asking you.

16  A    Then they would have to ask.

17  Q    What about --

18  A    Ask, "Could I join a committee?"  I mean, I don't know.

19  They -- I don't think -- I don't know if that ever really

20  happened.  That -- I mean, you're asking me a question that it

21  just -- doesn't make any sense to me.  If you want to join

22  something, obviously you ask.  I mean, they could call.  They

23  could try and call me, maybe put something on my Facebook page.

24  All they've got to do is -- I guess the best way to answer that

25  is they have to communicate with us in some way or fashion and

Trevino - Direct / By Ms.  Gutierrez          29

1   say, "We would like to help."

2   Q    Okay.  Well, let's say that I wanted to join a committee,

3   so I am asking you, Sheriff Trevino, how can I be considered

4   for that committee?

5   A    Okay.  Then I would have you contact Commander Montemayor

6   and you and him work it out.

7   Q    And where would I contact Commander Montemayor?

8   A    Well, I would probably give you his home number or his

9   cell number, I guess.

10  Q    How often does that committee meet?

11  A    I have no idea.

12  Q    How are you -- how is it then that you know whether these

13  events are being planned timely?

14  A    Because I trust him, and he's done two or three of them

15  for me.

16  Q    So you're not updated or briefed on --

17  A    No, no, not on fundraisers.  Like I said, I have very

18  limited participation in those type of fundraisers.  I don't

19  have that expertise in how to set up that sort of thing.  As a

20  matter of fact, John has to consult with others on certain

21  things.  That just -- it -- that's the way it works.  So I have

22  no daily participation and he doesn't brief me on it either.

23  He just takes care of it.

24  Q    And you -- so you're -- but your expertise in that is

25  being the politician, correct?

1  A    I guess that's the best way of putting it, yeah.

2  Q    And we are still talking here about your fundraiser for

3  your campaign to be sheriff, correct?

4  A    Well, my reelection campaigns, yeah.

5  Q    And so far you've served how many terms?

6  A    This is my third term.

7  Q    And Commander Montemayor is tasked with this -- preparing

8  these events during working hours for the county, correct?

9  A    No.  That's where you're absolutely wrong.  Number one, he

10 is not tasked with it.  He volunteered.  And number two, it is

11 on his off duty time.

12 Q    Does Commander Montemayor have regular hours that he works

13 at the county?

14 A    Well of course.

15 Q    And what are those hours?

16 A    I think his working hours are 8:00 to 4:00, 8:00 to 5:00

17 maybe, regular daytime hours.

18 Q    And so what you're saying is that this committee that he

19 created and is chairman of and the work that has to be done in

20 order to prepare the fundraiser, all of that is done at any

21 time after 8:00 to 4:00 or 8:00 to 5:00; is that what you're

22 saying?

23 A    That is one of the rules that I have, that there will be

24 absolutely no campaigning, no political work, during duty

25 hours.  And this particular committee, which I know a little

1  bit about -- not much -- I know that they meet at a hotel

2  meeting room that Commander Montemayor friends owns and is a

3  convenience, and they meet there after hours.

4  Q    What hotel is that?

5  A    I think -- I'm not sure.  All I know is that's what he

6  tells me.  He said, "I meet at a hotel meeting room."  I'd be

7  guessing if I told you, and I don't want to guess.

8  Q    Okay.  And it sounds to me like at these committee

9  meetings, because you have absolutely no knowledge about what's

10  going on there, that anything could be happening that you're

11  not aware of.

12  A    I think that goes for anything, Ms.  Gutierrez.  If I am

13  not there, and if I'm not participating, you're absolutely

14  right.  I mean, they could be having a heck of a party and me

15  not know about it.  You're right.  This is off duty, on their

16  own time.  They're having this committee meeting trying to

17  organize things.  What they discuss, how they discuss it, who

18  speaks, who doesn't, I have absolutely no idea because I have

19  never attended any of those committee meetings.

20  Q    Well, right.  But they're meeting for the -- in their

21  meeting and in their creation, they're representing Sheriff

22  Lupe Trevino; isn't that true?

23  A    Well, yeah, I guess -- if you put it that way, I would

24  imagine so.

25  Q    Okay.  And so wouldn't it be important for you to know

1   what's going on in these meetings?

2   A    No.  Because I trust John Montemayor.  Out of -- he

3   volunteered to be the chairman of this committee, that he would

4   take everything -- he would take care of everything that has to

5   be taken care of, and I don't involve myself in it.  That just

6   the way the fundraising goes in our organization.  Now, other

7   politicians are very different.

8   Q    If deputies are saying that they are made to work on your

9   campaign during work hours --

10  A    Yeah.

11  Q    -- then would they be lying?

12  A    Ms.  Gutierrez, yes, they would be.  I have two rules, and

13  every one of my commanders and every captains and everybody

14  knows this.  Rule number one is you must first be a volunteer.

15  If you do not want to volunteer for the campaign -- and that's

16  fine with me -- then don't.  It doesn't make any difference.

17  Volunteer is number one.  And number two, you will do it off

18  duty.  I will not allow anybody to campaign on duty or do

19  anything on -- as a matter of fact, I fired an individual for

20  that.  We investigated an individual for trying to trick us and

21  showing up in a campaign -- in a polling site and trying to

22  manipulate the paperwork and then come back on us and say,

23  "Look what you made me do."  And that was a complete

24  manipulation and he was dealt with.

25  Q    So he wasn't necessarily fired because he went polling on

1    office hours; he was fired because he was accusing you -- your

2    office of something -- of some wrongdoing, correct?

3    A    I don't remember the details.  I would have to review the

4    internal affairs file.  But the point that I'm trying to make

5    here is not why he was fired.  The point I'm trying to make is

6    that he violated that rule and he got investigated for it.  I

7    will not allow any of my employees to do any campaign work

8    during duty hours.

9    Q    And my point, Sheriff Trevino, is that in your example,

10   you didn't -- he wasn't punished because he violated your rule.

11   He was punished because he accused your office of forcing him

12   to do something that you are saying didn't happen, correct?

13   A    I would have to review the file to get the exact charge.

14   I don't remember.

15   Q    Well, let's go with -- based on what you've just told me.

16   You told me that this individual was fired because they tried

17   to trick you --

18   A    Right.

19   Q    -- by going out and polling and then changing the

20   paperwork and coming back to you to say that you forced him to

21   do that, correct?

22   A    Ms.  Gutierrez, I don't remember -- again, I'm not going

23   to testify by guessing.  I did not review the file, and I have

24   not seen that file in awhile.  I just don't remember exactly

25   why he was dismissed.  But part of the investigation showed

1    that he was on duty working a poll and tried to manipulate the

2    paperwork and was actually on the county clock while he was out

3    there.  That was a part of the investigation.  Now, was he

4    fired for that?  I don't know.  I don't remember.  And I'm not

5    going to speculate or lie or even try to attempt to guess.  I

6    would have to review the file and tell you exactly why that

7    person was dismissed.  But I do know that that was part of the

8    investigation.

9    Q    Very well.  When -- in your office, the Sheriff's Office,

10   you guys use what's called "comp time;" is that correct?

11   A    That's right.

12   Q    That is incorporated into the employees' time and how they

13   earn pay and leave, correct?

14   A    Not earn pay, no.  Comp time -- the county does not pay

15   overtime like municipalities do.  So if they work over their

16   hours they're required to work for their paycheck, then they

17   are given time and a half of competory (sic) time, which is

18   called "comp time," time that they can take off like, for

19   example, like a vacation or whatever -- time off.

20   Q    And so if somebody works -- let's say they have a 40-hour

21   work week, but in one particular week they work 60 hours --

22   A    Right.

23   Q    -- then they get paid for their 40 hours and 20 hours go

24   towards comp time, correct?

25   A    Twenty at time and a half.

Trevino - Direct / By Ms.  Gutierrez                    35

1   Q    Twenty at time and a half.  And so that generates some

2   comp time that they then can later use to say -- let's say,

3   like you said, a vacation, and then they can take a vacation

4   and use their comp time and still receive a paycheck, correct?

5   A    Okay.  That confused me there.  I'm sorry.  I --

6   Q    Well --

7   A    I mean, I'm sorry.  I did not understand that at all.

8   Q    Okay.  You said with my example of somebody working 60

9   hours in a 40-hour week --

10  A    Okay.

11  Q    -- they would get paid for 40 hours.

12  A    Uh-huh.

13  Q    And then 20 of those hours, they would get comp time at

14  time and a half you said, correct?

15  A    Right.  So they -- that would have -- they would have 30

16  hours.

17  Q    Okay.  So they would have 30 hours to be able to take a

18  vacation if they wanted --

19  A    To take off any time they wanted to do, whatever they

20  wanted to do.

21  Q    Okay.  And those 30 hours was (sic) -- is at some point

22  compensated, isn't it?  I mean, they worked those hours.

23  A    No, no, no.  That is their pay.  The time off is their

24  pay.  We don't pay overtime.  We give them comp time, which

25  means that if you go over, let's say, it is 40 hours, you get

Trevino - Direct / By Ms. Gutierrez                    36

1   to take that time off.

2   Q    Well, right.  But how is it then they're compensated for

3   the 20 hours that they worked over in a 60-hour week?

4   A    Ms. Gutierrez, I don't think you understand the concept.

5   Q    I clearly --

6           THE COURT:  No, no, I think, Sheriff Trevino, in your

7   example, say somebody worked 60 hours in one week, FMLA

8   requires time and a half anything over 40 hours.  So the 20

9   hours above 40 is actually, as you said, has to be compensated

10  at 30 hours.  So do they receive a paycheck at the end of that

11  60-hour week for 70 hours?

12          THE WITNESS:  No, your Honor.

13          THE COURT:  They receive it for 40 hours, correct?

14          THE WITNESS:  That's correct.

15          THE COURT:  But the other 30 hours they worked and

16  must be compensated for it, so they -- what you do is you say,

17  "Don't come in for those 30 hours, but you still get your

18  paycheck.  We want you to work ten hours next week, and you get

19  your 40-hour paycheck."

20          THE WITNESS:  That --

21          THE COURT:  So that in the two weeks together you've

22  worked 40 hours one week and 40 hours the next week, rather

23  than 60 -- they're paid 40 and 40 rather than 60 and 10; isn't

24  that --

25          THE WITNESS:  It could work that way.  It's really

1    very simple.

2            **THE COURT:**  But they're -- again, they're off during

3    that time, those 30 hours --

4            **THE WITNESS:**  Exactly.

5            **THE COURT:**  -- they're -- can take a vacation, they

6    can do whatever they want, but they're still paid for that,

7    because by law they have to be paid.

8            **THE WITNESS:**  They're paid in the sense they get the

9    time off, right.  Now, if -- let's -- I think our work week,

10   I'm not really sure if it's 80 or 86 hours -- I'm sorry, not

11   the work week, but the pay period.

12           **THE COURT:**  Uh-huh.

13           **THE WITNESS:**  It's either 80 or 86.  I'm not really

14   sure what it is.  Once you've reached that limit, that anything

15   that you worked over that is time and a half that you're given

16   to be taken off like as vacation or time that you want to do

17   whatever you want to do with it.

18           **THE COURT:**  But it's not -- if they've actually

19   worked the time, it's not -- they didn't -- it's not volunteer.

20   I mean, they're compensated for it.

21           **THE WITNESS:**  I guess, your Honor.

22           **THE COURT:**  I mean, nobody --

23           **THE WITNESS:**  I mean, I've never heard it --

24           **THE COURT:**  You've never had a deputy actually --

25           **THE WITNESS:**  -- that way, but I guess you're right,

Trevino - Voir Dire / By Mr. Sturgis          38

1   your Honor.

2          THE COURT:  -- work, physically work, any hour and

3   not get compensated for it?

4          THE WITNESS:  Right.

5          THE COURT:  All right.

6          THE WITNESS:  You're getting compensated with the

7   time off is the best way I can explain it, your Honor.

8          MR. STURGIS:  Wait, can I take it out of turn here?

9          THE COURT:  If you want to try and clarify, I'll

10  allow you briefly.

11         MR. STURGIS:  Thank you.

12                    VOIR DIRE EXAMINATION

13  BY MR. STURGIS:

14  Q   Sheriff Trevino, I think what's being said then is there's

15  the difference between having time off and not getting paid.

16  Nobody wants to have time off and not get paid because they've

17  got to pay their bills and stuff.

18  A   Right.

19  Q   So the 30 hours, they're actually getting paid; it's just

20  the next paycheck.  They're not having to work all 40 hours of

21  next week to get paid the same the next paycheck, because there

22  wouldn't be a benefit to someone to work overtime --

23  A   Right.

24  Q   -- and then turn around and say, "Well, you're off next

25  week, but you're not getting paid for it."

Trevino - Direct / By Ms.  Gutierrez                    39

1   A    Right.  I guess that's another way of explaining, right.

2            **THE COURT:**  All right.  So it is paid --

3            **MS. GUTIERREZ:**  All right.  So -- okay.

4            **THE COURT:**  -- time off.

5                    **DIRECT EXAMINATION (RESUMED)**

6   **BY MS. GUTIERREZ:**

7   Q    So, Sheriff Trevino, the individual is getting a paycheck,

8   even though they're taking time off because they've already

9   worked those hours, correct?

10  A    You're absolutely correct.

11  Q    And so when someone is taking comp time, you consider them

12  to be off duty, correct?

13  A    That's correct.

14  Q    Okay.  And you're saying that you're okay with your

15  employees campaigning for you while they're off duty, right?

16  A    That's the only way they can campaign.

17  Q    It's the only way they can --

18  A    They've got to be off duty, correct.

19  Q    So it's possible that an individual can be campaigning

20  while off duty, but still receiving comp time, correct?  Or

21  payment for their comp time that they've already worked?

