UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  7:13-CR-070-12 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| JORGE GARZA, | ) | Monday, August 5, 2013 |
| | ) | ( 8:43 a.m. to 10:19 a.m.) |
| Defendant. | ) | (10:39 a.m. to 10:57 a.m.) |
| | | (10:58 a.m. to 11:50 a.m.) |
| | | ( 1:39 p.m. to  2:42 p.m.) |


TESTIMONY OF GUADALUPE TREVINO DURING JURY TRIAL - DAY 5

BEFORE THE HONORABLE RANDY CRANE,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Plaintiff:              JAMES STURGIS, ESQ.
                           ANIBAL ALANIZ, ESQ.
                           Assistant United States Attorney
                           1701 W. Business Hwy. 83
                           Suite 600
                           McAllen, Texas 78501

For Defendant:             LILLY A. GUTIERREZ, ESQ.
                           4901 S. Jackson Rd.
                           Edinburg, TX 78539

Interpreter:               Elena Medrano

Court Recorder:            Richard Cortez

Transcribed By:            Exceptional Reporting Services, Inc.
                           P.O. Box 18668
                           Corpus Christi, Texas 78480-8668
                           361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

INDEX

| DEFENSE WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GUADALUPE TREVINO | 4/73/89 | 93/133 | 149 | 173 |


| DEFENDANT'S EXHIBITS | RECEIVED |
|---|---|
| 12 THROUGH 15 | 67 |
| 16 | 75 |
| 18 | 86 |

Trevino - Direct / By Ms. Gutierrez                3

1          **McAllen, Texas; Monday, August 5, 2013; 8:43 a.m.**

2          **(Partial transcript; testimony of Guadalupe Trevino)**

3          **THE CLERK:**  All rise for the jury.

4        **(The jury entered the courtroom at 8:43 a.m.)**

5          **THE COURT:**  Good morning.  Please be seated.

6          All right.  Members of the jury, when we broke early

7    on Friday, you'll recall the witness was still in the middle of

8    being examined by Ms. Gutierrez, Sheriff Trevino.  And, so,

9    we'll just resume with Sheriff Trevino.  We think there's a

10   couple of more witnesses; still hopeful we'll finish today, but

11   if -- and closing arguments tomorrow.  That's our current time

12   frame.  When we -- we'll reevaluate that around the noon hour

13   to give you a better idea.

14          All right.  Sheriff Trevino, if you could step

15   forward and just resume your place here on the witness stand.

16          Good morning.  All right.  If you want to -- I don't

17   remember where you left off, but do you want to just pick back

18   up where you left off with Mr. Trevino?

19          **MS. GUTIERREZ:**  Very well, your Honor.

20     **GUADALUPE TREVINO, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

21                **DIRECT EXAMINATION (CONTINUED)**

22   BY MS. GUTIERREZ:

23   Q    Good morning, Mr. Trevino.

24   A    Good morning, Ms. Gutierrez.

25   Q    Mr. Trevino, at the sheriff's office you have what is

1  called the Policies and Procedure Manual; is that correct?

2  A    Yes, ma'am.

3  Q    And that Policies and Procedures Manual applies to you, as

4  well; is that correct?

5  A    Well, that's a good question.  I write them; and I execute

6  them, and I have -- I think in the very first page it says that

7  I have the right to apply those as I wish, I believe.  I'm not

8  really exactly sure how that -- how that's worded.

9  Q    Right; but my question is:  Do they -- they do apply to

10 you, as well?  Or are you telling the jury that they do not?

11 A    I never -- I guess they do.  I'd have to say yes.  I'm not

12 really sure.  I've never -- nobody's -- I don't think I've ever

13 been asked that question before.

14 Q    But as far as your understanding, you write these policies

15 and procedures with the intent that your employees follow them,

16 correct?

17 A    That's -- now, that's correct.  Right.

18 Q    And when you write them, is it your intent that you,

19 yourself, are subject to these policies and procedures?

20         **THE COURT:**  Is that -- how is that relevant?

21         **MS. GUTIERREZ:**  Oh --

22         **THE COURT:**  Really, it's the employees that are at

23 issue here.

24 //

25 //

Trevino - Direct / By Ms. Gutierrez                    5

1    **BY MS. GUTIERREZ:**

2    Q    You are the ultimate -- you have the last say on grievance

3    procedures; is that correct?

4    A    No, ma'am.

5    Q    Um --

6    A    No, I don't.  It is not me.

7    Q    Well, under your policies it does state that decisions by

8    the sheriff are final.  Is that correct?

9    A    In -- in house, yes.

10   Q    And what you mean by "in house" -- is that any decisions

11   within the Hidalgo County Sheriff's Office?

12   A    Within the Sheriff's Office, yes, ma'am.

13   Q    And, so, when you say that they are not final, what is it

14   that you mean?

15   A    Well, the employee may grieve to the Civil Service

16   Commission, and he may even take it to the district court, I

17   believe.

18   Q    And within the Hidalgo County Sheriff's Office, your

19   decisions are final, correct?

20   A    Yes, ma'am.

21   Q    You have a policy with respect to off-duty employment of

22   your employees; is that correct?

23   A    Yes, ma'am.

24   Q    And that includes any of your employees who is seeking

25   employment outside of the Hidalgo County Sheriff's Office; is

1    that correct?

2    A    Yes, ma'am.

3    Q    And that procedure requires that they submit something --

4    well, I guess I'd ask for clarification; that they submit

5    something in writing, or that the business or the individual

6    seeking them to be employed for them is the one that submits

7    something in writing?

8    A    I believe the policy states that the employee must ask for

9    permission -- because it's not a right; it's a privilege --

10   that the employee may ask for permission to work off duty and

11   that he provide certain information on the employer.

12   Q    So, the employee is the person who submits the request for

13   permission, correct?

14   A    In writing.  Yes, ma'am.

15   Q    Okay.  And you are the person under your policies that

16   makes the decision as to whether they are granted that

17   permission, correct?

18   A    Actually, it is -- I have a captain that's in charge of

19   making that decision, and that was recently changed, I would

20   say about maybe a month ago, where I decided whether that

21   employer was suitable.

22   Q    So, you're telling the jury that you have not made

23   decisions, granted permission to employees to work outside of

24   the sheriff's office; is that correct?

25   A    No, that's not -- that's not correct either, because there

1    are times when -- when I've taken that initiative, and there's

2    times when the captain is assigned to that particular duty to

3    regulate our off-duty employment applications and -- and

4    reviewing who -- who's applying and who's not applying.  And --

5              THE COURT:  Well, let's talk about the time frame

6    2009; middle of 2009 through 12/12/12.  Were you making those

7    decisions about letting your officers go moonlight --

8              THE WITNESS:  No.  No.

9              THE COURT:  -- and other things?

10             THE WITNESS:  That -- during that time period, I

11   believe the captain was in charge.

12             THE COURT:  Which --

13             THE WITNESS:  One of the captains.

14             THE COURT:  Which --

15             THE WITNESS:  Captain Jerry Lopez.  Yeah.

16   BY MS. GUTIERREZ:

17   Q    And, so, are you telling the jury that it was Captain

18   Jerry Lopez who allowed some of your deputies to perform

19   security at Fernando Guerra, Sr.'s birthday party?

20   A    It could have been.  That's kind of a tricky question,

21   your Honor, because the command staff has the -- the latitude

22   to make those type of decisions.  I mean, that's why I have

23   command staff.  And if a commander decided that he was going to

24   allow it, as long as he followed the procedure, I wouldn't have

25   a problem with that.

1  Q    And, so, then, if it happens that the person who your

2  officers are going to work for outside the sheriff's office

3  happens to be a drug dealer, that would be something that would

4  not get to you?  Is that correct?

5  A    Well, um -- it --

6            **THE COURT:**  During this time period, again.

7            **THE WITNESS:**  During that time period, it's possible,

8  yes, ma'am.  Absolutely.

9  **BY MS. GUTIERREZ:**

10  Q    So, then, you're telling the jury that it's possible that

11  without your knowledge some of your employees could have worked

12  for individuals that are in direct conflict with the priorities

13  of the sheriff's office.  Is that correct?

14  A    That's most certainly correct.

15  Q    You have -- or you initiated an operation called "APE"?

16  Is that correct?

17  A    Yes, ma'am.

18  Q    And that operation was to target high crime areas; is that

19  correct?

20  A    That's correct.  Yes, ma'am.

21  Q    And your office used deputies from civil warrants for that

22  operation; is that correct?

23  A    Yes, ma'am.  That's correct.

24  Q    And, so, the deputies in civil warrants were then able to

25  conduct traffic stops, correct?

1  A    Any deputy -- as a matter of fact, that's one of the

2  things that I changed in 2005 when I came on board, was that

3  any -- any uniformed deputy in a patrol vehicle, regardless of

4  what -- where he was assigned, if he saw a violation, you know,

5  he was obligated to -- to initiate a stop and do something

6  about it.

7  Q    So, any deputy, regardless of what department they work

8  in, is able to conduct traffic stops, correct?

9  A    Absolutely.  Right.

10 Q    With respect to disciplinary actions, Sheriff, you make

11 the ultimate decision on those, don't you?

12 A    Yes, ma'am.

13 Q    And, so, any disciplinary action would go up the chain of

14 command and would end up with you.  Yes?

15 A    No.  The way it occurs, once -- for example, internal

16 affairs conducts an investigation, and they hand the file over

17 to me; I'll read it, and either I'll approve the investigation

18 or disapprove it.  If I approve it, then I send it back to the

19 command staff, to the chain of command of that deputy, and have

20 them read it and give me a recommendation for disciplinary

21 action, and then I take action based on that.  Sometimes I

22 agree with them; sometimes I don't.

23 Q    But it is your decision ultimately.

24 A    I have the ultimate decision.  Yes, ma'am.

25 Q    And do all of the disciplinary actions or intent to do a

1  disciplinary action on one of your employees end up with you,

2  or might it stop before it gets to you?

3  A    I am the only one that is authorized to initiate an

4  internal affairs investigation in that department.  Now, if --

5  a commander or a captain or any supervisor may initiate an

6  inquiry, bring it to me, and say, "We have this; what -- do you

7  think we should follow through with it," and then that's when I

8  initiate the investigation.

9  Q    But not all disciplinary action results in an internal

10  affairs investigation, correct?

11  A    That's correct.  At one time I was having the command

12  staff conduct their own internal affairs investigations.

13  Q    Was that during the period of 2009 through 2012?

14  A    Yes, ma'am.

15  Q    And, so, internal affairs is there for extreme cases?

16  A    No, ma'am.

17  Q    Is that accurate?

18  A    No; sometimes we can get so overwhelmed -- because we also

19  do all public integrity, corruption cases, and special

20  investigations outside the regular criminal investigation

21  division -- and they can get so overwhelmed sometimes that, for

22  the sake of expediency, I allow the command staff to conduct

23  investigations.  That has since stopped and all internal

24  affairs investigations are now conducted by the public

25  integrity unit.

Trevino - Direct / By Ms. Gutierrez          11

1  Q    Did that stop beginning -- at the beginning of this year?

2  A    Yes, ma'am.  It has.

3  Q    When the changes you mentioned on Friday were implemented;

4  is that correct?

5  A    I believe so.  Yeah.

6  Q    Do you recall, Sheriff, an individual by the name of Eddie

7  Rodriguez who worked at Crimestoppers?

8  A    Yeah; Deputy Eduardo Rodriguez?  Yes, ma'am.

9  Q    Yes.  Okay.  And it was your ultimate decision that caused

10 him to be moved from Crimestoppers into patrol, correct?

11 A    I don't remember the incident.  I don't remember why he

12 was transferred.

13 Q    Well, isn't it true that he was transferred because he

14 failed or refused to sell some of your campaign ticket --

15 fundraising tickets?

16 A    No.  No, that's -- that would not be true, because, again,

17 we don't force anybody to do anything they don't want to do.

18 And I don't -- I do not remember why he was transferred.  I

19 would -- we would have to look at the file, if there is a file.

20 I mean, I might have gotten a recommendation from the command

21 staff that maybe he wasn't performing adequately and we

22 transferred him out.

23 Q    Right; but you don't know, as we sit here --

24 A    I don't know.  I do not remember.  I'd have to review the

25 file.

1   Q    And you said "if there is a file."  Is there a possibility

2   that there is no file?

3   A    Right; there's a possibility there is no file, because

4   maybe there was not an investigation.  Maybe it was -- it was a

5   command staff decision, which they do have the right to do, as

6   I delegate that.  If they believe that a person is not meeting

7   their expectations, they can be transferred from one unit to

8   another or one division to another, and that's done quite

9   often.

10  Q    Wouldn't there at least be something in writing to

11  document that?

12  A    The only thing that would be in writing would be the

13  actual transfer, the notice that you are being transferred from

14  Unit A to Unit B, or wherever it might be.

15  Q    And, so, if that individual then wanted to file a

16  grievance, at that point, is that when the documentation

17  begins, as far as what the reasons were?

18  A    Well, there is no grievance.  That -- as sheriff, I have

19  the authority to assign people to wherever I want to assign

20  them to.  It's not their choice.  It is my choice.  And that I

21  delegate to the command staff, like in any organization, and

22  if -- and if they get transferred from A -- Unit A to Unit B,

23  for whatever reason, you know, that's not a grievable action.

24  He's not -- we're not taking disciplinary action against him.

25  It is a -- his pay is not being docked; he's not being demoted;

Trevino - Direct / By Ms. Gutierrez                    13

1    he's just being transferred from one job to another.

2    Q     But there are positions within the Hidalgo County

3    Sheriff's Office that, for whatever reason, might be more

4    appealing or less appealing, correct?

5    A     I guess that depends onto the individual, Ms. Gutierrez.

6    Q     Well, wouldn't you agree that being out on patrol is more

7    wearing on an individual than sitting in an office in an air --

8    in an air-conditioned office?

9         **MR. STURGIS:**  Judge, I'm going to object at this time

10   to the relevance.

11        **THE COURT:**  Sustained.

12   **BY MS. GUTIERREZ:**

13   Q     So, Sheriff Trevino, you're telling the jury that it is

14   possible that Eddie Rodriguez may have been transferred to

15   patrol because he didn't sell campaign fundraising tickets,

16   correct?

17   A     No.  I said exactly the opposite.

18   Q     Well, you said you didn't know.  Is that correct?

19   A     No.  No.  What I said was that it is virtually impossible

20   for something like that to happen without me knowing about it.

21   I'm sure Eddie Rodriguez would have come to my office and said,

22   "Sheriff, I'm being transferred because I don't sell tickets."

23   And that did not happen.

24   Q     Do you recall a female deputy by the name of Linda Garcia?

25   A     Yes, I do.

Trevino - Direct / By Ms. Gutierrez                  14

1    Q    And isn't it correct that you transferred her based on the

2    fact that she did not attend your kickoff campaign fundraiser?

3    A    That is absolutely not true.

4    Q    Sheriff, isn't it true that there -- that she recorded

5    your conversation and that recording is on You Tube under the

6    name -- the tape 0001?

7    A    I have never heard that recording.

8    Q    So, you're not aware of a recording where it is yourself

9    and Ms. Garcia discussing her transfer, you telling her that

10   she would be transferred?

11   A    I don't -- I didn't know that she was recording me.  I --

12   I had a conversation with her, and I did tell her she was being

13   transferred.

14   Q    Isn't it true that you told her that you had lost

15   confidence in her because she failed to go to this kickoff

16   party?

17   A    That's absolutely not true.  I told her I lost confidence

18   in her, in her performance in her job, not because she failed

19   to do anything.  That is absolutely not true.

20   Q    Well, isn't it true, Sheriff, that you told her in that

21   same discussion that she had done a good job?  She was

22   investigating the Sylvia Handy case, and you told her -- you --

23   she asked you, "Is it because I haven't done my job?"  And you

24   said, "No; in fact, you've done a good job."  Isn't that

25   correct?

1   A    I believe I did tell her she -- because she was a good

2   investigator, but she was -- she presented a hostile presence

3   in that office.  And, basically, the guys just -- they didn't

4   want to work with her anymore.

5   Q    And how is it that she presented a hostile presence?

6   A    Her attitude; just the way she conducted herself in the

7   office, and the guys just did not want to work with her

8   anymore.

9   Q    And isn't it true that you didn't tell her those details?

10  You didn't tell her that she had a hostile presence in the

11  office, that she had an attitude, or how she conducted herself

12  was the reason for the transfer.

13  A    That's right.  I did not.

14  Q    And that's because your say is final and you have that

15  authority to move people at your discretion, correct?

16  A    That's true.

17  Q    Do you recall an individual by the name of Miguel Flores?

18  A    Yes, I do.

19  Q    And isn't it true that he -- there was an internal affairs

20  investigation conducted on him after he -- it was revealed that

21  he was the individual who had secretly recorded some of the

22  ongoings with the Panama Unit?

23  A    Now, you're asking me if that was the reason for the

24  investigation?  Is that -- I didn't understand your question.

25  Q    Yes.

1   A    No, that was not the reason for the investigation.

2   Q    Isn't it true that there was some falsification of

3   documents to make it appear as though Mr. Flores had stolen

4   some drugs from a source?

5   A    That's the first time I hear about that.

6   Q    Can you tell the jury why it was that Miguel Flores was

7   transferred, then?

8   A    Miguel Flores was transferred because he took -- he was a

9   member of the narcotic unit, and he took action on some

10  individuals without notifying his supervisor.  He was fairly

11  new in narcotics, and I decided he was not ready for it, and we

12  transferred him.

13  Q    Isn't it true that Mr. Flores was working with the FBI

14  together with the Panama -- while at the same time associating

15  with the Panama Unit, and that caused some problems for the

16  sheriff's office?

17  A    I have absolutely no idea if he was working with FBI or

18  not.  You'd have to ask the FBI that.

19  Q    So, you were never made aware; is this the first time

20  you're hearing of this?

21  A    Oh, no; it's rumored all over the department, and he even

22  said it himself, but, I mean, nobody officially has ever told

23  me that he was an FBI informant.

24  Q    Isn't it true that the Panama Unit members all signed

25  affidavits that were submitted to you stating that an

1  individual, a source of information, had claimed that

2  Mr. Flores had stolen some drugs from him?

3  A    There was only two members that submitted those

4  affidavits, and I don't believe the gist of the affidavit was

5  that Miguel Flores had stolen drugs from an individual; I

6  believe the affidavits alluded to Mr. Flores asking two other

7  members of the Panama Unit to meet a friend of his so that they

8  could conduct a home invasion.

9  Q    Isn't it true that Gerardo -- well, Sheriff, answer this

10 for me.  Gerardo Duran was working closely with the Panama

11 Unit, correct?

12 A    He was not assigned to the Panama Unit, and he was never

13 directed to work with the Panama Unit.  He did that on his own.

14 Q    But he was working closely with the Panama Unit.

15 A    Well, I don't know.  He was -- again, I never assigned him

16 there.  If he associated with them, that was on his own time,

17 not on company time.

18 Q    Well, but I'm asking you, based on what you know, that

19 Duran did, in fact, associate with and work with the Panama

20 Unit, not that he was assigned.  Is that correct?

21 A    Well, what I've learned from testimony and the guilty

22 pleas, yes.

23 Q    And you're telling the jury that you had no knowledge of

24 this.

25 A    No.  That he was working with the Panama Unit?

1  Q    Yes.

2  A    No.

3  Q    And the Panama Unit was reporting directly to you,

4  correct?

5  A    No.  That's not correct.

6  Q    Who did the Panama Unit report to?

7  A    The Panama Unit reported directly to a sergeant.  That

8  sergeant was instructed, as by original agreement that I had

9  with the chief of police in Mission -- and at that time it was

10 Leo Longoria -- that I was going to give him one sergeant, and

11 I don't remember exactly how many deputies I was going to

12 assign to him, so that they could help clean up the street-

13 level drug dealing in the City of Mission; and they were to

14 report directly to them.  And that is evident by -- if you

15 look -- if you at the statistics and you look at all of the

16 seizures, I think, like, I would say 95 percent of all the

17 seizures, even more than that, that the Panama Unit ever made

18 were processed through the Mission Police Department and

19 through the Mission Municipal Court and through the Mission

20 evidence procedures.  I believe my sergeant, which was Sergeant

21 Roy Mendez, communicated a lot more with Chief Longoria than he

22 ever did with me.  I did not know or have any knowledge

23 whatsoever of their daily operations.  The only oversight that

24 we retained at the sheriff's office was the assignment of

25 personnel, approving time off, and that sort of thing.  That

Trevino - Direct / By Ms. Gutierrez                    19

1    was the oversight that we had.  But, ultimately, that sergeant

2    and those deputies worked under me, so, I guess technically you

3    could say that, yes, you know, but -- even though I'd had no

4    idea what they did on a daily basis.  It's pretty much the same

5    thing I do with the FBI, with DEA, with ICE, and with the

6    marshals.  I assign deputies to them, and I expect those

7    federal agencies to supervise my deputies, as I expected

8    Mission to supervise my deputies.  It was the same concept.

9    Q    But if they ultimately reported to you, shouldn't you have

10   done some supervisory -- shouldn't you have been supervising

11   them to some extent?

12   A    No.  Again, the task force concept is very different than

13   from a regular policing concept.  The agreement was that they

14   would be assigned to another agency under their supervision to

15   clean up -- help clean up their city.

16   Q    But the sheriff's office was paying them, wasn't it?

17   A    That's right.  We were paying all of our deputies.  Yes.

18   Of course.

19   Q    Okay.  So, the sheriff's office is paying these employees,

20   however, is not regulating or supervising their actions at all.

21   Is that what you're telling the jury?

22   A    That's exactly what I'm telling the jury.  The same thing

23   that we do with the federal agencies.  We pay their salaries,

24   but they're under their direction.

25   Q    Isn't it true that Gerardo Duran approached Miguel Flores

1    about working with the Panama Unit and ripping off these drug

2    loads?

3    A    That's the first time I hear that Duran approached Miguel

4    Flores.  I have no knowledge of that.

5    Q    During the -- is it possible that internal affairs has

6    that information?

7    A    I seriously doubt that, because I reviewed that file, and

8    I don't remember ever reading in that file that Duran

9    approached Flores.  He might have; I don't know.  I think -- it

10   might be in the file.  I don't -- I don't recall.

11   Q    Isn't it true that the problem that arose with respect to

12   this source is that when Miguel Flores connected the Panama

13   Unit with his source it turns out that the Panama Unit had

14   already ripped off his source?

15   A    I have no idea.  I do know that -- that I made it a

16   priority to identify who those people were.  And our unit was

17   successful in identifying them.  Now, I don't recall their

18   names, and I don't know if the Panama Unit had anything to do

19   with them.  And I -- that's a matter of record somewhere;

20   probably Mission P.D. may have a record of that if they ever

21   arrested them or had anything to do with them.

22   Q    But you testified that internal affairs conducted an

23   investigation.

24   A    That's right.

25   Q    So, why is it that Mission Police Department would have a

1    file?

2    A    No, I'm talking -- no.  I'm answering your second

3    question.

4    Q    Okay.

5    A    Your second question was:  Is there -- is there a

6    record -- or you said -- alluded to that the Panama Unit had

7    ripped off those people.  I have no idea of that.  And I'm sure

8    internal affairs does not either.  If any -- if there was any

9    connection or any prior action between the Panama Unit members

10   and those people, I would imagine it would be in a police

11   report somewhere, and it would have to be at the Mission Police

12   Department.

13   Q    Okay.  But you testified that it was two Panama Unit

14   members who had signed affidavits.

15   A    That's right.

16   Q    So, there is some connection between the Flores issue and

17   the Panama Unit members, correct?

18   A    Well, yeah.  That -- I don't think we've denied that.

19   Yes.

20   Q    Well, you said that you had no knowledge that the Panama

21   Unit was involved.

22   A    No.  Ms. Gutierrez, you asked me if -- if the Panama Unit

23   had ripped off those sources.  And I'm saying I have absolutely

24   no idea about that.  Now, is there a connection between Flores

25   and the Panama Unit?  Well, obviously, yes.  There is a record

1   of that.  There's two affidavits that connect those two Panama

2   Unit members to Flores.  Now, you were -- you asked me three

3   questions at once.  The source's connection to the Panama Unit

4   is what I have no knowledge of.

5   Q    Who were the two individuals from the Panama Unit who

6   filled out affidavits?

7   A    It was former Deputy Sal Arguello and former Deputy Duran.

8   And Duran, again, was not a member of that unit.

9   Q    Isn't it true that you forced Duran to fill out that

10  affidavit?

11  A    Forced him?

12  Q    Yes.

13  A    Absolutely not.  I -- I ordered him to fill out

14  affidavits, which then I called in the FBI and I gave them

15  those affidavits.

16  Q    Correct.  Aren't you aware, though, that Flores told

17  internal affairs that -- that Duran had made that claim?

18  A    I don't recall that.  I'd have to review the file.

19  Q    But internal affairs works for you, and, therefore, it's

20  not their job to investigate any claims made against you,

21  correct?

22  A    Okay.  What claim was made against me?  I lost that one.

23  Q    Well, the fact that -- if, in fact, it's true that Duran

24  claimed that the sheriff forced him to sign that affidavit,

25  what I'm saying is internal affairs, because they work for you,

Trevino - Direct / By Ms. Gutierrez                23

1    they're not -- they don't have the job of investigating you,

2    correct?

3    A    I don't know that Gutierrez -- I'm sorry; not Gutierrez --

4    I am not sure that Duran ever said that I -- that he was forced

5    to do something.  That's the first -- this is the first time I

6    hear about this.

7    Q    And I understand that, Sheriff.

8    A    Yeah.

9    Q    And I'm not asking you that.  I'm saying if, in fact, he

10   did make that claim, internal affairs would not investigate

11   you, correct?

12   A    Well, probably not.  Yeah, you're -- you're right.

13   Q    And Miguel Flores was not terminated, correct?

14   A    No, he was not.

15   Q    So, then, the conclusion or determination that came from

16   the internal affairs investigation, it turned out to be untrue;

17   is that correct?

18   A    No, that's not true either.  Miguel Flores had had -- I

19   saw Miguel Flores as a -- as an individual with a lot of drive,

20   with a lot of promise, but very inexperienced.  And because of

21   that, I gave him a -- either a verbal or a written reprimand.

22   It was something extremely light.  And I told him he wasn't

23   ready yet for that type of work, and he was going to go back to

24   the street.  And the morning that I told him that, I told him I

25   thought he -- I said, you know, "Miguel, I think you're a fine

Trevino - Direct / By Ms. Gutierrez                    24

1    young man, I think you've got a great future ahead of us --

2    ahead of you with us, and but you need a little bit more

3    experience."  And he said, "I realize that, Sheriff, and I

4    promise you I'll never mess up again, and I'll -- I'll do my

5    time in patrol, and then we'll go forward from that."  And that

6    was his words to me when we met in the hallway.

