UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  7:13-CR-070-12 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| JORGE GARZA, | ) | Monday, August 5, 2013 |
| | ) | |
| Defendant. | ) | (2:44 p.m. to 4:01 p.m.) |


TESTIMONY OF MIGUEL FLORES DURING JURY TRIAL - DAY 5

BEFORE THE HONORABLE RANDY CRANE,
UNITED STATES DISTRICT JUDGE



APPEARANCES:

For Plaintiff:          JAMES STURGIS, ESQ.
                        ANIBAL ALANIZ, ESQ.
                        Assistant United States Attorney
                        1701 W. Business Hwy. 83
                        Suite 600
                        McAllen, Texas 78501


For Defendant:          LILLY A. GUTIERREZ, ESQ.
                        4901 S. Jackson Rd.
                        Edinburg, TX 78539


Interpreter:            Elena Medrano

Court Recorder:         Richard Cortez

Transcribed By:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, Texas 78480-8668
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>INDEX</u>

| <u>DEFENSE WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| MIGUEL FLORES | 3/12 | 45 | | |

1      **McAllen, Texas; Monday, August 5, 2013; 2:44 p.m.**

2       **Partial transcript; testimony of Miguel Flores**

3      (Jurors present)

4          THE COURT:  All right, Ms. Gutierrez, whenever you're

5   ready.

6       **MIGUEL FLORES, DEFENSE WITNESS, PREVIOUSLY SWORN**

7                    **DIRECT EXAMINATION**

8   BY MS. GUTIERREZ:

9   Q    Good afternoon, Mr. Flores.

10  A    Good afternoon.

11  Q    Mr. Flores, my name is Lilly Gutierrez.  Can you please

12  state your full name to the jury?

13  A    Miguel Flores.

14  Q    And, Mr. Flores, without giving me an address can you tell

15  me what city you live in?

16  A    Mission, Texas.

17  Q    Mr. Flores, are you currently employed?

18  A    No, ma'am.

19  Q    What is your previous employment?

20  A    The Hidalgo County Sheriff's Office.

21  Q    And when was the last day that you were employed at the

22  Hidalgo County Sheriff's Office?

23  A    A few days ago, July 20-something -- 26th.

24  Q    And how was it that you stopped working there?

25  A    I resigned.

Flores - Direct / By Ms. Gutierrez                4

1  Q    When did you begin working at the Hidalgo County Sheriff's

2  Office?

3  A    November of 2006.

4  Q    And how -- what was your position at that time?

5  A    As a jailer detention officer.

6  Q    And how long were you a jailer detention officer?

7  A    Two years and a half.

8  Q    And then you moved -- you moved to what position?

9  A    Into Patrol.

10 Q    How long were you in Patrol?

11 A    Two years, 10 months.

12 Q    And from Patrol you moved to what?

13 A    To Narcotics Investigator.

14 Q    How long were you a Narcotics Investigator?

15 A    About a year -- yeah, about 11 months.

16 Q    And when you resigned were you a Narcotics Investigator?

17 A    No, I was a Patrolman.

18 Q    So did you move from Narcotics Investigator to Patrol?

19 A    I was demoted or whatever, I was transferred back to

20 Patrol.

21 Q    Do you recall when you were transferred back to Patrol?

22 A    It was effective some -- the second week of December or so

23 as far as that.

24 Q    Was that 2012?

25 A    2012, yes, ma'am.

1   Q    Within the Hidalgo County Sheriff's Officer, when you

2   moved from Narcotics Investigator to Patrol was that considered

3   a demotion?

4   A    Yes, ma'am.

5   Q    With pay change?

6   A    Yes, ma'am.

7           **THE COURT:**  And who demoted you?

8           **THE WITNESS:**  I'm sorry?

9           **THE COURT:**  Who is it that demoted you?

10          **THE WITNESS:**  I got a letter of reprimand from

11  Commander Padilla.

12  **BY MS. GUTIERREZ:**

13  Q    Was he your Commander?

14  A    Yes.

15  Q    And why is it that you were demoted?

16  A    I was -- there was some allegations brought against me by

17  two former deputies, but nothing was -- it wasn't true so I was

18  -- they got me on violation of policy, several policies that I

19  violated.

20  Q    Okay.  And what were the -- well, first of all, what were

21  the two former deputies that made allegations against you?

22  A    Gerardo Duran and Salvador Arguello.

23  Q    And they, too, were Sheriff's deputies?

24  A    Yes, ma'am.

25  Q    And what positions did they hold at the time?

Flores - Direct / By Ms. Gutierrez                    6

1   A    Salvador Arguello was officially assigned to the Panama

2   Unit and Gerardo Duran, at that time he was in the Patrol going

3   towards the Tactical Unit Patrol, but also worked with the

4   Panama Unit.

5   Q    There was a claim that you were a Narcotics Investigator,

6   you said it was about 11 months.  Did that mean the entirety of

7   2012?

8   A    Yes.  Yes, all of 2012.

9   Q    What were the allegations that these individuals made

10  against you?

11  A    They made an affidavit that I was planning to steal money

12  from a house and to do a home invasion.

13  Q    And was that true?

14  A    No, ma'am.

15  Q    Did you have any dealings with these two individuals that

16  would have led to these allegations?

17  A    No.

18          THE COURT:  Well, I'm sorry, "led" is a really vague

19  question.

20          MS. GUTIERREZ:  Yes, it is.

21          THE COURT:  Do you want to re -- either what would

22  pinpoint him or if something actually happened --

23  BY MS. GUTIERREZ:

24  Q    Did you -- had you had any communication with either of

25  these deputies, Duran or Arguello, before they made the

Flores - Direct / By Ms. Gutierrez                    7

1    allegations against you?

2    A    Yes.

3    Q    Okay, which of the two had you had communications with?

4    A    Mostly with Duran.

5    Q    Who did you have -- well, was there an incident that led

6    to these allegations, just a yes or a no?

7    A    Yes.

8    Q    And with respect to this incident that I will ask you some

9    questions about, who -- which of the two, Duran or Arguello,

10   did you speak to first?