22  A    You know, I don't know how to answer that.  To be

23  truthfully to -- with you, I don't know how to answer that,

24  because the way Sturgis and Judge explained it, that is their

25  time to do anything they want to do it with.  Okay?  Now, if

1   that time off -- I guess you could say that time off that's

2   given to them, that's their pay.  I guess it's the only way to

3   explain it.  Because they can do anything they want, you know,

4   during that comp time, during that time off.

5   Q   Right.  But the time off isn't being given to them.

6   They're taking it because they've already worked over time and

7   they -- that money is stuck somewhere --

8   A   Well, they can -- that can accumulate.  They can

9   accumulate comp time.  For example, you can work -- like the

10  example you gave, you can work 60 hours that week and you've

11  got 20 plus ten, you've got 30, you can work 40 hours the

12  following week, you pay -- you get your paycheck for, let's

13  say, 80 hours, so now you've got 30 hours on the books that you

14  can take at any time that you want.  And I don't allow anybody

15  to keep more than 80 hours, because if they were to separate

16  from the organization, from the county, then we'd have to pay

17  them.  We'd have to give them a paycheck for that money.  So I

18  don't allow anybody to keep more than 80 hours of comp time.

19  And they can take that 80 hours any time they want, like a --

20  like vacation time.

21  Q   Okay.

22        THE COURT:  I guess it's sometimes called paid leave.

23  I mean, you've earned the pay and you can take your time off.

24        THE WITNESS:  Right, paid leave, yeah.

25  //

1  **BY MS. GUTIERREZ:**

2  Q    Okay.  Great.  And so while they're -- if a person is --

3  let's call it "paid leave" -- is taking that "paid leave,"

4  they're considered to be off duty, correct?

5  A    That's correct.

6  Q    Okay.  And then, at that point, they could campaign for

7  you, correct?

8  A    That's correct.

9  Q    And so it is conceivable that a person could campaign for

10  you while they are receiving a paycheck from the county,

11  correct?

12  A    No.

13  Q    Well, I'm not saying that they're being paid for the time

14  that they are campaigning for you.  Do you understand the

15  distinction?

16  A    No.  I don't understand, because that doesn't make any

17  sense to me whatsoever.

18  Q    Okay.

19  A    It's like -- we get -- we pay so much for vacation --

20        **THE COURT:**  No, let her re-ask the question, because

21  it was an incongruent, I believe -- or *non sequitur*.

22  Q    You've already testified that a person could take paid

23  leave and be -- and qualify to campaign for you, correct?

24  A    You're correct.

25  Q    And when they're taking paid leave, they're not working,

1   but they're receiving a paycheck if they're using their paid

2   leave, correct?

3   A     That's correct.

4   Q     And so it is possible that a person is on paid leave and

5   at the same time campaigning for you?

6   A     It'd be the same thing as taking vacation time, which is

7   paid, and campaign, too.

8   Q     And who was in charge of allowing an employee to work more

9   than the 40 hours a week?

10  A     Their immediate supervisors.

11  Q     And in some cases, that would be your commanders, correct?

12  A     In some cases, yes.

13  Q     An employee can't generate comp time without the okay of

14  their supervisor or commander, correct?

15  A     No.  That's not correct.  For example, I have homicide

16  investigators that -- they'll work 48, 72 hours straight, and

17  they don't need the permission because that's something that

18  needs to be done.  The same thing with the tactical units.  If

19  they -- if the surveillance takes, I don't know, more than that

20  time, they're going to do it.  They don't need any immediate

21  approval.

22  Q     What about deputies?

23  A     Well, a deputy, if he's involved in a crime scene, that

24  would -- it would also apply.  He may have to stay and guard

25  the crime scene overnight.  I mean, it just -- it's part of the

1   job.  We don't -- we try to regulate it as much as we can, and

2   the supervisors try to oversee it as much as we can, but as you

3   well know in our job, we can't plan stuff.  You know, it just

4   happens.

5   Q    And when you say, "We try to regulate it," what do you

6   mean by that?

7   A    By not going over the 80 hours, for example.  If a deputy

8   accumulates more than 80 hours, why then, you know, we stop him

9   at that point, because we don't ever know what's going to

10  happen, yeah.

11  Q    And when you say 80 hours, you're talking about 80 hours

12  in a two-week period, or one week?

13  A    I'm talking about the pay period.  It's either 80 or 86.

14  I'm not really sure which it is.  It's either 80 or 86, but

15  it's during the pay period.

16  Q    Okay.  And that pay period is what, biweekly or --

17  A    Pay period is -- yeah, biweekly.

18  Q    And so what you're saying is that you -- is it 80 hour --

19  the 80 -- that you don't like for them to go beyond the 80

20  hours, or beyond the 86 hours?

21  A    I don't want them to go beyond the 80 hours of accumulated

22  comp time.  Okay?

23  Q    But what about during their hours that they're working as

24  far as in a given week, if they need to work more than 40

25  hours, it doesn't matter to you how much time they need to work

Trevino - Direct / By Ms. Gutierrez                  44

1   over the 40 hours, as long as it's required for what they're

2   doing?

3   A    In our business, we don't have a choice.  We just have to

4   do what we have to do at the time.

5            **THE COURT:**  All right.  Let's move along.

6   **BY MS. GUTIERREZ:**

7   Q    And so it would be accurate that your commanders tell

8   their deputies that they want no -- as little comp time

9   accumulated as possible, correct?

10  A    As long as they do not go above the 80 hours that we set

11  in a -- as a ceiling.  Now, there are some situations where

12  I've got detention officers that have up to 200 hours

13  accumulated.  But then the detention facility is such a

14  different animal from law enforcement that we don't have that

15  choice.  You know, I have to have -- by law, I have to have one

16  guard -- or one detention officer for every 48 inmates.  And

17  sometimes people call in sick, vacation, comp time, so some of

18  those guys have 200 hours.  In that case, I don't have a

19  choice.  But we do have weekly or biweekly meetings with the

20  command staff, and I bring them in one-by-one and say, "Look,

21  you've got so many people with 'X' number of hours above the

22  80, take care of it."

23  Q    Isn't it true that Joe Padilla tells his deputies that

24  they're to not acquire any comp time?

25  A    I have no idea what Joe Padilla tells his deputies as far

Trevino - Direct / By Ms.  Gutierrez                45

1    as comp time is concerned.  But that doesn't make any sense to

2    me.  The day -- you say that they -- Joe Padilla says that they

3    cannot accumulate comp time?

4    Q    Correct.

5    A    Well, no.  That's not possible.  I have no idea what he

6    said, but that wouldn't make any sense whatsoever.

7    Q    You're saying that that would be inconsistent with your

8    policy, correct?

9    A    Well, being consistent with the nature of our business.  I

10   just cannot see a commander telling a deputy, "You will not

11   accumulate comp time."  I mean, if you have to, you have to.

12   If you've got to do your job, you've got to do your job.  So

13   what you just said doesn't make any sense as far as our

14   business is concerned -- our law enforcement business.

15   Q    So if a deputy has testified that Joe Padilla tells them

16   that they could not have any comp time, then what they're

17   saying makes no sense to you, correct?

18   A    No, no.  You've got to understand, if he -- if Joe Padilla

19   tells a deputy, "You cannot accumulate anymore comp time," then

20   yes, I will say that is probably true, if we can show that that

21   deputy had already accumulated 80 hours and already reached

22   that ceiling.  Okay?

23   Q    And that's not what I'm asking you, Sheriff.

24   A    Okay.  Then I have no idea what you're asking, Ms.

25   Gutierrez.

Trevino - Direct / By Ms.  Gutierrez                46

1   Q    I'm stating that if a deputy has testified that Joe

2   Padilla tells them they can have no accumulated comp time, that

3   that would not make sense to you?

4   A    That's right.  Now they -- put in that context, you're

5   right.  That would not make sense to me.

6   Q    And it would go against your policy, correct?

7   A    Well, I don't know that I have a policy on that but, I

8   mean, we have to do what we have to do.  I guess -- it's not

9   written.  It's understood policy, verbal policy.

10  Q    But what you're saying is that you wouldn't fire someone

11  from a -- for accumulating 20 hours of comp time in a week if

12  they needed to do their job, correct?

13  A    Well, of course not.

14  Q    And so no one would get -- what you're testifying and

15  telling the jury is that no one would get in trouble for having

16  comp time, correct?

17  A    Well, right, correct.

18  Q    Okay.  So if -- don't you think you would know if Joe

19  Padilla was telling his deputies that they are to accumulate

20  zero comp time?

21  A    The only way I would know that would be if Joe came and

22  told me himself, which he did not, or one of the deputies -- or

23  one of his employees came and complained to me.  And I -- this

24  is the first time I ever heard of this, that actually Joe

25  Padilla or any of my commanders would say, "I want you at zero

1    hours." That just doesn't make sense.  The 80-hour rule is

2    understood by everybody.

3    Q    But you said it's unspoken, so how is it that it's

4    understood?

5    A    Because everybody knows that no -- that all commanders in

6    our staff meetings have been instructed by me that there is a

7    ceiling of 80 hours of accumulated comp time.  Now, if it -- if

8    you have to go above it for emerging (sic) purposes or because

9    you just have to be done, then you do it.  But we try to cap it

10   at 80.

11   Q    But you already testified that you don't know what your

12   commanders tell the deputies, so then there's no way that --

13   for you to say that everybody knows that the 80-hour rule is

14   what it is, correct?

15   A    You have to trust your command staff until you -- until it

16   has been proven that you cannot trust them.  And if I give a

17   directive to -- at one of our command staff meetings, and I

18   walk away from it, I feel very confident that my command staff

19   will then relay that directive to his captain, the captains to

20   the lieutenant, the lieutenant to the sergeant, the sergeant to

21   the lieutenants (sic) or detention officers.

22   Q    But you agree with me that you can't tell the jury that

23   everybody has been told based on your assumption that your

24   commanders will tell them, right?

25   A    I have to trust them, and I have to assume that they

1    carried out my directive.

2    Q    Isn't it true that Joe Padilla has the -- his deputies

3    generate comp time only when it's reelection campaign time for

4    you?

5    A    Ms.  Gutierrez, I have no idea what you're talking about.

6    I have never heard that there is, for example, a drive to

7    accumulate comp time so that we can use during election time.

8    I mean, that's -- certainly that's not anybody's policy.  And

9    if anybody is saying that then, you know, I guess they're going

10   to have to show it or prove it somehow.  But I have -- there is

11   no official drive or unofficial drive to accumulate comp time

12   to use during the campaign.  There's no such thing.

13   Q    Okay.  So you're saying that that's an impossibility,

14   correct?

15   A    No.  I didn't say that.  You said impossibility.  It's not

16   an impossibility.  It is within the realm of something that is

17   possible.  What I'm saying is I have never heard that

18   allegation or accusation, that commanders are forcing employees

19   to work extra so they can accumulate their 80 hours where they

20   can use during the campaign.  That is absolutely not true.  I

21   have no knowledge of that whatsoever.

22   Q    Okay.  The fact that you've never heard an accusation or

23   an allegation doesn't mean that it's not happening, correct?

24   A    Well, that's obvious, of course.  There's a lot of things

25   that have occurred and have happened that I've had absolutely

Trevino - Direct / By Ms.  Gutierrez                49

1   no knowledge of.  That's correct.

2   Q    Like what, sir?

3   A    There's a lot of things that can happen -- that have

4   happened, I would imagine.  I mean, if you want to ask me

5   specific questions, ask me.  But there's a lot of things that

6   can happen that I don't know about unless I am told or unless I

7   see it.

8   Q    Well, you just said that there's a lot of things that have

9   happened --

10  A    Well, I misspoke.

11  Q    Okay.

12  A    Anything can happen; and if nobody tells me about it and

13  if I don't see it, then I don't know it no more than you would,

14  for example.

15  Q    Well, Sheriff Trevino, you're aware that I subpoenaed Joe

16  Padilla to testify in this trial, right?

17  A    Yes, ma'am.

18  Q    Okay.  And you're also aware that he invoked his Fifth

19  Amendment right against self-incrimination, correct?

20  A    Yes, ma'am.

21  Q    And as the Sheriff, are you investigating that?

22  A    Investigating that he took the Fifth?

23  Q    Yes.

24  A    We have a policy --

25  Q    It's a yes or no question, Sheriff.  Are you investigating

Trevino - Direct / By Ms.  Gutierrez                    50

1   that?

2   A    Well, there -- we have a policy --

3                THE WITNESS:  You want it to be yes or no, judge?

4                THE COURT:  If you can answer yes or no.  Or --

5                THE WITNESS:  I can't.

6                THE COURT:  I mean --

7                THE WITNESS:  To be -- give justice to that answer, I

8   can't do that.

9                THE COURT:  Well, yes or no, and then you can

10  explain --

11               THE WITNESS:  Okay.

12               THE COURT:  -- your yes or no.

13               THE WITNESS:  No.  Can I explain, Judge?

14               THE COURT:  You may --

15               THE WITNESS:  All right.

16               THE COURT:  -- explain your --

17               THE WITNESS:  We have a policy that we will not

18  headhunt deputies or employees.  We don't headhunt anybody.

19  Now, if Joe Padilla is under investigation for something by the

20  Federal government, I would expect the Federal government to

21  give me some details, like they have in other cases, and say,

22  "Your employee is under investigation for this allegations."

23  Then that would be enough for me to open up an internal affairs

24  investigation and do whatever I have to do.  But up to this

25  point, nobody's told me that Joe Padilla is under criminal

1   investigation by the Federal government or by anybody else.

2   Now, you get me an FBI agent or a U. S. attorney say, "Joe

3   Padilla is under investigation for this allegations," that is

4   enough for me now to open up a criminal -- I mean a internal

5   affairs investigation and do whatever I have to do.

6   **BY MS. GUTIERREZ:**

7   Q    You didn't read his public filing that indicated that he

8   was invoking his Fifth Amendment right, which indicated that

9   they were seeking an indictment on him?