7    Q    So, are you saying that the internal affairs investigation

8    on Flores turned out to be true and correct and, therefore, you

9    told him, "You're inexperienced and you should probably go back

10   to patrol"?

11   A    That's right, and he was either -- I'm not sure if he got

12   a verbal or a written reprimand for failing to -- I believe it

13   was for failing to notify his supervisors of the action that he

14   had taken.

15   Q    And, so, you're telling the jury that there was an

16   internal investigation -- an internal affairs investigation

17   conducted on Flores --

18   A    Yes.

19   Q    -- that turned out to be true, and the --

20   A    Yes.

21   Q    -- the focus, or the claim, of this investigation was that

22   he was trying to rip off some drugs from a source, and you

23   didn't terminate him?

24   A    I did not terminate him because the facts of the

25   investigation showed that that could not be proven.  I could

1   not prove that he actually did that.  We were actually able to

2   find the other individuals that Flores had introduced to

3   Mr. Arguello and to Mr. Duran, but the facts of the case did

4   not show that he was -- that he actually did that.  So, I

5   didn't feel comfortable taking action against him more severe

6   than what I did.  I just didn't feel comfortable with it.  I

7   was -- I was trying to be as fair as I could with him.  And we

8   just -- we just couldn't prove it.

9   Q    Isn't that -- wasn't the allegation made against Flores a

10  very serious allegation?

11  A    Absolutely.  And that's -- and we took it very serious,

12  and this is why we conducted the investigation, but the results

13  of the investigation did not indicate that we had enough

14  evidence to terminate him that I could show at a civil service

15  hearing that I was right.  I just -- it just wasn't there.  If

16  it's not there, we're not going to fabricate it; if it's not

17  there, it's not there.

18  Q    So, you chose to keep somebody in your office that

19  potentially could, in the future, steal drugs from drug

20  traffickers, correct?

21  A    No, that's not correct, because the investigation did not

22  show that, Ms. Gutierrez. If the investigation had showed that

23  Mr. Flores was corrupt and that he actually did that, then

24  Mr. Flores would probably -- hopefully, he would have been in

25  jail, not only -- not only just fired.  And, but the facts of

Trevino - Direct / By Ms. Gutierrez                    26

1   the case, the results of that case, didn't prove that.  We

2   couldn't prove that.

3   Q    But it sounds to me like what you're talking about is that

4   you're asking that -- or you're saying that internal affairs

5   would have to do the job of a court in convicting him, proving

6   that he did it, before you took action such as terminating him.

7   A    Ms. Gutierrez, quite obviously, you don't understand the

8   investigative process.  We investigate to find facts that we

9   can take to a prosecutor that shows sufficiency of probable

10  cause to effect an arrest.  And if the D.A. or the U.S.

11  Attorney's office believes it, that there is sufficiency of

12  probable cause, then we take it to trial.  I mean, it's just --

13  it's -- that's what we do every day on all of our

14  investigations.  We conduct murder investigations where we have

15  a prime suspect, and we know that he did it; we just don't have

16  the proof, and we have to let go.  I mean, that's -- that goes

17  with any investigation.

18  Q    Well, right, but what you stated is that your

19  investigation gets forwarded to the District Attorney's office

20  and they're the ones that decide whether they're going to

21  prosecute based on the evidence, correct?

22  A    Absolutely.  That's the way it works.  That's right.

23  Q    However, you just described to the jury that it was -- it

24  is internal affairs, with respect to Flores's case, that

25  because they couldn't make the determination that there was

1    proof --

2    A    Right.

3    Q    -- that you took no action.

4    A    That --

5    Q    Well, I apologize.  You didn't terminate him.

6    A    That's right.  I did not terminate him because there

7    was -- the sufficiency of evidence was not there to prove it.

8    Q    And, so, as we sit here today, you understand that your

9    office has a problem with the fact that there were more --

10   there were various individuals within your department who were

11   corrupt, correct?

12   A    Absolutely.  Yes.

13   Q    However, you're telling the jury that in some cases you

14   allowed individuals who may be corrupt to remain within your

15   office because there were no -- there was no proof, correct?

16   A    No, that's not correct.  How would I know that a

17   individual is corrupt unless we conduct an investigation to

18   show that?  The investigation against Miguel Flores did not

19   indicate in any way that -- or at least have the sufficiency of

20   evidence and probable cause to do something against him.  Now,

21   we have conducted numerous other internal affairs and criminal

22   investigations within our own department where we have found

23   people to be in violation of the law that are eventually

24   arrested and prosecuted.  But in the Miguel Flores case we

25   just -- it just wasn't there.

Trevino - Direct / By Ms. Gutierrez                28

1   Q    How is it that the Miguel Flores case came to your

2   attention?

3   A    That's a good question.  Let me think.

4   Q    Isn't it true that your son is the one that informed you?

5   A    Yes.  That's right.  I forgot.  Yes.  Jonathan Trevino, my

6   son, assigned to the Panama Unit, employed by the Mission

7   Police Department, called me one night, and it was late at

8   night, to tell me what -- that -- that -- I'm not really sure;

9   I don't remember the facts, if -- I believe that either Duran

10  or Arguello had called him about a possible stash house that a

11  deputy had -- had pinpointed, and they wanted -- and the deputy

12  had told them that he had done this in the past before and that

13  he wanted those two deputies to rip off the house.  And

14  Jonathan called to alert me to that.

15         And I -- I mean, I got very upset; not that he called

16  me, but that he didn't go through his chain of command and

17  notify them so that we could -- could have set up a sting

18  operation to either catch Miguel Flores or to catch the real

19  crooks or to even catch the two -- two deputies that -- that

20  were involved in this.  And the procedures just were not

21  followed, and that's what really upset me about this whole

22  thing, where -- it was so serious, the argument was so serious

23  between Jonathan and I, that Jonathan stayed away from the

24  house for a few days and he missed Thanksgiving dinner with the

25  family because he was really upset.  And it -- it also upset me

1   that it went down that way.  But, you know --

2              **THE COURT:**  What year are we talking about?

3              **THE WITNESS:**  Sir?

4              **THE COURT:**  What's the time frame here?

5              **THE WITNESS:**  November of '12.

6              **THE COURT:**  Twelve.  Okay.

7   **BY MS. GUTIERREZ:**

8   Q    You mentioned two deputies that were involved.  What two

9   deputies are you talking about?

10  A    The same thing -- the same two that you asked me to

11  identify a second ago:  Arguello and Duran.

12  Q    And, so, it's clear that Jonathan didn't follow the chain

13  of command; he didn't follow procedures, correct?

14  A    That's correct.

15  Q    However, there was no action taken against him, correct?

16  A    I had no authority over Jonathan.  Jonathan worked for the

17  Mission Police Department.

18  Q    However, he sought your counsel with respect to what to do

19  with this issue, correct?

20  A    No.  That -- no.  See, that's the difference.  That was

21  the argument that I had with him.  That was -- that was the

22  very serious disagreement that I had with him.  He called to

23  tell me that he had already taken that sort of action.  He did

24  not --

25  Q    What action?

1    A     Notifying Duran and Arguello to go meet with Miguel,

2    surveil the place, take notes, do what you ordinarily would do

3    in that investigation, and then come back and report, when,

4    actually, that's the wrong way of doing it.  The first thing he

5    should have done was call his supervisor and say:  This is what

6    we have.  And then we would have notified, maybe got additional

7    help from -- from the FBI, because we don't have the

8    specialized equipment for the recorded surveillance, and we

9    would have set up a sting operation, which after the fact I

10   find out that happens, and that's when I turn it over to the

11   FBI for them to follow up on.

12   Q     But he contacted you, Sheriff, instead of -- his father

13   instead of the sergeant.

14   A     That's right.  And that was his biggest mistake.

15   Q     And that was his practice; isn't that correct?

16   A     No, that's not correct.  I -- I hardly ever spoke to

17   Jonathan.  I would call him because I was worried that he was

18   on the street, like any father would worry.  I mean, I did

19   that -- I did that type of work for a lot of years when I

20   worked in Austin, and there is a lot of danger assigned to it,

21   and -- and I worried.  Naturally, I worried about him.  So, I

22   used to call him and ask him, "How are you all doing?  Are you

23   doing okay?  Are there any problems?"  Says, "No, we're okay."

24   And he said, "We're working on this big thing," or he'd call

25   and say, "Hey, we just busted this big thing."  But I'd never

1    ask for details.  He was more bragging and gloating than

2    anything else to me.  It's not that he was reporting to me.

3    Q    That would -- that didn't raise your suspicion as to what,

4    in fact, is going on with the Panama Unit?

5    A    Well, yeah, absolutely.  And the first thing I did was I

6    called -- I called Fabian and asked him, "What is going on

7    here?  What's the deal with these two guys and Jonathan and

8    Miguel Flores?  Why is he -- why is he all so upset?"  That was

9    after he hadn't shown up for two or three days at the house and

10   missed the family Thanksgiving dinner.  And he said, "Well,

11   he's very upset at you" -- Jonathan being upset at me --

12   because I didn't -- because I had questioned him as to why he

13   didn't follow the chain of command.

14   Q    And at that point you didn't feel that it might be a good

15   idea to get him off of that Panama Unit?

16   A    That was not --

17   Q    You --

18   A    That was not my decision, Ms. Gutierrez.  That decision

19   belonged to the chief of police in Mission.  I already

20   testified to that.  He worked for the Mission Police

21   Department.

22   Q    Well, right; but you're not telling the jury that you

23   couldn't have called the Mission police chief and suggested:

24   There might be a problem here; there are individuals that are

25   going outside the chain of command; they are taking actions --

1    they are taking their actions into their own hands without

2    informing their supervisor; and there might be a disaster

3    because of it, so we need to do -- we need to act.

4    A    I did that, but through the sergeant -- I talked to

5    Sergeant Mendez.  I said, "You know, we've got a very serious

6    problem here.  You've got your people going out of the chain of

7    command doing this type of stuff; you know, you tell me what's

8    going on."  And he had no answer.  And it was quite obvious --

9    I mean, again, Monday morning quarterback, like we did the

10   other day I was here -- it was pretty obvious that the Panama

11   Unit was working outside the rules and outside the supervisor's

12   knowledge.  They lied to the supervisor as much as they lied to

13   me.

14   Q    And isn't it true that you had the power at that time to

15   dismantle that with the cooperation of the Mission chief?

16   A    Absolutely.

17   Q    But you didn't do that, correct?

18   A    No, I did not.

19   Q    And that was because it was your son's -- the Panama Unit

20   was created for your son; isn't that true?

21   A    No, that is not true.  Panama Unit was created to help

22   clean up the city, the streets of Mission.  As a matter of

23   fact, I had spoken to other police chiefs, and I told them that

24   -- that was going to be, like, a pilot type program to see if

25   actually we could do something like that; because back in the

Trevino - Direct / By Ms. Gutierrez                33

1   '80's or early '90's there used to be a local task force made

2   up of local agencies that took care of street-level drug

3   dealing.  And I believe that was disbanded in '05, so there was

4   nobody helping the smaller cities clean up the streets on

5   street-level drug dealing.  And I thought that was my

6   responsibility, and that was a pilot program.

7   Q    So, then, does the fault of what occurred with the Panama

8   Unit lie on you?

9   A    Absolutely.  And I've admitted that a hundred times.  I

10  mean, you know, in crisis management, which is exactly what

11  this is, the buck stops with me.  I am the man in charge.  And

12  I have taken full responsibility for it.  Even though I had no

13  knowledge of what was going on, as the supervisor, you have to

14  say, yes, it's me.  And the thing you do is you look at it, you

15  analyze it, you take corrective action, and you assure the

16  people that this will never happen again.

17  Q    Sheriff, let's talk about -- let's talk a little bit about

18  your son, because his TCLEOSE report -- which is the Texas

19  Commission on Law Enforcement Officers Standard Education

20  report -- they maintain the officers' information as far as

21  when they were licensed, what educational courses they've

22  taken, what awards they've received, correct?

23  A    That's correct.

24  Q    Okay.  And that information they received from either the

25  sheriff's office, if they're employed there, or whatever agency

Trevino - Direct / By Ms. Gutierrez                    34

1    they're employed with, correct?

2    A    You're correct.

3    Q    And, so, his report indicates that he was working as a

4    peace officer for both the Hidalgo County Sheriff's Office and

5    the Mission Police Department.  Isn't that correct?

6    A    That's correct.  And the reason for that is I have

7    commissioned police officers in almost all of the local police

8    agencies as deputies -- McAllen, San Juan, Weslaco; almost all

9    of the police department -- Edinburg -- almost all police

10   departments have deputies -- I mean, I'm sorry -- have officers

11   that have a double commission; not only the city, but the

12   county.  And the reason that I do that is, if they have to

13   conduct investigations out in the county somewhere, you know,

14   they've got that jurisdiction.  This is a way for me to help

15   the cities in their investigations.

16   Q    Okay.  So, then, the report is accurate when it says that

17   Jonathan Trevino was a peace officer for both the sheriff's

18   office and the Mission Police Department, correct?

19   A    Technically, no.  He was a full-time police officer for

20   the City of Mission.  He was a reserve deputy with Hidalgo

21   County Sheriff's Office.

22   Q    Okay.  Well, wouldn't you agree that this -- well, would

23   you agree that the report for your son states that he was a

24   reserve officer for the Hidalgo County Sheriff's Office,

25   service start date February 13th of 2006 with service end date

Trevino - Direct / By Ms. Gutierrez                35

1   of February 13th, 2006?  We're talking about the same day, one

2   day.

3   Q    Repeat those dates again?

4   A    Service start date February 13th of 2006, service end date

5   February 13th of 2006.

6   A    That he was only a reserve officer for one day?

7   Q    Yes.  It --

8   A    No, that -- that's -- that's an error.

9   Q    Well --

10  A    He wouldn't -- the state has made an error in their

11  paperwork, and that's -- and that's not surprisingly, because

12  my TCLEOSE paperwork shows that I was a police officer in

13  Arlington, and I never have been.  I mean, they're known to

14  make a lot of mistakes on their paperwork.  Jonathan's

15  commission was taken away from him on December the 12th of '12.

16  Q    Well, it states that it was -- with the Hidalgo County

17  Sheriff's Office as a peace officer he started December 2nd of

18  2008.  Is that date correct?

19  A    I have no idea.  I would have to look at the records.  I

20  do know -- I do know the date that it was revoked, you know,

21  that I took it away from him.  That day I do know.  That was

22  December 12th of '12.  When he was commissioned, I'd -- I would

23  have to look at the -- at our personnel records.

24  Q    Okay.  And how long was your son working with Hidalgo

25  County Sheriff's Office?

Trevino - Direct / By Ms. Gutierrez                36

1   A    Well, if I knew that, I could tell you -- I could give you

2   the date that he was commissioned.  So, I -- I don't know how

3   long that he -- that he was -- he didn't work for us.  That's

4   not the wrong -- the correct way of saying it.  He did not work

5   for us; just like the other police officers I have commissioned

6   don't work for us.  They just have the county authority to

7   enforce the law, conduct investigations out in the county, and

8   they don't get paid for this.

9   Q    But you -- you testified that they were paid by your

10  office.

11  A    Which --

12  Q    Wasn't Jonathan Trevino paid through -- by the Hidalgo

13  County Sheriff's Office?

14  A    Absolutely not.  That would be nepotism.  No.  He was not.

15  Q    Okay.  And what about --

16       **THE COURT:**  We're getting a little far afield.  Let's

17  try to rein it in to something related to either his

18  credibility or the credibility of the Government's witnesses,

19  which is what's been most of the testimony these last -- this

20  last day.

21  **BY MS. GUTIERREZ:**

22  Q    When the Panama Unit was created, Jonathan Trevino was one

23  of the first or original members of the Panama Unit; is that

24  correct?

25  A    That's correct.

Trevino - Direct / By Ms. Gutierrez          37

1   Q    Along with some of the other individuals from Hidalgo

2   County Sheriff's Office, correct?

3   A    That's correct.

4   Q    And that was a decision that you made as far as the

5   deputies from Hidalgo County Sheriff's Office to be assigned to

6   the Panama Unit, correct?

7   A    Right.  I have the ultimate decision as to who is assigned

8   to all the different task forces.  Yes, ma'am.

9   Q    How did you make that decision?

10  A    How did I make that decision?

11  Q    Yes.

12  A    Based on -- on what I thought was their capabilities,

13  based on their eagerness to do that type of work.  There is no

14  test; there is no real formal interview.  Like the people that

15  I send over to the federal agencies, I send them there because

16  I think they're best suited for that job, as I -- as I thought

17  that those people were best suited for the Mission Police

18  Department.

19  Q    And what was the total amount of members of the Panama

20  Unit?

21  A    How many -- how many members?

22  Q    Yes.

23  A    I'm not really sure, Ms. Gutierrez.  I can name and we can

24  count.  I sent one sergeant; I know Arguello was there; Eric

25  was there; that's two.  Fabian; at one time Linda Chavez.

Trevino - Direct / By Ms. Gutierrez                    38

1   Maybe -- maybe four; four to five; to include the sergeant.

2   Q    And Jonathan, correct?

3   A    Well, Jonathan, again, was assigned to the Panama Unit by

4   the Mission Police Department.

5   Q    So, you were just giving me the names of those deputies;

6   is that right?

7   A    The ones that I am responsible for, yes, ma'am.

8   Q    So, we've got Arguello?

9   A    Arguello, Alcantar --

10  Q    That's Eric Alcantar?

11  A    Eric -- I'm sorry; yes, ma'am -- Eric Alcantar.  Claudio

12  Mata and Fabian Rodriguez and Sergeant Mendez.

13  Q    And their territory was all of Hidalgo County; is that

14  correct?

15  A    Technically, yes; but their instructions were -- and to

16  the sergeant -- that they were to stay only on the west side of

17  the county, but they were to focus on Mission.

18  Q    And these individuals, these deputies that you assigned to

19  the Panama Unit, they were all friends of Jonathan, correct?

20  A    I believe they were all acquaintances, yes, ma'am.

21  Q    Are you aware that there was testimony that Sergeant

22  Mendez was -- really reported to Jonathan, in actuality?

23  A    I heard that, but have you ever met Sergeant Mendez and

24  spoke to him?  I don't think you would believe that either.

25  Q    Well, there was also testimony that your son, Jonathan,

1    was a monster.  Are you aware of that?

2    A    I heard that -- I heard about that testimony.

3    Q    And, so, isn't it possible that Roy Mendez would defer to

4    Jonathan's decisions based on the fact that maybe he had a

5    strong personality, but also that he was your son?

6    A    I do not believe so, because I can tell you this with one

7    hundred percent accuracy.  I brought Sergeant Mendez in.  And I

8    told him:  You, and only you, are responsible for this unit.

9    Nobody runs this unit but you.  Those are your decisions,

10   operations are your responsibility, and the conduct of those

11   people are your responsibility.  And I brought him in and told

12   him that several times, like I have all other supervisors in

13   there, in other units.  But I specifically remember having that

14   conversation with Sergeant Mendez more than one time.

15   Q    Sheriff, isn't it true that you, along with all other

16   individuals within the Hidalgo County Sheriff's Office, were

17   hearing rumors well in advance of the time that the Panama Unit

18   got arrested about their illegal activities?

19   A    No, ma'am.  That is not true.

20   Q    So, you're telling the jury that you had no -- hadn't even

21   heard about the Panama Unit ripping off drugs until the time

22   they were arrested on December 12 -- 12 of 2012?

23   A    That's correct, Ms. Gutierrez.  I had absolutely -- it was

24   December 12 of '12.

25   Q    Yes.

Trevino - Direct / By Ms. Gutierrez                 40

1   A    I had absolutely no knowledge whatsoever.  Nobody ever

2   gave me any information that they were doing illegal

3   activities.  None whatsoever.  I think -- I think you have

4   to --

5              **THE COURT:**  You've answered the question.

6              **THE WITNESS:**  Thank you, your Honor.

7              **THE COURT:**  Go ahead.  Next question.

8   **BY MS. GUTIERREZ:**

9   Q    Sheriff, do you recall an incident that occurred around

10  mid 2012 where some individuals who -- residents of a home on

11  La Homa Road in Mission, Texas, made a complaint to the

12  sheriff's office about the fact that the Panama Unit, including

13  your son, Jonathan, had gone into their home without consent?

14  A    Without what?

15  Q    Without consent.

16  A    Without consent.  I don't remember that specific incident.

17  No, ma'am.

18  Q    You don't?

19  A    I just said I don't remember that specific incident.

20  Q    Okay.  Do you recall hearing anything about that report

21  that was made to your -- to the sheriff's office?

22  A    No, I don't.

23  Q    Nothing at all.

24  A    No.

25  Q    Okay.  So, nobody informed you that there had been a

1  complaint that the Panama Unit had conducted this illegal

2  activity.

3  A    No.  I -- I didn't -- no.  I have never -- I have never

4  been told by anybody prior to 12/12 of '12 that the Panama Unit

5  was involved in any illegal activities.  I had absolutely no

6  knowledge of -- of their activities whatsoever.

7  Q    Jonathan lived with you, correct?

8  A    That's correct.

9  Q    And it was all -- during the year of 2009 all the way up

10  until his arrest, Jonathan resided with you, correct?

11  A    I believe he moved back home in nine.  If I had to guess,

12  I would say you're right.

13  Q    Okay.  Aren't you aware of an incident that occurred on

14  July 26th of 2012 where the Panama Unit went to a house on El

15  Dora Road in Pharr, Texas, where some items were stolen from

16  the house?

17  A    Is this the Perez case?

18  Q    Yes, it is.

19  A    Yes.  I am aware of the incident, but the allegation that

20  was made to -- to us -- well, actually, we never did receive an

21  allegation.  The information that we received was that there

22  was a seizure done and there were some jewelry that was

23  missing.

24  Q    And were you made aware of the fact that the seizure of

25  drugs was not -- did not come -- the drugs did not come from

1  the Perez's home?

2  A    Now, I believe there's -- and I don't recall the -- that

3  was -- that case was filed through the Mission court, again, so

4  I don't recall the particulars of that -- of the drug seizure,

5  but I believe there was -- there was two seizures made.  I

6  believe there was one seizure made at the house where the

7  Perez's lived, and I believe there was a second seizure that

8  was made that Mr. Perez, as an informant, set up for the Panama

9  Unit.  That's the way I understand it.  And I may be wrong on

10  this.  I did not investigate that part, no.

11  Q    It was actually the Pharr Police Department; isn't that

12  correct?

13  A    I believe Pharr would be -- yes.  Yes, you're right.

14  Q    And this information did reach you, correct?

15  A    Yes.  Of course.

16  Q    But you're saying you didn't investigate it, correct?

17  A    No, that's not correct either.

18  Q    Well, you --

19  A    I did not investigate the actual drug seizures.  What I

20  did investigate, through internal affairs, was the missing

21  jewelry part.  That's the part that we did investigate.

22  Q    Isn't it true that you were informed of the fact that the

23  Perez's were claiming that they were essentially kidnapped from

24  their home and taken to a parking lot at Matt's Cash and Carry?

25  A    I heard that way after the fact, not during any -- any

1  investigation or anything like that.  It was way after the fact

2  when I heard about that.

3  Q    And wouldn't that cause you to investigate that

4  allegation?

5  A    That was being investigated by Pharr Police Department.

6  Q    And I understand that, Sheriff.

7  A    Okay.

8  Q    But if you say that the Panama Unit ultimately reported to

9  you --

10 A    Right.

11 Q    -- couldn't you have investigated that and not just left

12 it to the Pharr Police Department?

13 A    Well, the allegations were made against the members, and

14 they were reported to the Pharr Police Department.  You're

15 right.  I could have, but I left it to the Pharr Police

16 Department to investigate.  I conducted a different

17 investigation.

18 Q    When you say that the allegations were made against the

19 members, you're talking about the members of the Panama Unit,

20 correct?

21 A    That's correct.

22 Q    And you say that the allegations of illegal activity you

23 left to the Pharr Police Department; however, you chose to

24 investigate the missing jewelry, correct?

25 A    Exactly.  The missing jewelry was an administrative

1    matter, as it turned out.  It was not a criminal matter, after

2    checking with the D.A.'s office on it.  So, I left it up to the

3    Pharr Police Department to conduct their own investigation.

4    Q    So, you spoke with Rene Guerra with respect to --

5    A    Yes.

6    Q    -- this issue?

7    A    Yes, I did.  And our investigators, internal affairs,

8    spoke also with Assistant D.A. Murray Moore and got her opinion

9    on -- on the facts of that investigation, and she agreed that

10   there -- there was just no way we could file criminal charges

11   on that jewelry.

12   Q    And, so, you determined, or your internal affairs

13   department determined, that Claudio Mata had not stolen the

14   jewelry?  Is that what you're saying?  Is that what you're

15   telling the jury?

16   A    No.  What I'm telling the jury is that we gathered all the

17   facts and we took them before the D.A.'s -- actually, first we

18   took them before our criminal investigation division, and they

19   looked at it.  Then we took it to the D.A.'s office and they

20   looked at it, and they agreed -- it was not my decision.  They

21   agreed that that was not a prosecutable theft.  And the

22   reason -- if I can -- I don't know if you want that explained

23   or not, but --

24   Q    That's okay.  No.  Thank you.  But you did have the power

25   to charge him if you wanted to, correct?

Trevino - Direct / By Ms. Gutierrez                45

1   A    Not if there was not sufficient probable cause and the

2   D.A.'s telling you that you can't charge him.

3   Q    I'm not ask -- you don't -- you don't -- Sheriff, are you

4   telling the jury that on every single case, before you make

5   that decision, you speak with the D.A.?

6   A    Significant cases.

7   Q    So, the answer is, no, that you don't on every case go to

8   the D.A.

9   A    That's right.  Only -- only on what we believe are

10  significant cases.

11  Q    And the -- what was the value of the jewelry?

12  A    I have no idea.  I -- we'd have to look at the report.  I

13  don't remember.

14  Q    It was jewelry and cologne, right?

15  A    I don't --

16  Q    I think that that was --

17  A    I do not remember the items.  I'd have to look at the

18  report.

19  Q    But you do remember it was a theft.

20  A    No.  It was never determined to be a theft.  That's why it

21  was not prosecuted.

22  Q    And I understand that, but it initially started as an

23  allegation of theft, correct?

24  A    That's right.

25  Q    And, so, when it came to you, that is what you were

1    investigating, whether it was a theft or not, correct?