11   A    Duran.

12   Q    And can you tell me what that conversation was about?

13   A    It was he -- I met him at the -- I was coming out of my

14   shift in the Sheriff's Office and I met up with him and he

15   asked me if I had real good informants, and I said, "Yeah, I

16   have a lot of informants."  He was kind of interested and he

17   like would I pass some information onto them and I said, "Yeah,

18   I can."  He gave me information as far as to share.

19   Q    At that time you were already an Investigator?

20   A    Narcotics Investigator.

21   Q    How long had you been a Narcotics Investigator?

22   A    This happened around the end of August or the first of

23   September.

24   Q    So you had been over six months a Narcotics Investigator?

25   A    Yes.  Yes, ma'am.

Flores - Direct / By Ms. Gutierrez                    8

1  Q    And within that position had you been successful in

2  busting drug deals or individuals?

3  A    I had pretty high stats, statistically I had done several

4  arrests.

5  Q    Okay, and so when you say "high stats" you mean that you

6  were successful in some of your operations?

7  A    Yes.

8  Q    And is that why Duran approached you?

9  A    Yes.  That's what -- I guess that's why he approached me.

10         **MR. STURGIS:**  Objection, speculation.

11         **THE COURT:**  Right.  He's speculating.  Only Mr. Duran

12  can tell us why.  Sustained.

13  **BY MS. GUTIERREZ:**

14  Q    Okay.  So then Duran asked you if you would share some of

15  your sources, correct?

16  A    Yes.

17  Q    And what did you say?

18  A    I said yes.

19  Q    And what was the purpose for him asking to share some of

20  your sources?

21         **MR. STURGIS:**  Objection, your Honor.  Speculation.

22         **THE COURT:**  Well, no -- I mean, this is not why he

23  was asking him to share.  What would be the purpose -- in law

24  enforcement, why do you share sources with a fellow law

25  enforcement officer?

1      **THE WITNESS:**  I had already shared information with

2  the Panama Units before and I usually share information with

3  any of my fellow deputies.

4  **BY MS. GUTIERREZ:**

5  Q    Within the Hidalgo County Sheriff's Office were you

6  familiar with other deputies or were you isolated?

7  A    I -- communications with most of the deputies either by

8  name or just by face, I would recognize people by face or --

9  Q    Do you recognize Jorge Garza who is sitting to my right?

10  A    Yes, ma'am.

11  Q    And you recognize him -- how do you recognize him?

12  A    As a Deputy Sheriff.  He used to work at Civil Warrants.

13  Q    And you were familiar with him during the time that you

14  worked there?

15  A    Yes.

16  Q    Were you -- did you know of a James Flores?

17  A    J. P., yes, I knew him by face, by who his name was.  I

18  shook his hand now and then.

19  Q    Were you -- did you ever shake Mr. Garza's hand?

20  A    Yes.

21  Q    And so you exchanged pleasantries, hello, good morning?

22  A    That's about it.

23  Q    What is it -- what position did J. P. Flores hold?

24  A    He was in something to do with the Crime Stoppers.

25  Q    And did J. P. work with anyone else within Crime Stoppers?

1   A    It was -- at that time it was J. P. Flores, Jerry Del

2   Angel and Fabian Rodriguez.

3   Q    And who did they follow up with?  Who was their Commander?

4   A    Commander Padilla.

5   Q    As far as you know, what was the relationship between --

6   other than being the Commander, what was the relationship

7   between Commander Padilla and J. P. Flores?

8   A    He was basically known as his boy, he would have him do

9   personal errands or campaigning, tickets, in charge of tickets.

10  Q    And that was something that you were aware of while

11  working there?

12  A    Yes, ma'am.

13  Q    What about Jerry Del Angel or Fabian Rodriguez?

14  A    They also shared the same duties, campaigning and tickets

15  and fund raisers.

16  Q    Were they also considered Padilla's boys?

17  A    Yes.

18  Q    So pretty much Crime Stoppers -- the people under Crime

19  Stoppers were Padilla's boys?

20  A    Yes, ma'am.

21  Q    Was Mr. Garza considered a Padilla's boy?

22  A    I never knew he was associated with them.

23  Q    Were you ever asked to sell tickets for a campaign, fund

24  raisers?

25  A    Yes.

1   Q    And were -- did you have a choice in that matter?

2   A    No.

3   Q    And who was it that asked you?

4   A    (indiscernible) my former Sergeant, Reginald Jackson who

5   was brought up by -- Commander Padilla called him up on my

6   first day in Narcotics.  Sergeant Jackson came out of Sergeant

7   -- Commander Padilla's office, and came back with some tickets,

8   you know, like "You guys, I'm sorry, but you know what this

9   means, you've got to sell them or we don't want tickets back.

10  They don't want no tickets back."

11  Q    Okay.  And that was information that Padilla had provided

12  to Mr. Jackson?

13  A    Yes, ma'am.

14  Q    So what happened with those tickets?  What did you do with

15  them?

16  A    I had to pay for them.

17  Q    And why didn't you just return them?

18  A    We couldn't.  If they were returned you were going to be

19  black-balled and there was going to be -- everybody was going

20  to be against you, that's it.

21  Q    Was this a policy that was written somewhere?

22  A    About no tickets being returned or --

23  Q    Yes.

24  A    No, but it was the practice and I knew about that since I

25  started working at the Sheriff's Office.

1   Q    And so you knew this -- what, as a deputy?

2   A    Yes.

3   Q    So this was unspoken, but definitely followed?

4   A    Yes.

5   Q    Were you asked to participate in campaign events outside

6   -- off duty.

7   A    No, ma'am.

8        **MR. STURGIS:**  Judge, may we approach?

9        **THE COURT:**  You may.

10       **(Bench conference from 2:55:07 to 2:56:42 p.m. omitted)**

11       **(Portions from 2:56:43 to 2:57:34 omitted)**

12       **(A recess was taken from 2:57 to 3:23 p.m.)**

13   **(Jurors present)**

14       **THE COURT:**  Good afternoon again, please be seated.

15       All right, so Ms. Gutierrez, I'll ask you to resume

16   your examination.

17       **MS. GUTIERREZ:**  Thank you, your Honor.

18                  **DIRECT EXAMINATION (CONTINUED)**

19   **BY MS. GUTIERREZ:**

20   Q   Mr. Flores, you testified about Officer -- Deputy Duran

21   approaching you and the last thing I think you said was that

22   you had agreed to share sources?

23   A    Yes, ma'am.

24   Q    Was he asking simply for your source or was he asking for

25   you to join him in an operation?

1  A    What he told me he said -- I told him there was plenty of

2  information so he could make arrests, and his answer was like,

3  "No, we don't want to arrest him, we take their shit," exactly

4  like that.

5  Q    And what did you understand -- did you -- what did you

6  understand --

7          **THE COURT:**  Could you pull the microphone a little

8  closer to you?  I'm having a little trouble hearing you.  There

9  you go.