10  A    I did not read that, no.

11  Q    Okay.  And Mr. Padilla didn't tell you that?

12  A    No.

13  Q    Did you ask him?

14  A    No.  He --

15  Q    So you --

16  A    He told me that he took the Fifth.  I said, "Joe, that is

17  your constitutional right and nobody can take that away from

18  you."

19  Q    Okay.  But --

20  A    Did anybody -- you know, give me somebody that can give me

21  something that I can initiate an investigation and I will.

22  Q    Well, I understand that.  But --

23  A    Yeah.

24  Q    -- you could also tell Mr. Padilla what -- why is it that

25  you pled the Fifth?

1  A    And he -- all he's going to tell me is I pled the Fifth

2  because I didn't want to incriminate myself, and that would be

3  it.  Same thing he did here.

4  Q    Okay.  And you're not saying that that's what he said

5  because you didn't ask him, correct?

6  A    Right.

7  Q    Okay.  And so you knew that he pled the Fifth --

8  A    Right.

9  Q    -- however, you didn't bother to inquire about it, even

10  though he's in your commander (sic).

11  A    Ms.  Gutierrez, again, we don't headhunt.  Okay?  Now, the

12  only thing I could possibly do is go to the U. S. Attorney's

13  office or go to the FBI and ask them.  And I know what the

14  standard answer is going to be.  "We cannot reveal any open

15  investigation that we have."  Now, if they want to volunteer,

16  like they have in the past, like they have in other

17  investigations, that they have one of my employees under

18  investigation and this is what the allegations are, then I will

19  take action, but not until somebody is willing to put it in

20  writing or give me some sort of verbal confirmation.  I don't

21  need a written statement from the U. S. Attorney's Office or

22  from the FBI.  All I need for them to call and tell me is there

23  is this criminal allegations that we believe your commander

24  committed.  That's all I need to start an investigation.  And

25  that's what I'm waiting for.

Trevino - Direct / By Ms.  Gutierrez                53

1   Q    But, you're the Sheriff.  Don't you think it's important

2   for you to know if your commanders -- not just your employees,

3   but your commanders are in some way engaged in criminal

4   activity or even alleged to be engaged in criminal activity?

5   A    You're absolutely correct, and I --

6   Q    But you don't --

7   A    -- could not agree with you more.

8   Q    But you don't ask him.

9   A    But I did.  What I did say -- do this -- I got all --

10  everybody together, said, "If anybody in this room, if any of

11  you all have broken the law, have done anything that you should

12  not have done, any criminal allegation against you, I need to

13  know them and I need to know them now."  Now, obviously nobody

14  raised their hand and said, "Yes, I did so and so and so and

15  so."  Of course they're not.  But until somebody gives me

16  something -- it doesn't have to be in writing either.  Just a

17  phone call from an FBI agent or the U. S. Attorney's office and

18  say, "We have targeted Joe Padilla and we believe that this are

19  -- what he committed, these are the allegations," then I will

20  take action.  But we did talk about it.

21  Q    Well, what you're telling the jury is that you talked to

22  all of your employees at the same time is what you said.

23  A    Well, and I've done this all throughout.  And my

24  instructions are very clear to them, individually and as a

25  group.  If you violate the law, then you're not worthy of

Trevino - Direct / By Ms. Gutierrez                    54

1    working for us, and we will take action.  And I've told that to

2    everybody --

3    Q    But, Sheriff --

4    A    -- including Joe Padilla.

5    Q    But Sheriff, you didn't take Joe Padilla aside after

6    yesterday when he pled the Fifth and tell him -- and sit him

7    and down and say, "Okay, what is this about and what -- why is

8    it that you pled the Fifth?"

9    A    As a matter of fact I did.

10   Q    Oh, you did do that?

11   A    Yes.  I did do that.

12   Q    What --

13   A    He ran by the office for five minutes and he said,

14   "Sheriff, I have absolutely no idea what they're talking about.

15   I didn't do anything."  And I said, "Joe, if you broke the law,

16   then you could be dealt with.  You know what's going to happen

17   to you and you know how I'm going to react."  And his answer

18   was, "I know what you're going to do.  You're going to fire me,

19   investigate me, and arrest me."  I said, "That's exactly what

20   I'm going to do."  But to this point, nobody has given me any

21   evidence whatsoever that Joe Padilla has broken any laws.  Now,

22   if he is a target of a Federal investigation, that's all I need

23   is a phone call from them and say, "We can't give you all the

24   details, but this is what I can give you," and then we can take

25   action, but not until then.

1    Q    And so you're not aware that Joe Padilla has interviewed

2    with the Government on two occasions regarding criminal

3    activity?

4    A    Yes.  I am aware of it.

5    Q    Okay.  So then you are aware of the fact that there's some

6    sort of investigation going on here?

7    A    I -- that's obvious.  What I'm not aware of is the

8    details.  And I have no idea what he's being investigated for.

9    Q    Well, wouldn't the best person to ask be -- or to get that

10   information, those details probably be --

11   A    It'd be Joe Padilla.

12   Q    Exactly.

13   A    That's right.  And obviously he -- I already answered

14   that.  I've already answered that.  He said, "I have no idea

15   what they're talking about, Sheriff.  I haven't done -- I

16   haven't broken any laws.  I haven't done anything."  I said,

17   "Fine."

18   Q    Well, but isn't it accurate that if he's met with the

19   Government on two occasions, he would have some information

20   about what it is they're alleging that he may have committed?

21   A    I think he was instructed by the U. S. Attorney's office

22   not to discuss anything that he was interviewed on.

23   Q    But you're the Sheriff.  Certainly he can discuss --

24   A    Believe me.  The Sheriff --

25   Q    -- it with you.

1  A     -- does not trump U. S. Attorney's Office.  If the U. S.

2  Attorney tells one of my employees, "You will not discuss what

3  we are talking about with anybody," that means nobody.

4  Q    But you just testified that the U. S. Attorney's Office

5  cooperates with you when there is one of your employees who's

6  being investigated.  Didn't you just testify to that?

7  A    In some cases they have, that's right.

8  Q    Okay.  So couldn't you inquire whether you have permission

9  to find out this information from the Government?

10  A    This just happened yesterday and I have not had a chance

11  to call the U. S. Attorney's Office.  But then the FBI and the

12  U. S. Attorney's Office have had a lot of opportunities to be

13  able to call me and say, "We have your commander under

14  investigation and these are the allegations."

15  Q    But you had time yesterday to get on the radio and do an

16  interview, right?

17  A    That's right.

18  Q    So you could have called the Government if you were

19  interested enough, right?

20  A    That's not true.  I mean, I am interested.

21  Q    But you didn't call (indiscernible)

22  A    But I didn't do it.

23  Q    Okay.  And so at this time, Joe Padilla is still employed

24  with the sheriff's county -- with the Hidalgo County Sheriff's

25  Office?

1   A    That's right.  He is.

2   Q    Okay.  And he will remain employed with the Hidalgo County

3   Sheriff's Office until if and when the Government decides to

4   inform you of something?

5   A    If and when.

6   Q    And the fact that I'm informing you now about this -- the

7   fact that Padilla has interviewed with the Government, that

8   he's pled the Fifth, that to you is not enough to do something

9   more about the fact that you may have an employee, a commander,

10  working for you?

11  A    Ms.  Gutierrez, you're not telling me anything I didn't

12  know this morning.  Okay?  And certainly, you're a defense

13  attorney.  You don't work for the U. S. Attorney's Office.  If

14  the U. S. Attorney's Office wants to call me this afternoon or

15  tomorrow morning, or whenever they please, if they want to do

16  it, or the FBI wants to call and say they are doing it, then

17  that's fine.  And I will take their -- whatever they've got to

18  give me and then I can proceed from there.  And I cannot compel

19  Joe Padilla to tell me anything that he doesn't want to tell

20  me.  I can't compel anybody, no more than anybody else can.

21  Obviously he took the Fifth.

22  Q    But you're aware that the U. S. Government has stated

23  their intent to seek an indictment against him, aren't you?

24  A    No.  I was not aware of that.

25  Q    So Padilla didn't tell you that --

1   A    No.

2   Q    -- even though he put it in a document that he filed

3   publically.

4   A    I have not seen it.  I have no idea what document you're

5   talking about.

6   Q    Well, I'm not asking you if you have an idea about a

7   document.  I'm saying he has not told you that, correct?

8   A    No, he has not.

9   Q    And you're saying that as Sheriff, you are not aware of

10  this either?

11  A    No.  Absolutely not.

12  Q    Do you know a Charlie -- an investigator, Charlie Vela, at

13  the D. A.'s office?

14  A    Yes, I do.

15  Q    And you're also aware that I also subpoenaed him to

16  testify in this case, and he also pled the Fifth, correct?

17  A    Yes, I do.

18  Q    And you're aware that Charlie Vela was terminated from his

19  employment after pleading the Fifth, aren't you?

20  A    Yes, I am.

21  Q    And so, however, you do not choose to take -- to follow in

22  Rene Guerra's footsteps and take care of the matter in that

23  way.  Correct?

24  A    There's a big difference in the two situations.  The way I

25  understand it, Charlie Vela was accused of several crimes --

1  openly, several crimes -- that he participated in drug

2  conspiracies by several witnesses.  Rene Guerra doesn't have a

3  choice.  He has to fire him, because it was in open court those

4  allegations were made and he took the Fifth.  Now, as far as I

5  know -- and I have not really read all the twists and stayed on

6  top of this trial -- but as far as I know, I don't know that

7  anybody has alleged that Joe Padilla committed any felonies.

8  As a matter of fact, I understand that the State's two

9  witnesses both said that Joe Padilla had absolutely no

10  knowledge whatsoever of what J.P. Flores was doing, he had no

11  knowledge what allegedly Jorge Garza was doing, and that he

12  never took any money whatsoever from the main drug dealer,

13  Deguerras (sic).  That's what I heard as far as -- I mean, he

14  got absolved as far as I know.  Now, if the Government knows

15  something else, or if you know something else and you're

16  willing to share it with me, then do so and I will conduct an

17  investigation and do the proper thing.  That's the difference

18  between Charlie Vela's situation and Rene's and my situation

19  with Joe.

20  Q    What -- where did you find out this information about the

21  testimony that you just recited?

22  A    Regarding Charlie Vela?

23  Q    No.  Regarding the testimony that you're saying absolved

24  Padilla.

25  A    I believe I read it in the paper, I think.  You know, or

Trevino - Direct / By Ms.  Gutierrez          60

1   it was tweeted or something like -- somebody told me.  Somebody

2   called to tell me.

3   Q    So either somebody told you or you read it in the paper --

4   A    Yeah.

5   Q    -- or in tweets?

6   A    Yeah.  I think somebody called to tell me that, yeah.

7   Q    So then you are keeping up with the evidence that's coming

8   out of this trial, correct?

9   A    Well, I'm not completely oblivious to it, but it's not --

10  this is not the focus of my life.  I mean, I have a very large

11  organization to run.  This is very important to me, but --

12  Q    Well, yes, Sheriff, but --

13  A    -- it's not my -- it's not the center of my focus right

14  now, you know.

15  Q    But Sheriff, it sounds like you don't know anything about

16  what's going on in your -- in the Sheriff's Office based on

17  what you're telling me.  I'm asking you questions about

18  different things that are going on and you say, "I don't know.

19  I don't know.  I leave that to my commanders.  I leave that to

20  the people I delegate it to."

21  A    That's because, Ms.  Gutierrez, you've never worked in an

22  800 -- almost 800-person organization.  You know, there's a lot

23  of delegation, there's a lot of things that occur that I don't

24  know about.  You know, I mean, that's -- I don't know if you've

25  worked in an organization that large before but, you know, the

1    guy at the top really only knows what he sees and what he's

2    told.

3    Q    And so nobody told you that Guerra, Senior, the drug

4    dealer, donated anywhere about between around $10,000 for -- to

5    purchase a boat for you?

6    A    You know, that -- when I heard that, I thought it was

7    absurd.  I -- that is the first time I ever heard of it.

8    Q    Well, but did you hear that the testimony was that it made

9    its way to Padilla, and that was J.P.'s testimony?

10   A    You know, I'm not sure about that.  I don't know that I

11   was told that it made its way to Padilla.  That I do not know.

12   Nobody told me that.  I heard -- what interested me was this

13   boat thing, which is a complete lie as far as I was concerned.

14   That never occurred, to my knowledge.  Obviously, I was not

15   involved in that.

16   Q    No one told you that the testimony that came from J.P.

17   Flores was that Joe Padilla asked J.P. Flores to ask Guerra,

18   Senior for a donation because you wanted a new boat?

19   A    I'm not really sure if I was told that way.  I'm not sure.

20   I don't remember.  I do remember the boat thing, but -- because

21   it -- that's what interested me.  I said, "Where'd that come

22   from?  That was a complete lie."  If anybody did that, they

23   were using my name to solicit funds and then keeping them.

24   Now, whether J.P. got the money and gave it to Padilla and

25   that's what J.P. has testified to then, then I guess you're

Trevino - Direct / By Ms.  Gutierrez                    62

1   going to have to believe J.P.  I have no idea.

2   Q    Well, right.  But we're talking about Padilla right now.

3   So --

4   A    Okay.

5   Q    -- isn't -- doesn't it interest you the fact that the

6   testimony that came out is that Padilla received or asked for -

7   - solicited money from a drug dealer on your behalf?

8   A    Well, of course it interests me, yeah.

9   Q    And doesn't it interest you that Padilla received money

10  from a drug dealer on your behalf?

11  A    Well, I don't know that he did.

12  Q    But you haven't asked about it either.

13  A    Who could I ask but Padilla, and --

14  Q    Exactly.

15  A    -- I have not seen him, you know.

16  Q    Well, you said that you spoke to him since yesterday.

17  A    Well, yes.  But the boat situation, I don't believe, came

18  up, because it was a nonissue because I know it never happened.