2    A    That's correct.

3    Q    Now, you were also provided information about the fact

4    that the Perez's were claiming that the Panama Unit had

5    violated their constitutional rights, correct?

6    A    No.

7    Q    Well, isn't it true that you were informed that the Panama

8    Unit had gone into their house, turned it upside down, and

9    taken them to the parking lot at Matt's Cash and Carry?

10   A    That was one version that I heard.

11   Q    And that is something that the Pharr Police Department was

12   investigating, correct?

13   A    That's correct.

14   Q    And you were made aware that there was surveillance video

15   from the Perez's home, correct?

16   A    That's correct.

17   Q    And you didn't bother looking at it, correct?

18   A    I believe internal affairs looked at it, yes.

19   Q    Okay.  So, but the fact is that this unit had your son in

20   it, and, so, even -- even that didn't cause you to look at that

21   video surveillance?

22   A    I had my internal affairs unit and criminal investigation

23   unit review it.  Precisely because my son was involved, I did

24   not want to make any decisions on there until we had all of the

25   facts.  And, again, I took it one step further.  Because it was

Trevino - Direct / By Ms. Gutierrez                47

1  a significant thing, I took it to the D.A. and to the Assistant

2  D.A. for them to review it and for them to make that decision.

3  Q    I understand that, Sheriff, but I'm now talking not so

4  much about the theft as I am about them going into this home,

5  taking this elderly couple, both husband and wife, out of their

6  home and driving them to -- in their vehicles -- to Matt's Cash

7  and Carry.  I'm talking about that aspect of it.

8  A    You know, I -- I think that's an allegation that's been

9  made, and I think that's going to be an allegation that's going

10 to be disproved, of what I hear now.  But -- but you're talking

11 about it like if it's fact.  And I don't know that that is a

12 fact.

13 Q    Well, it sounds to me like you don't know what happened --

14 A    That's right.

15 Q    -- because you didn't investigate it, correct?

16 A    That's right.  You're exactly correct.  I left it up to

17 the Pharr Police Department to investigate any criminal matters

18 associated with that particular case.

19 Q    And what was the outcome of that, Pharr's investigation?

20 A    I believe they turned it over to the FBI.

21 Q    And isn't it true that you were also made aware of the

22 Perez's allegation that they were forced -- that Mr. Perez was

23 forced to contact somebody who had some drugs that they had to

24 provide to the Panama Unit?

25 A    I think that's another allegation that's being made.

Trevino - Direct / By Ms. Gutierrez                48

1  That's part of a lawsuit that -- that I think will be

2  disproved.

3  Q    Isn't it true that the Panama Unit has already pled guilty

4  to having committed that action?

5  A    You know, I don't know.  I know that they -- I know my son

6  has accepted responsibility for what he has done.  And I know

7  that the other members of the Panama Unit have accepted

8  responsibility and pled guilty.  Exactly to what charges and

9  what were the specifics, I do not know.

10 Q    Are you telling the jury that you have not looked at the

11 indictment in this case?

12 A    As a matter of fact, Ms. Gutierrez, I have not.

13 Q    So, are you telling the jury that you have not

14 communicated with Jonathan about how his case is going?

15 A    I didn't say that.  What I said was I have not read the

16 indictment.

17 Q    And you haven't communicated with Jonathan about what he

18 is being charged with?

19        THE COURT:  Irrelevant.  He's not a witness.  Let's

20 move on.

21 BY MS. GUTIERREZ:

22 Q    Sheriff, do you recall an incident that occurred December

23 12th of 2012 where the Panama Unit seized some cocaine that had

24 GPS trackers?

25 A    Yes.

EXCEPTIONAL REPORTING SERVICES, INC

Trevino - Direct / By Ms. Gutierrez                    49

1   Q    And on that incident, it occurred at night, correct?

2   A    No.  No, you're wrong.

3   Q    What time of day did it occur?

4        THE COURT:  Well, remind -- what month and year are

5   we now?

6        MS. GUTIERREZ:  December 12 of 2012.

7        THE COURT:  Oh.  Right.  Okay.

8   BY MS. GUTIERREZ:

9   Q    What time of day did that occur?

10  A    I would have to say it was between -- I don't remember the

11  exact time.  I would say between 11:00 and maybe 12:30.

12  Maybe --

13  Q    Was that 11:00 a.m.?

14  A    Ma'am?

15  Q    Eleven a.m.?

16  A    A.m.  Yes, ma'am.

17  Q    And you know about this incident because you showed up to

18  the scene, correct?

19  A    That's correct.

20  Q    And you showed up to the scene after Jonathan contacted

21  you, correct?

22  A    That's correct.

23  Q    And isn't it true that while you were on -- you were on

24  the scene only about 10 minutes, and then you take off,

25  correct?

1  A    No, I think I was there a little bit longer than that,

2  because I had some real concerns about the seizure, and I

3  immediately called the FBI and I called DEA, and there -- there

4  is a reason for that.  And I don't know if we want to get into

5  it now, but --

6          THE COURT:  Well, I don't -- I guess I'm -- what I'm

7  having a hard time following is, earlier you said you had a

8  conversation with your son when -- and were upset with him when

9  he didn't follow the chain of command; he called you about an

10  incident, and you said, "Look, you need to call your

11  supervisor," or whatever.  But now you're telling me he calls

12  you --

13          THE WITNESS:  Yes.

14          THE COURT:  -- and you then, instead of telling him,

15  "Hey, call your supervisor if you have some issue," you go to

16  the scene.

17          THE WITNESS:  Yes.

18          THE COURT:  Why?

19          THE WITNESS:  There is an explanation for that, if

20  you'll allow me.

21          THE COURT:  What's the -- what's the right -- why

22  are -- why are --

23          THE WITNESS:  Yes.

24          THE COURT:  -- has the policy changed?

25          THE WITNESS:  What happened was on 12/11 of '12, or

Trevino - Direct / By Ms. Gutierrez                   51

1    either very late at night or on the early morning hours of

2    12/12 of '12, there was either a homicide or a multiple

3    critical shooting in the area of Goolie Road and Minnesota.

4    The media asked me if I could give an interview and give them

5    the details on that case since I did not make the initial crime

6    scene.  And I said that I would meet them in the area of Goolie

7    Road and Minnesota; somewhere in that colonia where the actual

8    murder or homicide or shooting took place.  I met the media

9    there.  Two of them showed up.  One was running late.  I gave

10   the interviews; we sat there, we talked about the case; we

11   spent more time there than I should have waiting for the other

12   station to show up.  The other station never showed up, so I

13   left, and then I ran into them at the intersection of Minnesota

14   and Valverde.  And I think it was Channel 40 that -- that was

15   running late, I think.  I met them at that intersection, and I

16   gave the interview, we spoke; then I -- and I always have my

17   police radio on.  I'm always scanning the channels to see

18   what's going on.  And I hear the Panama Unit asking for

19   assistance, because they use their moniker, "Panama Unit,"

20   whatever, asking for assistance from the sheriff's office.  And

21   it caught my ear.  I then called the radio, the dispatcher,

22   said, "What's going on?"  And they said, "We've got some sort

23   of incident somewhere in the area of Border Road and Frontage."

24   That's in Weslaco, Donna area.  And I said, "Okay.  What are

25   they asking for?"  And they said, "They're asking for the

1   Panama Unit supervisor, and they're asking for marked,

2   uniformed units."  And I said, "Okay."  And I guess Jonathan

3   might have heard me on the radio.  He calls me on the cell

4   phone, and I'm asking -- and I asked him, "What's going on?"

5   He said, "I need a supervisor, and I need some units over here.

6   We have a unique situation."  I said, "Okay."

7           I happened to be, like, maybe two miles away from

8   there.  I made a U-turn, turned back around, went over there,

9   and that's when I found that there was a traffic stop, and

10  during that traffic stop they came across some transmitters, or

11  GPS transmitters, within the packages of the drugs, and I also

12  saw there was a lady there that was going hysterical, and she

13  was crying and screaming and all, and I took her off to the

14  side, and I said, "What is wrong with you?"  She says, "Those

15  packages belong to the Sinaloa Cartel, and they're following

16  me, and we're all going to get killed."  I mean, I didn't know

17  if it was true or not.  I had absolutely no idea what was going

18  on.  But in the interest of safety, I was able to get a couple

19  of marked units there, maybe three of them; other members of

20  the Panama Unit showed up; and the supervisor showed up.  And

21  it wasn't Roy Mendez anymore.  I already changed supervisors.

22  It was Sergeant Rudy Salinas.  I instructed them what the lady

23  had told me, and I said, "In the interest of safety -- and I

24  don't know what the Sinaloa Cartel is or what they're going to

25  or what they're not going to do -- I want you to pack

Trevino - Direct / By Ms. Gutierrez          53

1    everything up and take it the office and we'll sort it out at

2    the office."

3             And as soon as I got to the office, I called the FBI,

4    and I called DEA, and I told them -- and I told them this:  I

5    said, "We have one of two things here.  Either the Sinaloa

6    Cartel is really tracking these things and we've got a problem,

7    a safety problem, or these are your GPS units and you need to

8    come and collect them and do what you have to do."  Shortly

9    thereafter the head of the McAllen office of the FBI, the head

10   of the DEA office here in McAllen, and the head of the FBI

11   corruption unit showed up to my office, like maybe an hour

12   later, after several telephone calls, and they explained the

13   entire thing to me, the sting operation, and that's when I

14   said, "Okay.  Do what you have to do."  And they took the

15   woman, they took the drugs, and they took the transmitters.

16   That's how I became involved in that particular -- in that

17   particular case.

18   **BY MS. GUTIERREZ:**

19   Q    Isn't that -- the sting operation was on the Panama Unit;

20   isn't that true?

21   A    Well, what I hear now, yes, that's exactly what it was.

22   Q    So, this is the incident that revealed everything and

23   caused their arrest, correct?

24   A    That was -- right.  You're right.

25   Q    So, the FBI, when they took the woman, they took the

1   drugs, they took the GPS trackers, they also took the Panama

2   Unit, correct?

3   A    No.  They did not.

4   Q    At some point they took them.

5   A    Not that afternoon they didn't.

6   Q    Well --

7   A    They were not arrested immediately.  The FBI allowed --

8   well, the FBI took -- now, they -- I'm sorry.  They instructed

9   some of those Panama Units to meet them at the office, at the

10  FBI office.  Jonathan was still with the sergeant interviewing

11  this lady that was going hysterical on us there at the office.

12  The head of the FBI here in McAllen -- I told him, you know,

13  "Hector, you do what you have to do."  And he says, "Well, let

14  me make a phone call."  And in my presence -- and he put it on

15  speakerphone -- he called his boss in San Antonio, Armando

16  Fernandez -- this is the FBI SEC -- and he said, "This is the

17  situation.  Is it okay with you if we leave Jonathan here with

18  his father and to contact his attorney, and he'll show up in

19  our office next -- whenever we need to talk to him."  And on

20  speakerphone, Mr. Fernandez said, "Yes, that's fine.  Just go

21  ahead and do it."  And that's the way it turned out, and the

22  rest is history.

23  Q    Isn't it true that you questioned that individual about

24  what federal agency she was working for?

25  A    Yes, I did, because, see, at that point I needed to make a

1    decision:  Do we need to get out of here because the Sinaloa

2    Cartel is going to try and rip the drugs back?  Or is it okay,

3    and can we take our time because there's a federal agency

4    involved?  I needed to make that decision quick.  And she stuck

5    to, "Yes, we -- this is a Sinaloa thing."  That's when I said,

6    "Well, we're going to get out of here."  But I think, from my

7    experience -- because I've been doing -- I've been doing this

8    for over 40 years.  And I think it was pretty obvious to me

9    what the deal was.  It wasn't to them, because they're very

10   young, very stupid, inexperienced.  But to me it was obvious

11   what was going on.  That's why I called the FBI and DEA

12   immediately.

13   Q    So, it was obvious to you that the Panama Unit was going

14   to steal those drugs?

15   A    No, ma'am.

16   Q    What was obvious?

17   A    That's not what I said.  What was obvious was that those

18   transmitters belonged to the federal government.  I mean, that

19   was just my gut feeling.  That's when I made that phone call --

20   made those phone calls immediately, and said, "Look, I don't

21   think this is the Sinaloa Cartel, but for safety's sake I need

22   to get my people out of here; we're going to be in our office;

23   whatever you need, you come and get your stuff, come and talk

24   to us; whatever you need."

25   Q    Well, why -- when you're saying that you needed to make

1   that decision and that's why you spoke with the -- with the

2   woman that was there --

3   A    Uh-huh.

4   Q    -- why didn't you ask Jonathan what they were up to?

5   A    Well, because Jonathan wouldn't have known who those

6   packages belonged to.

7   Q    Well --

8   A    All he knew was that he had seized packages of

9   transmitters.  He had no idea who they belonged to.  He didn't

10  know if they were FBI, DEA, or Sinaloa Cartel.  The best -- the

11  best person to have answered that question would have been that

12  woman, because she, obviously, would have known, and she said

13  they belonged to the Sinaloa Cartel.  And I said, "Well, we're

14  getting out of here."  And that's exactly -- what I am telling

15  you is exactly what I told the contingency of federal agent

16  supervisors that were in my office when they broke the whole

17  thing to me.

18  Q    Well, but regardless of who the drugs belonged to, they

19  were drugs.

20  A    Right.

21  Q    And you, as the sheriff, could seize them, so what was the

22  big deal about trying to find out whose they were?  You had

23  seized them.

24  A    I don't think --

25  Q    You could take them to your office and continue your

1    operation there, or your investigation there.

2    A     Well, there are certain things in crime scenes that you

3    can do at the crime scene.  Okay?  Like the photographs, the

4    fingerprinting, the DNA swabbing; you can do all that at a

5    crime scene.  But if -- but if you really believe that your

6    officers or your deputies are in danger, you need to get -- you

7    need to get them out of there.  You're not going to put them in

8    harm's way because you want to do a crime scene.  I mean, if we

9    lose evidence and I save the life of one of our officers,

10   that's what I'm going to do.  And that was my thinking; that

11   was my decision at the time, to get out of there and to get out

12   of there very quickly, and we could do whatever -- we could

13   salvage whatever we had at the office.

14   Q     But you took possession of the woman --

15   A     Yes.

16   Q     -- you took possession of the drugs and the GPS

17   trackers --

18   A     Yeah.

19   Q     -- and went to the sheriff's office, correct?

20   A     And her -- and her vehicle.

21   Q     Okay.

22   A     And that's when I told the federal agents that we were

23   going to be in our office, they needed to come over there.

24   Even if the stuff wasn't theirs, I think I needed federal

25   assistance in this case if it really was the Sinaloa Cartel.

1    Q    Why didn't you send them to the Mission department if

2    you're -- you've testified that they were under the authority

3    of the Mission department and you didn't supervise them, you

4    didn't regulate them --

5    A    Right.

6    Q    -- you did nothing with them because they were under the

7    Mission Police Department.  Yet when you -- when you -- they

8    seized this cocaine and this woman and there is a safety issue,

9    why didn't you send them to Mission P.D.?

10   A    Because, like I said a little while ago -- I think I

11   already answered that.  I think it was pretty obvious to me

12   what it was.  I mean, I couldn't prove it; I didn't have any

13   facts one way or the other.  But my gut feeling was that it was

14   not Sinaloa Cartel.  My gut feeling was that this was federal

15   property and that the woman was an informant.  That was just --

16   I've been doing this for a long time, Ms. Gutierrez.  And when

17   I saw that, as it developed there, it was pretty obvious what

18   it was.  I might have been wrong, completely wrong, but I

19   didn't want to take that chance.  So, I said, "Pack everything

20   up; let's go to the office," and on the way up there, that's

21   when I called the federal people and says, "Come and meet me

22   over here, because I think we've got something that may be

23   yours, or maybe it's not yours."

24   Q    And I understand that.

25   A    Okay.  So, I don't understand what else you don't

Trevino - Direct / By Ms. Gutierrez                59

1    understand about that.

2    Q    My question is:  Why did you take possession of

3    everything, of even the case itself --

4    A    Right.

5    Q    -- and bring it over to the sheriff's office when that,

6    you've already testified, is not your practice; because the

7    safety issue would have been resolved had you just left the

8    scene, everyone left the scene, and you could have sent them to

9    Mission P.D.  That you haven't answered yet.

10   A    Yes, I did answer it.  You just don't understand it.

11   Q    Well, then --

12   A    The answer to that is that my gut feeling was it was

13   pretty obvious what was happening.  So, I figured that was the

14   best thing to do, and that's the only way I can answer that.

15   You can ask me this question any other different ways you want.

16   There's only one answer to it.  My gut feeling was that there

17   was no Sinaloa Cartel involved.  I wasn't sure.  My gut feeling

18   was that it was federal property and we needed to get it to the

19   office, get it to our office, and come to a -- to some -- some

20   agreement, some consensus, which we did immediately.  And there

21   is just no other way I can answer that, Judge.  I mean,

22   that's -- that's it.

23   Q    Okay.  Well, so, what you're telling the jury is that your

24   gut feeling told you that it was obvious that the Panama Unit

25   was being -- there was a sting operation on the Panama Unit --

Trevino - Direct / By Ms. Gutierrez                60

1   A       Yeah.

2   Q       Okay.   That is what wasn't clear.   So, you, at the time --

3   at the point where you found -- you came on the scene, found

4   the cocaine with the GPS trackers, to you it was apparent at

5   that point that the -- that the -- well, some federal agency

6   was setting up or conducting a sting operation against the

7   Panama Unit and that they were in trouble.   Is that correct?

8   A       That's true.

9   Q       And for that reason -- that is the reason why you chose to

10  take them under your control versus sending them to the Mission

11  Police Department.

12  A       Well, you're making it sound like if I was covering up.

13  And that's the last thing I was doing; because as soon as we

14  took possession, I called the federal agencies, said, "We need

15  to come to my office; I've got your stuff here, if it is yours.

16  If it's not yours, then I still need your assistance."   And

17  that's -- there is just no other way to answer that.   I

18  don't -- I don't understand what your point is.

19          **THE COURT:**  Well, why did you immediately conclude,

20  or your gut feeling was, that this was a sting operation on the

21  Panama Unit, that they were in trouble?

22          **THE WITNESS:**  Because of the way the packages were

23  packaged, the transmitters on each -- on the packages.   I mean,

24  I --

25          **THE COURT:**  Well, why didn't you conclude that this

Trevino - Direct / By Ms. Gutierrez                61

1    was a -- perhaps a federal investigation that was occurring of

2    drug traffickers that the county or the Mission P.D. or the

3    Panama Unit had just themselves sort of gotten involved in, so

4    you had two agencies involved in the same drug load?  I mean,

5    why --

6              THE WITNESS:  And, your Honor -- and --

7              THE COURT:  -- why --

8              THE WITNESS:  Yeah.

9              THE COURT:  Why did you conclude that there was

10   some -- that this was a sting on the Panama Unit rather than --

11             THE WITNESS:  Well, it was just --

12             THE COURT:  -- just a legitimate -- sometimes two

13   people end up surveilling the same house and going in and --

14             THE WITNESS:  You're correct, Judge.

15             THE COURT:  I mean, why did you -- I don't understand

16   why you --

17             THE WITNESS:  Well, I don't -- I don't -- I don't

18   either.

19             THE COURT:  -- immediately concluded there was a --

20             THE WITNESS:  I --

21             THE COURT:  -- there was a sting on the Panama Unit?

22             THE WITNESS:  Well, like I said, I told the FBI and

23   DEA, it's going to be one or the other; either this is really a

24   legitimate deal or it's not.  And that was my concern.

25   //

1  **BY MS. GUTIERREZ:**

2  Q    Well, why was that, Sheriff?  I mean, trackers in drugs

3  isn't necessarily uncommon.  Drug dealers do that, too; isn't

4  that correct?

5  A    I would imagine they do, but I've never seen it.  I

6  haven't ever seen it.  That's the first time I ever seen that.

7  Q    And you --

8         **THE COURT:**  So, again, I don't understand why you

9  immediately concluded this was a sting on the Panama Unit

10  unless you had some prior knowledge that the Panama Unit was

11  doing something bad.

12         **THE WITNESS:**  No, I didn't have any prior knowledge,

13  Judge.  I --

14         **THE COURT:**  So, why would you think they were --

15  these are your -- what you think are honest police officers --

16         **THE WITNESS:**  Right.

17         **THE COURT:**  -- doing their job; why wouldn't you have

18  thought that they simply had gotten involved with the same drug

19  load that a federal agency was tracking rather than your

20  conclusion that you said was that the Panama Unit -- it was a

21  sting against the Panama Unit?

22         **THE WITNESS:**  Well, you're absolutely right, Judge.

23  And I totally agree with you.  I don't --

24         **THE COURT:**  I don't understand.

25         **THE WITNESS:**  You know, I had a decision to make, and

1    it was one or the other, and I didn't know which one it was.

2    But -- and the only thing I could do was just get out of there

3    and call the -- and call the federal agents to come take care

4    of it.  I mean, I didn't -- I didn't know one way or the other.

5    I couldn't be sure one way or the other.  That's why I needed

6    the federal agencies' assistance to come in and tell me what is

7    going on.

8    **BY MS. GUTIERREZ:**

9    Q    And, Sheriff, what you're not telling the jury -- what you

10   haven't told the jury is why the fact that you believe that one

11   of the options, either this was a legitimate deal and it was

12   the drugs for the Sinaloa Cartel or that there was a sting on

13   the Panama Unit, you're not -- you haven't explained to the

14   jury why the Panama Unit being in trouble was one of the

15   options.  Why wasn't it either, yes, this is legitimate and

16   it's the Sinaloa drugs, and let's just process it like any

17   other?

18   A    Well, because I had to consider all the options.  And I

19   don't have an answer for that.  I really don't.

20   Q    You testified --

21   A    I mean, I wish -- I wish I could actually tell you an

22   answer.  I didn't say that I had absolute truth.  I just said I

23   had a -- just a gut feeling that maybe -- maybe this was a

24   sting.  And that's why I turned it around and took it to the

25   office immediately, besides the safety issue.  I can't answer

1    that.  I mean, I wish I could.  And it's not that I had prior

2    knowledge, because I did not.  And --

3    Q    Based on your testimony, you -- at that time you had

4    absolutely no knowledge that the Panama Unit was conducting

5    illegal activity, right?

6    A    That's right.  That's absolutely correct.  I had no --

7    no --

8    Q    However --

9    A    -- no information at all, no proof or allegations for

10   anything that were (indiscernible).

11   Q    However, at that time, at that moment, the only other

12   option, other than it being a legitimate deal, or a legitimate

13   seizure, was that the Panama Unit was somehow involved in some

14   wrongdoing, correct?

15   A    It was one or the other.  And I needed help in deciding

16   which one it was.  You're right.

17   Q    Sheriff, you were close to the Panama Unit; isn't that

18   correct?

19   A    I guess you can -- well, because of my son being involved

20   in it.  I mean, I -- I've -- I've known some of those -- I knew

21   at least two of those members when they were children.  One of

22   their mothers used to work for me as an undercover officer

23   years ago when I ran a local drug task force.  So, yes, I -- I

24   mean, I -- they -- they visited my son at the house quite

25   often.

Trevino - Direct / By Ms. Gutierrez                65

1    Q    And you were around them frequently; isn't that correct?

2    A    No, not -- no, ma'am.  Not frequently, no.

3              MS. GUTIERREZ:  Your Honor, may I approach?

4              THE COURT:  The bench?  Yes.

5              MS. GUTIERREZ:  No, no, no, your Honor; the witness.

6    I'm sorry.

7              THE COURT:  Oh.  Excuse me.  What is it?  You have a

8    document you want to --

9              MS. GUTIERREZ:  I have some pictures.

10             THE COURT:  All right.

11             MS. GUTIERREZ:  I believe my next exhibit is 11, and

12   it would be 11, 12 --

13             THE COURT:  Okay.  Have you shown these to opposing

14   counsel?

15             MS. GUTIERREZ:  I will.  Just a moment, your Honor.

16             THE COURT:  You already introduced 11, so you're on

17   12 now.

18        **(Pause)**

19             MS. GUTIERREZ:  May I approach, your Honor, the

20   witness?

21             THE COURT:  You may.

22   BY MS. GUTIERREZ:

23   Q    I'm going to show you what I'll be marking Exhibits 11 --

24             THE COURT:  No, 12.

25             MS. GUTIERREZ:  I'm sorry; 12, 13, 14, and 15.

Trevino - Direct / By Ms. Gutierrez                66

1           THE WITNESS:  Yes, ma'am.

2           MS. GUTIERREZ:  Can you take a look at them?

3           THE WITNESS:  Yes.

4       (Pause)

5           Okay.

6           MS. GUTIERREZ:  Your Honor, I ask that they be

7    admitted into evidence.  Oh.  Well, let me ask him.

8           THE COURT:  All right.

9    BY MS. GUTIERREZ:

10   Q    These pictures show -- let's start with Number 12.  That's

11   you in this picture?  Do you recall --

12   A    Yes.

13   Q    Okay.  And does this picture -- are all of the pictures

14   that you're looking at accurate and reflect --

15   A    Yes.

16   Q    -- what they purport to reflect?

17   A    Yes, ma'am.

18           MR. STURGIS:  Judge, based on that testimony, I have

19   no objection.

20           THE COURT:  And you believe they're relevant?

21           MR. STURGIS:  At this point, I believe that she's

22   going to ask him who's in the pictures, so, yes, relevant.

23           THE COURT:  All right.  The Court will admit 12

24   through 15 without objection.

25       (Defendant's Exhibits Numbers 12 through 15 were received

EXCEPTIONAL REPORTING SERVICES, INC

1    **in evidence)**

2              You may publish them from the projector.

3              **MS. GUTIERREZ:**  Thank you, your Honor.

4    **BY MS. GUTIERREZ:**

5    Q    Can you see that?  I believe it's in your -- in front of

6    your (indiscernible)?

7    A    Yes, ma'am.  I can see it.

8    Q    Okay.

9    A    Oh, that's -- oh, okay.  Thank you.

10   Q    Okay.  Can you identify the individual to the left, to the

11   very left of the picture?

12             **THE COURT:**  Holding -- well --

13             **THE WITNESS:**  I believe --

14             **THE COURT:**  In the camouflage?  Are you talking

15   about --

16             **MS. GUTIERREZ:**  Yes.

17             **THE COURT:**  -- the cap?