10 **BY MS. GUTIERREZ:**

11 Q    What is it that you understood by that, or did you ask him

12 what he meant?

13 A    No.  I understood they would rip them off.  Something like

14 -- because I said, "Are you going to arrest them?" and he said,

15 "No, we take their shit."

16 Q    Okay.  And so did you inquire further about what the

17 operation entailed?

18 A    No, he himself told me the whole operation, who was

19 involved.

20 Q    What did he tell you?

21 A    He told me that they were very well protected, they were

22 working with Jonathan Trevino and they were protected by

23 Commander Padilla and the Sheriff himself, and he would go

24 round and they would clean everything.

25 Q    And did you agree to join them?

Flores - Direct / By Ms. Gutierrez                    14

1   A    No.  I kind of went around the conversation.  He gave me

2   his number.  That's when I made contact with a DEA agent I knew

3   and he made -- we got a meeting with a DEA supervisor at the

4   DEA Federal Building.

5   Q    Why do you think that you didn't agree to join them?

6   A    It's not the right thing.  It's not -- I seen from people

7   from (indiscernible), it's not the right thing.

8   Q    And so if I understand you correctly instead of joining

9   them you spoke with someone at DEA?

10  A    Yes.

11  Q    And in your meeting with DEA what occurred?

12  A    I told them everything -- the same thing that Duran had

13  told me.  A few days later they called me back and they told me

14  if I was interested in talking to FBI in reference to this --

15  what Duran had told me, and I agreed, I said, "Yes."

16  Q    And at this point have you indicated anything to Duran?

17  A    No.  No, ma'am.

18  Q    Have you told Duran anything about it or what did he --

19  A    Well, he just calling me and calling me.  I would tell

20  him, "Yeah, we'll see what happens.  We'll see what happens."

21  Never did I provide any information.

22  Q    And so then did you -- when you say that DEA asked if you

23  were interested in speaking with the FBI, did that mean that

24  DEA was not going to assist you?

25  A    I took that as that I just believed there was going to be

1  a little bit further more -- that the FBI was going to get

2  involved.  That was my understanding.

3  Q    You thought that because the FBI was going to get involved

4  it was more of -- a more --

5  A    It was a different issue because it was involving police

6  officers, that was my understanding.

7  Q    And did you meet with FBI agents?

8  A    Yes, ma'am.

9  Q    Do you recall who you met with?

10 A    It was Eric Barker and Matthew (indiscernible) -- I could

11 not recall that last name.

12 Q    Was it Matt Henshaw (phonetic) or --

13 A    It could have been.  I really don't remember the last

14 name.  He was a tall guy, bald.

15 Q    And how much -- how much time passed from when Duran

16 approached you to when you met with the FBI?

17 A    Maybe two weeks, or probably a little bit more because at

18 that time -- right after that, that we talked, I went to 2-week

19 training in Houston, a Narcotics course, and when I came back I

20 met with them.

21 Q    Okay.  And so we're talking maybe about -- you met with --

22 A    The FBI agents.

23 Q    Okay.

24 A    After I spoke with them.

25 Q    Did you speak with the DEA agents before your 2-week

Flores - Direct / By Ms. Gutierrez                    16

1    training course?

2    A    Yes.

3    Q    So when you met with the FBI what transpired at that

4    meeting?

5    A    I explained everything, the same thing I told the DEA

6    agent, what Duran had told me or what he had approached me

7    with.

8    Q    Okay.  And what -- and at this point did you just report

9    it and leave?

10   A    No.  They said they were going to go look into it in more

11   details and they would get back to me.

12   Q    Did you file any type of written report?

13   A    No.

14   Q    This was all oral?

15   A    Yes, ma'am.

16   Q    What you explained to them.  And did the FBI ever get back

17   to you?

18   A    Yeah, they did.

19   Q    How long after?

20   A    I don't recall, it may have been a week or less than a

21   week.

22   Q    And what did they tell you?

23   A    They asked me if I was willing to work with them, to do

24   undercover work is what I imagined, and I said, "Yes," that was

25   my main purpose of contacting them, getting a hold of them.

1  Q   Okay.  Did you, at this point did you feel like -- did you

2  feel like if -- that you had options.

3         Well, prior to you approaching the DEA, did you feel

4  like you had the complete option to say no to them?

5  A    No.  I knew I didn't have any option because he already

6  exposed everything to me of the operation, who was involved,

7  and if I would say, "No," then they might take action against

8  me.

9  Q   Okay.  And how is it that they would take action against

10  you?

11  A   They could always uses Internal Affairs, falsify records.

12         **MR. STURGIS:**  Your Honor, I'm going to object.  This

13  calls for speculation of what other people --

14         **THE COURT:**  Sustained.

15         **MS. GUTIERREZ:**  Very well, your Honor.

16  **BY MS. GUTIERREZ:**

17  Q   But you, yourself, for whatever reason, felt you couldn't

18  say no?

19  A    Yes.

20  Q   And that was your reason for going to the DEA agents?

21  A    Yes, ma'am.

22  Q   Was that also your reason for ultimately deciding to go to

23  the FBI?

24  A    Yes, ma'am.

25  Q   And then when the FBI asked you if you would cooperate --

Flores - Direct / By Ms. Gutierrez                    18

1   A    I voluntarily cooperated.  I said I would work on my free

2   will.

3   Q    I'm sorry?

4   A    It was all on my free will that I volunteered.

5   Q    And when you did that -- that is, what is that was going

6   to be required of you?

7   A    I was going to do -- they gave me a phone number and we

8   started recording conversations between me and Duran.

9   Q    So you -- they gave you a telephone --

10  A    A telephone number which was kind of a automated system.

11  I used my own phone, but it was -- I gave Duran the phone

12  number provided by the FBI.  When Duran would call that number

13  it would transfer to my cell phone.

14  Q    Oh, and so within that FBI number it recorded the call?

15  A    It recorded, yes, all our conversations.

16  Q    So when did you -- after you received -- well, when you

17  met with the FBI did you receive a phone call that day?

18  A    No, ma'am, it was a while after.  I believe the second

19  time I met with them is when they gave me -- I signed some

20  papers and they gave me the phone number, or right after -- a

21  few days afterwards.

22  Q    I'm sorry.  So they gave you a phone number, not a phone?

23  A    No, it was a phone number.

24  Q    And so how long after you received that phone number from

25  the FBI did you speak with Duran again?