19  Q    Well, you may know that it didn't happen on your end --

20  A    Yeah.

21  Q    -- but that doesn't mean you know it didn't happen on

22  Padilla's end.  But you didn't ask him, correct?

23  A    That's correct.

24  Q    Do you own a boat, Mr.  Trevino?

25  A    Yes, I do.

Trevino - Direct / By Ms.  Gutierrez                 63

1    Q    Okay.  How many boats do you own?

2    A    Just one.

3    Q    And what kind of boat do you own?

4    A    Oh, God, it's a --

5         THE COURT:  Just generally.

6         THE WITNESS:  Twenty-one --

7         THE COURT:  Generally, just generally.

8         THE WITNESS:  It's a fishing boat.

9         THE COURT:  A fishing boat.

10   BY MS. GUTIERREZ:

11   Q    And when did you purchase that boat?

12   A    About a year and a half ago, I believe.

13   Q    How much did it cost you?

14   A    Let me see, the boat itself was 15 and the engine was 11.

15   I think I paid like 26 total.

16        THE COURT:  And a trailer?

17        THE WITNESS:  And -- including the trailer, yeah.

18   BY MS. GUTIERREZ:

19   Q    Twenty-six total?

20   A    Yeah.  I believe it was 26.

21   Q    And where did you purchase it from?

22   A    The boat was purchased -- boat and trailer were purchased

23   from Triple J Boat Sales in Elsa, and the motor was purchased

24   at Dargel there in Donna.

25   Q    And who made the purchase?  Was that you personally?

Trevino - Direct / By Ms.  Gutierrez                64

1   A    Oh, yeah, absolutely, yeah.

2   Q    How did you pay for that?

3   A    I paid him with a check.

4   Q    Was that a personal check?

5   A    My personal check, yeah.

6   Q    Is that the only boat you've owned?

7   A    No.  I owned one before that that I've had for about nine

8   years, and I sold that boat while I was trying to get this one

9   -- while I was trying to buy this one.

10  Q    Did anybody tell you that there was testimony that came

11  from J.P. Flores that Padilla was selling law enforcement-

12  sensitive information to the drug dealer, Guerra, Senior?

13  A    I think I read that in the paper.

14  Q    But you didn't ask Padilla about that either, did you?

15  A    Yes.  I did.

16  Q    Okay.  And that was not enough for you to begin an

17  investigation?

18  A    He denied and he said, "That's absolutely not true.  I

19  never had anything to do with those people."  I guess --

20  Q    So he -- I'm sorry.  Go ahead.

21       THE COURT:  So did you find it odd that Mr.  Padilla

22  would discuss this with you but refuse to discuss it in court,

23  instead invoking his Fifth Amendment?

24       THE WITNESS:  I guess it would be considered odd,

25  yes.  But it was a general question.  I said, "Joe, what did

Trevino - Direct / By Ms. Gutierrez                 65

1   you do?  Is this true what has been alleged against you?"  And

2   he said, "No.  It is not true."

3            THE COURT:  I mean, you would agree that one of the

4   cornerstones of a civilized society is a honest police force?

5            THE WITNESS:  Absolutely.

6            THE COURT:  I mean, that is a cornerstone.

7            THE WITNESS:  That's right.

8            THE COURT:  Are you not concerned that Mr. Padilla

9   who, when confronted with the prospect of having to answer

10  questions about what he did as an officer, decided to instead

11  invoke his right to remain silent because his answers might

12  tend to incriminate him?

13           THE WITNESS:  Yes, sir.  I -- absolutely.  There's no

14  doubt that I'm concerned about that.  But my problem here is, I

15  mean, how can I argue with his -- with him invoking his

16  constitutional rights?  See, that's the problem I have.  And to

17  take disciplinary action against him for taking the Fifth would

18  be taking disciplinary action against him for invoking his

19  constitutional rights.  And I can't see that.  Now, if we had -

20  - if I had something to work with, then that'd be -- this would

21  be a complete different story.

22  BY MS. GUTIERREZ:

23  Q    It sounds to me like what you're saying is that unless

24  Padilla is arrested by other law enforcement, you're not going

25  to do anything.

1   A    No.  That's not true.  I didn't say that.  All I have to

2   have is some sort of call from the FBI, U. S. Attorney's

3   Office, and say, "This man is under criminal investigation for

4   this type of allegations."  Then we will call him in.  And at

5   that point, he will be compelled to answer our questions; and,

6   if he doesn't, then that's called insubordination, and he will

7   be fired.

8   Q    Well, don't you think that Padilla, having been

9   interviewed by the Government at least twice --

10  A    Right.

11  Q    -- makes -- it implies that he is a target of the

12  investigation?

13  A    And you're right.  You're absolutely right about that.

14  And I asked him, and he said, "I was -- I'm not allowed to

15  speak about what I was interviewed about."

16  Q    Well, right.  But right now you said unless the FBI or

17  someone came to --

18  A    Right.

19  Q    -- me and told me he was a target of the investigation,

20  then at that point I would compel him to answer my questions.

21  A    Right.

22  Q    So, you're saying yes, that is enough, you already know

23  that he was interviewed twice, and yes, that implies that he's

24  a target of the investigation, however, you didn't compel him

25  to answer your questions.  You just asked him and you said,

1   "Okay."

2   A    I can't, Ms.  Gutierrez, because the U. S. Attorney's

3   Office told him, "You will not discuss it."  And how -- what am

4   I going to do?  Go against the U. S. Attorney's Office and say,

5   "Because the U. S. Attorney told you not to discuss the

6   contents of our (sic) interview, I'm going to fire you?"

7   Q    So then why bother telling me that you would have --

8   compel him to answer the question?

9   A    Because if the U. S. Attorney or the FBI called to tell me

10   these are the criminal allegations against him, then I would

11   have something to work with.

12   Q    So are -- the distinction is that you don't know the

13   details?  That's the only distinction.  So if the FBI would

14   come and tell you the details, at that point you would compel

15   him to answer questions?

16   A    I would -- exactly, because they've revealed their case,

17   some of it -- I don't need details.  I just need the general

18   allegations that they have so I can call him in and say,

19   "You're under investigation, these are the allegations.  Now,

20   I'm compelling you to tell us the truth."  And if he refuses,

21   then that's insubordination and he will be terminated.  But

22   then he's going to refuse because that record's going to be

23   open to whoever wants it because of the Open Record Act.  I

24   would have to release that.  So he's going to refuse.

25   Q    So no matter what, Padilla -- you're not -- you're -- you

1  believe that Padilla's in a position where he never ever has to

2  -- he doesn't at this point have to reveal any information to

3  you?

4  A    Not unless I compel him if I have evidence that he has

5  broken the law.  Look, I'm in a very difficult position with my

6  employees in that particular situation, you know -- very

7  difficult situation for me.  And my concern is that I certainly

8  don't want to violate his civil rights by firing him because he

9  invoked his constitutional right to the Fifth Amendment.  I

10  can't do that.  I mean, I've got enough lawsuits already.  I

11  can't do that.  All right.  Now, if the Government gave me a

12  call and said, "Look, I've got this -- we've got into this

13  thing, these are the allegations, these are what we intend to

14  indict him on" -- it doesn't even have to be that much detail -

15  - then yes, we will take action.  But it puts me in a very

16  difficult situation because he has not been charged with

17  anything, and there's been no open allegations made against

18  him, and he took the Fifth.  And for me to take action against

19  him for invoke (sic) his constitutional rights, I think that

20  would put us in a very sticky situation.

21  Q    Well -- and I understand that --

22  A    Okay.

23  Q    -- Sheriff, but what I'm having a problem with is the fact

24  that you are the head of a law enforcement agency where you,

25  yourself, can charge somebody with a criminal action.

Trevino - Direct / By Ms.  Gutierrez          69

1  A    Right.

2  Q    You can charge someone with wrongdoing, committing crimes,

3  doing something illegal.

4  A    Right.

5  Q    Okay.  And it sounds to me like in this case -- and I'm

6  not sure if it's because it's Padilla, but in this case you're

7  throwing that burden, or that responsibility, to the U. S.

8  Attorney's Office when that's something that you, too, can do.

9  There's no rule that you can't have an investigation ongoing at

10  the same time that the U. S. Attorney's Office has an

11  investigation, correct?

12  A    You're absolutely right.  You are.  You're absolutely

13  right.  But the question remains, what am I investigating him

14  for?  For taking the Fifth Amendment?

15  Q    No.  For hear -- for the things that are coming out, under

16  oath, by individuals that are saying that Padilla has committed

17  illegal acts.

18  A    Are those people willing to go to my office and sign an

19  affidavit and a complaint for me to take action?  And that's

20  what it takes.

21  Q    So you're not --

22  A    That's exactly what it takes.

23  Q    But if I were to call the Sheriff's Office because there

24  was a burglary in my house, you're not going to need an

25  affidavit before you start an investigation.

1   A     No, of course not.

2   Q     Okay.  So --

3   A     That's -- you're comparing apples to oranges.  But I will

4   tell you something else, and I think we need to understand

5   this.

6   Q     Well, hold on --

7   A     That this --

8   Q     Hold on.

9   A     -- trial is not over yet.

10           **THE COURT:**  Hold on.  Let -- Ms.  Gutierrez gets to

11   ask the questions.

12   **BY MS. GUTIERREZ:**

13   Q     Hold on.  Let's just clarify this issue, because I don't

14   believe I'm comparing apples to oranges.  I believe it's

15   exactly -- we're talking about the same -- exact same issue.

16   Okay?  Your office can conduct an investigation at the same

17   time that the U. S. Attorney's Office is conducting an

18   investigation of Padilla, but you refuse to; isn't that true?

19   A     No.  It's not true.

20   Q     But you're not doing it.

21   A     This is why I'm not doing it, because this trial is not

22   over with yet.  Once this trial is over with -- is over and all

23   the witnesses has (sic) come forth and given whatever they've

24   got to give, then I can call the U. S. Attorney's Office and

25   say, "Okay.  The trial is over with, it's dealt with, everybody

Trevino - Direct / By Ms.  Gutierrez                    71

1   testified.  What can you give me to work with?"

2   Q    But you --

3   A    But not until then.  And, yeah, remember, you know, we've

4   had several witnesses, people that you've testified (sic) -- I

5   mean that you've subpoenaed, that have absolved him of any

6   criminal acts.  So --

7            THE COURT:  Who are you referring to?

8            THE WITNESS:  I mean a -- I'm sorry?

9            THE COURT:  Who are you referring to --

10            THE WITNESS:  I believe --

11            THE COURT:  -- that absolved him of --

12            THE WITNESS:  I believe J.P. Flores said that he had

13   never met the Guerras, never took money from the Guerras, and

14   that he -- and that Padilla had absolutely no knowledge of

15   J.P.'s actions.

16            THE COURT:  Would it surprise you that that is the

17   opposite of what he said?

18            THE WITNESS:  Yes.  It would surprise me.  Because,

19   see -- and that's -- I don't know all the facts.  And until

20   everything is over with, when this trial is over with, and

21   everybody has testified, and I can get a complete record and I

22   can talk to the AUSA's office, then we'll do something.  But I

23   can't now.  I am not going to jump the gun and take action

24   against him because he took the Fifth Amendment, his own

25   constitutional rights, until it is done -- over with, and I can

1   have a clear picture of exactly what was said.  And like the

2   Judge said, I was confused about that testimony.  See, I have

3   not attended this trial.  I'm not really -- it has an interest

4   to me, but I'm not keeping up with it.  You know, Jorge Garza

5   is no longer my employee.  Okay?  He is no longer my employee,

6   so he's really not an interest to me anymore.  The Government

7   did their job and then -- that's great.  But when this is all

8   over with, when this trial terminates, then I will have a clear

9   picture of what is -- of what has transpired, what all the

10  testimony is.  Then we can -- then I can do something, but not

11  until then.  I am not going to be impulsive and I'm not going

12  to jump the gun and I'm not going to violate his rights for

13  invoking his Fifth Amendment.

14  **BY MS. GUTIERREZ:**

15  Q    You're actually protecting him, aren't you?

16  A    That's absurd, Ms.  Gutierrez.

17          **THE COURT:**  That's argumentative.

18          **THE WITNESS:**  I cannot believe you said that.

19          **THE COURT:**  That's argumentative.  Next question.

20          **THE WITNESS:**  I cannot believe you said that.

21  **BY MS. GUTIERREZ:**

22  Q    Well, you have information at this time -- I mean, you

23  don't have to wait until the resolution of this trial in order

24  for you to take action; isn't that correct?

25  A    Yes.  I do because I want a clear picture of what has

Trevino - Direct / By Ms. Gutierrez                    73

1   happened.

2   Q    I'm not asking what you want.  I'm asking, you don't have

3   to.  You don't have to --

4   A    I could be impulsive, I could be -- I could react to what

5   has happened and maybe commit a very great error.  But if --

6   Q    Or maybe --

7   A    But maybe -- but obviously you don't know the way I

8   operate, you know.

9   Q    But you could start an investigation and weed out a rotten

10  apple, too, right?  That's a possibility.

11  A    If he is a rotten apple, and he's been there this long, I

12  don't think a couple of more days are going to make any

13  difference.  Okay?  Once this is over with, then I will be able

14  to take action.

15  Q    And it seems like you keep stating that you're not going

16  to start an investigation on him simply because he invoked his

17  Fifth Amendment right, right?  That's what you're saying?

18  A    Right.

19  Q    Okay.  And what I want you to understand is that I'm not

20  telling -- I'm not saying or suggesting that you investigate

21  him simply because he invoked his Fifth Amendment right, but

22  because there is testimony that implicates him in wrongdoing,

23  and that's the testimony that you say you lack.

24  A    That's right, exactly.  And once it is dealt with and I

25  get a clear picture of what has transpired, then I am -- then

Trevino - Direct / By Ms.  Gutierrez                74

1   I'm able to make that phone call and then I am able to do

2   something about it, but not until then.