18             **MS. GUTIERREZ:**  In the camouflage vest to the left,

19   to your --

20             **THE WITNESS:**  I believe that's Sal -- I believe it's

21   Sal Arguello.

22   **BY MS. GUTIERREZ:**

23   Q    Okay.  And the next individual?

24   A    I believe that's Claudio Mata.

25   Q    And that is you in the center; is that correct?

Trevino - Direct / By Ms. Gutierrez                    68

1   A    That's myself.  That's right.

2   Q    Okay.  And your -- the person to -- to your --

3             THE COURT:  Next in the order?

4             MS. GUTIERREZ:  The next in order.

5             THE WITNESS:  That's my son, Jonathan.

6   BY MS. GUTIERREZ:

7   Q    And, then, the last person.  Well --

8   A    Eric Alcantar.

9   Q    -- whose face we can see.  Okay.  And these are members of

10  the Panama Unit; is that correct?

11  A    That's right.

12  Q    And this is at a -- your skeet -- your annual skeet shoot

13  event?

14  A    Yes.  That's correct.

15  Q    I'm going to show you Defendant's Exhibit 13.  There are

16  five members of the Panama Unit in this picture; is that

17  correct?

18  A    I think there's four.

19  Q    Well, let's go through that.  This picture was taken at

20  the grand opening of your campaign headquarters; is that

21  correct?

22  A    From the background picture, I would say yes.

23  Q    Okay.  And this was in the year 2012; is that correct?

24  A    I'm -- yes, we opened in 2012, right.

25  Q    And the -- can you identify the members of the Panama

EXCEPTIONAL REPORTING SERVICES, INC

1   Unit?

2   A    Claudio Mata, Eric Alcantar, and my son, Jonathan.

3   Q    Okay.  And this individual -- your Honor, I don't have a

4   pointer -- but the individual in the very --

5           THE COURT:  What color shirt?

6           MS. GUTIERREZ:  -- middle -- excuse me?

7           THE COURT:  In the red shirt do you mean?

8           MS. GUTIERREZ:  No, the one in the middle with the

9   brown shirt and the sunglasses on his forehead.

10          THE COURT:  Oh.  In the back?

11          MS. GUTIERREZ:  That is Alexis Espinoza; is that

12  correct?

13          THE WITNESS:  That's correct.

14  BY MS. GUTIERREZ:

15  Q    And he also was arrested in connection with this case,

16  correct?

17  A    That's correct.

18  Q    I'm going to show you what has been marked Defendant's

19  Exhibit 14.  And that is also at the fundraising headquarters

20  kickoff, correct?  Or grand opening; I apologize.

21  A    Well, I don't know -- yeah, I believe it was.

22  Q    Okay.  And how many members of the Panama Unit are in this

23  picture?

24  A    Just one.  I don't -- which is Fabian Rodriguez to the

25  left.

1   Q    Yes; the one in the black shirt?

2   A    Yeah.  Right, black shirt.  That's right.  Yeah.

3   Q    Okay.  And there is an individual to the far right, and

4   that is J.P. Flores; is that correct?

5   A    That's correct.

6   Q    Okay.  And two from J.P. Flores, which is the individual

7   in the middle with the cap, that is Jerry Del Angel; is that

8   correct?

9   A    Doesn't look like him, but if -- yeah, I guess it would

10  be, but I don't recognize him.  It's --

11  Q    But you are familiar with Jerry Del Angel?

12  A    Yeah.  Yeah, absolutely.  Yes.

13  Q    Would you like to see the picture up close?

14  A    Well, it looks like him, and I would -- Jerry -- I know

15  that Jerry was there that evening.

16  Q    Okay.  And both Jerry Del Angel and J.P. Flores are

17  deputies with -- were deputies within the Crimestoppers unit;

18  is that correct?

19  A    You're correct.

20  Q    And that -- and during the time of that, when this picture

21  was taken, they were both employed in the Crimestoppers

22  division, correct?

23  A    Yes.  You're correct.

24  Q    And I am going to show you Defendant's Exhibit 15.  And

25  that, Sheriff, is a picture of yourself with members of the

Trevino - Direct / By Ms. Gutierrez                71

1   Panama Unit, including the sergeant, correct?

2   A    That's correct.

3   Q    Okay.  Can you name them beginning from left to right?

4   A    That's -- I believe that's Sal Arguello, Claudio Mata,

5   Eric Alcantar, myself, my son, Jonathan, and Sergeant Roy

6   Mendez.

7        **(Pause)**

8   Q    That last picture that I showed you had to do with the

9   Tierra Santa Golf event, correct?

10  A    That's correct.

11  Q    And that was a campaign fundraiser?

12  A    Yes, ma'am.

13       **MS. GUTIERREZ:**  May I approach, your Honor, the

14  witness?

15       **THE COURT:**  You may.

16  **BY MS. GUTIERREZ:**

17  Q    I'm going to show you what I've marked as Defendant's

18  Exhibit 16.  Do you recognize that picture to also be a picture

19  taken at the Tierra Santa golf fundraiser?

20  A     I'm going to -- I'm going to pull my glasses out, Judge.

21  I just --

22       **THE COURT:**  Of course.

23       **(Pause)**

24       **THE WITNESS:**  Yes, it is.

25       **(Pause)**

Trevino - Direct / By Ms. Gutierrez                72

1          MR. STURGIS:  Judge, may we approach?

2          THE COURT:  You may.

3      (Sealed bench conference omitted from 10:19 a.m. to

4  10:20 a.m.)

5      (Recess was taken from 10:20 a.m. to 10:39 a.m.)

6      (Jurors present)

7          THE COURT:  All right.  Good morning again.  Please

8  be seated.

9          All right.  Ms. Gutierrez, you may resume your

10  examination.

11          MS. GUTIERREZ:  Thank you, your Honor.

12              DIRECT EXAMINATION (CONTINUED)

13  BY MS. GUTIERREZ:

14  Q    Sheriff Trevino, the last picture that I showed you, do

15  you recall this picture from your website, Reelect Sheriff

16  Trevino (indiscernible)?

17          THE COURT:  What --

18          THE WITNESS:  Well, yes.  I do recall that, yeah.

19          THE COURT:  What's the exhibit number you're

20  referring to?

21          MS. GUTIERREZ:  The exhibit number is Defendant's

22  Exhibit 16.

23          THE COURT:  Sixteen has not been admitted yet.  Okay.

24          MS. GUTIERREZ:  No, it hasn't.

25  //

1   **BY MS. GUTIERREZ:**

2   Q    And you recall that this is a picture taken from the

3   Tierra Santa golf fundraiser?  Is that correct?

4   A    I recognize the building in the background.  Yes, ma'am.

5   Q    And that occurred in 2011; is that correct?

6   A    I believe it did.

7   Q    Okay.

8   A    Well, it could have; because I know I had one in '12 also.

9   It could have been '11 or '12.  I don't know what year that

10  was.  I've had -- I think I -- I believe I've had three

11  tournaments in that -- in that particular golf course, but I

12  don't know which year that was.

13  Q    And you are in this picture, correct?

14  A    Yes.  That's correct.

15  Q    And this picture, as I showed it to you, represents what

16  it purports to; it hasn't been adjusted in any way or

17  photoshopped, correct?

18  A    Well, I don't -- I don't know.  I couldn't say that.

19  Q    Well, right; but based on what you know is on your

20  website, this is an accurate depiction of what is on your

21  website, correct?

22  A    If you took it from the website, just like that, then,

23  yes, it is.

24          MS. GUTIERREZ:  Your Honor, I ask that it be

25  admitted.

1          **THE COURT:**  Any objections from the Government?

2          **MR. STURGIS:**  The only objection, your Honor, is the

3     relevance at this point.

4          **THE COURT:**  I thought you all showed me that there

5     were people relevant.

6          **MR. STURGIS:**  And that's what I was going to ask,

7     that she prove it up, your Honor.

8          **THE COURT:**  All right.  Well, I don't know these

9     people.  I've been told there are people that are relevant in

10    the picture, but I don't know that.  I assume the Government

11    would recognize these people.

12         **MR. STURGIS:**  Some of the people I do recognize, your

13    Honor.  All -- I think just the witness needs to identify the

14    people in the picture, and then we have no objection.

15         **THE COURT:**  All right.

16         **MS. GUTIERREZ:**  Well --

17         **THE COURT:**  Well, I'll admit it, but if it's -- if

18    you're unable to identify the people in the photo, then the

19    Court may strike it later.

20         **MS. GUTIERREZ:**  Very well, your Honor.

21         **THE COURT:**  All right.  So, I'm conditionally

22    admitting it.

23         **(Defendant's Exhibit Number 16 was received in evidence)**

24         **MS. GUTIERREZ:**  May I approach the --

25         **THE COURT:**  Yes.

**EXCEPTIONAL REPORTING SERVICES, INC**

1  **BY MS. GUTIERREZ:**

2  Q    Sheriff, can you identify the individual to -- on the very

3  left?

4  A    On the very left --

5  Q    Yes.

6  A    -- would be Commander Joe Padilla.

7  Q    Okay.  That is Commander Joe Padilla.

8  A    Right.

9  Q    Can you -- isn't it -- can you identify the individual

10  to -- on the far right-hand side?

11         **THE COURT:**  In the red baseball cap?

12         **MS. GUTIERREZ:**  Yes, in the red baseball cap, brown

13  jacket.

14         **THE WITNESS:**  I have no idea who that is.

15  **BY MS. GUTIERREZ:**

16  Q    Is that -- isn't it true that that's Fabian Rodriguez?

17  Would you like for me to zoom?

18  A    Well, it could be.  I -- I'm not really sure.  I can't

19  tell.  It looks like him.  It's kind of -- this is very fuzzy,

20  but it could be.  I can't -- I can't say positively that it is.

21  It could be.

22         **THE COURT:**  The big screen is not as fuzzy.  For some

23  reason the resolution on the monitors isn't that --

24         **THE WITNESS:**  May I stand, your Honor?

25         **THE COURT:**  Yes, please, if that's of any assistance.

1          **THE WITNESS:**  It looks like him.

2     **BY MS. GUTIERREZ:**

3     Q    Okay.  And isn't it true that the individual in the red

4     shirt and red cap that's standing next to Fabian Rodriguez is

5     Fernando Guerra, Sr.?

6     A    I have no idea who that man is.  I've never met him.

7     Q    But, based on this picture, you don't deny that that man

8     is at your golf fundraising event, correct?

9     A    That's right.  He's -- he's standing there, yeah.

10    Q    Okay.  And I'm going to show you again Defendant's Exhibit

11    15.  That picture with the Panama Unit at a -- that is also at

12    that same golf tournament, correct, at Tierra Santa?

13    A    I don't know, and that -- like I said, I've had several,

14    and I guess you can compare the shirts maybe and --

15    Q    Would you like for me to put them side by side?

16    A    I guess, but -- I've had several there, so I don't know

17    which one.

18          **THE COURT:**  Well, could you tell maybe from your

19    sunglasses or the shirt or something?

20          **THE WITNESS:**  Yeah, if I could tell -- you know, see

21    both of them, yeah.

22          **(Pause)**

23          It appears to be, yes.

24          **MS. GUTIERREZ:**  Very well.

25    //

1   **BY MS. GUTIERREZ:**

2   Q    Now, Sheriff, with respect to Jonathan Trevino, you

3   weren't suspicious at all that there was something going on

4   based on the -- the way that Jonathan was spending money, that

5   something was -- was up?

6   A    Jonathan lived with my wife and I.  I believe, like you

7   said, it started in '09.  He does not pay rent, didn't pay for

8   his meals; his mom did all his laundry.  He lived practically

9   free at the home.  And I -- he kept his entire paycheck.  And I

10  understand that he was making quite a bit of overtime money.

11  Now, he didn't own a vehicle until very recently that he had

12  bought a pickup truck.  So, I mean, I -- I had no reason to

13  question what -- what he was doing.

14  Q    What kind of truck did he purchase --

15  A    He purchased --

16  Q    -- that we're talking about here?

17  A    Yeah, he purchased a Ford F250.

18       **MS. GUTIERREZ:**  May I approach, your Honor, the

19  witness?

20       **THE COURT:**  You may.

21       **MS. GUTIERREZ:**  I have marked Defendant's Exhibit 17.

22       Mr. Trevino --

23       **THE COURT:**  Have you seen this, Mr. Sturgis?

24       **MR. STURGIS:**  No, I have not, Judge.

25       **THE COURT:**  And the relevance here is the truck?

Trevino - Direct / By Ms. Gutierrez                78

1          **MS. GUTIERREZ:**  Yes.

2          **THE COURT:**  Or the jet skis?

3          **MS. GUTIERREZ:**  Both, your Honor.

4          **THE COURT:**  And how is the truck relevant?

5          **MS. GUTIERREZ:**  To identify the fact that he

6  purchased it during the period of time that we're talking about

7  here.  But the jet ski, obviously, is more relevant.

8          **THE WITNESS:**  Go ahead.

9          **THE COURT:**  All right.

10 **BY MS. GUTIERREZ:**

11 Q    Do you recognize this to be Jonathan's truck?

12 A    It -- it's parked in front of my house, so that's got to

13 be it.  I don't -- I don't know what the license plate is, but

14 it's parked in front of my house, so I would say -- I would

15 say, yes, it is.

16 Q    Does this truck appear to be the exact -- exactly like the

17 truck --

18 A    Yes.

19 Q    -- that Jonathan purchased?

20 A    Yes.

21         **MS. GUTIERREZ:**  Your Honor, may I ask that it be

22 admitted?

23         **THE COURT:**  And what's the time frame on this?

24 What --

25         **MS. GUTIERREZ:**  The time frame --

1          **THE COURT:**  Do you know about when this must have

2    been -- could have been taken or --

3          **THE WITNESS:**  I don't -- I --

4          **THE COURT:**  Well, was it between whenever --

5          **THE WITNESS:**  I have no idea when that was taken.

6          **THE COURT:**  -- 2012, 2011?

7          **MS. GUTIERREZ:**  It was --

8          **THE COURT:**  Somewhere in that time frame?

9          **THE WITNESS:**  Well, it's -- the truck's a -- is a

10   '12, your Honor, so he might have bought it late '11; I'm not

11   really sure when he bought it.  So, I don't know when that was

12   taken.

13         **THE COURT:**  All right.

14         **MS. GUTIERREZ:**  I ask that it be admitted, your

15   Honor.

16         **THE COURT:**  On the truck?  I would say relevancy.

17   But --

18         **MR. STURGIS:**  Objection to the relevance of it, your

19   Honor.

20         **THE COURT:**  The only -- would be on the other issue.

21         **MS. GUTIERREZ:**  Yes, your Honor.

22         **THE COURT:**  The jet skis.  But, again, nobody's --

23         **MR. STURGIS:**  Oh, okay, but I -- but there is nothing

24   that's established --

25         **THE COURT:**  Nobody's proven that up, so the Court's

Trevino - Direct / By Ms. Gutierrez                    80

1   going at this time to deny admission of that until you have a

2   witness or -- or the sheriff can identify the other aspect.

3           **MS. GUTIERREZ:**  Very well, your Honor.

4   **BY MS. GUTIERREZ:**

5   Q    And you notice that this truck is pulling a jet ski.  This

6   truck that is parked in front of your house is pulling a jet

7   ski.

8   A    Yes, ma'am.

9   Q    Okay.  Do you recall an incident when you went to the

10  island and Jonathan took some jet skis?

11  A    He took one jet ski.

12  Q    Okay.  And this jet ski is the jet ski that he took,

13  correct?

14  A    I have no idea.

15  Q    Does it resemble the jet ski that he took?

16  A    Well, I don't know anything about jet skis.  They all look

17  the same to me, so -- it could be.  I don't know.

18  Q    Do you remember the color of the jet ski?

19  A    No, I do not.

20  Q    And isn't it true that you were made aware that the jet

21  ski belonged to Fernando Guerra, Sr.?

22  A    No.  That is not true.

23  Q    You have heard that allegation, however, correct?

24  A    Yes, I have heard the allegation.

25  Q    And did you question Jonathan about that allegation?

1  A    Not -- not the allegation.  The allegation was after the

2  fact, after he pled guilty.

3  Q    Well, right, but when -- once you heard the allegation,

4  did you question Jonathan about it?

5  A    Yes.

6  Q    Okay.  And isn't it true that he confirmed that the jet

7  ski came from Fernando Guerra, Sr.?

8  A    Actually, what he told me was this -- which was the same

9  answer, I believe, that he gave me when I first asked him about

10  it when we were going to go on a family vacation.  I said,

11  "Where did you get this from?  Did you buy it?"  He said, "No."

12  He said a -- "A friend of Fabian loaned it to Fabian to lend to

13  me."  And I said, "Who is the guy?"  He says, "I don't know who

14  the guy is.  I've never -- never met the guy."

15  Q    So, he borrowed it from someone he didn't know, or he

16  borrowed it from Fabian?

17  A    He borrowed it from Fabian and Fabian had borrowed it from

18  somebody else.  Jonathan knew it did not belong to Fabian.

19  Jonathan knew it belonged to a third party that was never

20  identified to me.

21  Q    And during that time that he took that jet ski to the

22  island, he hauled it in his Ford truck, correct?

23  A    He took "a" jet ski to the island.  Yes, ma'am.

24  Q    What I'm asking you is that he hauled it to the island in

25  his black Ford truck.

```
                   Trevino - Direct / By Ms. Gutierrez          82
```

1    A    Yes, ma'am.

2    Q    Okay.

3              THE COURT:  He towed it.  He didn't actually --

4              MS. GUTIERREZ:  He towed it.

5         THE WITNESS:  Towed it.

6              THE COURT:  -- haul it in the truck.

7         THE WITNESS:  Yeah.  Towed it.

8              THE COURT:  He towed it behind the truck.

9              MS. GUTIERREZ:  Your Honor, may I approach?

10             THE COURT:  You may.

11             MS. GUTIERREZ:  Exhibit -- Defendant's Exhibit 18.

12             THE COURT:  Okay.  You're skipping 17 for now?

13             MS. GUTIERREZ:  For now, your Honor.

14             THE COURT:  Moving on to 18?

15             MS. GUTIERREZ:  May I approach the witness, your

16   Honor?

17             THE COURT:  Yes.

18   BY MS. GUTIERREZ:

19   Q    Sheriff, can you take a look at this picture?

20   A    Yes, ma'am.

21   Q    Do you recognize it?

22   A    Yes, I do.

23   Q    Okay.  And does it purport to show what was going on at

24   the time the picture was taken?

25   A    Yes, ma'am.

Trevino - Direct / By Ms. Gutierrez                83

1  Q    And does it appear to be adjusted in any way or changed?

2           THE COURT:  He's already answered the question, does

3  it fairly and accurately purport to depict the matters

4  contained therein; he said yes.

5           MS. GUTIERREZ:  May I -- your Honor, I ask that it be

6  admitted; Number 18.

7           THE COURT:  Any -- Mr. Sturgis?

8           MR. STURGIS:  Judge, again, just if we could

9  establish the relevancy of it.

10           MS. GUTIERREZ:  Well, your Honor --

11           THE COURT:  I don't know -- these --

12           MS. GUTIERREZ:  -- Julio Davila is in this picture,

13  as well as J.P. Flores, and there was prior testimony about

14  the --

15           THE COURT:  So, this is just to establish the

16  relationship --

17           MS. GUTIERREZ:  Well, your Honor --

18           THE COURT:  -- existed?

19           MS. GUTIERREZ:  Yes.

20           THE COURT:  Or that they were in the room together?

21           MS. GUTIERREZ:  The relationship together with the

22  fact --

23           THE COURT:  Do you know when this -- or the

24  circumstances of this picture, like what event this was?

25           THE WITNESS:  It's --

Trevino - Direct / By Ms. Gutierrez                84

1          **THE COURT:**  They look all posed, from my --

2          **THE WITNESS:**  Your Honor, it's dated on 2005.  That's

3    when it's dated.  I don't remember -- actually, I don't

4    remember taking that photo, but I'm -- I'm in it, so,

5    obviously, I took it -- I was in the photo, but that was in

6    2005, when it's dated.

7          **MS. GUTIERREZ:**  Can I ask (indiscernible)?

8          **THE WITNESS:**  I can tell you what it is.

9          **THE COURT:**  Sure.  Sure.  Go ahead -- well, let --

10         **MS. GUTIERREZ:**  Well --

11         **THE COURT:**  -- Ms. Gutierrez --

12         **THE WITNESS:**  Would you like --

13         **THE COURT:**  -- ask the question.

14         **THE WITNESS:**  Yeah.

15   **BY MS. GUTIERREZ:**

16   Q    Isn't it accurate that the Crimestoppers board had given

17   you some sort of recognition?

18   A    No.  That particular photo is the entire Hidalgo County

19   Crimestoppers board, which again, testified earlier, is not in

20   any way connected to the sheriff's office.  They -- they

21   received a -- an award from the state, I believe for the

22   most -- either the most calls or for the most property seized;

23   I'm not sure.  It's in one of our -- that particular plaque is

24   displayed in one of our trophy cases there at the office.  It

25   was not for me.  It was for them, and we display it at the

1   office.

2          **MS. GUTIERREZ:**  Thank you, your Honor.  May -- your

3   Honor, I ask that it be admitted.

4          **THE COURT:**  And this was 2005?

5          **THE WITNESS:**  I believe that's my very first year

6   there, your Honor.

7          **THE COURT:**  All right.  And this is to establish the

8   connection between J.P. Flores and Mr. Davila?

9          **MS. GUTIERREZ:**  And -- and --

10          **THE COURT:**  And that they're on the board together?

11          **MS. GUTIERREZ:**  Well, there was the testimony that --

12   the sheriff testified that he didn't really associate with

13   Julio Davila socially or -- and, so, the questions would follow

14   with respect to the social aspect of this.

15          **THE COURT:**  All right.  I'll admit it, not for the

16   reasons you stated, but because it does reflect on the

17   testimony -- the truthfulness of the testimony of J.P. Flores

18   when he said, "I was acquainted with Davila and we did some

19   illegal things."

20      **(Defendant's Exhibit Number 18 was received in evidence)**

21          **MS. GUTIERREZ:**  May I publish it?

22          **THE COURT:**  Yes.  You may.

23   BY MS. GUTIERREZ:

24   Q    That's you in the center, Sheriff; is that correct?

25   A    That's correct.

1    Q    Okay.  And to the far right, can you identify that

2    individual?

3    A    That's J.P. Flores.

4    Q    Okay.  And the individual, the male, to -- that's right

5    behind your left shoulder -- your right shoulder?

6    A    My right shoulder?  That's -- I believe that looks like

7    Julio Davila.

8            **THE COURT:**  He was on the board of Crimestoppers?

9            **THE WITNESS:**  Yes, he was.

10   **BY MS. GUTIERREZ:**

11   Q    And, Sheriff, is that what you mean when you said that he

12   was a groupie trying to get close to people or involved with

13   people; Julio Davila, that is?

14   A    I would suspect.  But that -- that was, like I said, in

15   '05.

16   Q    And at that time you knew Mr. Davila, correct?

17   A    That's when I first met him.  I -- I think I first met him

18   in '04, like during my first -- my very first campaign.

19           **(Pause)**

20   Q    Are you aware that through Julio Davila it has been

21   alleged -- or that Julio Davila told agents that he introduced

22   Joe Padilla to a drug trafficker out of the Weslaco area named

23   Tomas Gonzalez?

24   A    That I'm -- I'm aware that --

25           **THE COURT:**  Well, that --

1     **THE WITNESS:** -- Julio told this to the agents?  I

2  have -- I have no idea what they -- what Julio told the agents.

3  **BY MS. GUTIERREZ:**

4  Q    Okay.  So, you haven't heard that before.

5  A    No.

6  Q    Do you know an individual named Tomas Gonzalez out of the

7  Weslaco area?

8  A    I know of him.

9  Q    And he is a known drug trafficker, correct?

10 A    Yes, he is.  If it's the same one we're talking about.

11 Q    Do you recall that your office conducted a raid on his

12 ranch back in 2011?

13 A    I know that we conducted a raid.  I don't know the date.

14 Q    And on that raid there was 2,000 pounds of marijuana

15 seized; do you recall that?

16 A    I don't recall the amount that was seized.

17 Q    Do you recall that there was -- there were drugs that were

18 seized?

19 A    Yes.  There were -- there was a -- there definitely was a

20 seizure made.

21 Q    Do you -- are you aware of any affiliation between Joe

22 Padilla and Mr. Gonzalez?

23 A    I don't know the -- the relationship.  I do know that they

24 do -- that either Joe speaks to somebody that works there; I

25 don't know if he speaks -- or spoke to him directly.

1      **(Pause)**

2   Q    Have you ever been to Julio Davila's house?

3   A    No.

4   Q    Are you aware of Commander Padilla ever being at Julio

5   Davila's house?

6   A    I don't -- I don't know.  I have no idea.

7   Q    Sheriff, with respect to some of the officers that were

8   asked to resign from the sheriff's office --

9            **THE COURT:**  Can I have you all approach quickly, or

10   briefly?

11        **(Sealed bench conference omitted from 10:57 a.m. to**

12   **10:58 a.m.)**

13            **THE COURT:**  You may proceed.

14                   **DIRECT EXAMINATION (CONTINUED)**

15   **BY MS. GUTIERREZ:**

16   Q    Sheriff, you informed the constituents, I suppose, about

17   the fact that after the Panama Unit was arrested that you asked

18   the deputies to resign, correct?

19   A    Yes.  And we're talking about Panama Unit members?

20   Q    I'm not sure.  That would be my follow-up question.

21   A    Well, I --

22   Q    You had indicated that you -- after the Panama Unit

23   members were arrested you asked some deputies that were

24   connected with the Panama Unit to resign, correct?

25   A    Yes, ma'am.

1  Q    And who were they?

2  A    I believe it was Claudio Mata, Eric Alcantar, Sal

3  Arguello.  And I believe it was Fabian, also.  And that person

4  not connected to the Panama Unit but which I also asked to

5  resign was J.P. Flores.  And I asked -- I believe I asked J.P.

6  I'm not sure about that.  I think I did.  And I know there's

7  one more.  I can't think of who it is.

8  Q    Would it be the sergeant in charge of handling it?

9  A    No.  No, it was not the sergeant.  Oh, yes, Mr. Duran.  I

10 can't think of his first name.

11 Q    Gerardo?

12 A    Gerardo.  But he was not assigned to the Panama Unit.

13 Q    And Roy Mendez was not asked to resign?

14 A    No, he was not.

15 Q    And he was a long-time sergeant for the Panama Unit,

16 correct?

17 A    That's correct.

18 Q    And I think that you stated that at the time of the arrest

19 it was Sergeant Lopez that was --

20 A    No.  No, it was Sergeant Rudy Rodolfo Salinas.

21 Q    And he was not asked to resign.

22 A    No, ma'am.

23 Q    And based on the policy there at the Sheriff's Office what

24 is the difference between termination and resignation?