1   A     I really don't remember, ma'am.

2   Q     Well, was it weeks or days?

3   A     It must have been days, no more than two weeks.

4   Q     And in your first conversation after having received that

5   phone number from the FBI what did you and Duran talk about?

6   A     I really don't recall.  It was -- I really don't recall

7   the first conversation.

8   Q     Okay.  Do you recall what happened with you and Duran with

9   respect to your cooperation in this scheme?

10  A     Yes.

11  Q     After that?  What was it that happened?

12  A     Well, with the informant?

13  Q     Well -- I'm sorry?

14  A     In reference to the informant are you --

15  Q     No.  Well, how is it that you began working with Duran

16  after --

17  A     I told him that I was working with some prisons in Mexico

18  moving kilos of cocaine.

19  Q     Okay, and at this point you represented to Duran that you

20  were willing to work with him, correct?

21  A     Yes.

22  Q     Okay, so you tell him about -- that you are working with

23  an individual from Mexico moving cocaine and then?

24  A     And then he come up with a plan about doing escorts --

25  drug escorts.

1   Q    What would that entail?

2   A    Entail with escort vehicles that were loaded with cocaine,

3   would follow them to a certain location, from one point to

4   another, and he would get paid to protect those loads.

5   Q    And that -- those vehicle escorts, were those having to do

6   with the people from Mexico that you --

7   A    Supposedly the people involving -- that I was working

8   with.

9   Q    Okay.  So then the job would be that you would assist in

10  having the people that you know from Mexico move cocaine

11  through the County?

12  A    Yes, ma'am.

13  Q    Okay.  And were you able to successfully do that?

14  A    We did I believe two operations.

15  Q    And were those operations overseen by the FBI?

16  A    Yes, ma'am.

17  Q    What was your role in that?

18  A    I would get with Duran after I had the vehicle, we would

19  follow it.  I was either on the back or the side and would

20  follow it from one point to another.  We were communicating

21  with radio or with cell phones with Duran.

22  Q    And so -- and this is the drug-laden vehicle?

23  A    Yes.

24  Q    And was that your responsibility to obtain?

25  A    Yes, ma'am.

1   Q    So once you had the drug-laden vehicle you would contact

2   Duran?

3   A    Yes, ma'am.

4   Q    And then he would meet you?

5   A    Yeah.  We were communicating with a radio or at a certain

6   point he would meet me.  I would give him a description of the

7   vehicle or the license plates.  He would (indiscernible) and

8   would tag along.

9   Q    And on the first escort was it just you and Duran?

10  A    Me and Duran, and I believe it was some other friend of

11  Duran.  I never got to know who it was.  It was another

12  vehicle.

13  Q    On the second escort who all was involved?

14  A    It was me, Duran and Alexis Espinoza.

15  Q    And you said it was two escorts?

16  A    Yes, ma'am.

17  Q    No more than that?

18  A    No more.

19  Q    And then when again did you work with them?

20  A    With them, it was like the last thing, that operations --

21  Q    Yes.

22  A    Yes, that was the last operation we had.

23  Q    Okay.  Is the -- you have already testified about the fact

24  that two individuals, one of them being Duran, had made some

25  allegations against you.

1   A    Yes, ma'am.

2   Q    This undercover operation that you were engaged in with

3   the FBI, did that have anything to do with this individual that

4   Duran was claiming you were trying to rip off?

5   A    In a way I felt I needed to get closer to the Panama Unit

6   so I offered an informant to Duran and Salvador Arguello.

7   Q    Okay.  And so is this after the two escorts --

8   A    Yes, ma'am, after.

9   Q    After.  And before I move on, on the two escort

10  operations, who would pay them?

11  A    I would pay them with money that was given to me by the

12  agents.

13  Q    Representing to be money from the --

14  A    From the drug dealers.

15  Q    So after the second escort you felt you had to get closer

16  to the Panama Unit?

17  A    Yes, ma'am.

18  Q    And in order to do that what did you do?

19  A    I introduced them to a source of mine.

20  Q    Did you do this with the knowledge of the FBI?

21  A    No, ma'am.

22  Q    Why is it that you didn't let the --

23  A    I didn't want to expose my source to the FBI or any other

24  agency for his safety.

25  Q    And during this time you are still a Narcotics

1  Investigator --

2  A    Yes, ma'am.

3  Q    Okay, at the Hidalgo County Sheriff's Office?

4  A    Yes, ma'am.

5  Q    And what was your intention in introducing -- I understand

6  that you wanted to get closer to the Panama, but does -- at

7  some point were you going to inform the FBI about this?

8  A    Yes.  My intention was to get closer, gain their

9  confidence, they could trust me more, then I could start doing

10  more operations closer to all of the other members.

11  Q    So you wanted to gain the confidence of the Panama Unit?

12  A    Yes, ma'am.

13  Q    And so you introduced a source to them in what way?

14  A    And I met him at a location, and he had some information

15  and I used it and they went from there.

16  Q    Okay.  So your source had some information?

17  A    Yes.

18  Q    Okay, your source had information and you introduced your

19  source to --

20  A    To Duran and Salvador Arguello.

21  Q    And where did this occur?

22  A    In Mission on La Homa Road at the 5-mile line.

23  Q    Was this having anything to do with the house that was

24  raided without consent?

25  A    No.

1  Q    And so your source met with Duran and Salvador --

2  A    Yes.

3  Q    -- Arguello, right?

4  A    Yes.

5  Q    Were you present?

6  A    Yes, at the time I introduced him I was present.

7  Q    And what happened?

8  A    I just introduced him to them, they talked a little bit

9  and then I left because I was working a detail at that time

10 across the street and so I left and they stayed together.  They

11 went in to see the operations on the how they were going to

12 -- that they had the information on.

13 Q    So your source was simply going to provide the Panama Unit

14 with the location where there was either, what, drugs or money?

15 A    Money.

16 Q    Money, okay.  And when you say that you had to go work

17 "detail," what does that mean?

18 A    That's a duty detail, that's some extra money.

19 Q    So that means that you had -- was it like a side job?

20 A    You can put it as a side job.

21 Q    But it wasn't within the Sheriff's Office?

22 A    No, it wasn't within the Unit.  I was providing security

23 for a restaurant.

24 Q    Okay, for a restaurant?

25 A    Yes, ma'am.

1  Q    Okay.  Who approved that?

2  A    It was approved by the Sheriff -- it's a -- several

3  details there are approved by the Sheriff.