3   Q    It's improper for your -- any of your employees to sell

4   law enforcement-sensitive data to drug dealers, correct?

5   A    Absolutely.

6   Q    And you, yourself, have never sold law enforcement-

7   sensitive data to drug dealers, have you?

8   A    Of course not.

9   Q    And you knew that Guerra -- you knew the Guerras, didn't

10  you?

11  A    No.  I did not know who the Guerras were -- I didn't even

12  know -- I knew -- I did not know who the Guerras were until

13  12/12 of '12, when the Panama Unit was busted out and all the

14  leaks started -- people started talking about it.  Then that's

15  when -- that's the first time I knew who they were.

16  Q    But isn't it true that you know who donates to your

17  campaign?  You testified earlier --

18  A    Yes.

19  Q    -- that you do.

20  A    I do.  And what you're alluding to, Ms.  Gutierrez, is --

21  Q    No.  But let me ask the question --

22  A    Go ahead.

23  Q    -- without you having to do that.  The Guerras contributed

24  substantially to your campaign, correct?

25  A    Not substantially.

Trevino - Direct / By Ms.  Gutierrez                75

1    Q    But they -- okay.  They contributed to your campaign.

2    A    Yes, they did.

3    Q    And they contributed to your campaign in quantities that

4    were in excess of $10,000, correct?

5    A    That's not true, not to my knowledge.

6    Q    And you would know, correct?

7    A    I would know because I fill out a campaign report.  And

8    the only check -- the only money that I know that we got from

9    the Guerras was a $1,000 check, and it wasn't from -- with a

10   Guerra name on it.  It was Astro Trucking, and I had absolutely

11   no idea who Astro Trucking was.

12   Q    So you're not suggesting to the jury that the only

13   campaign contributions you received are in the form of a check,

14   correct?

15   A    No, of course not.

16   Q    Okay.  So you received cash, too.

17   A    That's right.  I -- we have received cash over the years.

18   That's right.

19   Q    And you have received cash from the Guerras for your

20   campaign, correct?

21   A    No.  That's not correct.  I have -- I don't believe I've

22   ever received any cash from the Guerras.

23   Q    And so you're telling the jury that you are aware of where

24   every single dollar that comes into your campaign comes from?

25   A    No.

EXCEPTIONAL REPORTING SERVICES, INC

1   Q    Okay.  So then it's possible that you have received cash

2   campaign contributions for your campaign from the Guerras,

3   correct?

4   A    If somebody lied to me, it is -- yes, it is possible.  I

5   mean, you can donate to my campaign, you give it to Jorge, and

6   Jorge give it to me and Jorge says, "I'm giving you this

7   money."  I would never know that it came from you.  I would

8   never know that.

9   Q    So you just take money from people without asking where it

10  came from?

11  A    I would ask him, "Jorge, where'd it come from?" and if

12  Jorge wanted to take credit for it, he would say, "No, it's

13  coming from Jorge."  Now, if he wants to give you the credit

14  for it, for -- and put your name on the report, he would say,

15  "It's coming from Ms.  Gutierrez."

16  Q    But --

17  A    Nobody ever told me that the Guerras contributed cash to

18  our campaign.

19  Q    But aren't there rules that indicate that after a certain

20  amount of money, that you have to report that?

21  A    Yes.

22  Q    Okay.  So then it would mean that you would have to be on

23  top of that so that you can fill out the proper paperwork,

24  correct?

25  A    That's right.  And I depend on the person that's bringing

1    me the money to tell me where that money came from.

2            THE COURT:  Can you even accept more than a hundred

3    dollars in cash from a single contributor?

4            THE WITNESS:  Pardon?

5            THE COURT:  Isn't there a hundred dollar limit in

6    cash that you can receive?

7            THE WITNESS:  There is no limit.

8            THE COURT:  No limit.  And --

9            THE WITNESS:  It's -- was --

10           THE COURT:  -- is there a limit on -- or prohibition

11   against receiving campaign contributions from a corporation

12   rather than an individual?

13           THE WITNESS:  From a corporation, yes.

14           THE COURT:  So Astro Trucking, how is it that a --

15           THE WITNESS:  It's a company.  It's not incorporated.

16   It -- on the check, it says -- I believe it said, "Astro

17   Trucking Company."  It's not an incorporation -- it's not

18   incorporated.

19           THE COURT:  So you don't have to book that under an

20   individual's name?

21           THE WITNESS:  No.  Whoever the check comes from is

22   how we book them on the sheet.

23   BY MS. GUTIERREZ:

24   Q    So then you know all the loopholes, right?

25   A    What -- no.

Trevino - Direct / By Ms. Gutierrez                78

1              **THE COURT:**  That's argumentative.

2              **MS. GUTIERREZ:**  Well --

3              **THE WITNESS:**  What are you talking about?

4              **THE COURT:**  Rules, campaign finance rules.

5    **MS. GUTIERREZ:**

6    Q    You know all the campaign finance rules?

7    A    Not by heart I don't.  I know the ones that I need to

8    know.

9    Q    Which are?

10   A    If somebody gives me money, I must report it.

11   Q    What amounts?

12   A    Any amount.

13   Q    So you report every single dollar that's contributed to

14   you?

15   A    I -- everything that is given to me is reported.

16   Q    So then if someone contributes to you $5, you report that?

17   A    I don't think anybody's ever given me $5, but if they did,

18   I guess I'd be obligated to do so.  The rule -- I believe the

19   rule is anything above $50 in cash must be reported under an

20   individual's name.  I think that's what it is.  Unless -- and

21   it's almost impossible -- and any candidate will tell you this

22   -- because if they're selling, let's say, barbecue tickets to -

23   - for -- to raise funds, and somebody buys $200 worth of them,

24   nobody's going to write their name down.  It's just not done.

25   I mean, that's a practice that is not done.  Any candidate will

1    tell you that.  As long as you report that you received $200

2    and it was given to you by a certain individual.

3    Q    So when you say, "I don't think anyone's ever donated $5

4    to me," what is the least amount of a donation that you've

5    received?

6    A    I have no idea.  I would have -- maybe 50, maybe $25.  I

7    don't remember.  I don't recall the numbers.

8    Q    Isn't it true that you utilized the Guerras in order to

9    obtain products like food and drinks for some of your

10   fundraisers?

11   A    No, that's not true.  I have no knowledge of that

12   whatsoever, none.

13   Q    Isn't it possible that some of your commanders may have

14   utilized the Guerras, Seniors (sic) for those purposes?

15   A    It is possible that some of my employees could have used

16   the Guerras for that.  Yes, that is possible.

17   Q    And do you think it's okay for the Sheriff to be accepting

18   money from drug dealers for these fundraisers?

19   A    Of course not, of course not.  And there's been times

20   where I have turned money back.  Now, with the Guerras, again,

21   I had no idea who the Guerras were until this whole thing came

22   out.  I -- they were never on our radar.  We never -- I don't

23   think we ever investigated them for anything.  I had no idea

24   who they were.  All I knew is that I got a -- I believe it was

25   J.P. Flores -- I'm not sure who it was -- that brought us the

Trevino - Direct / By Ms.  Gutierrez                    80

1   check for a thousand dollars from Astro Trucking Company, and

2   we recorded it, deposited it, and went through the system.

3   Now, I had no idea at all who the Guerras were.  And I do not

4   accept any contributions from any drug dealers, nor am I in

5   collusion with any drug dealers.  That'd be absurd.  I don't do

6   that.

7           THE COURT:  Why don't we take our mid-afternoon

8   recess.  We've been going an hour and a half now.  All right.

9   This will be about a 15 minute recess for the jury.  All right.

10  We'll get started in 15 minutes.

11          THE CLERK:  All rise.

12      (Jurors exit at 2:53 p.m.)

13      (A recess was taken from 2:54 p.m. to 3:13 p.m.)

14      (Jurors enter at 3:13 p.m.)

15          THE COURT:  Good afternoon.  Again, please be seated.

16  All right.  You may resume.

17              DIRECT EXAMINATION (CONTINUED)

18  BY MS. GUTIERREZ:

19  Q    Sheriff, were you aware that Padilla would send deputies

20  on county time to go have his shoes shined?

21  A    Absolutely not.  I have not -- that's the first time I

22  hear about that.

23  Q    Were you aware that Padilla would send the deputies on

24  county time to go pay his personal taxes?

25  A    Absolutely not.  It's the first time I hear about that.

Trevino - Direct / By Ms.  Gutierrez                81

1    Q    Isn't it true that J.P. Flores would drive you to the

2    airport whenever you were flying out of town?

3    A    I had J.P. Flores drive me to the airport on company time

4    when I was going on company business so I would not have to

5    leave my vehicle and park and pay the airport parking fees here

6    at the McAllen airport.  And he would pick me up at the

7    airport.  That's right.  J.P. and Jerry Del Angel both did

8    that.

9    Q    What were J.P. Flores's duties in Crime Stoppers?

10   A    He was the coordinator.  And by that, he actually ran the

11   entire program.

12   Q    But he wasn't in charge of the Crime Stoppers program, was

13   he?

14   A    Well, he was in charge of the program itself, but it came

15   under the purview of Commander Padilla.

16   Q    So he was the head of the deputies in that department?

17   A    Who?

18   Q    J.P. Flores.

19   A    J.P. Flores was of equal rank to Jerry Del Angel.  And at

20   one time, I believe Fabian Rodriguez was also assigned to -- I

21   believe he was assigned to Crime Stoppers for a time.  He

22   didn't have any supervisory capabilities over them because he

23   wasn't -- he didn't have rank over them.  But he coordinated

24   the program.

25   Q    J.P. Flores would give directions and instructions to

Trevino - Direct / By Ms. Gutierrez                82

1  sergeants and lieutenants on behalf of Joe Padilla; isn't that

2  correct?

3  A    I am not aware of that, no.  And I cannot see a deputy

4  giving instructions, orders to command staff members.  No.  I

5  don't see that.

6  Q    But if a -- if some -- if a sergeant or lieutenant

7  received an order from a deputy that was coming from Padilla,

8  they would probably do it, correct?

9  A    Probably, yes.  But that wouldn't -- that's not the

10  natural order.  I mean, deputies don't carry orders for

11  commanders.  I mean, commanders make -- you know, give their

12  own orders.  So I don't -- I guess it's possible, but I just

13  don't see it happening.

14  Q    Okay.  So you're telling the jury that if that was

15  happening, it was happening without your knowledge, correct?

16  A    Well, absolutely, because a deputy has no rank or any

17  supervisory authority over anybody above him, period.

18  Q    Okay.  And just so we're clear, you're telling the jury

19  that if J.P. Flores, who was a deputy, was giving directions

20  and instructions to lieutenants and sergeants on behalf of Joe

21  Padilla, that would be happening without your knowledge,

22  correct?

23  A    Absolutely, yeah.

24  Q    And you would find that out of the chain of command,

25  correct?

Trevino - Direct / By Ms. Gutierrez          83

1   A    I guess it would depend on the circumstances, Ms.

2   Gutierrez.  If it was an emergency-type thing, I mean, I can

3   see it happening, where something had to be taken care of

4   immediately and Padilla could not give the order himself.  I

5   could -- I can see that happening in the workplace.  But it's -

6   - it'd be unusual.

7   Q    Okay.  But in the daily course of business, you would find

8   that out of the ordinary?

9   A    Yes, absolutely.

10  Q    And you probably don't believe that it happened, correct?

11  A    Well, no.  I'm not saying that, because it -- under

12  emergency-type situations, it could happen.

13  Q    Well, right.  I'm talking about in daily -- normal daily

14  (indiscernible).

15  A    Right, exactly, yeah.  It's hard to believe.  Now, did it

16  happen?  Well, maybe it did.  I don't know.  I have no

17  knowledge of it.  But it would be hard to believe that it did,

18  that J.P. would be issuing orders to sergeants and lieutenants.

19  I mean, that doesn't make any sense.

20  Q    Okay.  And so continuing with what J.P. Flores's duties

21  were, can you --

22  A    Well, he coordinated the program.  By that I mean he

23  attended the Crime Stoppers board meetings.  He was my

24  representative there.  I might have gone to maybe one or two.

25  He coordinated anonymous tips coming in and he coordinated the

Trevino - Direct / By Ms. Gutierrez                84

1    -- I guess the scheduling of how those -- of the meetings.  And

2    I think he also made the presentations to that -- to the county

3    board on payments or information.  He did everything that it

4    took to run the Crime Stoppers Unit, between him and Jerry Del

5    Angel and I believe Fabian was there one time.  But he was

6    primarily responsible for it.  He had the most experience in

7    that field.  When I took over in 2005, he was already there.

8    And it's such an area where you have to have this expertise and

9    know the rules and regulations that it would have made no sense

10   to change him.  He was doing a good job as far as I knew.

11   Q    Well, knowing now what you know, that turned out to be a

12   bad decision, huh?

13   A    Keeping him there?

14   Q    Yes.

15   A    Unless I knew that he was doing something wrong --

16   Q    No.  I'm saying --

17   A    -- and I had no knowledge.

18   Q    No.  I'm saying now, knowing now what you know, which is

19   that he has pled guilty to conspiracy to possess with intent to

20   distribute marijuana, cocaine, and methamphetamine, now,

21   looking back, that was a bad decision, correct?

22   A    Yeah.  Monday morning quarterbacking, absolutely.

23   Q    And speaking about mornings, you -- J.P. Flores was one of

24   the individuals that you would brief with every morning,

25   correct?