25 A    Between what?

Trevino - Direct / By Ms. Gutierrez                    90

1    Q     Termination and resignation.

2    A     Well, termination is when I tell you "You're fired."

3    Resignation is when they say "I quit."

4    Q     And with respect to benefits, if someone resigns do they

5    maintain their benefits?

6    A     I'm not sure about that.  I believe if -- oh, yes, right;

7    you're absolutely right.  I'm thinking of something else.

8    You're right.  If you resign, obviously you may be eligible for

9    retirement.  You can retire, you can do that, that's right.

10   Q     And whatever benefits that you've accumulated up until the

11   point that you resign --

12   A     Right, exactly.

13   Q     -- you get to keep, correct?

14   A     Yes, ma'am.

15   Q     However, if you're terminated you don't get to keep those

16   benefits, correct?

17   A     I'm not sure about that.  I believe you still -- I don't

18   see how they can take them away from you.  I have not -- that's

19   an administrative technical question that I cannot answer.  I'm

20   not really sure.

21            THE COURT:  Relevance, also.  Let's move along.

22   BY MS. GUTIERREZ:

23   Q     Why is it that you asked them to resign versus terminating

24   them?

25   A     Because the FBI had a meeting with me that day and they

EXCEPTIONAL REPORTING SERVICES, INC

1   briefly outlined to me what they had been doing, what the

2   charges were.  And I did not want to prolong any sort of

3   investigation, and it was in their best interest really, the

4   best interest of the department and the county that they resign

5   immediately.

6   Q    But you could have terminated them, correct?

7   A    Not unless I had conducted a thorough investigation that

8   might have taken some time.

9   Q    You stated that you have implemented a suitability

10  evaluation program within the Sheriff's Office, correct?

11  A    That's right.

12  Q    And what that means, what that is intended to do is root

13  out corruption within the Sheriff's Office, correct?

14  A    Yes, ma'am.

15  Q    And part of this program requires a written test together

16  with a polygraph, correct?

17  A    That's correct.

18  Q    However, you have not asked Padilla to take this test,

19  correct?

20  A    I haven't asked anybody because my polygrapher retired and

21  we're open for bids right now for a polygraph examiner.  As

22  soon as we -- the bidding process and we accept a polygrapher

23  and then we start our program.

24  Q    But the program is two-fold.  They will take a written

25  exam first and then a polygraph, correct?

Trevino - Cross / By Mr. Sturgis                    92

1   A    That's correct.

2   Q    And you have not asked Padilla to take the polygraph -- I

3   mean the written exam, correct?

4   A    I haven't asked anybody because I don't have a

5   polygrapher.  The polygrapher will not polygraph unless he

6   gives an exam right after the -- he will not polygraph you

7   unless he gives you the exam first.  So it's a one-two quick

8   step.

9   Q    And as you sit here today you have not taken any action

10  against Padilla, correct?

11  A    That's correct.

12          THE COURT:  The Sheriff's already answered these

13  questions.

14          MS. GUTIERREZ:  I pass the witness, your Honor.

15          THE COURT:  All right.  Any cross examination?

16          MR. STURGIS:  Yes.  Yes, your Honor.

17                    CROSS EXAMINATION

18  BY MR. STURGIS:

19  Q    Good morning, Sheriff.

20  A    Good morning, Mr. Sturgis.

21  Q    You were asked a whole bunch of questions on a variety of

22  topics.  I'm just going to go back through a few of them.  You

23  described how the events happened on December the 12th of 2012,

24  how you became involved in that.  You stated before that you

25  had no information, no idea that anything was going on; is that

Trevino - Cross / By Mr. Sturgis                    93

1   correct?

2   A    Yes, sir.  I have no knowledge of any illegal activities

3   that the Panama Unit was involved in.

4   Q    That day when you were meeting with the media concerning

5   the shootings or the murders --

6   A    Yeah.

7   Q    -- you had no connection to your son or the Panama Unit at

8   that time.

9   A    No.  No, sir, not that morning, not at all.  I didn't even

10  know -- I had no idea they were out in the street.

11  Q    Okay.  Because, as you said, normally you don't get

12  involved with those things unless it's a murder or shooting or

13  something of that sort.

14  A    A significant nature type of event, yes, sir.

15  Q    And then you said you got delayed by whichever, and then

16  you met with them at Minnesota Val Verde.

17  A    That's correct.

18  Q    Were you still meeting with them when you first got some

19  indication that something had happened or you had already left?

20  A    I had already left and I was in route to the office when I

21  heard the radio traffic.

22  Q    And the radio traffic that you heard came about through

23  how?  Through the computer system, through the -- just the

24  radio itself, your cell phone?  How did you --

25  A    The first was through the radio.

1    Q    Okay.

2    A    That's when I made communications with the dispatcher.

3    And then the second call -- I'm sorry.  Then the next step was

4    the telephone call from Jonathan.

5    Q    Okay.  So first you heard it through radio dispatch at the

6    SO, at the Sheriff's Office.  And when you first heard that

7    dispatch, did you try to communicate back over or were you

8    still traveling before you got the call from your son?

9    A    No, I was still in route to the office.

10   Q    And if I heard right, you tried to get communication back

11   through dispatch over to the scene to see what was going on or

12   is it --

13   A    Right, exactly.  To see what was happening.  That's when

14   Jonathan came on the radio and then he calls me and says, "We

15   have something different or unique or significant."  He used

16   some sort of word; I forgot what it was and said -- no, he said

17   we have a situation that needs to be dealt with, something to

18   that effect.  I don't remember his exact words.  He must have

19   heard me on the radio.

20   Q    Okay.  But you heard him on the radio before he called?

21   A    That's right.

22   Q    And how did he identify himself?  Did you just hear his

23   voice or did he say, "This is, you know, Jonathan Trevino"?

24   A    No, he just said "Panama Unit," something or other,

25   whatever his number was.  But I recognized his voice.

1  Q    So you heard him and then recognized his voice.

2  A    Right.

3  Q    And then shortly after that is when he contacted you.

4  A    That's right.

5  Q    And he told you there was something unique going on and --

6  A    Yeah.

7  Q    -- you turned around and went out there.

8  A    Right.

9  Q    When you got back to the scene, what was the first thing

10 that happened?

11 A    The first thing that happened was I rolled up, I got out

12 of my vehicle, I saw a lady being hysterical out by herself.

13 And I said, "What's she doing by herself, you know?  Have

14 somebody stand with her."

15 Q    So she was standing separate.

16 A    Separate from everybody.

17 Q    Like how far away?

18 A    Two car lengths.

19 Q    Okay.

20 A    And she was standing there with them -- by herself.  And I

21 said, "Get somebody with her."  And we got somebody with her

22 and I said, "What do you have?"

23       And he said, "Well, we pulled this lady over.  We had

24 information she was transporting narcotics.  We opened up this

25 package and this is what we found."

Trevino - Cross / By Mr. Sturgis                    96

1   Q    Did you see what was found?

2   A    Yes, I did.

3   Q    So you went over -- if I understand it right, it was still

4   in the trunk of her car?

5   A    Yes, it was.

6   Q    So the bundles hadn't been moved to some other vehicle,

7   they were still in the car.

8   A    They were still in the car.  Yes, sir.

9   Q    And what did you see when you first got to the trunk?

10  What did you see?

11  A    Well, they displayed the package to me, and then they

12  said, "There's something in it."  And they opened it up and

13  then that's when I saw the transmitters.

14  Q    Did you pick the transmitter up and look at it or you just

15  saw the transmitter --

16  A    I just saw them.

17  Q    Okay.

18  A    I don't believe that -- I might have touched them.  I

19  don't think I did though.

20  Q    And what happened after that?  What did you do after that?

21  A    Then I got Jonathan off to the side.  I said, "Tell me

22  exactly what happened here.  I mean what's so significant about

23  this?"

24         And he says that Alexis had called him that morning,

25  that this lady was in possession of narcotics and that she

1   needed to be pulled over.  And the first thing I asked him was,

2   "Did you call your supervisor?"

3          And he said, "Well, we haven't called him yet."  And

4   that's when he shows the package to me, tells me what traffic

5   stop went on, took the packages and saw the transmitters, then

6   he called.

7   Q    So you asked him -- I guess the supervisor you are

8   referring to is Mr. Mendez?

9   A    No, no.  This is -- now we have Rudy Salinas here.

10  Q    Okay.  So Mr. Salinas.

11  A    That's right.

12  Q    And he worked for the Sheriff's Department?

13  A    Yes, sir.

14  Q    Was your son's direct supervisor since he came from

15  Mission -- was the direct supervisor a sheriff's deputy or was

16  it the Mission person?  Who would have been your son's direct

17  supervisor?

18  A    He -- the way I understood, Chief Longoria had set it up.

19  For field operations he had our supervisor take care of things.

20  When it came to Mission stuff, then there was a Mission

21  supervisor assigned to that unit.

22  Q    Okay.  So if I understand right, he had basically two

23  supervisors?

24  A    Yes, pretty much.  Yes.

25  Q    And that was the question I had.  Whose idea was the

1   Panama Unit originally?

2   A      Mine.

3   Q      The very first idea.

4   A      It was my idea.

5   Q      Your idea.  So you talked to the Mission --

6   A      Yes, sir.

7   Q      Going back to December the 12th now, you've seen the

8   tractors, you've talked to your son who says that Alexis

9   Espinoza set up this deal where this lady was supposed to be --

10  when I say "set up," he had provided your son information that

11  this female was supposed to be transporting cocaine.

12  A      I don't think he --

13  Q      He told you --

14  A      I don't know that he said cocaine, Mr. Sturgis.  I know

15  he -- I know he said she was transporting drugs.  I don't know

16  that he was specific as to what type of drugs she was

17  transporting.

18  Q      Okay.  And did you talk to Mr. Espinoza at all that day?

19  A      Yes, I did.  I pulled him aside.  I said --

20  Q      Okay.  After you talked to your son.

21  A      After I talked to Jonathan.

22  Q      You pulled Mr. Espinoza aside.  This is Alexis Espinoza.

23  A      Alexis.  By himself.

24  Q      Okay.

25  A      And I said, "What happened here?"  And he basically tells

1   me the same story, that he got information that this lady was

2   transporting drugs.  He had called Jonathan and went out there

3   to make the arrest.

4   Q    And Mr. Espinoza was a Mission Police Department officer,

5   correct?

6   A    He's a Mission police officer assigned to the ICE Task

7   Force.

8   Q    Right.  He actually wasn't Panama.

9   A    That's correct.  He was not.

10  Q    And why would he be out there if he was a Mission police

11  officer but he's assigned to ICE, now HSI but the federal

12  agency?  Why would he be out there with just all the Panama?

13  A    I have no idea, Mr. Sturgis.  I have absolutely no idea

14  why he was allowed to do that by his Mission or his HSI

15  supervisor.  I have no idea why.

16  Q    Were you aware that Mr. Espinoza had helped Panama do, I

17  guess, legitimate law enforcement duties, tasks, as well as the

18  other deals where Mr. Espinoza was working in conjunction with

19  the members of Panama to steal narcotics?

20  A    I do now after the fact.  I had heard that he was -- that

21  he had provided information that he was getting from HSI or ICE

22  back then to the unit and working deals.  That I had heard.

23  Q    Prior.

24  A    But it was sharing of information.

25  Q    Prior to December the 12th.

Trevino - Cross / By Mr. Sturgis                    100

1   A     Prior to December the 12th.  Yes, sir.

2   Q     How long prior?  I mean I know you probably don't know the

3   exact dates, but are we talking a month or two?

4   A     Months.  Within months.

5   Q     Okay.

6   A     Months.

7   Q     So you were aware that he was helping your son --

8   A     Right.

9   Q     And if I understand it right, your son Jonathan and Alexis

10  Espinoza have been friends for many, many years; they go way,

11  way back.

12  A     Go back since they were babies, yeah.

13  Q     Now, after you talked to Mr. Espinoza and he gives you

14  this scenario about how this happened, did you talk to the

15  lady?

16  A     Yes, I did.

17  Q     And was someone else with you when you talked to her or --

18  A     No.

19  Q     -- did you talk to her alone?

20  A     I talked to her alone.

21  Q     Okay.  And what was that conversation about?

22  A     I asked her, I said, "I want you to tell me exactly what

23  is going on here."  And she was really hysterical.  And I said,

24  "Just calm down."  I said, "First of all, do you know who I

25  am?"

1           And she says, "No, I have no idea who you are."

2           And I said, "Well, my name is Lupe Trevino.  I am the

3    County Sheriff.  Now I want you to tell me exactly what is

4    going on here."

5           She says, "If we don't get out of here we're going to

6    get hurt, I'm going to get killed.  These packages belong to

7    the Sinaloa Cartel and, you know, we've got to get out of

8    here."  And she says, "I'm really scared."

9           And she was really -- I mean she put on a heck of a

10   good act.  I mean she was really crying and carrying one and

11   this sort of thing.

12          And, you know, Mr. Sturgis, maybe I've been doing

13   this too long.  You know, maybe I'm just too cynical and too --

14   over suspicious.  But things just didn't seem right to me; they

15   really didn't.  And that's the only answer I can give you as to

16   why it --

17   Q   Right.  As you testified, you already had -- after seeing

18   the tracker, seeing the situation, at this point you certainly

19   had it in your mind that I believe the feds are probably

20   involved.

21   A   At some point, you know, either it's their stuff or it is

22   stuff that Jonathan and Alexis ran -- I mean either one.  I

23   mean I was thinking of all options.  All options were available

24   here.

25   Q   So you testified that -- if I remember right that at this

Trevino - Cross / By Mr. Sturgis                    102

1  point you kind of have a gut feeling, you believe that it's not

2  the Sinaloa just based on everything you've seen at the scene

3  the way people are acting and -- but out of, I guess caution

4  sake, you say, "Let's pack everything up, get out of here and

5  get over to the SO where we're at at least a secure place."

6  A    The way she was acting when she was saying that -- I give

7  her the benefit of the doubt.  And you're right, I just had to

8  get out of there for safety sake.

9  Q    Right.  And I'm assuming, the way it was being described,

10 is let's get everybody out of your car, the officers, the

11 cocaine, everything, let's get it out of here and get it

12 somewhere where it's secured.

13 A    That's right.

14 Q    So in case there is cartel members or something, we don't

15 have a shootout or something like that.

16 A    That's exactly my thoughts.

17 Q    During this time that you're talking to her were you

18 standing outside or did you all go into vehicles, or how did

19 that happen?

20 A    She was sitting inside a patrol vehicle handcuffed, and I

21 was standing outside the door.

22 Q    Did you transport her -- did you transport her over to the

23 SO, to the Sheriff's Department?

24 A    Personally?

25 Q    Yes, sir.

Trevino - Cross / By Mr. Sturgis                     103

1   A    No, sir.

2   Q    Okay.  So there was a marked unit that showed up?

3   A    Yes.

4   Q    Was that marked unit there when you got there or did it

5   show up after you got there?

6   A    I think there was already a marked unit there.  I'm not

7   really sure.  There's a little bit of confusion.  Because I

8   know that I told dispatcher to send any available -- or

9   available marked units to the scene immediately and to find a

10  supervisor.  I don't know if one was already there or it got

11  there right after I did.

12  Q    That being a marked unit.

13  A    A marked unit.  Because I'm not really sure on the

14  sequence, sir.

15  Q    And there was no supervisor there, correct?

16  A    That's right.

17  Q    And didn't that kind of strike you as --

18  A    That's exactly why I was really upset about the whole

19  thing.  I mean that's -- I don't see a street supervisor on

20  there, I don't see a CID supervisor there, I don't see a

21  Mission supervisor there, I don't see the Panama Unit

22  supervisor there.  So, you know, they start thinking; you know,

23  they start exploring all options.

24  Q    And what were you thinking when you got there and there

25  was no supervisors -- and at that time I don't know if it was

1    Mr. Salinas or Mr. Mendez, but the Panama Unit supervisor isn't

2    even around.

3    A    That's right.

4    Q    To your knowledge doesn't even know what's going on.

5    A    That's right.

6    Q    So what are you thinking at that point, you know, about

7    why there are no supervisors --

8    A    Well, I didn't start thinking that way until I separated

9    everybody and got their stories.  See, I didn't have a

10   preconceived notion as soon as I drove up there, you know.  I

11   spoke to everybody.  And then I realized we don't have

12   supervisors here.  You're got following -- and I guess this is

13   what triggered it, that they didn't follow the protocol; it

14   just didn't seem right.

15   Q    Right.  I mean you would expect the supervisor --

16   A    I would expect the -- because I had just had a meeting

17   with them.

18   Q    And they were conducting -- and I'm getting to what you

19   probably were thinking if you had had a meeting with the

20   supervisors and say, "You need to be out there, you need to

21   control these guys, I mean this is your job" and then you get

22   out here on a situation and your gut immediately tells you

23   something is not right and the supervisor is not there.  I

24   assume you start to think something is up with these guys.  And

25   unfortunately including your son; but something is up,

1    something is not right, the supervisor is not here, this

2    doesn't seem to make sense.

3    A    That was one of the options that I was considering; you're

4    right.

5    Q    So during any time was the lady frisked to make sure she's

6    not carrying any weapons or anything of that sort?

7    A    I would have expected the people that -- I did not frisk

8    her.

9    Q    You didn't --

10   A    No, I did not.  But I would have assumed -- I expected

11   either the arresting officers -- and I am almost sure that the

12   deputy that took custody of her -- because that is our

13   policy -- that she was frisked for weapons or anything before

14   she was placed in the marked unit.  I have to assume that.  I

15   don't know that is was or it was not.

16   Q    You never ordered anybody or asked anybody, "Hey, please

17   frisk her and --

18   A    No.

19   Q    -- make sure she's okay."

20   A    No.

21   Q    Did you put her in the car or did someone else put her in

22   the car?

23   A    Someone else did.  And I don't know who it was.

24   Q    And then you approached her.

25   A    That's correct.

1   Q    And after talking with her for a brief amount of time and

2   talking to your son and Mr. Espinoza, you basically said,

3   "Everybody, let's get out of here."

4   A    That's right.

5   Q    Okay.  And did you leave?

6   A    Yes.  I left before anybody else did.

7   Q    Okay.  You left.  Did the cocaine ever show back up over

8   at the Sheriff's Department?

9   A    Everything -- well, you ask a good question.  I believe --

10  I'm not sure.  I believe the cocaine was taken over to ICE, I

11  think.

12  Q    Right.

13  A    I'm not sure about that.

14  Q    And I think you're correct.  I don't think the cocaine was

15  ever --

16  A    Yeah.

17  Q    -- taken to the Sheriff's Department.

18  A    I think you're -- yeah, I believe the cocaine was taken

19  directly to ICE.  Because as a matter of fact, I remember now,

20  I mean so much happened that morning.  I believe I spoke to

21  Agent Champion I believe it was from ICE and everybody -- I

22  believe everybody went to ICE or the FBI with the cocaine and

23  transmitters.  And somehow, unbeknown to me, because I thought

24  everything was going to the Sheriff's Office, but it got

25  diverted at some point.  The lady and maybe the vehicle -- or

Trevino - Cross / By Mr. Sturgis                    107

1   maybe just the lady ended up at the Sheriff's Office, come to

2   think of it.

3   Q    Did you ever speak with -- do you remember an Agent

4   Fattig?

5   A    Who?

6   Q    Lyle Fattig.

7   A    Now, the first -- no, I don't.  I  might have.  I spoke to

8   several.  The first one I spoke to was Special Agent -- FBI

9   Special Agent Chris Lee.  I called him immediately and told him

10  what was going on.

11  Q    So I can figure out, what time of -- in all these events

12  did you first speak to Agent Chris Lee?

13  A    It was -- I believe I called him either when I was in

14  route to the office or when I -- as soon as I got to the

15  office.

16  Q    Okay.  And what was the purpose of speaking to Mr. Lee?

17  A    Because I needed the FBI assistance in this.  I needed

18  their -- I needed to know what had happened just in case.

19          THE COURT:  Well, why is that?  I mean you don't

20  know -- I mean I thought you said when you show up to the scene

21  there's drugs.  But why did you think I needed to call the FBI?

22          THE WITNESS:  Well, first --

23          THE COURT:  Her story was --

24          THE WITNESS:  Well, they weren't the only ones I

25  called, your Honor.  I often call DEA.

1          THE COURT:  This is -- again, you're leaving the

2    scene.  This is on your way back to the Sheriff's Office.

3          THE WITNESS:  Yes.  Yes, sir.

4          THE COURT:  You're making calls on a cell phone?

5          THE WITNESS:  Yes, sir.  And not only the FBI, I also

6    called DEA.  And I think I might have even spoken to -- I

7    forget who I -- if I didn't speak with ASAC Will Glasby

8    (phonetic), I spoke with -- I don't remember who at DEA I spoke

9    with.

10          THE COURT:  And your purpose is to find out whose

11    transmitters these are?

12          THE WITNESS:  No.  The purpose was to tell them what

13    we had and that they needed to come to the office.  Because if

14    it was the Sinaloa Cartel involved in this thing, we needed

15    some real help.  If it was something else, well, we needed to

16    do something with it.  And --

17          THE COURT:  You already at that point deduced it was

18    either a sting on the Panama Unit --

19          THE WITNESS:  Yeah.

20          THE COURT:  -- or that it was some --

21          THE WITNESS:  A legitimate --

22          THE COURT:  -- federal operate -- some federal

23    operation that they happened to intercept?

24          THE WITNESS:  Either one.  Either one.

25    //

Trevino - Cross / By Mr. Sturgis                    109

1   **BY MR. STURGIS:**

2   Q    When did you finally realize that, in fact, it was the

3   sting operation?  When did --

4   A    When did I first realize that it was --

5   Q    You were thinking it could be this, it could be that, it's

6   probably this.  But at what point did you realize, okay, it is

7   this?

8   A    When the FBI Assistant Agent in Charge and DEA Assistant

9   Agent in Charge and the FBI corruption unit supervisor came to

10  my office and told me exactly what was going on.

11  Q    Okay.  And what did -- and who was it, if you remember,

12  and what did they tell you?

13  A    I can't -- Hector -- I can't think of Hector's last name.

14  Q    He worked with FBI?

15  A    He was either assistant official agent in charge -- and

16  he's transferred out now.  It was Hector and then Will Glasby

17  and Minnie Perez (phonetic), who was in charge of the Task

18  Force who now is retired.  And then they said, "Look, we've

19  been working a sting operation on the Panama Unit and your son,

20  and this is what we've been doing."

21  Q    Okay.  So they just told you.

22  A    Yeah.  They just told me right out, yeah.

23  Q    And then as I understand it, and you testified earlier and

24  obviously that's changed a little bit, but you said, "Okay,

25  here, take the drugs; take the lady."

Trevino - Cross / By Mr. Sturgis                110

1    A     Yeah.

2    Q     But obviously --

3          THE COURT:  He didn't say take the drugs.  He just

4    said the drugs never were there.

5          THE WITNESS:  Yeah.

6          MR. STURGIS:  Well, I think previously he testified

7    that he said --

8          THE WITNESS:  Yeah.

9          THE COURT:  At the scene.

10         MR. STURGIS:  -- take the drugs, take the lady.  But

11   now, in fact, the drugs weren't there.

12         THE COURT:  Right.

13         THE WITNESS:  Actually, what --

14         THE COURT:  Now, why -- maybe I've missed a little

15   bit of this information, but at the scene I've heard two names

16   of people that were not Sheriff's deputies:  Jonathan Trevino

17   and Alexis Espinoza.

18         So how are you there ordering them to take the

19   cocaine to your office?  These are not deputies that you have

20   any control over there.

21         THE WITNESS:  Yeah.

22         THE COURT:  One is a -- they're both Mission PD

23   officers.  I guess --

24         THE WITNESS:  Because my sergeant was involved in

25   this.  And the other Panama Unit's guys showed up, and my

Trevino - Cross / By Mr. Sturgis                111

1   marked units were out there.

2           THE COURT:  Right.  So you had --

3           THE WITNESS:  And we were out there in county

4   jurisdiction.

5           THE COURT:  So you had other -- there were some

6   deputies that eventually showed up.

7           THE WITNESS:  Oh, absolutely, yes.

8           THE COURT:  All right, okay.  I'm sorry, I didn't

9   mean to interrupt.  Your last question if you could --

10          THE WITNESS:  What I was saying, Mr. Sturgis, was

11  that to be exact Hector -- I just want --

12          THE COURT:  We're talking about you had ordered

13  everybody to bring the cocaine --

14          THE WITNESS:  No, it's --

15          THE COURT:  -- and the woman to your office, but that

16  didn't happen.

17          THE WITNESS:  No, he asked me how I found -- how he

18  told me --

19  BY MR. STURGIS:

20  Q    Right.  We had moved on to that.

21  A    Yeah.

22  Q    The question was in relation to the fact the cocaine was

23  never there.  It was taken over --

24  A    Right.

25  Q    -- somewhere else.  But the lady was taken away at that

Trevino - Cross / By Mr. Sturgis                    112

1   time.

2   A     That's what it was.  Hector -- and I'm sorry to call him

3   Hector but I can't think of his last name.  He tells me, "I

4   need the woman."

5           And I said, "Fine.  Let me call somebody to go get

6   her."

7           He says, "No, we have three agents in the parking lot

8   ready to take custody of her."

9           I said, "Okay."  So I called Sergeant Salinas, and I

10  said, "Take the lady to the front lobby and turn her over to

11  the FBI."  And that's when they started breaking the news to

12  me.

13  Q    And during this time that -- I guess before the FBI and

14  DEA showed up and then broke the news -- if I understand what

15  you testified earlier, that your son Jonathan was down there

16  interrogating the lady when -- during this time prior when she

17  got over to the Sheriff's Department at some point your son

18  showed up --

19  A     Yes, that's right.

20  Q     -- and went down to interrogate her.

21  A     That's right.  And when I found that out I called Sergeant

22  Salinas and I said, "Separate them."  Because I had already

23  been told what was going on.  Because Hector -- actually, the

24  FBI and DEA were under the impression that Jonathan was over

25  with the rest of the agents at ICE, which he wasn't.  Because

1  he followed the marked unit and the supervisor I believe to our

2  office.  He broke off from them.

3          And as soon as I found out when the FBI advised me as

4  to what was going on, I immediately called the sergeant and I

5  said, "Where's Jonathan at?"

6          And they said, "He is interviewing or talking to the

7  lady."

8          And I said, "Immediately you separate them.  You put

9  the lady in one room, put Jonathan in another room and you just

10  let them sit there until I tell you what to do with them."

11  Q    Did you contact Mission that day and let them know what

12  you knew?