4  Q    So is there something in writing --

5  A    Yes, ma'am.

6  Q    And when you say "Sheriff" do you mean like from the

7  Sheriff's Office or the Sheriff himself?

8  A    The Sheriff himself.

9  Q    Is that the protocol that the Sheriff would do the

10  approving of off duty work?

11  A    Yes, ma'am.  Yes, he would.

12  Q    So you leave your source with Duran and Salvador Arguello?

13  A    Yes, ma'am.

14  Q    And then what happened?

15  A    I remember it was that same day or the next day that Duran

16  called me.

17  Q    And what did he say?

18  A    He told me he -- that Salvador had recognized my

19  informant, that they had already stole drugs from that

20  informant and that Jonathan was very paranoid and thought I was

21  setting him up.

22  Q    Okay.

23  A    So I said to Duran, "You know what, I'm going to try to

24  talk and calm him down" and then I remember I talked with Sal

25  Arguello as well and he told me the same thing, like, "Oh,

1   Jonathan is all paranoid.  He's all messed up.  He thinks

2   you're going to set him up" and I told him I'm not doing that,

3   I'm not trying to do that.  So after that they called me back

4   and they told me, "You know what, everything is okay.  We

5   already talked to John and he's cool, there's nothing to worry

6   about.  Don't worry about it."

7   Q    This was -- when you say they called you back, are you

8   talking about Sal Arguello --

9   A    And Duran.

10  Q    -- and Duran.  Okay.  So there was a period of time where

11  everybody was shaky that Jonathan was upset.

12  A    Yes.  Upset, he thought I was setting him up.

13  Q    Okay.  And as far as you understand, who was the leader of

14  the Panama Unit?

15  A    Jonathan Trevino.

16  Q    And so when you left your source with Arguello and Duran

17  and you leave, you later learned that nothing came of that?

18  A    Yes, nothing came of that.

19  Q    And nothing came of that because they had recognized your

20  source as someone they had stolen from?

21  A    That's what Duran and Salvador told me, that Jonathan was

22  very paranoid.

23  Q    Okay.  And so from that day when you left the source with

24  Duran and Arguello, how long -- how much time passed from that

25  point to when they told you, "Oh, everything is okay.  Jonathan

Flores - Direct / By Ms. Gutierrez                27

1   has calmed down --

2   A     Probably like two days.

3   Q     At this point have you informed the FBI about anything?

4   A     I believe this happened on a Thursday or Friday and I got

5   a hold of the agent on Sunday and I told him I had gone a

6   little bit out of my way and I already got more contact within

7   the Panama Unit.

8   Q     Did you get in trouble with the FBI?

9   A     No, they didn't tell me.

10  Q     And then what's the next step from there?

11  A     The next step from there I remember is Duran called me

12  back the following Wednesday, it was around 8:00 o'clock at

13  night and he told me he wanted to meet me at -- somewhere on

14  Military Road and somewhere by the river banks.  At that time I

15  was very suspicious so I remember I called the agent and I told

16  him and he was like, "No, don't go."

17  Q     Do you recall who you spoke to?

18  A     Eric Barker.  I believe it was (indiscernible) -- I don't

19  remember what I called him, but I know I made contact with him.

20  Q     And he told you not to go?

21  A     Yes.

22  Q     So did you go?

23  A     No.

24  Q     And you told Duran this?

25  A     No, I didn't tell him -- I said, "Yeah, yeah," I just

1    ignored his call and I didn't answer no more.

2    Q    Okay.  And so then when was your next communication?

3    A    On Friday, that same Friday.  It happened on Wednesday and

4    then that coming Friday I made contact with Duran again.

5    Q    And what was that contact -- how was --

6    A    He was very desperate.  He needed to talk to me, he said,

7    "I need to talk to you.  I need to see you.  I really need to

8    talk to you."

9    Q    Did he tell you why?

10   A    No, he just said, "I really need to talk to you."  He was

11   like real, real desperate.

12   Q    And so did you talk with him?

13   A    Yes.  I got a hold of the FBI agents first and I met with

14   him before I went --

15   Q    Well, let me ask you this because you say that Duran calls

16   you and said, "I need to talk to you."  While you're on the

17   phone don't you just talk right then and there?

18   A    Yeah, I told him I was going (indiscernible) -- he said,

19   "I really need to meet you.  I really need to see you."

20   Q    Okay, so he said "I want to talk to you" --

21   A    In person, he wanted to see me in person.

22   Q    Okay.  So it wasn't over -- he was seeking to see you in

23   person.

24   A    In person.

25   Q    So then you called the FBI agent and advised him of this?

Flores - Direct / By Ms. Gutierrez                    29

1   A     Yes, ma'am.

2   Q     And what did the agent tell you?

3   A     So we met up first before going with Duran.  I met up with

4   the agent and he gave me a recording device and that's when I

5   proceeded to meet with Duran.

6   Q     Okay.  And so where did you meet Duran?

7   A     It was somewhere on the east side.  It was at -- south of

8   (indiscernible) 107 and (indiscernible) Longoria, in a park on

9   the east side.

10  Q     In a park?

11  A     Yes.

12  Q     You said that when you met with the agents prior to seeing

13  Duran, you said you got a recording?

14  A     Yeah, he had a recording device.

15  Q     Okay, so like a wire?

16  A     Like a wire, yeah.

17  Q     Taped to your body, that kind of --

18  A     A little device that I had in my pants.

19  Q     Oh, okay.  And so then you meet at a park, you go to the

20  park to meet with Duran, and is he there?

21  A     Yes, he was there.

22  Q     Okay.  Was he alone?

23  A     Yes, ma'am.

24  Q     Okay.  What happened?

25  A     Well, the first thing he told me was like "It's really

1   messed up what they're trying to do to you, it's not right."

2   Q    Okay.  Did you inquire about what he was talking about?

3   A    Yeah, like I told him, "What are you talking about?"

4   "Well, yeah, that's right, the Sheriff made me and Sal

5   Arguello, write affidavits against you stating that you're

6   trying to -- turning everything around, stating that you're

7   trying to steal the money or the load."

8   Q    Okay.  Did -- did you see anything that would corroborate

9   what he was saying?

10  A    Duran pulled out a affidavit that the Sheriff made him do

11  and I started reading it.  I knew I was being recorded so I

12  started reading it and I remember reading that Jonathan had

13  told him a few months ago that Deputy Miguel Flores was

14  corrupt, to be careful with him.  And at this point I

15  remembered telling Duran, "Hey, you know, this is not true.