Trevino - Direct / By Ms.  Gutierrez                85

1   A    No.  That's not true.

2   Q    Did you never brief?

3   A    No.

4   Q    Never?

5   A    Not with J.P. Flores, no.  Not on Crime Stoppers stuff.

6   Q    How about anything else?

7   A    No.  J.P. Flores I think had never -- hardly ever came to

8   my office.  I don't think -- he had nothing to brief me on.  He

9   was -- the commanders and the captains are the ones that I hold

10  briefings with every morning.  They're the ones in charge of

11  the bureaus and the divisions.  Very rarely would I speak to a

12  lieutenant or a sergeant, unless it was out of the homicide

13  unit.  And then -- or the kidnapping unit.  Those I do keep

14  direct contact with the sergeant and lieutenants of those

15  units.  But all the others I don't.

16  Q    And it would be less likely that you speak with the

17  deputies, correct?

18  A    I try to make myself available to the rank and file as

19  much as I can, but -- like I'll walk the hallways, go to

20  briefings, go to their offices.  I mean, I have to make myself

21  available to them but, you know, as Sheriff of one of the

22  largest sheriff's offices in the State of Texas, I have a lot

23  of administrative duties, so it doesn't give me the opportunity

24  to be in the field.  I mean, I'm out on the street on Saturday

25  nights just to do backup calls and just to get involved with

1   them, but that's the only opportunity I get.

2   Q    Do backup calls with whom?

3   A    Well, when deputies go out on and get calls, they get

4   whatever type of calls, I try to get out there in the street

5   with them.  I'm probably the only staff member that has a

6   laptop computer assigned -- attached to my truck so I can see

7   all the calls that are coming in.  So I try to be interactive

8   with our deputies as much as I can, but I can only do it in the

9   evenings and at nights.

10  Q    So you weren't aware of the daily activities that were

11  going on in Crime Stoppers, are you?

12  A    Not a minute-for-minute.  No, I was not.  It's one of

13  those units that pretty much ran on its own.  You know, we have

14  a commander in charge of it.

15  Q    Tell me how the tips would come in.  How would that work?

16  A    The way I understand it -- and, again, you know, you have

17  to work that field to really know how Crime Stopper (sic) work,

18  and I'm not that familiar with that unit.

19  Q    You are not that familiar with it?

20  A    No.  It's too detailed.  We just rewrote the entire

21  protocols for it, as a matter of fact.

22  Q    Well, I'm asking you --

23  A    Back then.

24  Q    -- during the period of time --

25  A    Yeah.

Trevino - Direct / By Ms. Gutierrez          87

1  Q    -- in 2009.

2  A    The -- an anonymous caller would call a -- the number, 66-

3  8-7-T-I-P-S, he would -- the person would give the information

4  to whoever answered the phone, and it was one of three people.

5  Q    Was it a phone that was there at the office?

6  A    No.  It's a cell phone.

7  Q    Okay.

8  A    Most Crime Stopper units throughout the state operate on

9  cell phones --

10  Q    Okay.

11  A    -- so they can always be available.  And they take the

12  call and then the -- whoever took the call would then relay it

13  to whatever unit it pertained to.

14  Q    Were you aware that J.P. Flores was running license plates

15  for drug dealers?

16  A    Absolutely not.

17  Q    You're familiar with Julio Davila, aren't you?

18  A    Yes, I am.

19  Q    And you know him personally, correct?

20  A    I know him personally, that's right.

21  Q    And you are also -- you're aware that he also pled guilty

22  to conspiracy with intent to possess marijuana?

23  A    That's right.  I am aware of that.

24  Q    And he was also a contributor of yours; isn't that true?

25  A    Yes, he was.

Trevino - Direct / By Ms.  Gutierrez                    88

1    Q    He would have some boots made for you; isn't that correct?

2    A    I believe he did that -- do that -- in 2004.

3    Q    That type of contribution, do you have to report it?

4    A    It was a gift from one friend to another.  It was not a

5    contribution.

6    Q    Oh.  So you and Julio Davila were friends?

7    A    Well, he was an acquaintance of mine.  That's when I first

8    met him, yeah.

9    Q    Were you aware that he was engaged in criminal activity?

10   A    Absolutely not.

11   Q    Were you aware that he was utilizing the services of the

12   Hidalgo County District Attorney's Office for his criminal

13   activity?

14   A    Absolutely not.  I had no idea that Julio was doing that.

15   Q    There was an incident where Julio assisted Guerra, Senior

16   in recovering some firearms from your office that you all had

17   seized.  Do you recall that?

18   A    Vaguely.  I do remember -- I remember -- I didn't know it

19   was Guerras.  I do remember that Mr.  Davila had wanted some

20   weapons released and I referred him over to somebody in the

21   Criminal Investigation Division to take care of the matter.  I

22   mean, if we had -- if those weapons were no longer of any

23   evidentiary value to us and if those weapons were no longer of

24   use to us or they were not stolen, then we have to release them

25   back to the owners.  But I do -- I didn't know it was to the

1    Guerras.  I don't remember them being the Guerras.  I do

2    remember Mr. Davila asking me to look into the case and I

3    referred him to the CID people.

4    Q    So you may have known at the time that they were Guerras -

5    - the Guerra's firearms, but you don't recall that now?

6    A    No, no.  I've never known who the Guerras were until it

7    all busted out.  I remember Mr. Davila asking about the case,

8    and then I referred him to the Criminal Investigation Division,

9    says, "Go speak with them."

10   Q    And because you and Davila were friends, he went directly

11   to you to request those weapons, correct?

12   A    Right.  And I referred him to the proper people.

13   Q    Isn't it true that you told Fabian Rodriguez to stay away

14   from the Guerra, Seniors because they were being -- from the

15   Guerras because they were being investigated?

16   A    What happened on that, I got a call from a political

17   operative of mine in Elsa.

18   Q    What's a political operative, before we go any further?

19   A    Political operative is -- it would be an individual that

20   helps me with my campaign, puts up signs, gets location for

21   signs, you know, that level type of work.

22   Q    Okay.

23   A    He calls me and says, "Look, we -- the people in Elsa are

24   talking."  And I said, "What are you talking about?"  He says,

25   "They're saying that Fabian is hanging around with some drug

1    dealers, this Astro Trucking people."  And I said, "Is there

2    anybody that is willing to come forth, give me an affidavit, or

3    are you willing to give me an affidavit to show that Fabian is

4    doing this?"  He says, "Nobody wants to come forward."  I said,

5    "Who are these people?"  He said, "All I know is some drug

6    dealers, they're from Astro Trucking."  I said, "Okay."  I

7    called Fabian immediately on the phone and I said, "Fabian, I

8    just got information that you are consorting with some drug

9    dealers of the Elsa area.  They are supposed to be Astro

10   Trucking.  And I need to know are you doing this?  Are you

11   hanging around with them?  Are you doing anything with them

12   whatsoever?"  And he said, "No.  I am not."  He said, "I know

13   them, I know who they are," he says, "but I am not."  And right

14   before we hung, then he says, "And Sheriff, I want to assure

15   you" -- and I'll never forget this -- he said, "Sheriff, I want

16   to assure you that I have not done anything illegal with them

17   or anybody else."  And then my goodbye to him was, "Fabian, you

18   know what my rules are.  If you consort with criminals, I'm

19   going to fire you.  If I find out that you are violating the

20   law in any way, I'm going to fire you and arrest you."  He

21   said, "I know that, Sheriff.  I would never do that to you or

22   to myself."  Then we hung up.  I did not warn him, "Stay away

23   from the Guerras."  I warned him to stay away from any drug

24   dealer or anybody involved in any criminal action.

25   Q    But you didn't start an investigation on the Guerras

1   either, did you?

2   A     I didn't know who the Guerras were, Ms. Gutierrez.  I

3   already told you that.  I know there was Astro Trucking.  I

4   didn't have -- I mean, you'd be surprised how many calls we get

5   of people saying, "These are drug dealers" and "they're not

6   drug dealers," and we don't have -- I don't have the manpower.

7   I don't have the resources to apply to all those calls.  I just

8   don't do it.

9   Q     Well, I understand that, but --

10  A     I don't have it.

11  Q     -- as the Sheriff of this county -- as a citizen of this

12  county, shouldn't we be -- feel comfortable that if you get a

13  tip that somebody's doing something wrong, that you at least

14  inquire into it and investigate?

15  A     Ms. Gutierrez, I don't think you understand how large we

16  are and how many calls we get like that.

17  Q     So are you saying that you can't do that --

18  A     Of course I can.

19  Q     -- that you cannot?

20  A     Of course I can.  But there was nothing to work with.  And

21  I asked --

22  Q     But this came from --

23  A     -- the caller to give me -- people to give me information

24  so we could start something, either on Fabian or them.  He said

25  he couldn't do it because it was just rumors that were floating

Trevino - Direct / By Ms.  Gutierrez                92

1    around.

2    Q    Well, I understand that.  But what it sounds like you're

3    saying is that before you even investigate anything, you need

4    affidavits.

5    A    No.  That's not true.  That may sound like that to you,

6    but that is not true.

7    Q    Okay.  So then in other cases, you don't need affidavits

8    and you don't need anything other than a tip for you to start

9    investigating, correct?

10   A    That's correct.

11   Q    However, in this case, you didn't do that with the

12   Guerras, right?

13   A    That's right.

14   Q    Okay.  And this information that you got was from a

15   political operative that was trustworthy, correct?

16   A    Yes.  Yeah, he's a trustworthy person.  But he didn't have

17   any names.  He had the name of the company.

18   Q    I understand that.

19   A    Yeah.

20   Q    You could have, had you chosen to, sent out someone in

21   investigations to go take a look around the company, correct?

22   A    Take a look around the company?

23   Q    Yes.

24   A    Yeah.  I guess I could have, yeah.

25       **(Pause)**

Trevino - Direct / By Ms. Gutierrez                93

1  Q    Now going back to convicted drug trafficker Julio Davila,

2  how long did you know him?

3  A    I first met him in 2004, I believe -- 2005 maybe.

4  Q    And you were friends up until the time he was arrested?

5  A    No.  We were not friends.  He -- Julio Davila, I guess you

6  would have to know him.  He's like a groupie.  He likes to

7  involve himself with people, you know.  He -- we never had a

8  social understanding.  We never went out and ate, we never had

9  coffee together, we just didn't do anything like that.  He was

10 somebody that was just there.  And the reason I knew him more

11 than anything else was his work with attorneys and his work

12 with bail bondsmen.  That's how I knew him more than anything

13 else.

14 Q    But you accepted some boots from him, right?

15 A    Initially, yes.  That's right.

16      **(Pause)**

17 Q    Didn't you hear -- as a Sheriff, didn't you hear the same

18 rumors that were common to everyone else about Julio Davila and

19 what he was doing in stealing narcotics?

20 A    No, no.  Nobody has ever told me that Julio Davila was a

21 drug dealer.

22 Q    Even to -- and -- even to this point?

23 A    No.

24 Q    Even to right now?

25 A    You're talking about the past now.  You're asking me did I

Trevino - Direct / By Ms.  Gutierrez                94

1   have knowledge that Julio -- or heard rumors, and I never had.

2   I never did hear that Julio Davila was a drug dealer until all

3   of this came out.

4   Q    Okay.  So what point was the first time that you learned

5   that Julio Davila was a drug dealer?

6   A    When he got arrested.  Nobody has ever given me

7   information that Julio Davila was a drug dealer.

8   Q    Would you consider yourself a man that has good judgment

9   and perception of people?

10  A    I believe so.

11  Q    Okay.  And don't you agree that drug dealers -- there's

12  some identifying factors.

13  A    Are you talking about profiling a drug dealer?

14  Q    Well, I mean, there's identifying factors of individuals

15  who maybe don't have jobs but have a lot of material things,

16  have a lot of money, without an explanation as to where that

17  money comes from.

18  A    I guess you could say that, yes.

19  Q    And you never saw those patterns in Julio Davila?

20  A    As far as I know, Julio Davila always had a job, as far as

21  I know.  He always either represented a bail bond company, was

22  an agent for a bail bond company, or he was an agent or a

23  runner for a law firm.  And that's -- that was my dealings with

24  him.  My dealings with him were not social.  I mean, he -- as

25  far as I knew, he always had a job.

Trevino - Direct / By Ms.  Gutierrez                95

1  Q    Okay.  But he contributed to you -- to your campaign,

2  correct?

3  A    That's right, yeah.

4  Q    Okay.  So he wasn't just someone that you didn't know much

5  about.  You knew that he contributed money to your campaign,

6  correct?

7  A    Yeah, like a lot of the people that I don't even know.

8  Q    Well, right.  But --

9  A    Yeah.

10  Q    -- in his profession, he was a bail bondsman.  He didn't

11  own the bail bonds company, correct?

12  A    That's right.  He was a -- I think they call them agents

13  or runners for them, yeah.

14  Q    Okay.  And so he had probably an 8:00 to 5:00 job like

15  everyone else, correct?

16  A    I have no idea what his hours were.

17  Q    Okay.  But what I'm saying is that he wasn't a business

18  owner, correct?

19  A    No.  I guess not.  I mean, I don't know if he owned a

20  business or not.  I have no idea what his economic situation

21  was.  All I knew was that he was associated with bail bond

22  companies and lawyers.

23  Q    When he contacted you about the firearms that belonged to

24  the Guerras, he contacted you directly to your cell phone,

25  correct?

1  A    I don't remember how -- I don't remember if he contacted

2  me on the cell phone or the office phone.  I don't remember.

3  That was a long time ago.  I didn't remember when it was.

4  Q    Okay.  Well, in order for someone to contact you at your

5  office, you couldn't just dial the Hidalgo County Sheriff's

6  Office number and get you on the line, correct?

7  A    Sure you can.

8  Q    Well, you -- would you answer the phone if I called the

9  Sheriff's Office?

10 A    If you called my desk phone, I would.

11 Q    Okay.

12 A    If you call my cell phone, I would.

13 Q    Well, right.  But I would have to have your cell phone in

14 order to call it, correct?

15 A    You'd have to have my cell phone, that's right.

16 Q    Okay.  And I would have to have your desk phone in order

17 to call it, correct?