13  A    I'm not sure if I did or not.  I'm pretty sure that I did.

14  I think I did.  I think I called -- it was then Chief Martin

15  Garza.  And I told them we had a situation with the Sheriff's

16  Office and that I'd call him later to give him the details,

17  which I did.

18  Q    And at this time you obviously know that Alexis Espinoza

19  is involved.

20  A    That's right.

21  Q    Did you -- and my understanding is that the now City of

22  Hidalgo's police chief, Rudy Espinoza, is his father; is that

23  correct?

24  A    That's correct.

25  Q    Did you call Mr. Espinoza?

Trevino - Cross / By Mr. Sturgis                    114

1  A     I don't believe that I did.

2            **THE COURT:**  The father.

3  **BY MR. STURGIS:**

4  Q     The father?

5  A     I don't believe I -- I don't believe did.

6  Q     And Mr. Espinoza used to work -- the father, used to work

7  for you?

8  A     Yes.

9  Q     From when to when did Mr. Rudy Espinoza work for you?

10 A     In two different jobs.  He has probably worked for me

11 close to -- close to 20 years maybe.  And actually three

12 different jobs.  And I supervised back in the late -- no, early

13 Nineties a street level drug task force and he was assigned

14 there when he was with the McAllen Police Department.  So he

15 worked for me then.  And then when we created the HIDTA Task

16 Force and I was supervisor of that or ran that for about

17 14 years, he worked for me there for about -- I actually hired

18 him -- maybe eight, nine years.  I'm not really sure how long

19 it was.  Maybe ten years.  I'm not sure how long it was.  And

20 then when I got elected sheriff I took him with me --

21 Q     In 2005 he went --

22 A     -- to the Sheriff's Office.

23 Q     -- with you to the Sheriff's Office.

24 A     Yeah.  Yeah.

25 Q     Or close to that --

Trevino - Cross / By Mr. Sturgis                    115

1    A    It's been a long time.

2    Q    And I'm not sure, but was Mr. Espinoza ever in charge of

3    the Panama Unit?

4    A    Oh, no.  I don't think he was.

5              THE COURT:  Senior or --

6              MR. STURGIS:  Senior.

7              THE COURT:  Senior, okay.

8    BY MR. STURGIS:

9    Q    Rudy Espinoza, was he ever in charge of the Panama Unit?

10   A    No.  I don't think that he was, Mr. Sturgis.  I know that

11   at one point Chief Espinoza was in charge -- he was the captain

12   over the tactical division at one point but I don't -- I don't

13   think he had anything to do with Panama; I don't think he did.

14             THE COURT:  So he was with the Sheriff's Office at

15   the same time the Panama Unit had already been formed at your

16   direction.

17             THE WITNESS:  I believe so.

18   BY MR. STURGIS:

19   Q    And gathering from the fact that your son and his son have

20   known each other, been friends since they were real little and

21   you've been with Mr. Espinoza as a colleague for this many

22   years, I would assume that you would also consider your

23   relationship with Mr. Espinoza to be good friends.

24   A    Yes.  We've been very good friends for -- as a matter of

25   fact, even before that.  When I was Austin PD he was McAllen PD

Trevino - Cross / By Mr. Sturgis                     116

1    and we exchanged information on narcotic dealers.  I've

2    probably known him for over 30 some years.

3    Q    I assume based on this that you would say his reputation

4    is one of being honest and of good character.

5    A    Chief Espinoza?

6    Q    Yes, sir.

7    A    Of the very highest, Mr. Sturgis.

8    Q    I want to go back a little bit because you were asked

9    about the July incident in Pharr.

10   A    Okay.

11   Q    The one where the jewelry --

12   A    Yeah.

13   Q    -- came up.  How did you first learn about there being a

14   situation or a problem there?  How did you first learn about

15   it?

16   A    I don't remember how I first learned about it, but I'll

17   tell you what I did learn.  And I don't remember who called me

18   on this.  It might have been the Pharr Police Department

19   themselves that called me to tell me that there was some

20   jewelry missing from that particular home.  And I started

21   asking questions and nobody knew anything about it.

22   Q    When you were asking questions who --

23   A    Of the supervisor, especially the supervisor.  And nobody

24   knew anything about it.

25   Q    And just so -- which supervisor?  At Pharr --

Trevino - Cross / By Mr. Sturgis                    117

1    A    At that -- no, my supervisor at that time was Sergeant

2    Mendez.  And he had no idea.  Finally it somehow comes out that

3    Mr. Claudio Mata had the jewelry in possession.  I'm sorry, he

4    had possession of the jewelry that was missing.  So I called

5    him in and I said, "What did you do?"

6    Q    Well, just going back a little.

7    A    Yeah.

8    Q    Were you aware that this all started as a drug situation?

9    Before the jewelry was ever started were you aware that it

10   involved cocaine?

11   A    I found out about all of it at the same time.  I didn't

12   even know they were out there in Pharr until everything broke.

13   Q    And by "Pharr" they, you mean --

14   A    The Panama --

15   Q    -- the Panama --

16   A    I'm sorry, the Panama Unit, right.

17   Q    And you don't know -- at that time I'm taking it you don't

18   know which members are out there.  You know, maybe not all

19   Panama Unit is out there on a given time.

20   A    Right, exactly.  I have no idea who was out there.

21   Q    And you don't remember who told you or how you found out

22   that there was a problem?

23   A    No, I don't.  And it might have been the Pharr Police

24   Department that called me or maybe the Chief called me himself.

25   Q    And who would the Chief have been?

Trevino - Cross / By Mr. Sturgis                    118

1   A    Chief Ruben Villescas.

2   Q    If that --

3   A    Yeah.

4   Q    -- whoever it is that contacted you, what did you do in

5   response to that?

6   A    I tried to find out if, in fact, there was jewelry missing

7   and I called the sergeant in.

8   Q    So during this time you may have learned that there was

9   narcotics.  You definitely learned about a jewelry --

10  A    Yeah.

11  Q    -- situation.  What did you do when you found out?  What

12  was the next thing you did?

13  A    The next thing I did when -- once I found out that Claudio

14  Mata, who was a member of the Panama Unit and one of my former

15  deputies, had the jewelry in his possession, I called him in.

16  Q    How did you find out he had the jewelry?

17  A    I keep forget -- I don't remember exactly who was the one

18  that told me.  But somebody in the conversation -- somebody

19  said Claudio took custody of the jewelry.

20  Q    So your indication was that Mr. Mata took custody as like

21  evidence?

22  A    Well, that's what I was trying to find out; was he trying

23  to steal it or was he actually keeping it as evidence?  And

24  that's when we initiated our internal affairs and a criminal

25  investigation into Claudio Mata and that particular piece of

1    jewelry.

2              **THE COURT:**  How many days or after the event was it

3    that this was brought to your attention?

4              **THE WITNESS:**  I believe it was that very next

5    morning, your Honor.

6              **THE COURT:**  Okay.

7              **THE WITNESS:**  If not that same afternoon, the very

8    next morning.  It was almost immediate.

9              **THE COURT:**  Of the incident where they did the raid

10   on the Pharr home.

11             **THE WITNESS:**  That's correct.

12             **THE COURT:**  All right.

13   **BY MR. STURGIS:**

14   Q    That day did -- when you first found out did you send

15   Commander Joe Padilla over to Pharr?

16   A    I sent somebody.  It might have been -- it might have been

17   Joe Padilla because of his brother being the Assistant Chief

18   there.  And there would have been a relationship and been able

19   to get reports and get to the stuff very quickly.  But I spoke

20   to the Chief personally so if I -- all I had to do -- I could

21   have sent anybody.

22   Q    Right.  So you did speak to Mr. Villescas.  I guess he's

23   the one that contacted you and said --

24   A    Right.

25   Q    -- we have an incident, we have a problem.

Trevino - Cross / By Mr. Sturgis                    120

1    A    Right.

2    Q    Was there a point in this that they were trying to

3    identify -- do you remember this whether or not there was a

4    point where they were trying to identify who, in fact, it was

5    that had raided the house, whether it was Panama or somebody

6    else?  Do you remember being contacted in trying -- with Pharr

7    to figure out who, in fact, it was there that day?

8    A    I don't remember that that came up.

9    Q    Now, you get contacted by Chief Villescas, you know, and

10   given the information.  You said that you contacted the

11   sergeant to find out what was going on.

12         In this time, Mr. Trevino, did you contact or have

13   communications with your son Jonathan about what was going on?

14   A    I believe I did call Jonathan if I think about it.  I

15   called Jonathan and said, "What is going on?  What's going on

16   here?"

17         And he says, "Dad, I don't know anything about any

18   jewelry.  I don't know anything about it at all."

19   Q    Did he tell you that, in fact, they had been at the house

20   and that there was a drug investigation?  He did tell you that

21   part.

22   A    Yes, yes, he did.

23   Q    Okay.  But he told you, "I don't know anything about any

24   jewelry."

25   A    He says, "I don't know anything about any jewelry

Trevino - Cross / By Mr. Sturgis                    121

1   whatsoever."

2   Q    Do you know whether or not he took any steps to try to

3   find out if jewelry had been taken or was missing?

4   A    I believe he did and -- because I had asked -- I asked

5   everybody, "Does anybody know anything about any jewelry?"  And

6   somebody in the group identified -- and I don't remember if it

7   was Jonathan or it could have been Alexis -- somebody in the

8   group identified Claudio as being the one that seized that

9   jewelry, that had taken it from the house.

10            **THE COURT:**  Is it jewelry or jewelry and cologne?

11   I've heard it both --

12            **MR. STURGIS:**  Do you know --

13            **THE WITNESS:**  I don't know about any cologne.

14            **THE COURT:**  Okay.

15            **THE WITNESS:**  I know about jewelry.  I don't know

16   about any cologne.

17   **BY MR. STURGIS:**

18   Q    You said that it had been seized or taken.

19   A    Or taken, yeah.

20   Q    Okay.  At this time what are they telling you, that it had

21   been seized?  Because obviously seized, you know, it will be

22   taken into evidence or whatever.  Taken can mean, okay, they're

23   not entering it into evidence.  At this point are they telling

24   you that it had been seized as evidence?

25   A    I don't know if they said the word seized.  I used that

1   because that's the word I used.

2   Q    Okay.

3   A    I might have misspoken.  I was told that Claudio was in

4   possession of the jewelry.  Now, I don't know if they said he

5   seized it or he took it.  I know that he was in possession of

6   it and he was the one that had taken it, physically got a hold

7   of it and taken it from her.

8   Q    Okay.  So what did you do when you found out that Mr. Mata

9   was the one that was in possession of it?

10  A    I called him in.  I said, "Do you have the jewelry with

11  you?"

12          He said, "Yes, sir, I do."

13          I said, "What are you thinking?  What are you doing?"

14          And then at that point he said, "I've got the

15  jewelry."

16          I said, "Well, I'm not going to speak with you

17  anymore."

18          We called Internal Affairs and the Criminal

19  Investigation Division.  We put him on leave and we conducted

20  two investigations.  We conducted an internal affairs

21  investigation and we conducted a theft criminal investigation.

22  Q    So you conducted a theft criminal investigation on

23  Mr. Mata?

24  A    Yes.

25  Q    Okay.  And then an internal administrative --

Trevino - Cross / By Mr. Sturgis                    123

1   A    That's right.

2   Q    The criminal investigation I assume is what you determined

3   that you spoke to the Assistant DA, Mary Moore (phonetic),

4   about.

5   A    That's correct.  Well, I didn't personally.  The

6   investigators took the facts of the case to her and said, "This

7   is what we have.  Will you prosecute him for theft?"

8           And she says, "We can't do that."  And her reasoning

9   was that there was no way that the state could prove that he in

10  any way tried to convert that -- the jewelry for his own use

11  over the use of others.  Because all the evidence showed that

12  he had that jewelry I believe in a paper sack in his car or his

13  truck, whatever vehicle he was driving.  And we couldn't prove

14  either way that he -- he didn't melt it, he didn't sell it, he

15  didn't pawn it.  He just kept it there.  And Mary Moore -- or

16  the Assistant D.A. said that there was no way she could

17  prosecute something like that.

18  Q    But not -- as I gather, these are your internal affairs

19  investigation you're talking -- you weren't --

20  A    No, they --

21  Q    That's what they're reporting to you.

22  A    Sir, that's -- no, that's the second investigation.

23  That's my theft investigation.

24  Q    Okay.  Who was speaking to ADA Mary Moore?  It wasn't you,

25  you said.

Trevino - Cross / By Mr. Sturgis                           124

1   A    It was not me.  It was our criminal investigators.

2   Q    And who was that?

3   A    I don't remember who it was.  I'd have to look at the

4   report to see who actually conducted that investigation.

5   Q    Okay.  And they reported back to you that this is what she

6   had stated.

7   A    Through the command staff, yes.

8   Q    And then the internal affairs investigation continued on

9   the site.

10  A    That's correct.

11  Q    And was Mr. Mata punished in any way?

12  A    Yes, he was.

13  Q    And how was he punished?

14  A    He was given time off without pay.  So he was suspended

15  without pay for failing to follow our protocols in the chain of

16  custody of evidence.  Because actually that's all that we had.

17  Q    Okay.  So he was given time off without pay --

18  A    Right.

19  Q    -- for doing what?  Exactly what was it?

20  A    For failing to follow our chain of custody evidence of

21  protocols of --

22  Q    Which would be what?

23  A    Which would -- if you go to a crime scene and you seize

24  evidence, you report it to the supervisor, you mark it on a

25  tag, you put it in a bag, you take it into the evidence room

1   and follow the chain of custody of the evidence.  And he failed

2   to do that.

3   Q    Did Mr. Mata ever tell you what his intentions where,

4   whether or not he was going to steal the jewelry or what had

5   happened?

6   A    I asked him that.  I did ask him.  I said, I said -- I

7   think I said, "What are you doing?  I mean what's going through

8   your head?"  I said, "Were you going to steal this or what were

9   you going to do with this?"

10  Q    How did he respond --

11  A    And he looked at me and he kind of shrugged his shoulders

12  and he -- I don't know if he said "yes" or "no" or just

13  shrugged his shoulders.  And I said -- at that point, you know,

14  I'm now interrogating somebody.  I said -- at that point I

15  stopped it and I said, "We're going to hold two investigations

16  and I'm calling in criminal investigators and Internal

17  Affairs."

18  Q    Why would you stop it if -- I mean it's obviously your

19  employee.  I mean --

20  A    Yeah.

21  Q    -- that's what -- it's your employee.  He may have just

22  stolen something --

23  A    Right.

24  Q    -- while on the job.  I assume everybody is going to

25  expect -- well, you're going to want an answer.  What were you

Trevino - Cross / By Mr. Sturgis                    126

1   doing with this --

2   A    Well I --

3   Q    -- if he did answer --

4   A    As a head of the department I did not want to introduce

5   myself into the investigation, because I've got to make the

6   ultimate decision of what to do with him.

7   Q    Well, wouldn't you -- wouldn't you have done that prior --

8   wouldn't you -- if you didn't want to be a part of it just let

9   everybody -- wouldn't you have had him go over and talk to the

10  internal affairs person right away rather than you talking to

11  him?

12  A    That could have been one way I could have handled it.  I

13  could have done that.

14  Q    Did he ever make a statement to you in regards to what he

15  was doing with the jewelry?  I know you said he shrugged his

16  shoulders, but did he ever say, "Yeah, I was going to steal it;

17  I did wrong"?

18  A    You know, Mr. Sturgis, he might have said that.  He might

19  have said that.  That's when I put a stop to it.  And I put a

20  stop immediately to it and I said, "At this point we're going

21  to conduct a criminal investigation and an internal affairs

22  investigation."

23  Q    Did he receive any instruction on what to do with the

24  jewelry, to your knowledge?

25  A    You mean after he admitted to having it?

1    Q    Yes, sir.

2    A    Well, I would imagine somebody at some point told him

3    you're going to have to process it and process the jewelry,

4    turn it in and go through the regular procedure.

5    Q    This is occurring at the Sheriff's Department --

6    A    That's correct.

7    Q    -- correct?

8    A    That's correct.

9    Q    Did you see the jewelry?

10   A    No, never --

11   Q    You never saw the jewelry.

12   A    I never saw it.

13   Q    Okay.  His processing then -- obviously if you're

14   conducting an investigation, as you said, at that time you got

15   a criminal investigation going and an internal affairs going.

16        Was that jewelry taken in as possible evidence on you

17   all's criminal investigation?

18   A    Yes.  Well, it was taken into evidence by the Mission

19   Police Department; it was given to them.  And they were to hold

20   it until we had completed our entire investigation.

21   Q    Why was it taken to Mission?

22   A    Because that's where the case -- all the cases were filed

23   and they took it to Mission.  We knew it was going to be in

24   their custody.  Whoever needed it for prosecution we knew where

25   it would go.  The instructions to Mission were, you know, you

Trevino - Cross / By Mr. Sturgis                    128

1   do not release this jewelry until the District Attorney says

2   that you can release it.

3   Q    Okay.  But I'm confused.  Why was it taken to Mission if

4   at that time you're conducting a theft investigation?  It would

5   be evidence of the theft.

6   A    Right.

7   Q    So if the Sheriff's Department is conducting the

8   investigation and obviously Panama is tied to this, Mission

9   wouldn't be conducting any of it.

10  A    Right.

11  Q    I guess the only other logical place would have been

12  either the Sheriff's Department or Pharr PD, since that's where

13  the crime originally occurred.  So why would it go to

14  Mission?

15  A    You're right.  And I have no idea why it went to Mission.

16  That's where they ended up.  I don't think it was by -- there

17  was a reason for it, I mean a specific reason.  It just ended

18  up in the Mission evidence room where Mission kept it.

19  Q    And at this time -- if I got it right, this time you are

20  still unaware of the narcotic investigation that's going on

21  with Pharr and the Perezes and all that that happened at --

22  A    That's right.  Mission was -- I mean Pharr PD was taking

23  care of all that.

24  Q    At any time did you learn that there was an investigation

25  going on over there in regards to cocaine and such?  At some

Trevino - Cross / By Mr. Sturgis                           129

1   point did you learn that?

2   A    After the fact, right.  Is that what you're asking me?

3   Q    Well, yeah, obviously --

4   A    Yeah, after the fact of course I knew.  Before the fact I

5   did not.

6   Q    Okay.  Did you after the fact ever talk to Police Chief

7   Mr. -- Police Chief Villescas about this investigation what was

8   going on with Pharr as far as checking into this and --

9   A    I don't -- we spoke several times and he said that they

10  were going to investigate it; that's fine.  At some point he

11  even said I think maybe you all should take this.  And I said,

12  "No, it happened in Pharr.  I think you need to do so."

13           And they took off with it and I believe they must

14  have turned everything over to the federal people.  Because I

15  don't know what the outcome of that investigation was.

16  Q    During this investigation obviously that you have the

17  jewelry going on, were any of the other members -- because I'm

18  sure at some point you learn, okay, Panama is out there; the

19  various members of Panama are involved in this -- were each of

20  the members of the Panama Unit that were involved in it were

21  they interviewed by your office, you know; okay, what happened

22  this day, what took place?

23  A    I'm sure -- I have not seen the file since it occurred,

24  but I am sure -- I'm almost sure that our internal affairs

25  investigators interviewed everybody that was involved or had

Trevino - Cross / By Mr. Sturgis                    130

1   anything to do with it.

2   Q    Do you know which investigator that was?

3   A    I do not, sir.

4   Q    Okay.  But there should be a file on all that, correct?

5   A    There definitely is a file, yeah.

6   Q    When Panama was originated, as you said, it was designed

7   to help Mission, correct?

8   A    Right.

9   Q    And then you said their duties are going to be Mission;

10  they may move west towards La Joya and all that area.  But

11  that's where it was designed.

12  A    That was the original intent.

13  Q    When you find out in July that obviously Panama is over

14  here in Pharr doing something, you know, they're hitting a

15  house here in Pharr and maybe -- you know, do you know whether

16  or not the supervisor was there on that day on the El Dora

17  (phonetic) Road thing in Pharr?  Do you--

18  A     I don't know that he was.  But I do remember calling him

19  in and reminding him what my instructions were, that they

20  needed to stay in the Mission area.  And I think their excuse

21  was that the informant -- or they developed the information on

22  the west side and it led them to Pharr, which is not uncommon.

23  Q    And this was Sergeant Mendez telling you this; is that --

24  A    It had to have been him.  I mean he was the supervisor.

25  If he was the one that gave me the follow-up on it, yes, sir.

Trevino - Cross / By Mr. Sturgis                    131

1  Q    And did you instruct Sergeant Mendez to remind the guys,

2  tell the guys, "Hey, we're supposed to be doing west stuff over

3  here"?  You know, if something developed, obviously, as you're

4  well aware of, if they developed information, it would be

5  common for them to call Pharr.  If they work over here and they

6  get some information about Pharr, it would be common for them

7  to call the Pharr narcotics guys and say, "Hey, we got this

8  information; you guys want to run with it."

9  A    Our policy was this, that if you're going to hit -- if you

10  hit a house outside the city of Mission or wherever you're at,

11  you will call that police department and let them know exactly

12  what you're doing.  Either right before you hit it or when you

13  hit it, you know.  And that is one of our rules.

14         But obviously, Mr. Sturgis, we all agree here that

15  the Panama Unit was completely rogue.  They went off on their

16  own.  They weren't even telling their own supervisor what they

17  were doing, and that was the problem.  The supervisor was in

18  the cold most of the time.

19         **MR. STURGIS:**  Judge, may we approach?

20         **THE COURT:**  Why don't we take our noon recess and we

21  can talk about this after I release the jury.

22         All right.  If you'll be back at 1:30 and if you'll

23  take your notepads with you.  Don't talk about the case with

24  anybody, et cetera.

25         All right.  The jury is excused until 1:30.

Trevino - Cross / By Mr. Sturgis                    132

1          **THE CLERK:**  All rise for the jury.

2          **(Jurors exit courtroom at 11:50 a.m.)**

3          **(Portion of transcript and sealed bench conference from**

4     **11:50:32 to 11:51:37 a.m. is omitted)**

5          **(A recess was taken from 11:51 a.m. to 1:31 p.m.)**

6          **(Portion of transcript and sealed bench conference from**

7     **1:31 to 1:39 p.m. is omitted)**

8          **THE CLERK:**  All rise for the jury.

9          **(Jurors enter courtroom at 1:39 p.m.)**

10         **THE COURT:**  Good afternoon.  Please be seated.  All

11    right, Sheriff Trevino, if you could resume your seat.

12         **(Pause)**

13         Yes.  And Mr. Sturgis, whenever you're ready you may

14    continue and finish up your questioning.

15         **MR. STURGIS:**  Thank you.

16              **CROSS EXAMINATION (CONTINUED)**

17    BY MR. STURGIS:

18    Q    Sheriff Trevino, you were asked a bunch of questions about

19    campaigns and contributions and all that.  And my understanding

20    is you have people that are doing the campaign financing and

21    administrative stuff separate from yourself; is that correct?

22    A    For the most part, yes, sir.

23    Q    Who is it that -- do you do the accounting on your

24    campaign or does someone else take in the money and all that

25    stuff?

Trevino - Cross / By Mr. Sturgis                    133

1   A    Actually, the money is turned in either to me or to the

2   treasurer.  But I am ultimately responsible for signing the

3   final report.

4   Q    And who is the treasurer?

5   A    The treasurer is Pat Medina.

6   Q    Am I correct she works at the Sheriff's Office?

7   A    That's right.

8   Q    Okay.  And essentially if I have it right, whoever may

9   bring in monies from whichever contributor, those monies would

10  be handed to her, she does an accounting, and then I guess

11  gives it to you to oversee it?

12  A    One way or the other.  They give it to me, I give it to

13  her, she gets it from me, I'll get it to her, then they give it

14  to me.  I sign off on it and then we make a deposit.

15  Q    You were also asked about -- a number of questions about

16  Miguel Flores.

17  A    Right.

18  Q    And you stated you know who he is.

19  A    Yes.

20  Q    Were you aware of who he is prior to the incident where

21  apparently there was some allegations of misconduct?  Did you

22  know who he was?

23  A    No, I had no idea who he was.

24  Q    Okay.

25  A    Well, no, that's not accurate.  I knew he was my deputy.

1   Okay.

2   Q     Okay.

3   A     And I knew he was assigned to narcotics.  But I didn't

4   know him personally or never heard of him.

5   Q     Okay.  You may have heard the name or whatever --

6   A     Right.

7   Q     -- as a person there but you didn't know the person.

8   A     Right.

9   Q     Okay.  And if I understood right, the first time you heard

10   of this person in a personal capacity was from your son.

11   A     Actually, one of the sergeants that I was thinking of

12   moving into the Panama Unit to make a switch -- I was going to

13   make an all around -- I was going to probably make an all

14   around switch of personnel -- he suggested to me that we

15   should -- that he -- he said "If I take the sergeant position,

16   will you allow me to take somebody with me?"

17           And I said, "Who is this?"

18           And he said, "It's Miguel Flores."

19           I said, "What do you know about him?"

20           He said, "He's a good guy.  He's a good guy and I

21   trust him.  I work with him."

22           I said, "Fine.  If that's what you want, that's

23   okay."

24   Q     And who was the sergeant that you were talking to?

25   A     Sergeant C.J. Rivera.

Trevino - Cross / By Mr. Sturgis                    135

1   Q    And I guess that ultimately did not happen?

2   A    That did not happen.  That's right.

3   Q    And this was prior to your son calling you saying this had

4   happened.

5   A    That's right.

6   Q    Because obviously if you got these allegations, you sure

7   wouldn't consider moving him into the Panama Unit.

8   A    That's correct.

9   Q    Okay.  And I think you testified that your son called you

10  and told you that he, and I guess the other maybe members of

11  Panama, has come across information that Mr. Flores may be

12  stealing drugs or money and that they were going to conduct or

13  had been starting to conduct an investigation to Mr. Flores.

14  And you were upset because they weren't following the chain of

15  command on how to do that.

16  A    That's correct.

17  Q    So it wouldn't have been their job, their duties, to

18  investigate Mr. Flores.

19  A    No.

20  Q    That would have been passed on to someone else.

21  A    That's right.

22  Q    And I'm assuming Internal Affairs.

23  A    It could have been, yeah.

24  Q    And if I understand in the end, there was an internal

25  affairs investigation?

Trevino - Cross / By Mr. Sturgis                    136

1   A    That's correct.

2   Q    And they found no wrongdoing?

3   A    We found no criminal wrongdoing on Mr. Flores' part.

4   Q    Okay.  But there was some wrongdoing.

5   A    Administrative.  He did not follow proper protocol.  It's

6   administrative wrongdoing.