16  This is not right."  Duran said again, "No, it's not true, but

17  they made us do it."  He said, "The Sheriff told me that I

18  better not tell anybody or else he's going to kill me."

19  Q    And this is all recorded?

20  A    Yes, ma'am.

21  Q    Okay.  And were you scared?

22  A    I was kind of worried, I didn't know what was going to

23  happen other than in a way I was kind of relieved.  Duran was

24  telling me all of this was going to happen, Internal Affairs

25  was going to get a hold of me, that they had nothing on me,

1    just to be -- hang in there.

2    Q    So Duran was still your friend?

3    A    Yes.

4    Q    And he was warning you?

5    A    Yes, he was telling me it wasn't right.  I remember him

6    telling me, "I already told Sal it's just not right," but Sal

7    said, you know, he couldn't do anything about it.

8    Q    Do you know why they were doing this?

9    A    Apparently cause Jonathan thought I was going to -- I was

10   setting him up so he planned to discredit me; otherwise he had

11   no way to discredit me.

12   Q    And so once you were done -- well, let me ask you,

13   anything else happen at that meeting?

14   A    No, I remember Duran telling me he was in trouble with

15   some sexual assault case and that's why he was doing what he

16   was doing, that he was going to need money or he was going to

17   need somebody when he goes to jail, and that's why he was doing

18   that for me, he was helping me out.

19   Q    What do you mean, he -- he was going to need money when he

20   went to jail?

21   A    That's what he said, "I'm doing it because I know I'm

22   already going to jail."  He was talking about a sexual assault

23   case that he --

24   Q    His own sexual assault?

25   A    His own sexual assault.  He was getting -- he was going to

1   get in trouble for something else.  He was like, "If I go down

2   I'm taking everybody down."

3   Q    Okay, and so Duran wasn't telling you, "I'm going to jail

4   over the stuff at the Panama Unit" --

5   A    No, no.  That was the least of his worries.

6   Q    Okay.  And after this meeting what did you do?

7   A    I went back with the agent and I told him everything that

8   Duran told me and I gave him back the recording device.

9   Q    Okay.  So at this point the FBI has the recording,

10  correct?

11  A    Yes, ma'am.

12  Q    And he's also already done two operations --

13  A    Operations, plus multiple phone recordings and that.

14  Q    So when you say that you returned the recording device to

15  them, that didn't mean that you were no longer working with

16  them, did it?

17  A    No.

18  Q    So what happened next?  Did you --

19  A    After that, that was on a Friday, Sunday morning --

20  Saturday night Duran went to my house unexpected.  He was just

21  -- he was outside and he told me, "Hey, let's go, get inside

22  the car."  I was like, "No.  Be careful, because there's a lot

23  of FBI agents already that's in my house" so he got scared and

24  he took off.

25  Q    You told him that?

1   A    Yeah, I told him that.

2   Q    Why would you tell him -- you were revealing now that you

3   --

4   A    No, I told him there's a lot of FBI agents doing

5   surveillance in my house, meaning that I was -- in reference to

6   the allegations against me.

7   Q    Okay, I'm sorry.  At this point have -- are you talking

8   about the allegations coming from the Hidalgo County Sheriff's

9   Office?

10   A    Yes.  Yes, from that.

11   Q    Okay.  And because you are law enforcement, that would

12   mean that the FBI would get involved?

13   A    Yeah, I just told him that right off the bat, just to get

14   him scared and get him off -- make him leave.

15   Q    He didn't ask you why?

16   A    No, he just got scared and took off.

17   Q    Why is it that -- did he tell you why he wanted you to get

18   in the car?

19   A    I had no idea.  He was just very weird, he wanted me to go

20   with him.

21   Q    Okay.  And so then what happened?

22   A    I remember I called Eric that night and I told him what

23   had happened.  So he told -- I called him back with a recording

24   device, and Duran told me, "No, it was the Sheriff who wants us

25   to keep in touch with everything -- everything you do or you

1   call us, make sure we call him."  He was like, "Right now I

2   have to call him and let him know that you called me."

3   Q    Okay.  And so did anything ever come of this -- these

4   affidavits that Duran informed you about?

5   A    Well, Monday morning -- that following Monday, November

6   26th, I was brought into Internal Affairs.

7   Q    Okay.  And had you been warned about this at some point?

8   A    By Duran.

9   Q    Okay.  The FBI didn't inform you?

10  A    No.  Well, they called me that same Monday also before

11  they called me -- they brought me into IA they told me, "Yeah,

12  they're fixing to call you into Internal Affairs."

13  Q    And how is it that they knew?

14  A    I have no idea.

15  Q    Okay.  So then you're -- you are, in fact, called into

16  Internal Affairs --

17  A    Yes, ma'am.

18  Q    -- at the Sheriff's Office?

19  A    Yes, ma'am.

20  Q    What happened then?

21  A    I was met by Lieutenant Ralph Garza and Investigator

22  George -- or Joe Alvarez.

23  Q    George or Joe?

24  A    Joe Alvarez.

25  Q    Okay, and what happened?

1  A    And they started -- they bring up the allegations and I

2  told them, you know, this is something -- they're just -- it's

3  not true.  Jonathan -- I mean, Sal and Duran told me that

4  Jonathan was scared and that's why they're doing this.  They

5  were like --

6  Q    Okay, let me -- I'm sorry to interrupt you, but these

7  allegations are what you had already testified about which is

8  that they were alleging that you were trying to get them --

9  A    Yes, ma'am.

10 Q    -- to steal drugs or money?

11 A    The money, yes, ma'am.

12 Q    Or money, sorry.  Okay.  So those were the allegations

13 that IA --

14 A    Brought.

15 Q    And so at this point are they just asking you, or are they

16 saying "This is a formal complaint?"

17 A    Yeah, this is a formal complaint.  "We got allegations

18 from credible sources" meaning Duran and Arguello.

19 Q    And so they -- did they interrogate you or --

20 A    Yes, ma'am.

21 Q    And what do you tell them?

22 A    I kept telling them that it wasn't true, I wasn't -- I

23 keep telling them -- I remember I keep telling them the truth

24 was going to come out.

25 Q    Did you inform IA that you had worked with the FBI?

1  A    No, I couldn't do that, ma'am.

2  Q    And why couldn't you do that?

3  A    Because the work was still in process.  The investigating

4  was still going on.  It hasn't -- it wasn't concluded.