18 A    Well sure, absolutely, yeah.

19 Q    And so then Julio Davila had either your cell phone or

20 your desk phone, correct?

21 A    Like thousands of people have my cell phone.  I've had the

22 same cell phone for the last nine years and half of the county

23 has it.  I make myself very accessible to everybody.

24 Everybody's got my cell phone number.

25 Q    Would you care to share it with the jury then?

Trevino - Direct / By Ms. Gutierrez                97

1  A     Sure.  Would you like me to?

2           THE COURT:  That's okay.  We don't need it.

3           MS. GUTIERREZ:  I'm kidding.

4  BY MS. GUTIERREZ:

5  Q     When you're -- when you have your fundraising events, we

6  talked already about a flyer that you said they weren't

7  tickets.  You corrected me and you said they weren't tickets,

8  they were flyers.

9  A     Yeah.

10 Q     Did you have events that you sold tickets for?

11 A     Oh, yeah, yeah.

12 Q     Okay.  And so there is a distinction between the

13 fundraisers that you had, some were with flyers and some were

14 with tickets?

15 A     That's right.

16 Q     Okay.  And the fundraisers that you had when you had

17 tickets, those tickets could sell for as much as a hundred

18 dollars, correct?

19 A     That's correct.

20 Q     And even higher, correct?

21 A     I don't think so.  I don't think we've ever had -- I don't

22 think I've ever had a fundraiser where the ticket was more than

23 a hundred dollars.  I don't think so.

24 Q     Okay.  So this was different than the flyer.  It was

25 possible that the flyer could be -- but the events that had a

1   flyer could be for more than a hundred dollars, correct?

2   A    Oh, yeah, absolutely, yeah.

3   Q    Okay.  How high could the amount be for the flyers?

4   A    You know, you asked me that earlier, and I don't remember.

5   I would have to find a flyer or I'd ask Commander Montemayor.

6   He would definitely know.

7   Q    Could it be as high as a thousand dollars, a flyer?

8   A    Yeah, probably so, yeah.

9   Q    Okay.  So with respect to the tickets -- not the flyer --

10  isn't it true that the tickets were disseminated within the

11  employees of the county for them to sell them?

12  A    Not only employees, but any other citizen that wished to

13  help me out.

14  Q    Well, right.  But what I'm asking --

15  A    Yeah.

16  Q    -- you is that you would give them out to the employees of

17  the Hidalgo County Sheriff's Office and have them sell them.

18  Not necessarily that they wanted to, you were just giving them

19  to them.

20  A    No.  That's -- that is not true.  That's been a rumor and

21  an allegation made by my political opponents for years.  That

22  is absolutely not true.  Again, you have to volunteer in order

23  to work on my campaign.  Nobody forces you to do anything -- at

24  least I don't.  And everybody knows that rule.  All the

25  commanders, all the captains know you have to volunteer.  If

Trevino - Direct / By Ms.  Gutierrez                 99

1    you want to volunteer that you want to sell "X" number of

2    tickets to a fundraising dinner, well, you take them and you go

3    sell them.  But you do it off duty, and you have to volunteer.

4    Now, what's clear here is I never give any tickets out.  If I

5    did, it was maybe one time this last fundraiser that I had like

6    maybe a month, two months ago.  There was ten, 15 left over,

7    and they said, "I got ten tickets left over."  I said, "Well,

8    let me give them to individuals there at the office."  And I

9    asked her, "Do you have the opportunity to sell these tickets

10   for me?"  She said, "Yeah.  I can get rid of them," and she

11   did.  That is probably the only time in nine years or ten years

12   that I have done that.

13   Q    Have you heard testimony come out of this trial wherein

14   people -- deputy -- former deputies have testified that they

15   were forced to sell tickets?

16   A    I have not heard the testimony because I wasn't here.

17   Q    Okay.  No, have you heard about --

18   A    About it?

19   Q    -- that testimony?

20   A    I -- yes, I did.

21   Q    Okay.  And are you aware that J.P. Flores indicated that

22   you had to sell the tickets or buy them?

23   A    I heard that, yes.  And that -- go -- I'm sorry.  Yes, I

24   heard that.

25   Q    And you heard that that was something that was ordered by

1   Padilla?

2   A    I heard from a reporter that J.P. Flores had testified to

3   that.

4   Q    And so is that something -- is that a rule that you would

5   implement?

6   A    Absolutely not.  Again, you have to volunteer and you have

7   to say, "I want to do it."  If I find out that anybody was

8   being forced to do something like that, I would have taken

9   action immediately --

10  Q    And --

11  A    -- because for the simple reason, it would be political

12  suicide for me to do something like that, number one.  Number

13  two, if I condone that practice, I would lose the respect of my

14  employees.  I do not force them to do anything they don't want

15  to do.  They must volunteer.  And they know my character and

16  they know my reputation, and they know that I would never allow

17  something like that.

18  Q    Don't you currently have some lawsuits pending from former

19  employees who are claiming that you did just that?

20  A    There's some lawsuits that have been filed.  That's right.

21  I have no idea what they are claiming.

22  Q    Oh, you don't know the particulars of the lawsuits?

23  A    No.  I don't.  I gave them to our legal staff and they

24  take care of it.

25  Q    So you just testified that if you had any information that

Trevino - Direct / By Ms. Gutierrez                101

1  they -- someone from your office was doing that, giving tickets

2  and forcing employees to sell them --

3  A    Right.

4  Q    -- that you would take action.  Well, now that you know

5  the allegation that J.P. Flores has made about Padilla, will

6  you take action and investigate this issue?

7  A    I would like to have J.P. Flores come to my office and

8  make that complaint, and of course I would.

9  Q    So it's not enough that he made it under oath?

10  A    No, it's not.  It would have to -- he would have to come

11  to my office and make that complaint.  You know, if J.P. Flores

12  has been doing this for nine years, why didn't J.P. Flores come

13  to my office and tell me?  I mean, I've got an open-door

14  policy.  And I've had -- when he's taken me to the airport, we

15  would have this personal conversation and I would ask him,

16  "Things going okay for you?"  He said, "Yeah, I got no

17  problems."  "Everything all right?"  "I got no problems."  Just

18  like I ask all my employees.  Not one time did J.P. Flores ever

19  complain to me about any type of treatment or mistreatment that

20  he was receiving by anybody.

21  Q    But you understand, Sheriff, that you are a powerful man?

22  A    No.  I don't understand that.

23  Q    You don't understand that?

24  A    No, I'm not a powerful man.  I've got a title.

25  Q    Well, I'm not --

Trevino - Direct / By Ms.  Gutierrez          102

1   A    I've got a title that belongs to the people.  I am not a

2   powerful man.

3   Q    Well, right.  I am not saying that Guadalupe Lupe Trevino

4   is a powerful man.  I am saying Sheriff Guadalupe Lupe Trevino

5   had -- is a powerful man.  Would you agree with that?

6   A    No.  I wouldn't.  I wouldn't.

7   Q    Okay.  Well, how about at least within the Hidalgo County

8   Sheriff's Office, because you are the Sheriff and at the top,

9   that you have the power in that office?

10  A    Oh, absolutely.  Now that's true.

11  Q    Okay.  And so if J.P. Flores is driving you to the

12  airport, he's driving the most powerful person in his job to

13  the airport, correct?

14  A    He's driving his boss.

15  Q    Yeah.  He's driving his boss.

16  A    Yeah.

17  Q    And you're not his only boss, but he has a supervisor that

18  he reports to and who -- and that supervisor reports to you;

19  isn't that correct?

20  A    That's correct.

21  Q    And so then if he were to tell you or make a complaint to

22  you that implicates his supervisor, that would have some

23  consequences on him, wouldn't it?

24  A    Well, I don't know.  I guess it all depends what that

25  supervisor would do.

Trevino - Direct / By Ms.  Gutierrez                103

1   Q    So then it's possible, right?

2   A    Well, sure.  Of course it is.

3   Q    Okay.  And so it's not very realistic to expect J.P.

4   Flores to have made a complaint to you about tickets for your

5   fundraiser that he's being forced to sell, because in turn it

6   would be a complaint about you, right?

7   A    Oh, you confused me on that one.  Ask me again.  I'm

8   sorry.

9   Q    Well --

10  A    I'm sorry.  You just --

11  Q    That's okay.

12  A    You confuse me easily, but go ahead.

13  Q    That's okay.  If the tickets that he's being forced to

14  sell --

15  A    Yeah.

16  Q    -- are for purposes of fundraiser for you --

17  A    Uh-huh.

18  Q    -- if he were to complain to you about being forced to

19  sell those fundraising tickets, he's actually complaining to

20  you about you.

21  A    No.  Because J.P. knows my character, and J.P. knows the

22  way I operate.  And J.P. should have come and told me, because

23  they've -- if J.P. -- if actually J.P. Flores was being

24  mistreated and was being forced to do something he didn't want

25  to do, I think J.P. would have told me.  I really think he

Trevino - Direct / By Ms.  Gutierrez                104

1    would have, unless he was just so terrified of Joe Padilla, if

2    that's who you're alluding to, then I can see him not doing it.

3    But I have had one or two employees come and complain to me

4    about the words and maybe some of the treatment that Padilla

5    did, and I took a very strong stance and I called Padilla in

6    and I said, "Look, you're the old-type policeman.  You're the

7    old-kind policeman.  You have to soften your approach."  And he

8    has admitted to me that he has softened his approach.  We can't

9    treat police officers -- managers cannot treat police officers

10   the way we used to in the seventies.  You know, things have

11   changed dramatically since then -- and in the eighties.  Things

12   have changed dramatically.  And I've brought Joe -- I brought

13   Joe in several times and sat him down and said, "Look, you have

14   to soften your approach.  You know, your people are not going

15   to respect you if you don't respect them.  And you -- and your

16   people are either going to make you or break you, so you

17   respect them and you soften your stance."  And he has admitted

18   to me within the last year, several times he has admitted to me

19   that I have changed his personality and that he has softened.

20   Q    When was the last time you brought him in to talk to him?

21   A    Oh, God, I don't know, like six months ago maybe?  I'm not

22   sure.  I'm guessing.  I -- that's not -- I'm not really sure.

23   Maybe six months ago.

24   Q    Well, it was within 20 -- 12 months, correct?

25   A    Within the year I would imagine so.  Yeah, we've talked.

Trevino - Direct / By Ms.  Gutierrez                105

1    We've talked about his -- the way he treats people.  And he --

2    I think he did soften his approach.

3    Q    So then you have heard about this culture that he

4    perpetuates of fear within the county?

5    A    Well, see, what you described was -- and -- you described

6    an elementary school bully.  That's what you described:  mean

7    and scary and I have no idea what other words you used.  And

8    that's not the way we looked at it.  I mean, at our level, Ms.

9    Gutierrez, no, we would call that authoritative, over-

10   authoritative; not mean and scary or whatever other words you

11   used.  So, yes, you know, Joe Padilla is old style, you know,

12   he's an old school-type of guy, been around for a long time.

13   You know, he doesn't have what you would call a formal

14   education that has changed his way of being like others have.

15   And I think I've done a lot in softening his stance.  I think

16   I've done a lot in that --

17   Q    But you --

18   A    -- because he has admitted it.

19   Q    And you don't mind his style because he gets the job done,

20   correct?

21   A    No, no, no.  I didn't -- of course I mind his style.

22   That's why I called him in.  Of course I did.  I did mind his

23   style, and I wanted a softer approach.

24   Q    How long has he been with the county?

25   A    Again, I'm going to guess.  I would say 26 years maybe.

1   Maybe 26 years.  I'm not sure.

2   Q    And in 26 years, even up until the time that some deputies

3   testified in this trial, who have been former employees of the

4   county -- within months from now -- I mean, they retired

5   recently -- and I'm talking about J.P. Flores --

6   A    Okay.

7   Q    -- he still maintains that over-authoritative style;

8   wouldn't you agree?

9   A    Well, he never did to me.

10  Q    Well --

11  A    And I used to ask him.  I said, "J.P., is everything okay

12  with you?  Are you all right?"  Because I don't talk to J.P.  I

13  said, "Is everything okay with you?" when he would drive me to

14  the airport.  That's the only time I ever saw him.  He said, "I

15  don't have a problem, Sheriff.  We're doing okay."

16  Q    Well, right.  But you -- what you're saying is that he

17  never complained to you --

18  A    Right.

19  Q    -- about his supervisor --

20  A    Right.

21  Q    -- who is one of your commanders.

22  A    But that makes no difference.  It's been done before.

23  Q    But it makes no difference to you, but it might make a

24  difference to the employee; wouldn't you agree?

25  A    It may make a difference to J.P., but it did not make a

Trevino - Direct / By Ms.  Gutierrez                107

1    difference -- and I forget who it was -- one or two people did

2    come to my office that complained about the over-authoritative

3    approach that Joe Padilla was taking.  And they didn't mind any

4    possible consequences.  They didn't.

5    Q    Well, you're -- you don't know that.  You -- you're just

6    speaking --

7    A    Obviously they didn't because they came and told me.  And

8    that's when I started talking to Joe and trying to soften his

9    approach.

10   Q    But if you heard this testimony about recent deputies who

11   are testifying that he had an over-authoritative style --

12   A    Yeah.

13   Q    -- that means that in 26 years, he hasn't changed,

14   correct?

15   A    Well, either that or they're not telling you the truth.

16        **(Pause)**

17   Q    The -- who was in Joe Padilla's inner circle?

18   A    I have absolutely no idea what you mean by that.

19   Q    Well, who were the -- his go-to guys within your county?

20   A    You'd have to ask Joe Padilla that.  I have no idea what

21   his inner circle is.

22   Q    I wish I could.

23   A    Yeah.  I will ask him for you if I see him, but I have no

24   idea what you're talking about.

25   Q    Okay.  Wouldn't you agree that there were certain deputies

1  that Joe Padilla would surround himself with on a regular

2  basis?