7   Q    Okay.  What was it that he did wrong?

8   A    Well, it's --

9   Q    That he was cited for doing wrong.

10  A    It is our policy that if a member of our -- of any of our

11  units comes across information that requires surveillance or an

12  undercover operation, something where you would have to have an

13  operational plan, that you would go through your chain of

14  command so that we can set things up the right way.

15  Q    Okay.  And is it normal policy for the deputy and such

16  there to have operational plans?  Is that something that's

17  normally done?

18  A    Operational plans are done on every operation that we

19  conduct, whether it's a narcotic operation or a homicide,

20  whatever it is.  If it's a police operation, we have an

21  operational plan.

22  Q    Okay.  And that's what he was cited for.

23  A    Yes.

24  Q    And as I guess punishment for not following the policy,

25  what was given to Mr. Flores?

Trevino - Cross / By Mr. Sturgis                137

1  A    Either a verbal or written reprimand.  And he was --

2  that's when I had the talk with him and we put him back on

3  uniform.

4  Q    Where was he at the time before he was put in uniform?

5  A    He was in narcotics.

6  Q    He was in narcotics.

7  A    Yes, sir.

8  Q    Okay.  And then he was put back on patrol.

9  A    That's right.

10  Q    Okay.  And I think it was described that he was basically

11  a really good hard worker, maybe just too young, too driven.

12  A    That's the way I saw him and exactly what I told him.

13  Q    Did anybody describe -- did Mr. Flores describe how he

14  had -- at the time did he describe how he had gotten involved

15  in this entire deal?

16  A    No, sir.  And even if he did it's going to be in the

17  Internal Affairs' file.

18  Q    Did he ever tell you that he was involved in this scenario

19  where somebody was trying to rip off a bunch of money from

20  people that were allegedly drug dealers?

21  A    No, sir, he did not.

22  Q    Did you ever receive that information from anybody?

23  A    Other than initially from Duran and Arguello that that's

24  what they were trying to do.  That's what he was asking them to

25  do through a third party.

Trevino - Cross / By Mr. Sturgis                    138

1   Q    Okay.  So from Mr. Arguello's point what was it that

2   Mr. Flores was supposedly trying to do?

3   A    What Mr. Flores was supposedly trying to do was get Sal

4   Arguello and Duran to meet with two individuals that he passed

5   them -- I think Mr. Flores passed them off as relatives, that

6   they had a house located that had either a lot of money or a

7   lot of drugs in that particular location; and that they wanted

8   to go do the -- or do a, I guess a home invasion or whatever

9   you want to call it.

10  Q    Steal the money or drugs.

11  A    Yeah, steal the money or steal the drugs, whichever one it

12  was.  And I understand they meet; everybody meets.  But then

13  Miguel Flores goes to a part-time job and leaves Arguello and

14  Sal -- I'm sorry -- Arguello and Duran with those two other

15  individuals.  And they go off and they actually -- they spot a

16  house.  And they look at it and then they come back, and I

17  think Arguello tells them, "We don't want to do this.  This is

18  not right.  There is something wrong with this and we don't

19  want to do this."

20          And I believe that's -- I forget -- that's when I

21  find out about it after all of that transpired.

22  Q    And this is what Mr. Arguello told you had happened in a

23  sequence of events --

24  A    In an affidavit form, yes, sir.

25  Q    Okay.  And then did you also speak with Mr. Duran?

Trevino - Cross / By Mr. Sturgis                          139

1   A    He told me basically the same thing.

2   Q    Okay.  He told you the same thing.

3   A    Yeah.

4   Q    At any time in this did they mention that in some form or

5   fashion they were talking to your son?

6   A    Yes.  Yes, they did.

7   Q    And what did they say about that?

8   A    That they called Jonathan about it, and Jonathan said,

9   "Well, go meet the guy and see what he's got."  They went to go

10  meet him and that's I believe that's -- and I'm not sure of the

11  timeframe there, but at some point Jonathan calls me and tells

12  me what he had already done.  And that's what upset me.

13  Q    And what was it that he had done that upset you?

14  A    He had -- I guess Duran and -- I'm guessing here -- I

15  think I'm guessing Duran --

16  Q    Well, I guess what did he tell you -- what did he tell --

17  A    Okay.  He told me that Duran and Arguello had called him

18  to tell him about this.  And then he said, "Well, go take a

19  look at it and then we'll see what we can do with it."  And

20  that's -- at some point after that he calls to tell me that we

21  have a bad deputy that we have to do something with it.  And

22  that's when I called Arguello and Duran and said, "What is

23  going on?"

24  Q    Why did -- did your son tell you why he thought that you

25  had a bad deputy amongst you?

Trevino - Cross / By Mr. Sturgis                    140

1   A    Yes, he did tell me.  He said because he had approached

2   Duran and Arguello to go do this.

3   Q    Do you know why it was that Duran or Mr. Arguello both

4   contacted your son about this?

5   A    No.  I don't know why they did that.

6   Q    Because as I understand it, the next step either for them,

7   even though they're not in that category of internal

8   investigations, would have been to call their sergeant when --

9   A    Yes, it would have.

10  Q    Is that the normal --

11  A    That should have been one thing to do, you're right.  And

12  that's what upset me about that whole thing.

13  Q    Because it wouldn't make much sense for them to contact

14  your son --

15  A    That's right.

16  Q    -- just another member as they are.

17  A    Exactly.

18  Q    Okay.

19  A    You're right.

20  Q    But apparently he took the extra steps there.

21  A    Right.

22  Q    Now, during all of this time you were unaware of what

23  Mr. Guerra, what Mr. Flores -- that being J.P. Flores -- what

24  Mr. Rodriguez, Fabian, and all that what was going on as far as

25  their dealings with the Guerras; is that correct?

Trevino - Cross / By Mr. Sturgis                    141

1    A    That's correct, Mr. Sturgis.  I had actually no idea of

2    their illegal activities.

3    Q    And I think that you stated -- and I want to make sure

4    I've got this right -- you stated earlier that the first time

5    that you had heard about the Guerras was on 12-12-12.  I think

6    that's what you stated.

7    A    Yeah, I believe that was the first time I actually found

8    out who they were.  I knew that there was a trucking firm on

9    2812.  As a matter of fact, when I testified about this, a

10   campaign operative had called me to tell me that he had rumors

11   in the Elsa area about Fabian.  You know, I might have assumed

12   it was Astro.  But I do remember one thing that he said that

13   there was bad guys that operated out of 2812.  And with all the

14   testimony and all, maybe I assumed it was Astro Trucking.  But

15   I had absolutely no idea who the Guerras were, by name or

16   description.  Even when they showed me the photos I had no idea

17   who they were.

18   Q    Okay.  And when this person told you it was 2812 --

19   A    Yeah.

20   Q    -- was it at that time that you assumed the Guerras or you

21   had not --

22        **(Voices overlapping)**

23   A    I didn't know who the Guerras --

24   Q    -- somewhere that was on 2812.

25   A    Right, exactly.  Just 2812, yeah.

Trevino - Cross / By Mr. Sturgis                     142

1   Q    How is it that on December the 12th of 2012 that the

2   Guerras came up?  How did they --

3   A    On when?

4   Q    On December the 12th of 2012, how did the name Fernando

5   Guerras or --

6   A    Oh.

7   Q    -- any of the Guerras, how did they come up?  How did

8   that --

9   A    I don't know if they -- I don't know if they did come up

10  after that date.  I'm using that date as a reference because

11  that's when everything busted out.  I mean I didn't know who

12  the Guerras were until -- I guess I should have said after

13  12-12 of 12.  I mean I don't believe the Guerras -- I didn't

14  know the Guerras name or who they were on that particular date.

15  It was after sometime during this whole investigation when the

16  names come up.

17  Q    And did you learn it by just basically the charges or did

18  someone talk to you about the Guerras?  If you remember.

19  A    I guess the charges and people talking about it, yeah.

20  Q    Had you heard  -- without knowing who they were, had you

21  heard of, probably most likely Fernando Guerra, Sr., that name

22  before aside from 2812 or --

23  A    No, sir.  No.  I don't ever remember anybody talking to me

24  about that particular name.  And if they had, it didn't -- it

25  meant nothing to me, yeah.

Trevino - Cross / By Mr. Sturgis                    143

1   Q    Okay.  And the reason I ask this is because, if I

2   understand right, Fernando Guerra, Sr. had a shootout, I guess

3   for the lack of a better word, where he was shot on his ranch

4   outside of Hargill.  So I didn't know if you were aware of that

5   or not.

6   A    Oh, okay.  I do know -- I believe that occurred in Willacy

7   County.

8   Q    Correct.

9   A    Yeah, that occurred in Willacy County.  And I do remember

10  that Julio Davila called to tell me that these guys had been

11  shot.  And I said, "Well, have you called the deputies?"  And

12  he said, "Well, it happened in Willacy County."  And I said,

13  "Well, you need to call Willacy County and have them take care

14  of it."

15        And I believe he mentioned -- I don't know that he

16  mentioned a name, to be real honest with you.  But I do not

17  believe he said Astro Trucking.  So I think it -- I said,

18  "Well, call the station and make your call to 911 and then call

19  Willacy County."  And that's the last I heard about it.

20  Q    Okay.  And was that your only dealing with Julio Davila

21  and if he mentioned Fernando Guerra, Sr. -- like you said, he

22  may have not mentioned the name, but would that have been your

23  only dealing with Julio Davila in connection with Fernando

24  Guerra, Sr. at any time I guess?

25  A    Not knowing who Fernando Guerra, Sr. was --

**EXCEPTIONAL REPORTING SERVICES, INC**

Trevino - Cross / By Mr. Sturgis                    144

1    Q     Correct.

2    A     -- other than at one time that Ms. Gutierrez asked me

3    about some weapons being released.  And I remember him

4    saying -- I don't remember if he actually said Fernando Guerra,

5    but I just -- I'm assuming that that's who he had to have been

6    talking about; that I didn't want to -- I mean I didn't want to

7    have to deal with that.  I didn't have time to start off with.

8    And I said, "You need to call people in criminal investigations

9    and send them off over there," and they took care of it.  And I

10   have no idea what happened to that case.

11   Q     You didn't pay attention to --

12   A     No, not at all.

13   Q     Okay.  But Mr. Davila contacted you I guess in regards to

14   these guns, and you said, well, contact these people.

15   A     Right.

16   Q     Okay.  Aside from that deal, is that the only time that

17   Julio Davila ever mentioned Fernando Guerra, Sr. or Fernando

18   Guerra had had any dealings with you?

19   A     I believe so, Mr. Sturgis.

20   Q     If he provided monies to Mr. Padilla or to anybody else in

21   your campaign, you were unaware of who the money was coming

22   from.

23   A     That's correct.

24   Q     Okay.  So any other money you wouldn't have had -- you

25   wouldn't have any knowledge of.  I mean whether it happened or

Trevino - Cross / By Mr. Sturgis                    145

1   not, maybe but --

2   A    Whether it happened or not I don't know.  And if it did

3   happen, I had no knowledge of it whatsoever.

4   Q    Okay.  So nothing else with Fernando Guerra as far as you

5   know.

6   A    That's correct.

7   Q    Okay.  So if Fernando Guerrero and Fabian Rodriguez and

8   J.P. Flores were doing these things, you didn't know about it.

9   A    That's absolutely correct.  I had absolutely no knowledge

10  of their illegal activities.

11  Q    And in regards to Mr. Garza, you knew him for a long time

12  or have known him for a long time?

13  A    I've known Mr. Garza for the last nine years as a deputy,

14  and I might have met him before that.  And I've known his

15  family for quite a long time.

16  Q    Okay.  And you didn't keep direct supervision over him; is

17  that correct?

18  A    That's correct.

19  Q    And as I understand it, where he was in civil process,

20  that ultimately falls under Mr. Padilla.

21  A    You're correct.

22  Q    Okay.  Do you know whether or not there was another

23  supervisor between Mr. Garza and Mr. Padilla?

24  A    There was at one time.  Lieutenant Fidel Jasso.

25  Q    Jasso?

Trevino - Cross / By Mr. Sturgis                    146

1    A     Fidel Jasso.  And we transferred him out, which is very

2    recently we've put in another supervisor, Connie -- Sergeant

3    Connie Covarrubias as a sergeant of that unit.

4    Q     And when did Ms. Covarrubias come in as -- roughly come in

5    as the sergeant?

6    A     Connie came in approximately maybe a month-and-a-half ago

7    maybe.  Two months ago.

8    Q     So very recently.

9    A     Very recently.

10   Q     So more recent than when Mr. Garza was working there.

11   A     That's correct.

12   Q     Okay.  So at the time that we're talking about, Mr. Garza

13   and Mr. Flores and the Guerras doing these illegal acts,

14   Ms. Covarrubias wasn't there.

15   A     She was but she was also of equal rank.  And then very

16   recently we promoted her to sergeant and placed her immediately

17   in charge of that unit.

18   Q     And is she -- so it would go from the civil process

19   deputy, which Mr. Garza was, to Ms. Covarrubias to Mr. Padilla

20   in that chain.

21   A     We've had changes, Mr. Sturgis.  And we have to talk a

22   timeline here, because we've had a lot of command staff

23   changes.  Now it goes from Connie -- Sergeant Covarrubias to a

24   lieutenant.  Well, it went to a lieutenant.  He's not with us

25   anymore.  From there it went to Captain Herrera; from Captain

1    Herrera it went to Mr. Padilla.

2            At one time when there was less responsibilities for

3    the command staff, Mr. Garza was supervised directly by

4    Lieutenant Jasso.  Once we removed Lieutenant Jasso then he

5    became directly supervised by Commander Padilla.  But we've had

6    a lot of changes within the last year-and-a-half.

7    Q    Going back prior to that, you wouldn't have had I mean a

8    daily supervision of Mr. Garza.

9    A    Oh, no.  No, sir.

10   Q    You wouldn't have known where he was at any given time

11   particularly after duty hours.

12   A    Yes, sir, you're right.

13   Q    And to your knowledge do the commanders or direct

14   supervisors have any knowledge as to what the personnel may be

15   doing off duty?

16   A    Off duty?

17   Q    Yes.

18   A    I don't see how.  I don't see how the supervisors --

19   unless they were intimately involved with each other or very

20   good friends.  Other than that I just don't see how they could

21   keep track of their people off duty.

22           **MR. STURGIS:**  I pass the witness, your Honor.

23           **THE COURT:**  All right.  Any redirect?

24           **MS. GUTIERREZ:**  Yes, your Honor.

25   //

1                        **REDIRECT EXAMINATION**

2    **BY MS. GUTIERREZ:**

3    Q    Sheriff Trevino.

4    A    Yes, ma'am.

5    Q    In all the years that you've been sheriff here in Hidalgo

6    County you've never had a shootout with the Sinaloa Cartel when

7    you seized drugs; isn't that correct?

8    A    In the nine years we've never had a shootout with the

9    Sinaloa Cartel.  You're absolutely correct.

10   Q    So why did you think that there was a safety issue on

11   December 12th, 2012 when there was a seizure of cocaine that

12   you felt it was necessary to move the entire sting --

13   A    Yeah.

14   Q    -- over to the Sheriff's Office?

15   A    Because that's what the lady, who was just completely

16   hysterical, was telling me.  She said, "I am scared for my

17   life.  They're going to kill me.  This stuff belongs to the

18   Sinaloa Cartel.  I'm going to get hurt."  And she just kept

19   going on and on and on and she just wouldn't get off that.  And

20   that's the decision that I made at that time, because that's

21   all I had to make it with.

22   Q    You've been in law enforcement for a long time by your own

23   testimony, correct?

24   A    Yes, ma'am.

25   Q    And you would agree with me that people who are busted

1   doing criminal activity can make outlandish allegations in

2   order to (indiscernible) to them, correct?

3   A    Yes, ma'am.

4   Q    So that could have been the possibility in that case,

5   correct?

6   A    Yes, ma'am.

7   Q    As far as that incident you testified that Jonathan went

8   to the Sheriff's Office when the other officers went to ICE,

9   correct?

10  A    That's right.

11  Q    You ordered Jonathan to follow you to the Sheriff's

12  Office, correct?

13  A    No, that's not correct.  I never testified to that.

14  Q    I'm asking you.

15  A    No, I did not order him.  I left -- I gave him

16  instructions and then I left and I didn't see them for another

17  30, maybe 45 minutes by the time they cleaned up the scene and

18  everybody got out of there.  And that's when I find when --

19  that's when the federal contingency meets me at my office and

20  tells me what they're doing.  Even the federal people thought

21  that Jonathan was over at the federal building.  And I said,

22  "No he's not; he's here."

23  Q    Isn't it true though that you told Jonathan that you

24  wanted the female, the drugs, all moved to the Sheriff's

25  Office?

Trevino - Redirect / By Ms. Gutierrez          150

1   A    No, I did not give Jonathan a direct order.  I gave a

2   direct order to the sergeant at the crime scene, which is

3   Sergeant Rudy Salinas, to remove everything and get out of

4   there as quick as possible and meet at the Sheriff's Office.

5   That's when I contacted the federal authorities.  The federal

6   authorities then obviously got back with probably Alexis

7   Espinoza, whose was working for ICE at the time as a task force

8   agent, and told him bring the drugs and the transmitters over

9   to the ICE office or the HSI office.  That's probably what

10  happened.

11  Q    And so you're guessing as to what may have happened

12  with --

13  A    Well, that's the only thing that could have happened.

14  Because I gave him a direct order, and then he just split two

15  different ways so -- and I already talked to the federal

16  people.  And that's probably what happened.

17  Q    Okay.  Isn't it true though that you testified earlier

18  that there were no sergeants or supervisors on the scene and

19  that was one of the things that --

20  A    That's right.

21  Q    -- concerned you?

22  A    That's right.  Initially when I got there everybody

23  arrived like five, maybe ten minutes behind me.

24  Q    And you testified that there was a Mission police marked

25  unit when you arrived, correct?

Trevino - Redirect / By Ms. Gutierrez          151

1   A    No, I didn't say that.

2   Q    There was a marked unit when you arrived; is that correct?

3   A    I believe there was one of our marked units that arrived.

4   As a matter of fact, come to think of it -- and I mean so much

5   has happened this year-and-a-half -- I even believe that even

6   after the fact, I believe the Mission crime scene investigation

7   people even showed up.  I believe they did.

8   Q    Isn't it true that the Mission -- some Mission officers

9   are the ones that destroyed the GPS trackers or de-activated

10  them?

11  A    No, I did that.  I gave it -- I gave the order to cut the

12  wires on the GPS trackers because I was still assuming at that

13  point that this was cartel activity, and I did not want them

14  tracked any further than that for safety purposes.  And that's

15  one of the things that I told the FBI immediately after I

16  called them.  I said, "Look, I also cut the wires because I

17  didn't want these cartel people to give us -- to follow or to

18  track them any more than where they're already at."  But

19  they're intact except for the wires.  I had the wires cut

20  because of that.

21  Q    Okay.  And the effect of cutting the wires meant that you

22  de-activated the trackers, correct?

23  A    Well, I was hoping that would do it.  I'm not that

24  technical.  I'm just assuming if you cut a wire it shuts it

25  off.

Trevino - Redirect / By Ms. Gutierrez          152

1    Q    So you're not familiar with the GPS trackers --

2    A    Well, I know what they look like.  I just, you know -- I

3    don't know how to operate them.  I mean I'm not that technical.

4    Q    Okay.  Who was operating the Hidalgo County Sheriff's

5    Office unit that was there when --

6    A    I have no idea, Ms. Gutierrez.  We'd have to go through

7    the report to see who the uniformed people were.  I have no

8    idea who they were.

9    Q    Well, you said there were very few people --

10   A    Yes.

11   Q    -- on the scene.  You're saying Jonathan was there.

12   A    Right.

13   Q    You're saying Alexis Espinoza was there.

14   A    Initially, right.

15   Q    And that's all you testified to --

16   A    Right.  That's the people that were there that initiated

17   this whole thing.  Now, afterwards a whole host of people

18   showed up.

19   Q    I understand that.  I'm trying to get all the -- the names

20   of the individuals or the persons that were present when you

21   arrived.  You testified Jonathan and Alexis were both there.

22   A    Right.

23   Q    There were no supervisors.

24   A    Right.

25   Q    Who was operating the Hidalgo County Sheriff's Office --

Trevino - Redirect / By Ms. Gutierrez                153

1  A    I don't remember.  We'd have to go back through the

2  reports and see if -- and see if, in fact, there was one.  And

3  I'm pretty sure that there was; I just don't remember who it

4  was.

5  Q    Okay.  Was it a female or a male?  Do you know that?

6  A    I do not.

7  Q    So out of three people you only remember two; is that

8  correct?

9  A    Yes.  The people I spoke to, yeah.

10  Q    Isn't it true that you asked Alexis Espinoza, "How much

11  are you getting paid for this"?

12  A    No.  That's the first time I hear about that.

13       **(Pause)**

14  Q    You testified that when you got on scene and you saw that

15  there was no supervisor that that caused you to suspect that

16  maybe it was a sting operation against the Panama Unit,

17  correct?

18  A    Well, it was one of the options that I considered.  It was

19  either that or they're violating policy again by not contacting

20  their supervisor.  And that's really what upset me the most and

21  really set me off that morning that we had two people out there

22  and one side to the Panama Unit, which ultimately -- you know,

23  which way you look at it, it still falls under the Sheriff's

24  Office and Mission Police Department and had no supervisor

25  there.  And one of our policies is if you take any type of

Trevino - Redirect / By Ms. Gutierrez                    154

1    enforcement action, you will have a supervisor unless it's --

2    well a spontaneous type thing.

3    Q    So when Jonathan contacted you when you were in your

4    vehicle returning from the -- I don't know if it was a press

5    conference or a conference regarding the orders -- you went

6    directly to the scene, which at that time prior to you arriving

7    to the scene you didn't call a sergeant or a supervisor of the

8    Panama Unit to arrive; it wasn't until after, correct?

9    A    No.  I testified that I called the office through the

10   radio.  Either the radio or my phone, whichever one it is.  I

11   said, "What is going on over there and who's there and who's

12   not?  And get me a supervisor and get me some people over there

13   now."  That was my direct orders to them.

14   Q    What is it that caused you to make the decision since

15   you've already made that call for you to go and be present

16   physically at that call?

17   A    What caused me to go there?

18   Q    Yes.

19   A    Well, the urgency of the matter for one thing.  And I do

20   this -- I do this all the time when I'm on the street.  If

21   there's an urgent call, sometimes I beat the supervisors there

22   and really to observe.  And I do that a lot.  But I knew that

23   this was a serious situation.  I could hear it in the tone of

24   their voice.  And I think I would have been derelict in my duty

25   if I didn't go.  I was very close by.  And I don't care who it

Trevino - Redirect / By Ms. Gutierrez          155

1    would have been.  I mean I go to a lot of homicide scenes where

2    I beat the homicide investigators and the supervisors.  I do

3    that a lot.

4    Q    But what was the urgency in this call?  It was simply a

5    cocaine seizure, and that's happened before at the county, with

6    an individual who was hysterical, which I assumed this happened

7    before at the county.  You had two individuals that are law

8    enforcement at least who are capable of handling the situation

9    based on their positions.  What was the urgency?

10   A    Aside from everything that you just mentioned, which I

11   considered that to be urgent, was the presence of the tracking

12   devices.  That made it urgent.

13   Q    The tracking devices concerned you, correct?

14   A    Absolutely, yeah.

15   Q    Now, with respect to the raid on the Pharr home --

16   A    Yeah.

17   Q    -- with the Perezes, you testified that you did -- you

18   were aware of the circumstances of the raid, correct?

19   A    After the fact.

20   Q    Okay.  But shortly after the fact.  Because I believe you

21   said if you weren't informed that afternoon, it was the

22   following --

23   A    Yes.  Yes, it was after the fact.  And I believe it could

24   have been that same afternoon.  I really don't remember.

25   Q    Okay.  And so you testified that someone in the group,

1    meaning the Panama Unit, identified Claudio Mata as the one who

2    had taken the jewelry, correct?

3    A    That's correct.

4    Q    And when you say that "someone in the group," you gathered

5    the Panama Unit together to talk to them about this incident,

6    correct?

7    A    No, I did not gather them.

8    Q    Okay.  How is it that someone in the group is -- how is it

9    that you heard about it being Claudio Mata from someone in the

10   group?

11   A    The first person I called obviously was a supervisor, and

12   he didn't know anything of what was going on.  And the second

13   person I called was Jonathan.  I said, "Jonathan, what is going

14   on here?"  And he had no idea of the jewelry.  And then I

15   believe he called -- he might have called Eric, he might have

16   called Alexis.  I don't know who he called after that.  And

17   that's either Jonathan called me or Alexis called me -- I

18   forget who called me -- to tell me that Claudio had the

19   jewelry.

20   Q    Wouldn't you agree, Sheriff, that if you're doing a drug

21   investigation that jewelry would be inconsistent with evidence

22   in a drug investigation?

23   A    No.  No, I'd have to correct you on that.

24   Q    Okay.

25   A    The Perezes, which are the people -- and I believe that's

Trevino - Redirect / By Ms. Gutierrez                157

1    their last name -- involving this have been described as street

2    level drug dealers.

3    Q    Have been or haven't been?

4    A    They were described as street level drug dealers.  And --

5    Q    Sheriff -- go ahead, I'm sorry.

6    A    Okay.  And it is very common for street level drug dealers

7    to exchange property, whether it be jewelry, stolen jewelry,

8    guns, whatever, for street level narcotics.  And it would not

9    be out of the ordinary for a unit to seize amounts of jewelry

10   thinking that it could have been -- it could be stolen jewelry

11   that was exchanged for narcotics.  So it's not out of the realm

12   of possibilities.  It has happened numerous times before.

13   Q    But you also testified that you questioned Claudio Mata

14   about the jewelry and about what it was that he was doing.

15   A    Right.

16   Q    But you did question him about the fact -- about whether

17   that jewelry was, in fact, exchanged for narcotics, right?

18   A    Well, no, no, that's not right.  I didn't ask him that

19   because he wouldn't have known that unless he had conducted an

20   investigation.

21        But I'd like to correct earlier testimony if I may.

22        **MS. GUTIERREZ:**  Your Honor, I'd like for him to

23   answer my question.

24        **THE COURT:**  All right.  If you could just answer the

25   question.  If you want to change an answer in response to

EXCEPTIONAL REPORTING SERVICES, INC

1    something she asked you again, you can.

2         **THE WITNESS:**  Okay.

3    **BY MS. GUTIERREZ:**

4    Q    You testified that Claudio Mata just shrugged and that's

5    when you stopped interrogating him, correct?