5  Q    Okay, so you weren't done cooperating with the FBI --

6  A    Yes, ma'am.

7  Q    -- and you did not want to reveal that?

8  A    Yes, ma'am.

9  Q    And so how -- were you kept there for a long period of

10  time or --

11  A    It must have been five hours -- about five hours.

12  Q    Did the Sheriff himself ever come question you?

13  A    No, ma'am.  I remember that Captain (indiscernible) and

14  Lieutenant Garza kept walking out of the room and going to talk

15  to the Sheriff.  Every time they would come back they would ask

16  me to resign.  They kept telling me "You need to resign, this

17  is not looking good.  You need to resign."

18  Q    So they weren't trying to bring criminal charges against

19  you, they just wanted you to leave, is that --

20  A    Yes, that's what they were telling me.

21          **MR. STURGIS:**  Objection, your Honor, speculation.

22          **THE COURT:**  Sustained.  Disregard his answer.

23  BY MS. GUTIERREZ:

24  Q    Did they ever tell you that they were going to bring

25  criminal charges against you?

1    A    They told me that already that FBI and DEA were getting

2    involved and it was going to get pretty bad for me.

3    Q    And so what was your understanding if you, in fact,

4    resigned?

5    A    I would leave the Sheriff's Office under investigation.  I

6    would be discredited.

7    Q    So then what happened?

8    A    So they kept going back and forth trying to make me

9    resign.  I kept saying "No, no."  I stood my ground.  The last

10   time Ralph Garza -- Lieutenant Ralph Garza went to the Sheriff

11   he came back with a letter and they placed me on administrative

12   leave pending investigation.

13   Q    For how long?

14   A    Until the investigation concluded.  It was about two

15   months until they concluded the investigation.

16   Q    And at any point did they ever bring anyone who -- any

17   person who was making the allegations against you to confront

18   you?

19   A    No.  I know they brought the informants, they brought them

20   into the Sheriff's Office.

21   Q    And when you say "informants," are you talking about the

22   source?

23   A    The source that I provided to them, the same person that

24   Jonathan and the Panamas had stole from.

25   Q    Okay.  And they brought him into what, to the Sheriff's

Flores - Direct / By Ms. Gutierrez                    38

1   Office?

2   A    Yes, ma'am, to Internal Affairs.

3   Q    And were you present?

4   A    No, I wasn't.

5   Q    How did you learn about this?

6   A    The informant called me.

7   Q    So you were placed on -- is it administrative leave, you

8   said?

9   A    Yes.

10  Q    And you said for two months?

11  A    No, two weeks.  It must have been two, three weeks.

12  Q    And so then what happened?

13  A    Well, they interrogated the informant and they were the

14  same thing, I mean, it's not true.  I remember the informant

15  telling me, "Hey, they really want to get you."  I was like,

16  "Why?"  "Because they really wanted me to tell something that's

17  not true, they wanted me to tell them something that never

18  happened" so they got their affidavits and nothing happened, it

19  wasn't true.

20  Q    They got -- they got the affidavits from the source --

21  A    From the infor -- yeah, they got affidavits from them.

22  Q    Okay, and that affidavit incriminated you or --

23  A    No, it didn't incriminate me.

24        **THE COURT:**  What time frame are we now?  Are we into

25  December at this point or still in --

1        **THE WITNESS:**  It's November 26th.

2        **THE COURT:**  Still at the end of November.  Okay.

3    **BY MS. GUTIERREZ:**

4    Q    And so at this point you've been working undercover from

5    what, about September --

6    A    Well, August, the end of August, September the 1st.  The

7    last of August, 1st of September, you're right.

8    Q    Okay.  And even at this point when you were placed on

9    administrative leave, were you still working with the FBI?

10   A    Yeah, I had contact with them.

11   Q    Did it appear as though you were -- you weren't going to

12   be able to work with them much longer because of the

13   circumstances with the administrative leave?

14   A    The last time I spoke after that I remember Agent Barker

15   told me that they had nothing.  They just realized they made a

16   mistake, they had nothing on me, they were just -- they had

17   just gone on a fishing expedition.

18   Q    Okay, and so were you allowed -- were you ever released

19   from your administrative leave?

20   A    Yes, ma'am.

21   Q    And you were -- you returned to the Sheriff's Office?

22   A    Yes, ma'am.

23   Q    When did you return?

24   A    That was effective December -- the second or third week of

25   December I went back to Patrol.

Flores - Direct / By Ms. Gutierrez                    40

1  Q    So you were no longer a Narcotics Investigator?

2  A    No, ma'am.

3  Q    Was that as a result of the investigation?

4  A    Yes, ma'am.

5  Q    So even though they didn't find anything wrong -- well,

6  that's not true.  You testified that they got you on --

7  A    On violations of policy.

8  Q    On policy?

9  A    Yeah.  Yes, ma'am.

10 Q    And what was that?

11 A    One them I remembered I failed to notify a supervisor I

12 had endangered the lives of other deputies, and there was two

13 other more that I don't recall at this time.

14 Q    And what deputies' lives did you endanger?

15 A    They were referring as to Duran and Arguello -- Gerardo

16 Duran and Salvador Arguello.

17        **THE COURT:**  So I don't understand.  Are you saying

18 that these findings were true, you really did these things

19 wrong, or these were just bogus findings?

20        **THE WITNESS:**  The violation of policy, some of them

21 -- the only one I accepted was the one that I didn't notify my

22 supervisor.

23        **THE COURT:**  All right.  And the others you considered

24 bogus?

25        **THE WITNESS:**  I went over them and there's nothing

1   (indiscernible).

2   **BY MS. GUTIERREZ:**

3   Q    Now you remained on Patrol through the beginning of this

4   year, correct?

5   A    Yes, ma'am.

6   Q    Okay.  Did you encounter an additional problem?

7   A    Yes, I did, ma'am.

8   Q    What was that?

9   A    I had a domestic dispute with my wife on May 14th.

10  Q    And then?

11  A    No charges were filed.  Nothing -- it was just a domestic.

12  This happened on the 14th.  By May 16th I was already at

13  Internal Affairs.

14  Q    And you were back in Internal Affairs as a result of the

15  domestic dispute?

16  A    Yes, ma'am.

17  Q    Okay.  And although no charges were brought against you on

18  the domestic dispute, what were the allegations?

19  A    Violation of -- continued violation of policy.

20  Q    Well, right, I understand that, but as far as the domestic

21  dispute, what were the allegations there?

22  A    They were just trying to investigate, that I had

23  transported my kids in my marked unit a block away.  We had a

24  -- it was a hostile environment at that time so that's -- that

25  was one of the violations they were trying to get me on, that I

 1  had used my marked unit to transport my kids from my house,

 2  away from my house.