3  A    I don't know that Joe Padilla was social with anybody.  I

4  don't believe he was.  I don't think he went out to the movies

5  or family picnics and that sort of thing with particular

6  people.  I don't think any of my command staff members do that.

7  Q    He went to your fundraisers; isn't that correct?

8  A    I had hundreds of my deputies go to my fundraisers.

9  Q    Is that a yes?

10  A    Yes.

11  Q    And he would attend your annual skeet shoot events,

12  correct?

13  A    Along with numerous deputies, yes.

14  Q    And at those events, were you able to witness him there?

15  A    Yes.

16  Q    Okay.  And isn't it true that he was usually with J.P.

17  Flores and Jerry Del Angel and Fabian Rodriguez even sometimes?

18  A    Yes.

19  Q    Other than the briefings, does Padilla have to prepare any

20  type of written report to you on a regular basis?

21  A    No.  We do not have an evaluation system in the county.

22  The only things I get from the command staff through the daily

23  verbal briefings.  And if there's any documentation attached to

24  it, it would be a case file.  But since Padilla is not in

25  charge of any real law enforcement function of the department,

Trevino - Direct / By Ms.  Gutierrez                109

1   I don't get those type of things.  I get them from Montemayor -

2   - Commander Montemayor because of the homicides and the

3   kidnappings and the home invasions.  I get them from the jail

4   because there's so many different incidents that occur in the

5   jail, from Commander Garcia.  And then I do -- and occasionally

6   -- well, more than occasionally, I get my budget briefings from

7   Commander Castaneda on our budget situation --

8   Q    Well --

9   A    -- and financial stuff.

10  Q    Well, right.  But I was not talking about briefings.  I

11  was talking about written reports.

12  A    No.  Right.

13  Q    So none of your commanders provide you with written

14  reports?

15  A    Well -- I just said they did.  I just explained to you who

16  did.

17  Q    Okay.  So in the financial aspect, whoever's in charge of

18  that does provide you with --

19  A    Right.

20  Q    -- something in writing?

21  A    Absolutely, yeah, uh-huh.

22  Q    You testified that Padilla was in charge of the golf

23  tournament.

24  A    I believe he was.

25  Q    And that was a fundraiser for the county or for your

Trevino - Direct / By Ms.  Gutierrez                110

1   political campaign?

2   A     Okay.  Going back to that, when you say "county

3   fundraising," I have never heard of that.  This is the first

4   time I hear about "county fundraising."  The only fundraising

5   that I am familiar with is that fundraising that is done for my

6   campaign.  This "county fundraising," I have no idea what

7   you're talking about.

8   Q     Okay.  And that might be my fault.  Well, it is my fault,

9   and I apologize for that.  But what would you call the toy

10  drives and the turkey drives?

11  A     Those are donations that, for example, I believe several -

12  - like HEB, I believe -- HEB, Wal-Mart, they give items for us

13  to distribute to the community.

14  Q     And when I say, "fundraising events for the county,"

15  that's what I'm talking about, because I'm taking those items

16  as not necessarily funds, but stuff you collect.  Okay?

17  A     Well, that's -- those are not --

18  Q     So that's --

19  A     They're not funds.

20  Q     And I understand that.  I just want to --

21  A     They're not money.

22  Q     Right.  And I want to clarify --

23  A     Yeah.

24  Q     -- so that you understand that I understand that I don't

25  think the county is collecting money.  Okay?  The golf

Trevino - Direct / By Ms.  Gutierrez                111

1   tournament, is that political?  Is that for your political

2   campaign?

3   A    That's right.

4   Q    And what is Padilla -- what are Padilla's duties with

5   respect to the golf tournament?

6   A    He's -- I believe Padilla was either the chairperson or

7   co-chairperson of that particular fundraising activity.

8   Q    And if he was the co-chair, who would be the chair?

9   A    The other co-chair.  The other co-chair would probably be

10  -- I'm not really sure.  I think it would be Commander Garcia.

11  I'm not really sure about that.  I'd have to go back and ask

12  them.

13  Q    Were all your commanders in some way involved with your

14  political fundraising events?

15  A    As a matter of fact, most of my employees are.

16  Q    Okay.

17  A    Yeah.

18  Q    And how does that happen?  Do you say, "If you're

19  interested" -- and because you state that it's voluntary

20  only --

21  A    Yeah.

22  Q    -- strictly on a voluntary basis, do they show up to your

23  office and say, "Hey, Sheriff, I want to volunteer?"  Is that

24  how --

25  A    As a matter of fact, that happened twice here in the last

1   month or -- last three months.

2   Q    Okay.

3   A    I had a deputy come up to me and said, "Sheriff, I've got

4   an idea to raise funds for you."  And I said, "What do you want

5   to do?"  He said, "I want to have this dinner and I'll take

6   care of everything.  I'll be -- I'll put the committee together

7   and we'll do it that way."  I said, "Fine.  Go ahead and do

8   it."  And I had nothing to do with it.  He did it.  John

9   Montemayor came up to me years ago and said, "I've got an idea

10  to raise funds for you."  I said, "How are we going to do

11  this?"  He said, "Let's do an annual skeet shoot."  I didn't

12  even know what a skeet shoot was, and then he explained the

13  concept to me.  Ad he volunteered the idea and the people.  And

14  I said, "Fine.  Do it."  And we've been doing it ever since.

15  That's usually the way it works.

16  Q    Well, let's talk just for a quick second about tickets.

17  If it's on a voluntary basis, then where -- are the tickets in

18  a central location so that your employees show up to that

19  location and say, "Can I have a pack of tickets because I'd

20  like to volunteer and sell them?"

21  A    Again, you would have to ask the chair people how they

22  handle stuff like that.

23  Q    Well --

24  A    And I would imagine that it's either done that way or

25  they're disseminated by and -- several levels.  I don't know.

Trevino - Direct / By Ms.  Gutierrez                113

1   I'm telling you, from the very beginning I said, I don't get

2   involved in the fundraising, and I don't get involved in the

3   organization of it.

4              **MS. GUTIERREZ:**  Your Honor, may we approach?

5              **THE COURT:**  You may.

6        **(Begin bench conference at 3:56 p.m.)**

7              **MS. GUTIERREZ:**  Your Honor, I was hoping that we

8   could recess early --

9              **THE COURT:**  I was going to --

10             **MS. GUTIERREZ:**  -- (indiscernible) -- okay.

11             **THE COURT:**  -- but I was going to shoot for like 4:00

12  or 4:15.

13             **MS. GUTIERREZ:**  You want me to go until 4:15?  Okay.

14             **THE COURT:**  I mean, you can.  Are you going to stay

15  on that awhile?

16             **MS. GUTIERREZ:**  Well, I was going to change subjects,

17  and that's why I thought to start something new and then --

18             **THE COURT:**  Well, okay.  There may be still a little

19  bit more you could do with this.

20             **MS. GUTIERREZ:**  I -- yeah, I could.  I can go 15

21  minutes with this.

22             **THE COURT:**  It's 4:00.  I mean, I --

23             **MS. GUTIERREZ:**  Yeah.

24             **THE COURT:**  Doesn't matter to me.

25             **MS. GUTIERREZ:**  Why don't you just go another five

Trevino - Direct / By Ms.  Gutierrez          114

1    minutes and we'll just cut it off at 4:00.

2              **MS. GUTIERREZ:**  Okay.

3              **THE COURT:**  You have any problem with that?

4              **MR. STURGIS:**  No.

5              **THE COURT:**  Okay.

6         **(End bench conference at 3:57 p.m.)**

7    **BY MS. GUTIERREZ:**

8    Q    And so what exactly was this golf tournament?  What was

9    that event?  Like, what was it?  I don't play golf, so I don't

10   know what's --

11   A    So what is your question?

12   Q    What was this golf tournament event about?

13   A    The purpose of a golf tournament, fundraising golf

14   tournament, is to raise funds for the candidacy, for the

15   election.  And -- I don't play golf either.  Never have in my

16   life.  I know that they go out there, play -- they call them a

17   round of golf, I think, or two rounds of golf, and they

18   contribute to buy a team.  I'm really -- I'm not sure.  I don't

19   play golf.

20   Q    Are you present at the tournament?

21   A    Oh, absolutely, yeah.

22   Q    Okay.  So you see it all happen --

23   A    Yeah.

24   Q    -- but you don't participate.

25   A    I do not.

Trevino - Direct / By Ms.  Gutierrez                  115

1    Q    And about up to how much could you collect on such an

2    event?

3    A    Total?

4    Q    Yes.

5    A    I don't know.  Sometimes -- personally, I think in ours

6    we've done up to 50,000, 60,000, something like that.  I'm not

7    really sure.  I would have to look at the reports to give you

8    an exact number.  I'm not really sure.

9    Q    Okay.  You talked also about a barbecue drive.

10   A    Right.  Well, we've had that like six, seven -- say six

11   years ago.  We haven't had one in a long time.

12   Q    Okay.  And so what was that about?  That was for -- that

13   was political also?

14   A    All fundraisers, Ms.  Gutierrez, are political.  And that

15   particular fundraiser we had a certain number of tickets were

16   printed out for a barbecue plate at I believe it was Ramos

17   Barbecue.  And on a certain date, you'd have to go redeem that

18   ticket for a plate of barbecue.

19   Q    What would you call National Night Out?  That was just an

20   event?

21   A    No.  National Night Out is a community outreach program

22   where we pick a part of the county that is high crime or needs

23   our attention more than others, and we take all of our

24   available resources and we have this giant picnic for the

25   people of the community, and just -- to interact with the

Trevino - Direct / By Ms.  Gutierrez                116

1   community, just to exchange information.  I mean, this is done

2   all throughout the United States.

3   Q    Okay.  Don't you provide food and drinks for the community

4   on those events?

5   A    Yes.  We do.

6   Q    Okay.  And don't you pick up donations for the food and

7   drinks?

8   A    We -- I believe the way that's done, those are donated,

9   for example, to the Salvation Army.  They -- they're one of our

10  partners, they participate in that program, and they show up

11  with some food and drink.  Wal-Mart donates to the community,

12  so does HEB.  And I don't know which other vendors or companies

13  donate.

14  Q    So when Julio Davila -- or there's testimony that Julio

15  Davila donated fajitas or chicken --

16  A    Yeah.

17  Q    -- for some of these events, would that be a possibility?

18  A    That could be true, yes.

19  Q    Okay.  So then you do pick up collections in form of items

20  for some of these events?

21  A    I've never denied that.  I just explained to you how we do

22  that.  Yeah.  That's -- for those community events, we do pick

23  up items.

24  Q    Okay.

25  A    We don't pick up money.  We pick up items from either

Trevino - Direct / By Ms.  Gutierrez                117

1    committee members or companies.

2    Q    So you don't collect -- if somebody wants to donate a

3    hundred dollars to go towards the food for that event, you

4    don't accept the hundred dollars?

5    A    I don't think that we can.  The county cannot collect --

6    the -- not collect, I'm sorry.  The county cannot accept any

7    monetary donations unless they go before Commissioner's Court

8    first.  And Commissioner's Court must accept it before it is

9    donated to a particular department.  Now, I think what you're

10   alluding to is it is possible that maybe some companies donated

11   to the Crime Stoppers Board.  Now, the Crime Stoppers Board has

12   absolutely nothing to do with the Hidalgo County Sheriff's

13   Office or the county of Hidalgo government.  The Crime

14   Stopper's Board is an independent, nonprofit entity that

15   operates by themselves.  They've got their own reporting laws

16   and all that stuff.  And people donate to them, and then that

17   Board will donate some of the toys or whatever to the

18   community.

19   Q    Because that has nothing to do with the Hidalgo County

20   Sheriff's Office?

21   A    Well, right.  We don't -- we have no purview over the

22   Crime Stopper's Board.  They have their own precedent, their

23   own Board.  They do their own thing.  They're a nonprofit

24   organization.  Okay?

25   Q    Well, right.  But are they part of the Sheriff's Office

Trevino - Direct / By Ms. Gutierrez                118

1   for Hidalgo County?

2   A    No.  They're not a part of the Sheriff's Office.

3   Q    Okay.

4   A    No.  They're not.  We have no authority over them

5   whatsoever.

6   Q    Did J.P. work closely with that Board?

7   A    Oh, absolutely.  He's the one that reported to them on the

8   anonymous tips, and the Board had to approve the compensation

9   for the informant.  That's their main duty.

10  Q    So is it possible that J.P. Flores would collect cash for

11  that Board for their events?

12  A    I have no idea what J.P. did for that Board, not on that.

13  I have absolutely no -- I have never heard of that and I have

14  no knowledge of that.

15           **THE COURT:**  All right.  It's 4:00 p.m.  Unfortunately

16  the Court still has a lot of its other work to take care of

17  before the end of the week, so I'm going to recess the jury at

18  this time.  We'll start at 8:30 Monday morning, so if everybody

19  could be here by 8:30 Monday morning.  Again, we expect Monday

20  to conclude with the evidence, and then closing arguments

21  probably Tuesday is what everybody is sort of estimating.  We

22  may finish early Monday.  But, anyway, that's the current

23  estimates.  You can let your employers know.  For those of you

24  that need certificates of attendance for the week, we have

25  those already prepared and we can provide them to you now for

1    the week.

2         My same admonishments.  Please don't discuss the case

3    with anybody.  Please don't read anything about the case,

4    listen to anything on the radio, or watch anything on TV about

5    this case.  All the evidence that you'll need to determine

6    those decisions that you'll need to make in this case will be

7    submitted to you here in the courtroom.

8         Your notepads, if you'll put them back in those

9    sealed envelopes, we'll get them to you back on Monday morning.

10   And keep your juror badges on while you're in the building.

11   Thank you very much for being here all week.

12        **(Proceeding was adjourned at 4:04 p.m.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>October 9, 2013</u>

           Signed                                         Dated



                    *TONI HUDSON, TRANSCRIBER*