6    A    Well, and to be honest with you, the shrug was more of an

7    affirmative shrug and a yes than a negative, and I stopped it

8    immediately thereafter at that point.  I testified earlier --

9         **MS. GUTIERREZ:**  Your Honor, I believe -- I'm not sure

10   if this would be responsive to my question.

11        **THE COURT:**  All right.  You answered the question?

12        **THE WITNESS:**  Yes.  I answered the question, yeah.

13        **THE COURT:**  So next question?

14        **THE WITNESS:**  Okay.

15   **BY MS. GUTIERREZ:**

16   Q    But ultimately he confessed and you could have arrested

17   him, yes?

18   A    You know, I had a problem with that and --

19        **THE COURT:**  Well, that was two questions.

20        **MS. GUTIERREZ:**  Okay.

21        **THE COURT:**  Did he ultimately confess and then could

22   you have arrested him?  So ask one question at a time.

23        **MS. GUTIERREZ:**  Okay.

24   //

25   //

Trevino - Redirect / By Ms. Gutierrez          159

**BY MS. GUTIERREZ:**

Q    Claudio Mata confessed, correct?

A    It could have been taken as a confession, yes, ma'am.  It

could have been.  Okay.

Q    And because of that you could have arrested him, correct?

A    I could have, yes.

Q    But instead you chose to back off --

A    Yes.

Q    -- and hand over the investigation to Internal Affairs,

correct?

A    That's where I made the mistake in my testimony this

morning.  If I may correct it now.  And I was -- during the

lunch break I get a call from my investigator, Internal Affairs

investigators, who are following this through the media tweets,

and said, "You made a mistake in your testimony.  It was not

Internal Affairs that investigated Claudio Mata.  It was a

command staff member."  At that time I was allowing command

staff members to conduct internal investigations.  And they

reminded me that it was Captain Gabriel Castaneda, who is now a

commander.

          And they also corrected me --

          **THE COURT:**  Well, let's just --

          **THE WITNESS:**  Oh.

          **MS. GUTIERREZ:**  Yeah.

          **THE COURT:**  Only if it's responsive to the question.

Trevino - Redirect / By Ms. Gutierrez          160

1          THE WITNESS:  All right.

2          THE COURT:  So it wasn't an Internal Affairs

3    investigation; it was a commander that did the investigation of

4    Mata.  Okay, next question?

5    BY MS. GUTIERREZ:

6    Q    And at that time you did have an Internal Affairs

7    department, correct?

8    A    That's right.

9    Q    Okay.  And so what would be the reason for it not being

10   sent to Internal Affairs versus having just a commander

11   investigate?

12   A    At that time I was trying to divide the work load between

13   Internal Affairs -- because I only had a couple of people in

14   there and the command staff members.  And that was probably one

15   of the reasons why I did that.

16          THE COURT:  And remind me.  This commander, what was

17   his name?  I'm sorry.

18          THE WITNESS:  Gabriel Castaneda.

19          THE COURT:  Castaneda.  Was he the one that did the

20   skeet shoot you testified earlier or --

21          THE WITNESS:  No.

22          THE COURT:  No.

23          THE WITNESS:  No.

24          THE COURT:  Okay.

25          THE WITNESS:  No.  That was Montemayor.

Trevino - Redirect / By Ms. Gutierrez          161

1          **THE COURT:**  All right.

2     **BY MS. GUTIERREZ:**

3     Q     And you testified that, yes, you could have arrested --

4     A     Right.

5     Q     --- Claudio Mata but you chose not to, correct?

6     A     That's right.  I chose not to because I really wasn't sure

7     at that point because of my position that I really could have

8     done that.  I wanted to stop -- you know, I didn't want to put

9     myself in the investigation.

10          And I'll tell you, I made a very big mistake.  I

11     should have never called Claudio in and questioned him.  I

12     should have sent him straight to a command staff member or to

13     Internal Affairs.  That was a management mistake that I made

14     and I shouldn't have done -- knowing that now, I shouldn't have

15     done that.  I should have sent him straight to a Internal

16     Affairs or a command staff member.  But I was really upset by

17     the ways things were evolving, and that's why I did it that

18     way.

19     Q     So it's possible that your emotions clouded your judgment,

20     correct?

21     A     Well, in that particular decision I would have to agree

22     with you, yes.

23     Q     Sheriff Trevino, isn't it true that in a lot of your

24     testimony it has appeared as though there's been a lot of

25     mistakes made by you?

Trevino - Redirect / By Ms. Gutierrez                162

1  A    There were some mistakes, of course.  You know, I've made

2  some mistakes.  There's no doubt about that.

3  Q    And you also chose not to conduct your own investigation

4  with respect to the raid of the Pharr home, correct?

5  A    That's right.  I left that up to the Pharr Police

6  Department.

7  Q    And this was already -- this was in mid 2012, correct?

8  A    It was -- I'm sorry, say that again?

9  Q    Mid 2012 when this occurred?

10 A    I don't remember the date of that.  I really do not

11 remember the date.

12 Q    Would you disagree that it was in July of 2012?

13 A    It could have been.  I don't remember the date.

14 Q    And by this time the Panama Unit had gone -- had been

15 rogue for at least a year, correct?

16 A    How could I have known that if I had no idea that they

17 were involved in criminal activity?

18 Q    I'm asking you with what you know today.

19 A    Even now.  I have not read the Indictments.  I have not

20 read the charges.  I have stayed completely away from it.  And

21 I don't know when they were in rogue and I don't know any of

22 the specifics of what they were doing.  I've completely stayed

23 away from it.

24 Q    You haven't -- even after your son pled guilty you haven't

25 inquired from him, "Son, let's talk about this.  Why did you do

Trevino - Redirect / By Ms. Gutierrez          163

1   that.  What were your choices?  How did we get here"?

2   A    Ms. Gutierrez --

3              **THE COURT:**  That's not really relevant.

4   **BY MS. GUTIERREZ:**

5   Q    You testified about the Panama Unit having gone rogue, and

6   it came from you, your testimony prior to the lunch break.  And

7   based on what we know now, there are some similarities with

8   respect to the Panama Unit going rogue and the Zetas from

9   across the border; isn't that correct?

10  A    I don't think so.  I don't think we've beheaded anybody.

11  Q    Well, minus the murders and the killings.

12  A    I don't -- I think you're completely off base and out

13  of --

14             **THE COURT:**  Right.  It's argumentative.  You can make

15  that argument to the jury, but it's not a question.

16  **BY MS. GUTIERREZ:**

17  Q    Remaining on the Pharr home raid, you testified that

18  somebody from internal investigations did interview all Panama

19  members with regard to that incident, correct?

20  A    I'm sorry.  Ask me again.  I don't understand.

21  Q    You testified earlier that Internal Affairs with the

22  Sheriff's Office did, in fact, interview all Panama Unit

23  members with respect to the Mata incident in Pharr, the Mata

24  incident and the -- do you agree with me that the --

25  A    No, I do not agree with you.  Because Pharr PD took care

Trevino - Redirect / By Ms. Gutierrez                164

1    of all that.  The only thing that we investigated was the

2    jewelry part.  Everything else was investigated by Pharr PD and

3    federal agencies.  We had nothing to do with that

4    investigation.

5    Q    Didn't Internal Affairs interview the Panama Unit members

6    with respect to the missing jewelry?

7    A    See, that's the correction I just made earlier,

8    Ms. Gutierrez.  I was -- I gave wrong testimony and I corrected

9    it already.

10   Q    Okay.

11   A    It was not Internal Affairs that conducted that

12   investigation.  I was corrected during the noon hour by my

13   Internal Affairs division that it was Commander Gabriel

14   Castaneda that conducted that investigation.

15   Q    But Commander Castaneda did interview all Panama Unit

16   members regarding the missing jewelry.

17   A    I would have to look at the file and tell you exactly who

18   he interviewed.  I don't know the method that he undertook to

19   investigate that.

20   Q    And you instructed Commander Castaneda to limit his

21   inquiry to only the jewelry?

22   A    Yes, exactly, yeah.

23   Q    With respect to Miguel Flores, you testified about having

24   known and been informed about what went on in that incident.

25   Didn't it seem odd to you that Flores approached two of your

Trevino - Redirect / By Ms. Gutierrez          165

1   deputies and asked them to steal drugs?

2   A    Absolutely.  And that's what caused the suspicion about

3   Miguel Flores, and that's why we opened the investigation.  It

4   just didn't make any sense to me that one deputy would just

5   approach two others and say, "Let's do something."  It just

6   didn't make any sense to me since he was the one that initiated

7   the action and he was the one that was reported on, and

8   obviously he was going to be the suspect.

9   Q    But wasn't it suspicious to you about -- it didn't raise

10  suspicious of the two individuals that Flores asked to steal

11  drugs?

12  A    Well, yes, it did.  Of course it did.  But then, again,

13  there was -- there had to have been a prior relationship I

14  would imagine unless just Flores decided to pick on two guys

15  and ask.  I don't know.  I have no idea why Flores did that.

16  Q    But you did investigate in order to determine that,

17  correct?

18  A    Well, of course.  It was part of the internal

19  investigation.  And we couldn't find -- we couldn't find any

20  links between Flores and Arguello and Duran from the past.  We

21  couldn't find any links whatsoever that were criminal between

22  Flores and these two other associates.  And we just couldn't

23  find any criminal activity on Flores' part, period.  We just

24  couldn't find it.

25  Q    Well, what about criminal activity on the part of Arguello

Trevino - Redirect / By Ms. Gutierrez                 166

1    and Duran?

2    A    That's right.  And that was part of the investigation.

3    And Internal Affairs couldn't find any link whatsoever.

4    Q    Okay.  We're talking about any criminal activity of

5    Arguello and Duran independent of Flores.

6    A    Well, I don't know that they were -- they were conducting

7    a widespread probe, if that's what you're insinuating.  That

8    was not done.  They didn't do that.  The focus -- the focus was

9    really Flores.  He was the focus of the investigation.

10   Q    And what I'm asking is wouldn't it be reasonable for you

11   to conduct an independent investigation of those two cops that

12   were approached to steal?

13   A    I don't know that it would be.  I left that up to the

14   investigators to take a look at, and they just couldn't find

15   any links in that.  I think I already testified to that.

16   Q    Sheriff, isn't it true that when you warned Fabian

17   Rodriguez to stop hanging out with the individuals on 2812 that

18   you also told Fabian Rodriguez to keep Jonathan away from them?

19   A    No, that's not true.

20   Q    That's not true?

21   A    No, that's not true.  Because there was -- the information

22   that concerned me was that one of my deputies was consorting

23   with criminal elements.  That was concerning to me.  But I had

24   nobody to tell me who they were, what they were doing.  So I

25   couldn't have just yanked Fabian Rodriguez in and to start an

Trevino - Redirect / By Ms. Gutierrez          167

1    investigation, because I didn't have the elements for the

2    accusations.  So the next best thing is to alert him and say,

3    "Look, if you are doing this, you will stop.  Because if you

4    don't stop, then I'm going to either arrest you or I'm going to

5    fire you."

6    Q    Wouldn't you ask Fabian Rodriguez, "Are you doing this"?

7    A    I did.  You're absolutely right.  That's exactly the

8    question that I asked him.  And he said -- and I'll never

9    forget his response because of the way he finished the

10   conversation.  He said, "I am not hanging around with any

11   crooks.  Those are just political innuendos and political

12   rumors that are just started against me in the Elsa area."

13   Because Fabian is very active in politics or was very active in

14   politics in Elsa.

15        And he finished the conversation by saying, "Sheriff,

16   I promise you; I promise you I have not done anything wrong.  I

17   would never do that to you and I would never do that to the

18   department."  And those were his exact words.

19   Q    So if Fabian Rodriguez testified that you told him to keep

20   Jonathan away from the Guerras he would be lying?

21   A    If actually Fabian said that, then he is actually lying;

22   you're correct.  Because he never -- that conversation never --

23   I don't think Jonathan was ever brought up in that

24   conversation.  That is not true.

25   Q    You talked about your political operative who informed

1   you --

2   A    Right.

3   Q    -- about some drug dealers --

4   A    Yeah.

5   Q    -- in the 2812 area.  Astro Trucking isn't the only

6   business on 2812, correct?

7   A    That's correct.

8   Q    So why is it that you assumed it was them?

9   A    Well, I think I explained that earlier.  I might have made

10   that assumption after the fact.  Again, so much has happened

11   since that maybe I did think it was Astro Trucking after the

12   fact.  To be honest with you, I really believe this person that

13   called me actually said he's hanging around with some bad guys

14   that work or live somewhere on 2812.  I  made the connection

15   after the fact, after Astro Trucking came out as being owned by

16   the Guerras.  I'm assuming that's what happened.  But I don't

17   believe he said Astro Trucking and I know he didn't say the

18   Guerras, because I didn't know that last name.

19   Q    Okay.  But did you assume that it was the Guerras or Astro

20   Trucking when they told you 2812 because --

21   A    No, no, no.  That's what I just explained to you.  It was

22   way after the fact like, I don't know, a month, maybe three

23   months ago that I made that connection.  See, I didn't even

24   know that the Guerras existed, okay.  I knew Astro Trucking

25   existed because they send us a check.  But I had no idea who

Trevino - Redirect / By Ms. Gutierrez                169

1  the owners were.  I had no idea whatsoever.  So I think after

2  the fact, way after the fact I made that connection; and that's

3  why I testified that way.

4  Q    Isn't it true that you referred to the Guerras as 2812?

5  A    When?

6  Q    That was your name for them.

7  A    No.  To whom?  I don't understand what you are asking me.

8  Q    If Fabian Rodriguez testified that you called the Guerras

9  2812, would that be incorrect?

10 A    Yes, it would be incorrect.  Because I didn't know who the

11 Guerras were.

12 Q    Isn't it true that if come mid 2012 when you were informed

13 about the Pharr incident, the Pharr home raid, if you had taken

14 action with respect to the Panama Unit, investigated them, that

15 you may have prevented all the following drug -- illegal drug

16 activity conducted by them?

17 A    A lot of things are possible, Ms. Gutierrez.  I mean an

18 open -- to answer a question like that, I mean anything is

19 possible.  You have no idea how much I wish I had a time

20 machine.

21     **(Pause)**

22 Q    So you're telling the jury that Jonathan, your son, who

23 lived with you, hid all the monies that he made from drug

24 trafficking from you.

25 A    Absolutely.

Trevino - Redirect / By Ms. Gutierrez          170

1  Q    And that you saw no signs that were questionable with

2  respect to how much money he was making, that he hid all that

3  from you?

4  A    Absolutely.  Jonathan had no -- Jonathan had no living

5  expenses.  I think his cell phone was the only -- and his

6  credit card was the only expense he had.  Everything else he

7  had at home.

8  Q    But isn't it true that he would travel to casinos to

9  gamble frequently?

10 A    He would, that's right.

11 Q    And you didn't think that that was odd and it takes money

12 to do that?

13 A    Again, he had a very good paycheck.  He made a lot of

14 overtime with the Mission Police Department and all that money

15 was his.  I mean we didn't charge him rent; again, no food, no

16 laundry, no light.  Everything was -- I mean he lives free.

17 Q    And how much was his paycheck his --

18 A    I have no idea how much he would get paid.

19 Q    Well, then you don't really know how much money he was

20 making, correct?

21 A    I never said I knew.

22 Q    Well, you said he was making good money.

23 A    I'm assuming he was because he worked a lot of overtime.

24 Q    So then this is all based on the assumption you assume he

25 was making good money and that would have paid for the casino

Trevino - Redirect / By Ms. Gutierrez                171

1    trips.

2            **MR. STURGIS:**  Judge, asked and answered.

3            **THE COURT:**  Sustained.  Let's move on.

4    **BY MS. GUTIERREZ:**

5    Q    Sheriff, you're telling the jury that the Panama Unit --

6    the illegal activity conducted by the Panama Unit was all done

7    without your knowledge, correct?

8    A    Absolutely, Ms. Gutierrez.

9    Q    And you're also telling the jury that any illegal activity

10   conducted by Gerardo Duran was also done without your

11   knowledge, correct?

12   A    Absolutely.

13   Q    You're telling the jury that if Miguel Flores is guilty of

14   any wrongdoing, that was without your knowledge, correct?

15   A    That's correct.

16   Q    And you're telling the jury that if Joe Padilla conducted

17   any illegal activity, that was done without your knowledge,

18   correct?

19   A    That's correct.

20   Q    And you're telling the jury that any illegal activity that

21   J.P. Flores did was done without your knowledge, correct?

22   A    That's absolutely correct.

23           **MS. GUTIERREZ:**  No further questions, your Honor.

24           **THE COURT:**  All right.  Any final recross?

25           **MR. STURGIS:**  Short, your Honor.

1                    **RECROSS EXAMINATION**

2    **BY MR. STURGIS:**

3    Q    Sheriff Trevino, you said you cut the wires on the

4    trackers?

5    A    I cut the first one, Mr. Sturgis.  I cut the first wire

6    and then I instructed the sergeant to cut the rest of the them

7    because I didn't want -- if it was the Sinaloa Cartel, I didn't

8    want them tracking them as to where we were going.  I think I

9    cut the first one.

10   Q    Okay.  And then you said you told the FBI that you cut the

11   wires?

12   A    I believe that's what I told them, yes.

13   Q    Do you know who you told that to?

14   A    If I told that to anybody, it would have been Special

15   Agent Chris Lee.

16   Q    But you're not sure if you --

17   A    I am not sure, no.  I'm not sure if I actually cut them or

18   told them to cut them.  But I know that I was very concerned

19   about being tracked if, in fact, that was what was happening.

20   Q    Okay.  So obviously it was after you got there that the

21   wires were cut.  They were not cut before you --

22   A    Oh, no, no.  I gave that order.

23   Q    At any time while you were there did you talk to your son

24   Jonathan or any of the other agents about charging the female?

25   A    About charging her?

Trevino - Recross / By Mr. Sturgis                    173

1   Q    Yes, with --

2   A    Yes.

3   Q    And what crime would that have been that you all

4   discussed?

5   A    The possession of the cocaine.

6   Q    Okay.

7   A    Absolutely, yes.

8   Q    That would have been the only charge.

9   A    That would have been the first charge that we could have

10  come up with.  I guess possession with intent to distribute and

11  maybe passed it on to the federal agencies for their follow-up.

12  Q    I mean it would have only been drug related charges.  At

13  that time you weren't aware of any other type of charges.

14  A    I had no idea what else was going on.  That's right.

15  Q    All right.  So you never had a conversation with them

16  about a bribery charge or anything did you?

17  A    Oh, no, no.  Absolutely not.

18  Q    And when you were considering these charges, did you ever

19  consider keeping the case -- I guess a state case or more

20  appropriately a sheriff's office case as opposed to going to

21  the --

22  A    No, it was -- I think just by the amount and the

23  circumstances that it was going to be a federal case from the

24  get-go.

25  Q    From the get-go?

Trevino - Recross / By Mr. Sturgis                  174

1    A    Oh, yeah.

2    Q    Now, you were discussing with Ms. Gutierrez again the July

3    incident at Pharr with the jewelry, and essentially you stated

4    several times that you or the Sheriff's Department looked at

5    the jewelry case but never the drug case.  Is that accurate?

6    A    The drug case, the possession?  Right, you're right.

7    Q    Right.  There was some -- you quickly became aware that

8    the Perezes were involved and then there was somebody over at

9    Mission, correct?

10   A    Right.

11   Q    I mean that's going to --

12   A    Yeah.

13   Q    -- part on the initial investigation.

14   A    That's right.

15   Q    When that happened you obviously know that there's some

16   charges of drugs related.  What the exact facts are you may not

17   know.

18   A    I do not know the exact amount from when it was seized,

19   no.

20   Q    Did anybody look into the drug case?

21   A    Mission PD did.  Mission PD followed up on that because it

22   was -- like I said, they worked under the Mission protocols and

23   I believe everything was submitted into the Mission crime scene

24   lab and they ran with the charges on that, or they have.  It

25   was not our case to prosecute.

Trevino - Recross / By Mr. Sturgis                    175

1   Q    Afterwards the jewelry comes up, it's obviously missing,

2   and it seems like we can all agree that at least in some form

3   or fashion Claudio Mata admitted to you --

4   A    Yeah.

5   Q    -- he stole the jewelry.

6   A    Pretty much.

7   Q    Yeah.  I mean it's -- whether it's a shrug or he said, "I

8   stole the jewelry" --

9   A    Yes.

10  Q    -- or whatever that seems to be uncontroverted.  And I

11  think you testified, but I want to make sure, that you don't

12  remember who it was that initially told you, "Hey, call in

13  Claudio; he's the one that stole the jewelry."

14  A    Right.  If I had to guess, Mr. Sturgis, the only person

15  who probably could have told me something like that would have

16  been Jonathan after he spoke to the other members of the unit.

17  And I think somebody finally ratted Claudio off to Jonathan and

18  Jonathan tells me.  If it happened, that's the way it happened.

19  Q    And then you said that Mr. Castaneda did the

20  investigation --

21  A    That's correct.

22  Q    -- afterwards.  And you said several times that it was a

23  mistake for you to speak to Mr. Mata.

24  A    To Mr. who?

25  Q    To Mr. Mata.

Trevino - Recross / By Mr. Sturgis                    176

1   A    Yes, to Mr. Mata.  It was.  That was a mistake on my part.

2   I should have never done that.

3   Q    Why is it a mistake?  He's your employee.  You're in

4   charge.

5   A    It was a mistake because I should have let -- I was really

6   upset because of the way things were developing.  And it was a

7   mistake on my part because I should have let the investigation

8   take its course and I didn't.

9   Q    But it seems to me like it worked out the best way, the

10  quickest way it could, because Mr. Mata confessed to you --

11  A    Right.

12  Q    -- yeah, I stole the jewelry.  So there didn't need to be

13  a big investigation to see if he did.  He's telling you, "I did

14  it."

15  A    Yeah.  Well, I know; I realize that.  And that's a mistake

16  and I admit that's a mistake that I made.  And I shouldn't have

17  done that.  That's when I turned and I said, "Stop."  You know,

18  I hadn't given him his rights; I hadn't done anything.  I said,

19  "Stop right there.  We're going to conduct this -- we're going

20  to conduct an investigation."

21  Q    Well, what is the mistake?  I don't understand the mistake

22  in that it's someone who had done wrong, obviously he shouldn't

23  be a police officer any more.

24  A    Right.

25  Q    You've solved it right away rather than going for a long

1   investigation.

2   A     Yeah.

3   Q     I don't see what the mistake is.  It seems like it was

4   a -- it was done and all the knowledge that needed to be out

5   was there.

6   A     Right.

7   Q     So I'm curious what the mistake is.

8   A     Well, I think the mistake was that there's a lot more than

9   just what was uttered by him, you know.  I think there was.  I

10  want to know if other people were involved.  So I just said,

11  "Stop, we're going to conduct a full investigation into this."

12  Q     And do you know whether or not Mr. Castaneda interviewed

13  him and said, "Okay, you've already told them you did it.

14  Let's sit down and get all the facts"?  Do you know if that

15  happened?

16  A     Yeah, I'm sure he did.  And he conducted an investigation.

17  Q     Right.  But what I'm asking, do you know whether or not

18  Mr. Castaneda actually interviewed --

19  A     Yeah.

20  Q     -- Mr. Mata?

21  A     Yes, he did interview him.  But we would have to go to the

22  report to see exactly what was asked of him.

23  Q     Did Mr. Castaneda interview any of the other people that

24  were on the scene at Pharr that day?

25  A     I don't know, Mr. Sturgis.  We would have to look at the

Trevino - Recross / By Mr. Sturgis                178

1    file.

2    Q    Okay.  And just briefly along kind of the same lines, you

3    were asked about Mr. Miguel Flores, Mr. Arguello and Mr. Duran

4    on the thing that Mr. Flores was trying to set up.  And I think

5    I understood that the assumption would be that Mr. Flores

6    obviously had some kind of connection with Mr. Duran to in

7    order to even approach the subject with Mr. Duran in the first

8    place.

9    A    You would seem to think so, yes.

10   Q    You would believe --

11   A    Yes.

12   Q    -- that he's not just going to pick anybody out.

13   A    Right.

14   Q    So obviously Mr. Flores, you know, probably for some -- or

15   in some form or effect trusted Mr. Duran to even approach the

16   subject about ripping off money or drugs.

17   A    That's right.

18   Q    And then do you know who it was that Mr. Duran would call

19   about that?

20   A    No, I do not.

21   Q    You don't know who he called.

22   A    No.

23   Q    Do you know how it is that -- do you know how it is that

24   Mr. Arguello became involved in that at all?

25   A    I don't remember.  We'd have to look at the affidavits.

1   But I believe if I'm not mistaken -- and again, I'd have to

2   look at the affidavits and the file, but I believe he -- either

3   he called Jonathan or he called -- or Duran called Arguello.

4   I'm not sure how Arguello got involved in it.

5   Q    And obviously if Mr. Duran was considering joining this

6   venture, whoever he contacted he would have to trust a -- I'm

7   going to approach the subject with it because I don't want to

8   tell the wrong person I'm thinking about being a dirty cop and

9   ripping off some money or drugs.  He's obviously going to have

10  to have the same trust.

11  A    See, I don't think that's the way it started.  What I was

12  told was when Duran calls Jonathan about Miguel Flores

13  approaching him that I guess in their mind, or at least they're

14  trying to make me believe that in their mind they're acting as

15  righteous policemen and not corrupt policemen.

16  Q    That being?  "They" who?

17  A    Well, they being Duran and Arguello.  That's the way

18  they're telling me.  Well, we're good guys and now we have a

19  bad guy telling me let's go do this.  Whether it's true or not,

20  you know, obviously it wasn't.  But I didn't know it at the

21  time.

22  Q    But if Mr. Duran contacted Jonathan --

23  A    Right.

24  Q    -- and said, "Hey, Mr. Flores -- Miguel Flores -- Miguel

25  wants to do this; what do you think" and Jonathan said, "I

Trevino - Recross / By Mr. Sturgis          180

1   don't know" and sent Mr. Arguello over to see what was going

2   on; obviously, Mr. Duran would have had to have had some trust

3   in your son to approach the subject.

4   A    I would imagine so, yes.

5            **MR. STURGIS:**  I pass the witness.

6            **THE COURT:**  All right.  That concludes your

7   testimony, Sheriff Trevino.  You're excused at this time.

8            **THE WITNESS:**  Am I excused?

9            **THE COURT:**  You're excused.

10      **(Testimony and transcription was concluded at 2:42 p.m.;**

11   **proceeding continued)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

181

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>October 9, 2013</u>

           Signed                                              Dated


*TONI HUDSON, TRANSCRIBER*