 3  Q    Okay, and so that you had used the Sheriff's Office

 4  vehicle --

 5  A    Yes, ma'am.

 6  Q    -- for personal reasons?

 7  A    It was an emergency at that time.  It was -- like --

 8  Q    Well, right.  I'm not asking why you did it, I'm saying

 9  that was what the Sheriff's Office determined?

10  A    Yes.  Yes, ma'am.  That was one of the main ones of what

11  was going on.

12  Q    And with respect to the domestic dispute, what were those

13  circumstances surrounding that?

14  A    The reason why I had a dispute with my wife?

15  Q    Yes.

16  A    I caught her texting with another male subject, another

17  man.

18  Q    A male subject?

19  A    Yes.

20  Q    Okay, and what did that result in?

21  A    And we were just struggling for the phone and that's about

22  it.  I tried to take away the phone from her.

23  Q    Did your wife say anything to the officers that indicated

24  it was something more than that?

25  A    I -- I believe so.

1  Q    And was that investigated?

2  A    Yes.

3  Q    And after the investigation it was determined that --

4  A    Yeah, it was -- according to the Investigator Tomas

5  Garces, it was -- the case was reviewed by a judge at Mission

6  P.D. that (indiscernible) himself, the investigator, and it was

7  all a domestic dispute, there was no offense.

8  Q    Okay, the investigator that you mentioned right now that

9  investigated the domestic dispute, that was out of Mission

10  P.D.?

11  A    Yes, ma'am.

12  Q    And you were talking -- you mentioned a judge.  Are you

13  also talking about a judge from Mission?

14  A    The Mission P.D.

15  Q    Mission Municipal Court?

16  A    The Municipal Court.

17  Q    And so after they reviewed it, no charges were brought?

18  A    No charges were brought.

19  Q    Have you reconciled with your wife on that issue?

20  A    Yes, ma'am.

21  Q    Now you say that on the 16th of May you were brought back

22  to Internal Affairs?

23  A    Yes, ma'am.

24  Q    Okay.  And that was for the reason of the domestic

25  dispute?

1   A    Yes, ma'am.

2   Q    What was it that they told you?

3   A    I remember the investigator called me back telling me that

4   they were looking into continued violation of policy.  For that

5   domestic they were looking into family violence in my house.

6   Q    And --

7        **MR. STURGIS:**  Judge, May we approach?

8        **THE COURT:**  Yes, you can.

9        **(Bench conference from 3:58 p.m. to 3:59 p.m. omitted)**

10       **THE COURT:**  All right, quickly, let's finish up.

11  **BY MS. GUTIERREZ:**

12  Q    Mr. Flores, did you contact me about testifying here?

13  A    Yes, ma'am.

14  Q    You contacted me?

15  A    Or you contacted me.

16  Q    Okay.  Did you contact me?

17  A    No, ma'am.

18  Q    Okay.  Do you currently have a lawsuit pending against --

19  A    Yes, I do, ma'am.

20  Q    -- against the Hidalgo County Sheriff's Office?

21  A    By the Hidalgo County Sheriff's Office.

22  Q    Okay.  And that's for --

23  A    For mental anguish, defamation and loss of benefits.

24  Q    And this is like a whistle blower thing?

25  A    Yes, ma'am, a whistle blower.

1        **MS. GUTIERREZ:**  I pass the witness, your Honor.

2        **THE COURT:**  All right.  Mr. Sturgis, quickly,

3   briefly.

4                        **CROSS EXAMINATION**

5   **BY MR. STURGIS:**

6   Q    Mr. Flores --

7   A    Yes, sir.

8   Q    You stated that you knew J. P. Flores and Jorge Garza,

9   right?

10  A    Yes, sir.

11  Q    And you knew most of the people, if not all of the people

12  in the Panama Unit?

13  A    Yes, sir.

14  Q    Okay.  Did you know who Fernando Guerra -- or do you know

15  who Fernando Guerra, Senior or Junior?

16  A    No, sir.

17  Q    Never met them?

18  A    Never met them.

19  Q    Don't have any idea what they do?

20  A    No.

21  Q    Would you recognize them if you saw them?

22  A    Not at all.

23        **THE COURT:**  What about Astro Trucking?

24        **THE WITNESS:**  No.

25        **THE COURT:**  Or 2812?

Flores - Cross / By Mr. Sturgis                      46

1          **THE WITNESS:**  No.  I know -- 2812, we used to hit a

2    lot of houses when I was in the Narcotics Unit.  There's a lot

3    of drug trafficking there.  (indiscernible) as Neho (phonetic)

4    Brothers (indiscernible), that's how I know that 2812.

5          **THE COURT:**  But you don't know anybody who goes by

6    the nickname of 2812?

7          **THE WITNESS:**  No.

8          **THE COURT:**  Or the nickname Delta?

9          **THE WITNESS:**  No, sir.

10          **THE COURT:**  All right.

11   **BY MR. STURGIS:**

12   Q    And you say that -- or Ms. Gutierrez asked you about, I

13   guess, some of the people that hung around with Joe Padilla,

14   that being those people in Crime Stoppers and such, correct?

15   A    Yes, sir.

16   Q    Did you know that Mr. Garza and J. P. Flores were best of

17   friends?

18   A    No, sir.

19   Q    You didn't know anything about their relationship?

20   A    No, sir.

21   Q    You didn't know about the comings or goings or anything

22   that Mr. Garza did or Mr. Flores did?

23   A    No, sir.

24          **MR. STURGIS:**  Pass the witness.

25          **THE COURT:**  Or this biker club?  I don't remember the

1    name of it --

2              MS. GUTIERREZ:  The Reguladores?

3              THE COURT:  The Reguladores?

4              THE WITNESS:  No.  No, no.

5              THE COURT:  They would do fund raisers or shows or

6    whatever, you never knew that -- who was involved?

7              THE WITNESS:  No, sir.

8              THE COURT:  All right.  Any final Re --

9              MS. GUTIERREZ:  I have nothing, your Honor.

10             THE COURT:  All right.  Thank you for being here

11   today.  You are excused at this time.

12             THE WITNESS:  Thank you.

13        **(Witness excused)**

14        **(Transcription concluded at 4:01:53 p.m.; proceeding**

15   **continued)**

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>October 9, 2013</u>

         Signed                                      Dated



                   *TONI HUDSON, TRANSCRIBER*