UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION

UNITED STATES OF AMERICA,    )     CASE NO:  7:13-CR-070-12
                             )
              Plaintiff,    )        CRIMINAL
                             )
    vs.                   )      McAllen, Texas
                             )
JORGE GARZA,             )      Thursday, August 1, 2013
                           )      (8:56 a.m. to 11:40 a.m.)
               Defendant.    )      (2:00 p.m. to  4:00 p.m.)

TESTIMONY OF JAMES PHIL FLORES DURING JURY TRIAL - DAY 3

BEFORE THE HONORABLE RANDY CRANE,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**

For Plaintiff:          JAMES STURGIS, ESQ.
                         ANIBAL ALANIZ, ESQ.
                         Assistant United States Attorney
                         1701 W. Business Hwy. 83
                         Suite 600
                         McAllen, Texas 78501

For Defendant:         LILLY A. GUTIERREZ, ESQ.
                         4901 S. Jackson Rd.
                         Edinburg, TX 78539

Court Recorder:        Richard Cortez

Transcribed By:        Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, Texas 78480-8668
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

INDEX

| GOVERNMENT'S WITNESS | CROSS | REDIRECT | RECROSS |
|---|---|---|---|
| JAMES PHIL FLORES | 3/64/117/162 | 167 | 178 |

| DEFENDANT'S EXHIBITS | RECEIVED |
|---|---|
| 10 | 11 |
| 8 | 165 |

Flores - Cross / By Ms. Gutierrez          3

1           **McAllen, Texas; Thursday, August 1, 2013; 8:56 a.m.**

2        **(Partial transcript; testimony of James Phil Flores)**

3           **THE CLERK:**  All rise for the jury.

4        **(Jurors enter courtroom at 8:56 a.m.)**

5           **THE COURT:**  Good morning.  Please be seated.  All

6   right.  Good morning, members of the jury.  Again, we

7   anticipate today's testimony will comprise most of the day, if

8   not all of the day, although sometimes it's hard to predict.

9   So we'll have just a regular day.  This morning we'll take a

10  mid morning recess, a noon recess and a mid afternoon recess.

11          The Government had begun questioning Mr. Flores,

12  concluded their direct.  So we'll begin the cross examination,

13  Ms. Gutierrez, whenever you're ready.

14          **MS. GUTIERREZ:**  Thank you, your Honor.

15     **JAMES PHIL FLORES, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

16                        **CROSS EXAMINATION**

17  **BY MS. GUTIERREZ:**

18  Q    Good morning, Mr. Flores.

19  A    Good morning.

20  Q    I want to talk a little bit about your employment, okay?

21  And from what I understand your testimony yesterday that you

22  were -- at some point you were a jailer, is that correct, or in

23  the detention center?

24  A    Yes.  Yes, ma'am, that's correct.

25  Q    And that would make you a jailer at the time; is that

Flores - Cross / By Ms. Gutierrez                    4

1   right?

2   A    Right.

3   Q    Okay.  And from there you transitioned into patrolman,

4   correct?

5   A    That's correct.

6   Q    And at that time you were assigned to Mr. Garza for a

7   period about maybe a month to maybe show you the ropes; is that

8   correct?

9   A    That's correct.

10  Q    And during that period of time -- I mean that's how you

11  got to know him; isn't that right?

12  A    Yes.

13  Q    And at that time there was no Internet, there was no

14  Google, Google Maps.  So he kind of showed you how it is to

15  respond to locations; is that right?

16  A    That's correct.

17  Q    Okay.  He also taught you about checking out and checking

18  in equipment; is that correct?

19  A    That's correct.

20  Q    How to address the complainant when you go out to meet

21  them at their property or whatever location they were calling

22  from?

23  A    That's correct.

24  Q    And again, that period was about a month before you kind

25  of went out on your own?

Flores - Cross / By Ms. Gutierrez                    5

1    A     Yes, it was a month.

2    Q     And shortly after that period of time Mr. Garza left the

3    county; is that correct?

4    A     Yes, that's correct.

5    Q     And by county -- I apologize -- he left his employment

6    with Hidalgo County Sheriff's Office; is that correct?

7    A     That's correct.

8    Q     And the reason that he did that is because he ran for

9    constable.

10   A     Yes, that's correct.

11   Q     And during that time you, as well as your family,

12   supported Mr. Garza in his bid for constable by voting for him;

13   is that correct?

14   A     Yes, that's correct.

15   Q     And it was at this time that Flores met your parents; is

16   that right?

17   A     Mr. Garza met my parents.

18   Q     I'm sorry.  Mr. Garza, yes.

19   A     Yes.

20   Q     Thank you.  Mr. Garza was unsuccessful with his bid for

21   constable and some time after returned as an employee for the

22   Hidalgo County Sheriff's Office; is that correct?

23   A     Yes, that's correct.

24   Q     All this time though you remained with the Hidalgo County

25   Sheriff's Office.

Flores - Cross / By Ms. Gutierrez                    6

1   A    Yes.

2   Q    At the time that Mr. Garza returned to the Hidalgo County

3   Sheriff's Office you were still as a patrol deputy, correct?

4   A    Yes.

5   Q    And just to help me out, what is it that you would be

6   called?  You were a deputy, right, at the time?

7   A    Yes, I was a deputy.

8   Q    Are employees of the Hidalgo County Sheriff's Office all

9   called deputies?

10  A    At that time we were all called deputies.  Well, it was

11  deputies; and then we had investigators.  At the current time

12  they're all called senior deputies.

13  Q    Okay.

14  A    Not all -- excuse me.  Though you have to have two years

15  and more to be a senior deputy.

16  Q    And so those that have less than two years what are they

17  called?  Just deputies?

18  A    Deputies.

19  Q    Just deputies.  Okay.  And so within your job description

20  at the time that Mr. Garza returned to the Hidalgo County

21  Sheriff's Office you were patrolling, correct?

22  A    Yes.

23  Q    Okay.  And what would you be called?  Were you a patrol

24  deputy or -- this is just for reference for me when I'm asking

25  you questions.

Flores - Cross / By Ms. Gutierrez                    7

1   A    Patrol deputy.

2   Q    Patrol deputy?

3   A    Deputy, yes.

4   Q    And as a patrol deputy what were your duties?

5   A    Pardon?

6   Q    What were your duties as a patrol deputy?

7   A    To take any incoming calls, patrol Hidalgo County and

8   every type of -- respond to any type of call that we would

9   receive.

10  Q    Are the duties still pretty much the same today for a

11  patrol deputy?

12  A    Yes.  Pretty much the same, yes.

13  Q    When Mr. Garza returned to the Hidalgo County Sheriff's

14  Office he was a patrol deputy for about a year and then

15  transferred to the civil division; is that right?

16  A    Approximately, yes.

17  Q    And he remained at the civil division up until he retired

18  early this year; is that correct?

19  A    Yes.

20  Q    So he was at the civil division for about 19 years

21  approximately?

22  A    Yes.

23  Q    And while Mr. Garza was at the civil division he was

24  sometimes asked to conduct trainings and some teachings in the

25  academy; is that correct?

Flores - Cross / By Ms. Gutierrez                          8

1   A     Yes, that's correct.

2   Q     With respect to the qualifications, firings arms and so

3   forth; is that correct?

4   A     Yes.

5   Q     And there was also like a home safety program that the

6   Hidalgo County Sheriff's Office initiated at the county; is

7   that correct?

8   A     Yes, that's correct.

9   Q     And with respect to that program Mr. Garza was asked to

10  teach on the paper work, the civil part of it, preparing paper

11  work; is that correct?

12  A     Not on the -- the home safety?

13  Q     Yes.

14  A     No, ma'am, not on that.

15  Q     Okay.  And this is something that you're aware of?

16  A     Yes.  The only thing he would do on that, he would be a

17  safety officer for the firearm part when the civilians would go

18  to the firing range.

19  Q     Okay.  The home safety program was a program that the

20  Hidalgo County Sheriff's Office offered to the residents of

21  Hidalgo County if they wanted to get training on protecting

22  their home; is that correct?

23  A     Yes, that's correct.

24  Q     And with respect to that, wasn't there also a part of that

25  where the participants were trained on how to prepare paper

Flores - Cross / By Ms. Gutierrez                    9

1   work, for example, filing a report?

2   A    I don't recall on that particular program.

3   Q    Okay.  Now during that period of time I would say -- how

4   long were you at the Hidalgo County Sheriff's Office?

5   A    Twenty-eight years.

6   Q    Twenty-eight years.  And much of those 28 years did you

7   know Mr. Garza?

8   A    From 1991 to the present.

9   Q    So over 20 years; is that correct?

10  A    Yes, that's correct.

11  Q    And during that period of time you not only worked

12  together -- you did not only have a working relationship but

13  that relationship extended outside of your employment, correct?

14  A    Yes.

15  Q    And you would consider him -- well, during the time --

16  during the 19 years you would consider him a friend; is that

17  correct?

18  A    Yes, that's correct.

19  Q    As a matter of fact, you and Mr. Garza and other law

20  enforcement individuals were all part of a motorcycle club

21  called the Reguladores, is that correct?

22  A    Yes, that's correct.

23  Q    And the Reguladores was a motorcycle club made up of law

24  enforcement individuals; is that correct?

25  A    Yes, that's correct.

Flores - Cross / By Ms. Gutierrez                    10

1  Q    And you would hold meetings at different times; is that

2  right?

3  A    Yes, that's correct.

4  Q    And you all would get together on certain days and make

5  trips out of town on your bikes in a group, correct?

6  A    Yes.

7  Q    Other deputies from the Hidalgo County Sheriff's Office

8  were also a part of this Reguladores motorcycle club; is that

9  correct?

10 A    Yes, that's correct.

11        **MS. GUTIERREZ:**  Your Honor, may I approach the

12 witness?

13        **THE COURT:**  You may.

14        **MS. GUTIERREZ:**  I'm going to show the witness

15 Defendant's Exhibit Number 10.  It is not on your witness list.

16 This is not something that I had at the time.

17        **THE COURT:**  Okay.

18 **BY MS. GUTIERREZ:**

19 Q    Mr. Flores, can you take a look at that?

20 A    Yes, ma'am.

21 Q    Do you recognize that picture?

22 A    Yes, I do.

23 Q    Do you remember when it was taken?

24 A    Not exactly, no.

25 Q    But it was taken in the year 2012; is that correct?

Flores - Cross / By Ms. Gutierrez                    11

1    A    That's correct.

2            **MR. STURGIS:**  Judge, that's a picture of the

3    motorcycle club.  We have no objection.

4            **THE COURT:**  All right.

5            **MS. GUTIERREZ:**  I would ask that it be admitted.

6            **THE COURT:**  Exhibit 10 is admitted.

7        **(Defendant's Exhibit Number 10 was received in evidence)**

8            **MS. GUTIERREZ:**  Yes, your Honor.

9            **THE COURT:**  You may publish it to the jury.

10           **MS. GUTIERREZ:**  Thank you, your Honor.

11           **THE COURT:**  Defense 10.

12   **BY MS. GUTIERREZ:**

13   Q    And Mr. Flores, that's you -- the picture that I've

14   enlarged, that's you in the center, correct?

15   A    That's correct.

16   Q    And you're kneeling right next to an individual holding a

17   vest; is that correct?

18   A    That's correct.

19   Q    Okay.  And did you hold a position within this club?

20   A    Yes, ma'am.

21   Q    And what was your position?

22   A    I was the vice president.

23   Q    You were vice president.  And as a matter of fact, you

24   were the individual who encouraged others to -- other law

25   enforcement deputies to join, correct?

Flores - Cross / By Ms. Gutierrez                    12

1   A    Yes.

2   Q    Okay.  And I am going to enlarge this here.  And that

3   right there, (indicating), in the middle right next to the

4   individual with the red cap is Mr. Jorge Garza, correct?

5   A    Yes, that's correct.

6   Q    And the individual to Mr. Garza's right is a deputy from

7   the Hidalgo County Sheriff's Office named Orlando Cantu,

8   correct?

9   A    That's correct.

10  Q    And the individual at the far right is another deputy --

11  sorry, here we go -- is another deputy with the Hidalgo County

12  Sheriff's Office by the name of Jerry Del Angel; is that

13  correct?

14  A    Yes, that's correct.

15  Q    And Jerry Del Angel actually worked in the Crime Stoppers

16  Division; is that correct?

17  A    Yes, ma'am, that's correct.

18  Q    Now, the man to the left -- let me do this; there we go --

19  the man to the left with his hands over on a woman's shoulders

20  is Ralph Garza; is that correct?

21  A    Yes, that's correct.

22  Q    And he's also -- he works with the county, correct?

23  A    Yes, that's correct.

24  Q    Any other individuals I didn't point out who worked with

25  the county in this group -- in this picture, excuse me?

Flores - Cross / By Ms. Gutierrez                    13

1   A    No, ma'am.

2   Q    Now when you all would head out of town in this group, the

3   Reguladores your meeting location was the Love's Truck Stop;

4   isn't that correct?

5   A    Sometimes.  Or other times it would be at Flying J.

6   Q    It was usually a truck stop?

7   A    Yes.

8   Q    Either Love's or Flying J, correct?

9   A    And you all would all gather there together, or meet let's

10  say, and then from there you would take off all together in a

11  group wherever -- to whatever destination you were headed,

12  correct?

13  A    Yes.

14  Q    During your 20 plus years that you were friends with

15  Mr. Garza you would consider yourselves to be close friends;

16  isn't that right?

17  A    Yes, that's correct.

18  Q    And you would consider him to be good friends; isn't that

19  correct?

20  A    Yes, very good friends.

21  Q    And during that period of time you would ask him to do

22  extra patrol around your house whenever he was in the area;

23  isn't that correct?

24  A    Yes, that's correct.

25  Q    And that wasn't an uncommon request of a deputy; is that

Flores - Cross / By Ms. Gutierrez                          14

1    correct?

2    A    Right.  That's correct.

3    Q    And other people, in fact, would ask Mr. Garza to do extra

4    patrol in their homes -- friends; is that right?

5    A    Yes, that's correct.

6    Q    And even other individual -- well, for example, whenever

7    you would go out of town, you would ask Mr. Garza to keep an

8    eye on your house, do extra patrol, and those types of things,

9    correct?

10   A    Yes.

11   Q    And there was a period of time when Mr. Garza had a -- I

12   think a key to the gate to your property; isn't that correct?

13   A    No, I don't recall that.  I don't think we ever locked the

14   gate with a key -- with a lock.

15   Q    Don't you have a security code to your gate in order to

16   enter your property?

17   A    Yes, I do.

18   Q    And prior to there being that security code -- I mean

19   that's not something that you had for 20 years, correct?

20   A    That's correct.

21   Q    That's fairly new; isn't that right?

22   A    Yes.

23   Q    How new is it?

24   A    Approximately probably two years.

25   Q    And prior to that time in order to secure your property

Flores - Cross / By Ms. Gutierrez                    15

1   there was a locking mechanism; isn't that true?

2   A    We had a gate but most of the time we would never close

3   it.  That was probably why we went into the electric gate.

4   Q    Wouldn't you close it and secure it when you would go out

5   of town?

6   A    Probably close it.  I don't remember putting a lock on it.

7   Q    Okay.  But you do remember asking Mr. Garza when you would

8   go out of town to extra patrol your property, correct?

9   A    Yes.

10  Q    And as a matter of fact, there was an ongoing instruction,

11  let's say, that your daughters would call Mr. Garza if and when

12  they needed anything and they couldn't get ahold of you; isn't

13  that correct?

14  A    Yes, that's correct.

15  Q    And your daughters are named Josie and Brenda, correct?

16  A    Yes, that's correct.

17  Q    And also you had Mr. Garza -- basically you left your

18  parents -- Mr. Garza in charge of your parents whenever you

19  would go out of town; isn't that correct?

20  A    Yes, that's correct.  They're elderly and would need some

21  help.

22  Q    And after the time that Mr. Garza became familiar with

23  your -- met your family and became familiar with your parents,

24  they actually attended church together, right, Mr. Garza with

25  your parents?

1   A    Yes.

2   Q    They would actually meet at church and sit together for

3   service; isn't that correct?

4   A    I believe so.  I wasn't there.

5   Q    Right.  It was Mr. Garza and your parents; however, you

6   weren't present, right?

7   A    Right, right.

8   Q    Okay.  Now, about four years ago you ran for constable

9   yourself, correct?

10  A    Yes, that's correct.

11  Q    And during your campaigning for your bid for constable

12  Mr. Garza and his family supported you by assisting in your

13  campaigning, correct?

14  A    Yes, that's correct.

15  Q    And Mr. Garza and some of his family members stood outside

16  polling stations to campaign for you, correct?

17  A    Yes, that's correct.

18  Q    And Mr. Garza never asked you to look after his children;

19  isn't that correct?

20  A    No, that's correct.

21  Q    And Mr. Garza never asked you to look after his mother or

22  father, correct?

23  A    That's correct.

24  Q    And Mr. Garza didn't ask you to go check on his property;

25  isn't that correct?

Flores - Cross / By Ms. Gutierrez                    17

1   A    Yes, that's correct.

2   Q    Now, you're a fairly generous man, wouldn't you say?

3   A    Yes.

4   Q    And in that you would -- you would pay for meals for other

5   deputies when you would go out to eat; isn't that correct?

6   A    Yes, that's correct.

7   Q    You would pick up the tab whenever -- in some cases when

8   you would go out with Mr. Garza and as couples you and your

9   partner, Mr. Garza and his partner, you would pick up the tab;

10  isn't that correct?

11  A    Yes.

12  Q    And there was a time -- there was a time in 2010 where

13  Mr. Garza had purchased a Harley Davidson motorcycle and you

14  actually paid for a luggage rack to be placed on that

15  motorcycle; isn't that correct?

16  A    Yes, that's correct.

17  Q    And you stated that in 2001 you moved -- and this is

18  yesterday you testified -- 2001 you moved to the Crime Stoppers

19  Division of the Hidalgo County Sheriff's Department, correct?

20  A    Yes, that's correct.

21  Q    And did you move into that division as the coordinator

22  from the get-go?

23  A    Yes.

24  Q    And being a coordinator for the Crime Stoppers, was that

25  an administrative position?

Flores - Cross / By Ms. Gutierrez                    18

1   A    No, not -- at the Sheriff's Office it was considered an

2   administrative position, yes, ma'am.

3   Q    Okay.  And so then there is a difference between the

4   administration and the actual deputies that are either in the

5   detention department, in jailers or the patrol deputies or --

6   isn't that correct?

7   A    Yes.  It's the detention, criminal enforcement and you

8   would go to administration.  There is a difference.

9   Q    Is that the ladder, basically?

10  A    Yes, but not -- it's not a promotion.  It's just where you

11  fall in.

12  Q    Okay.  So I'm sorry, what did you say the first one was?

13  A    It's not a promotion.  I didn't get promoted to

14  administration.  It was just I was -- my supervisor was under

15  the administration department.

16  Q    Okay.  But just prior to this you stated three different

17  things.

18  A    Yeah.  Detention; criminal enforcement, which consists of

19  patrol, investigation; and then you would have your

20  administration, which would consider of Crime Stoppers,

21  quartermaster office and -- I believe that's about it -- and

22  secretaries.

23  Q    So then basically the makeup of the Hidalgo County

24  Sheriff's Office is detention -- and I'm sorry, is that what

25  you said, detention?

Flores - Cross / By Ms. Gutierrez                    19

1  A    Yes.

2  Q    Okay.  And the detention includes even patrol deputies?

3  A    No, ma'am.

4  Q    Okay.  And I guess maybe I need to -- you need to help me

5  understand that a little bit.

6         Detention is basically the first group; is that

7  correct?

8  A    Detention is the jailers, working in the jail section.

9  Q    So that includes only the jailers.

10 A    Yes.

11 Q    And the booking, the deputies there, their booking and

12 release.

13 A    Right.

14 Q    Okay.  Anything having to do with housing the inmates; is

15 that right?

16 A    That's correct.

17 Q    And so then criminal enforcement is what?

18 A    Criminal enforcement is patrol and investigation -- and

19 we're talking back when -- in 2001.  It's currently changed

20 now.

21 Q    Okay, that's fine.  We'll get to that.

22         Criminal enforcement would be patrol and

23 investigation?

24 A    Yes.

25 Q    Back in 2001 where -- when you moved to Crime Stoppers,

1    where did Crime Stoppers fall in this?

2    A    It fell under administration.

3    Q    Oh, okay.  All right.  So then under criminal enforcement

4    you had patrol and investigation only.

5    A    Yes.  And that includes civil process, also.

6    Q    Okay.  And under criminal enforcement.

7    A    Yes.

8    Q    Okay. And then we have administration.

9    A    Right.

10   Q    And who comprised -- or what was administration comprised

11   of?

12   A    It was the secretaries, quartermaster, crime stoppers.  I

13   believe that was it.

14   Q    And, of course, the sheriff himself would fall under

15   administration, right?

16   A    Yes.

17   Q    Or was he in a different category of --

18   A    That was administration, yes.

19   Q    Okay.  And he had an office with a support staff; is that

20   correct?

21   A    That's correct.

22   Q    Okay.  So in 2001, you moved to Crime Stoppers and so

23   would you say that -- well, it wasn't a lateral move; you

24   didn't move sideways; it was -- because it went from criminal

25   enforcement to administration, wouldn't you say that that was a

Flores - Cross / By Ms. Gutierrez                    21

1    vertical move?

2    A    It was -- I was getting the same amount of pay.  I didn't

3    go up in pay, so there was no promotion on it.

4    Q    Okay.

5    A    It was just assigned from criminal enforcement to

6    administration, Crime Stoppers.

7    Q    Okay.  Would you agree with me that the policies that

8    are -- that come out of the Hidalgo County Sheriff's Office

9    with respect to how the employees do their jobs come down from

10   administration?

11   A    Yes.

12   Q    And they also -- administration is -- or the individuals

13   within administration are the ones who enforce those policies

14   as well, correct?

15   A    Yes.

16   Q    Okay.  And whatever protocol there is within the Hidalgo

17   County Sheriff's Office is also something that comes from

18   administration; isn't that right?

19   A    That's correct.

20   Q    And it's also enforced by administration, correct?

21   A    Yes.

22   Q    Okay.  Let's talk about the chain of command, because I

23   think that's also something I need -- the jury needs to hear

24   about.

25            I understand that there's some lieutenants, some

Flores - Cross / By Ms. Gutierrez                    22

1  sergeants, some commanders.  And I'm not sure that I understand

2  how they all fall.  If you can help me understand that, and we

3  can start from the bottom and work our way all the way to the

4  top.

5  A    Okay.  We have -- you would have the sergeants.  After

6  sergeants -- well, let's start from the very bottom.  It's

7  deputy.  Then you have your senior deputies, your sergeants,

8  lieutenant, captain and commander.

9  Q    Okay.  And the sheriff.

10 A    And the sheriff -- oh, commander, then we had a chief

11 deputy and then the sheriff.

12 Q    In 2001, who was the sheriff of Hidalgo County?

13 A    Henry Escalon.

14 Q    And at that time there was a chief deputy?

15 A    Yes.

16 Q    Who was the name of that person?

17 A    Chief Ramiro Castellano.

18 Q    And who was the commander at that time?

19 A    At that time they weren't called commanders.  At one

20 point -- I'm not sure when they changed -- they were chiefs.

21 And it was Chief Tino Garza.

22 Q    I'm sorry, the first name?

23 A    Tino Garza.

24 Q    Okay.  And who was the captain at that time?

25 A    Captain Alvarez.

Flores - Cross / By Ms. Gutierrez                      23

1    Q    Lieutenant?

2    A    There was -- I don't recall.  It was --

3    Q    From this point on there were several who were all called

4    those names, right?  I mean there wasn't just one person?

5    A    That's correct.

6    Q    Okay.  So, of course, the sheriff can only be one so there

7    was only one sheriff.

8    A    Yes.

9    Q    At that time there was a chief and there was only one

10   chief, correct?  Well, you said Tino Garza?

11   A    Yes, there was one chief.

12   Q    And there was only one --

13   A    Well, one chief of criminal enforcement.

14   Q    Okay.  So there would be a chief for --

15   A    For detention.

16   Q    Oh, okay.  So each of these three departments would all

17   have a chief?

18   A    Yes.  Not the administration.  The administration still

19   fell under Chief Tino Garza.

20   Q    Well, right.  So the administration fell under the chief

21   for what --

22   A    Criminal enforcement.

23   Q    Criminal enforcement?

24   A    Yes.

25   Q    Okay.  So detention was kind of off on its own.

Flores - Cross / By Ms. Gutierrez                    24

1   A     Yes.

2   Q     I mean under the control and authority of the sheriff but

3   didn't share their chief with anyone.

4   A     That's correct.

5   Q     At some point -- well, would you agree that back then

6   there were several lieutenants and there were several

7   sergeants?

8   A     Yes.

9   Q     Okay.  And when I say several, would there be only one per

10  division or would there be several within each division?

11  A     Well, depending on what division you are talking about.

12  Under criminal enforcement there were several within criminal

13  enforcement.  And detention I would believe there's several.

14  Q     Okay.  And you say that you believe that because you

15  haven't been involved in detention for years, right?

16  A     That's correct.

17  Q     And while administration, or let's say the commander or

18  sheriff do -- oversee everyone at the Hidalgo County Sheriff's

19  Office because you were in -- was it criminal enforcement?

20  Crime Stoppers would fall under criminal enforcement, right?

21  A     It fell under administration.

22  Q     Oh, administration.  But because you were mainly within

23  criminal enforcement or administration, you didn't have too

24  much to do with the detention center after you left as a

25  jailer, correct?

Flores - Cross / By Ms. Gutierrez                    25

1   A    That's correct.

2   Q    Now, senior deputies and, of course, deputies, there's

3   lots of them, correct?

4   A    Yes.

5   Q    And --

6   A    Back -- excuse me -- back in 2001, it was just deputies,

7   no senior deputies.

8   Q    Okay.  Back in 2001.  So the differences between back in

9   2001 and the way that the current -- well, it's at the time

10  that you retired were that back in 2001 it was:  deputy,

11  sergeant, lieutenant, captain, commander, chief and sheriff.

12  A    Yes.

13  Q    And the way it is -- well, when you retired it is or was:

14  deputy, senior deputy, sergeant, lieutenant, captain,

15  commander, chief deputy and sheriff.

16  A    As when I retired there was -- yes, that's correct, there

17  was a chief deputy.

18  Q    Okay.  So let's talk about -- well, you have pled guilty

19  to conspiracy to possess with intent to distribute marijuana,

20  cocaine and methamphetamines, correct?

21  A    Yes, that's correct.

22  Q    And the period of time for this conspiracy was some time

23  in -- beginning January 1st of 2009 to on or about

24  December 12th of 2012, correct?

25  A    That's correct.

Flores - Cross / By Ms. Gutierrez                          26

1   Q    Okay.  And so during that period of time did this

2   hierarchy of individuals change?  I'm talking just titles.  Did

3   it change from the time that you retired?

4   A    No, the titles -- I mean they're still sergeant,

5   lieutenant, captain and commander.

6   Q    Okay.

7   A    Chief deputy, sheriff.

8   Q    All right.  So let's talk -- well, I guess let me ask you

9   this, if you know.  You said that in 2001 the sheriff was Henry

10  Escalon.

11        At what point did the sheriff change?

12  A    In 2005.

13  Q    In 2005, who became the new sheriff?

14  A    Lupe Trevino.

15  Q    Is that Guadalupe Trevino?

16  A    Guadalupe Trevino.  That's correct.

17  Q    And correct me if I'm wrong.  When the new sheriff comes

18  in, new people come in as well.

19  A    Mostly his administrative staff, command staff.

20  Q    The deputies don't all get replaced, right?  It's

21  mainly --

22  A    No.

23  Q    -- the support staff that the sheriff works closely with,

24  correct?

25  A    His command staff.  Yes, ma'am.

Flores - Cross / By Ms. Gutierrez                    27

1   Q    So did the -- well, let's talk about that.

2            In 2005, you were present; you were at the Crime

3   Stoppers Division, correct?

4   A    Yes, that's correct.

5   Q    And the fact that the sheriff changed didn't change --

6   didn't affect your position, correct?

7   A    That's correct.

8   Q    And so in 2005, the sheriff was Lupe Trevino and who was

9   the -- at that time was there already a chief deputy?

10  A    Yes.  Well, he appointed -- when he came in, he brought in

11  his chief deputy.

12  Q    So those two changes were implemented by Sheriff Trevino.

13  And the two changes I'm talking about are instead of the chief

14  there's a chief deputy and before there was no senior deputy

15  but now there is.

16  A    Yeah.  We did have a chief deputy in 2001.

17  Q    Right.  But what I'm saying is the fact that -- oh, you

18  did have a chief deputy.  I thought you only had a chief, Tino

19  Garza.

20  A    And the chief deputy and the sheriff.

21  Q    Oh.

22  A    Back in 2001.

23  Q    So then Lupe Trevino did away with the chief position?

24  A    No.  Prior to Lupe Trevino coming in, Henry Escalon

25  changed it from a chief -- from a chief to commanders.  So now

1  their classification was commander.

2  Q    Oh.  So there were no commanders in 2001.

3  A    In 2001, no, there was no commander; they are chiefs.

4  Q    Okay.  Okay.  So in 2005 when Lupe Trevino comes in, who

5  is the chief deputy?

6  A    Chief Martinez.

7  Q    Do you have a first name?

8  A    Anacleto.

9  Q    Okay.  And at this point they do away with the chief and

10  now there's a commander?

11  A    No.  They still have the chief deputy and he's got

12  commanders.

13  Q    I'm sorry?

14  A    He's got his chief deputy plus commanders, also.

15  Q    Okay.  And how many commanders does Lupe Trevino have?

16  A    I would say eight -- I can't -- I don't have an exact

17  number.

18  Q    Oh, okay.  So then there -- did Henry Escalon have more

19  than one commander?

20  A    Yes.

21  Q    And these commanders are they all under administration?

22  A    Yes, they're under the administration.

23  Q    What is the job description of a commander?

24  A    They're the command staff of the sheriff.  They're the --

25  basically the supervisors overseeing the running of their

Flores - Cross / By Ms. Gutierrez                29

1   department.

2   Q    And when you say "the department," do you mean the

3   sheriff's department or the departments within the sheriff's

4   department?

5   A    The department -- the bureaus.

6   Q    Okay.  And by that you mean like the civil department,

7   the --

8   A    Right.  Well, back when 2005 came in, they changed -- the

9   divisions came into bureaus.  So we had detention, we have your

10  criminal enforcement and our special services.

11  Q    What is "special services"?

12  A    Special services contain -- it's Crime Stoppers, the gang

13  unit, the narcotic unit, academy.  I believe that's it.

14  Q    And who was -- since you were in Crime Stoppers, who was

15  the commander for those divisions?

16  A    Are you talking about 2005?

17  Q    Well, let's now talk about during the period of time of

18  the conspiracy.

19  A    Okay.

20  Q    2009 to --

21  A    It was Commander Joe Padilla.

22  Q    So Joe Padilla was the commander in charge of the special

23  services?

24  A    Yes, ma'am.

25  Q    Only the special services?

Flores - Cross / By Ms. Gutierrez                    30

1   A    Yes.  And also special services consisted of civil

2   process.

3   Q    Oh, okay.  So during this period of time you and

4   Mr. Garza, because he was in the civil process division, you

5   all worked under the same commander; is that correct?

6   A    Yes.

7   Q    And the commander would give out instructions for the

8   deputies; is that correct?

9   A    Yes.

10  Q    And he would also give out directions, you know, direct

11  the deputies on things that needed to be done; is that correct?

12  A    Right.  He would use his supervisors, and sometimes he

13  would direct them himself.

14  Q    Did you have a supervisor at the Crime Stoppers

15  Department?

16  A    No.

17  Q    Were you a supervisor?

18  A    No.

19  Q    I understand that -- I'm not sure if it was you or where I

20  put this, but I understood that you were the coordinator for

21  the Crime Stoppers?

22  A    Yes, I was.

23  Q    Okay.  What does that mean?

24  A    I was in charge of the Crime Stoppers.  At that particular

25  time I was the only one assigned to Crime Stoppers.

Flores - Cross / By Ms. Gutierrez                    31

1    Q     In 2009 through 2012?

2    A     Two thousand -- I'm talking about when the sheriff came

3    in; 2009 I believe I was still alone, and then Jerry Del Angel

4    got assigned to me.  I'm not sure what year he was assigned to

5    me.

6    Q     Okay.  And okay.  Tell me a little bit about how it is

7    that you do your job within the Hidalgo County Sheriff's

8    Office.

9            Do you have an office just for Crime Stoppers or are

10   you within -- together with other divisions, other offices?

11   A     No, we had an office just for Crime Stoppers.

12   Q     So when you worked at Crime Stoppers alone, you were the

13   only one in that office.

14   A     That's correct.

15   Q     And then at what point did Jerry Del Angel get assigned to

16   you?

17   A     I don't recall the exact year, but Jerry at this time, you

18   know, he was assigned to me.  I'm not sure the exact year when

19   he came in.

20   Q     But it was after 2009.

21   A     It could have between prior.  I know it was after 2005,

22   but I'm not sure of the year.

23   Q     At the time that you retired how many deputies made up the

24   Crime Stoppers Division?

25   A     At the time I retired it was just myself and Jerry

Flores - Cross / By Ms. Gutierrez                    32

1   Del Angel.

2   Q    And you retired when, December of last year?

3   A    December of 2012.

4   Q    What day?

5   A    December 31st.

6   Q    Okay.  And at that time there were only two deputies, and

7   that was you and Jerry Del Angel.

8   A    Yes.

9   Q    Is that correct?

10  A    Yes.

11  Q    So is it correct to say that from 2009 up until the time

12  you retired it was only you and Jerry Del Angel within the

13  Crime Stoppers Division?

14  A    No.

15  Q    Okay.  Tell me what --

16  A    We had the Crime Stoppers Division.  The first one that

17  came on board was Jerry Del Angel.  Then we had Eddie

18  Rodriguez.

19  Q    Okay.

20  A    And then we had Fabian Rodriguez.

21  Q    Did Jerry Del Angel, Eddie Rodriguez and Fabian Rodriguez

22  all work at Crime Stoppers at the same time?

23  A    At one particular time we were all there, yes.

24  Q    So there was a period of time where there was up to four

25  people within that division.

Flores - Cross / By Ms. Gutierrez                    33

1  A    Yes.

2  Q    And how long did that last?

3  A    That lasted a few months.

4  Q    More than six months?

5  A    I would say -- I would say so, yes.

6  Q    Twelve months?

7  A    I would say -- I would say it was between maybe six

8  months, seven months.

9  Q    Okay.  And so then who was the first one to come in after

10 Jerry Del Angel?

11 A    Eddie Rodriguez.

12 Q    And so there was a period of six to seven months where all

13 four of you were working together.

14         Who was the first one to stop working with that

15 division?

16 A    Eddie Rodriguez.

17 Q    And why did he leave?

18 A    He was transferred to patrol.

19 Q    Is that considered a demotion?

20 A    No.  It was considered just a lateral transfer.

21 Q    And who made that decision?

22 A    He received the information he was being transferred from

23 Commander Joe Padilla.

24 Q    So it wasn't his choice; it was something that was ordered

25 by Joe Padilla; is that correct?

Flores - Cross / By Ms. Gutierrez                    34

1  A    That's correct.

2  Q    Had he gotten into trouble that caused this?

3  A    I don't recall.

4  Q    What do you recall about why Eddie Rodriguez was moved

5  laterally to patrol?

6  A    I don't -- I don't recall.  I mean it was just a decision

7  they made and I don't recall why the reason was.

8  Q    Okay.

9  A    I don't remember.

10  Q    Okay.  You being in that division did you supervise these

11  individuals?

12  A    No, I didn't.

13  Q    So would you say that you guys were all equal, on equal

14  level within the Crime Stoppers?

15  A    Yes, we were all senior deputies.

16  Q    So then anyone could make any decisions without having to

17  get the okay from any of the other three people; is that right?

18  A    That's right.

19  Q    Were Jerry Del Angel, Eddie Rodriguez, Fabian Rodriguez

20  also coordinators for Crime Stoppers?

21  A    Yes, they were.

22  Q    So the coordinator title doesn't necessarily mean that you

23  are the head of that division, correct?

24  A    That's correct.

25  Q    It's just a title like deputy where there's several

Flores - Cross / By Ms. Gutierrez                    35

1   deputies.

2   A    Right.

3   Q    And you didn't ask anyone why Eddie Rodriguez was being

4   taken from your division and moved somewhere else?

5   A    No.  Basically, the commander said Eddie is going to

6   patrol and that's what happened.

7   Q    You didn't question the commander, correct?

8   A    No, I didn't.

9   Q    No, I'm saying no one questions the commander; isn't that

10  correct?

11  A    Right.  I didn't question him, no, ma'am.

12  Q    And so pretty much what the commander says goes, correct?

13  A    Yes.

14  Q    And the commander is pretty much speaking for the sheriff

15  to some extent because his instructions and directions are

16  coming from the sheriff; isn't that right?

17  A    I'm assuming so.

18  Q    Who was the next person to leave, Jerry Del Angel or

19  Fabian Rodriguez?

20  A    Fabian Rodriguez.

21  Q    How long did Fabian Rodriguez work with Crime Stoppers?

22  A    I would say about less than a year, maybe eight months.

23  Q    And why did he leave?

24  A    He got moved to the Panama Unit.

25  Q    And when people were moved from the Crime Stoppers

Flores - Cross / By Ms. Gutierrez                      36

1   Division they didn't replace them?

2   A    Sometimes they did and sometimes they weren't.  For that

3   particular time, no, he was not replaced.

4   Q    What about when Eddie Rodriguez was moved?

5   A    No, he wasn't replaced.

6   Q    And so the entire time that you worked at the Crime

7   Stoppers the most there's been is four people, no one has ever

8   been replaced when they've been moved, correct?

9   A    That's correct.

10  Q    And was the -- Fabian Rodriguez's transfer into the Panama

11  Unit considered a promotion?

12  A    No, it was just a lateral transfer.

13  Q    Tell me about the Panama Unit.  What place did it have in

14  the Hidalgo County Sheriff's Office?

15  A    It was -- consists of three or four investigators or

16  senior deputies from the Sheriff's Office assigned to the task

17  force, the drug task force of Mission PD.

18  Q    And when was the Panama Unit created?

19  A    I don't recall that.

20  Q    Was it in existence in 2005?

21  A    No, it wasn't.

22  Q    It was after 2005.

23  A    Yes.

24  Q    Okay.  From the time that the Panama Unit was arrested in

25  connection with this case how long had it been in existence?

Flores - Cross / By Ms. Gutierrez                    37

1   A    I don't recall.

2   Q    Well, you say they weren't in existence in 2005.  Were

3   they in existence for four years at least?

4   A    I don't recall.

5   Q    And when you say you don't recall, you knew that at some

6   point, you just don't remember now, or you never knew?

7   A    Yes, I knew at some point it became existent.  There was

8   a -- senior deputies over there, but I don't recall the year it

9   happened or the month.

10  Q    Did Fabian Rodriguez request to be transferred or was it

11  just an order?

12  A    No, he requested to be transferred.

13  Q    Did he get more pay with the Panama Unit?

14  A    I don't -- I don't think so.

15  Q    And where were the -- what is the job description or the

16  responsibilities of the Panama Unit?

17  A    I don't -- I don't know.

18  Q    Well, as far as what you understood what was it they were

19  doing?

20  A    They were doing drug work, narcotics.

21  Q    Well, we all know now what they ended up doing, but

22  initially when it was created there were some -- when you say

23  "drug work" what do you mean by that?

24  A    They would work cases, any type of tips that came in.

25  Q    And who supervised the Panama Unit in the county?

Flores - Cross / By Ms. Gutierrez                    38

1   A    They fell under the sheriff.

2   Q    So they reported to the sheriff.

3   A    They reported to the sheriff, yes.

4   Q    Have you ever held a supervisory position at the Sheriff's

5   Office?

6   A    No.

7   Q    Have you ever had any reason to report something that

8   needed to be addressed by the sheriff, Lupe Trevino?

9   A    Report something to him?

10  Q    Yes.  That needed to get to him.

11  A    Yes.  I would have sometimes briefing with him and just

12  let him know what was going on since I was in charge of Crime

13  Stoppers.  Also, crime prevention.  So we had a lot of

14  presentations and meetings that I would attend, and sometimes I

15  would attend meetings in behalf of the sheriff.

16  Q    In other words, in his place, correct?

17  A    That's correct.

18  Q    Okay.  Now, you said right now that you were in charge of

19  Crime Stoppers.  Tell me about that.  Because it sounds to me

20  like that's a supervisory role to some extent.

21  A    I was never seen as a supervisor.  I didn't hold a

22  supervisor.  But it seemed like if anything would go wrong it

23  was -- they would -- they wouldn't address all of us.  They

24  would just maybe address me and, you know, I would say, "Oh,

25  you know, yes."  If something did go wrong or, you know, a

Flores - Cross / By Ms. Gutierrez                    39

1    presentation.  I was the one in charge of entering the

2    presentations in the calendar to make sure we attended all the

3    presentations.

4    Q    But there were other things -- I mean presentations and

5    community service --

6    A    Yes.

7    Q    -- and all that is important.  However, there were much

8    more important as far as law enforcement duties that you in the

9    Crime Stoppers Division did.

10   A    Yes.

11   Q    Isn't that true?

12   A    That's correct.  I also mostly was administrative work,

13   which meant I did a lot of purchasing.  I worked on the budget

14   for our bureau and anything else that came up throughout the

15   daily activities.

16   Q    Like what?

17   A    Whatever the commander needed to be done I would take care

18   of it for him.

19   Q    And that commander would be Padilla, correct?

20   A    Joe Padilla, yes.

21   Q    And if he needed something done he would come to you and

22   tell you to do it and you'd do it.

23   A    That's correct.

24   Q    That's what you mean by whatever the commander needed to

25   be done.

Flores - Cross / By Ms. Gutierrez                    40

1   A    Daily activities.  You know, it was never the same thing

2   every day.  I mean it could have been something different.

3   Q    Just different things that would pop up during the day.

4   A    Right.

5   Q    Okay.  And correct me if I'm wrong, but when I hear Crime

6   Stoppers Division I feel like you all would at least attempt to

7   stop crime.  And that would be done through phone calls or tips

8   or concerned citizens calling in or -- I mean was that part of

9   Crime Stoppers?  Up to now I haven't heard that; that's why I'm

10  asking.

11  A    Yes, that's part of Crime Stoppers, having the tips line

12  and receiving tips from citizens with any type of information

13  on wanted subjects, drugs, anything else.

14  Q    Okay.  So if you're doing administrative work, you're

15  doing budget stuff, you're doing presentations, you're

16  calendaring, at what point are you doing the stuff having to do

17  with these tips?

18  A    That's the time that the other ones I got help, Jerry

19  Del Angel or Fabian or Eddie Rodriguez would mostly do the

20  Crime Stopper presentations and answering the phone.  I wasn't

21  even at that point on call to answer the phone because I had

22  just too much work.

23  Q    And now that you say "on call" did you all have a system

24  where a certain person was the one who's taking the calls?

25  A    Yes.

Flores - Cross / By Ms. Gutierrez                    41

1   Q    Because I imagine it being like a phone thing where

2   there's just phones and calls coming in and you guys are just

3   sitting there taking in the tips.  Apparently, that's not the

4   way that it is, correct?

5   A    That's correct.  The way it is, it's the tip number gets

6   transferred to a office phone.  And the office phone gets

7   transferred to a mobile, whoever is on call.

8   Q    Okay.  Were you ever -- from 2005 to the time -- up until

9   the time you retired were you ever on call to receive -- the

10  person receiving --

11  A    Yes.

12  Q    And during those times that you were on call would your

13  phone be like ringing and ringing like off the hook?

14  A    Yes.  They get quite a bit of calls.

15  Q    Okay.  And the reason that it's going to a mobile phone is

16  because you all are mobile yourselves, you're out and about, or

17  how is it -- why is it not coming in to a land line?  Why is it

18  not coming to a phone that's on a desk?

19  A    Because the Crime Stoppers' phone that's a 668 number it's

20  not a cell.  It's -- our Crime Stoppers number is 668-8477.

21  That gets -- that number when they first started the crime

22  stopper program is a -- it's a land line that's in McAllen.

23  That land line gets transferred to a different land line at the

24  Sheriff's Office.  And from that land line, since we're not

25  there 24/7 or we're in and out of the office, from that land

Flores - Cross / By Ms. Gutierrez                    42

1    line from the office will get transferred to a mobile.

2    Q    Okay.  And what about -- well, did you have regular work

3    hours?

4    A    Regular work hours were 8:00 to 5:00, and at times,

5    depending on events that we had going on, it would be in the

6    evening time, also.

7    Q    I'm not sure I understand you.  Depending on events?

8    A    Yeah.  Regular work hours were 8:00 to 5:00.  If we had a

9    presentation at 7:00 or 8:00, our work hours could change.  It

10   could be from 3:00 to 11:00.

11   Q    Okay.  So that it could cover --

12   A    It could cover what we were working on in the afternoon.

13   Q    Okay.  And that was done so that either the Sheriff's

14   Office didn't have to pay overtime or to compensate in that way

15   so that you're not working 100 hours a week.  Is that --

16   A    Yes, that's correct.

17   Q    Okay.  So from your regular -- during your regular work

18   hours from 8:00 to 5:00 were the phone calls coming into an

19   office phone that was -- a land line that was there at the

20   office?

21   A    No, they would still be transferred to the mobile.

22   Q    Okay.  So no matter what hour it was the crime stopper

23   tips that were coming in were coming in to a mobile phone.

24   A    Yes.

25   Q    And by mobile phone we're talking about a cell phone,

Flores - Cross / By Ms. Gutierrez                    43

1   correct?

2   A     A cell phone.  That's correct.

3   Q     And there would be a designated person to receive those

4   calls; is that correct?  Is that correct?

5   A     That's correct.

6   Q     So at the time that you had four people working under

7   Crime Stoppers you would only -- there would only be one person

8   receiving those calls, correct?

9   A     Yes.

10  Q     Okay.  And what would the other three people be doing?

11  A     Activities that we had, presentations.  There was

12  something almost every day that -- you know, we had

13  presentations, so much presentations going on that we also

14  needed to get help from other deputies.

15  Q     Help from other deputies to do the presentations?

16  A     To do presentations.

17  Q     Okay.  And these presentations were out in the community,

18  correct?

19  A     The community, schools, subdivisions.

20  Q     Okay.  Did Crime Stoppers play a role in this home safety

21  program that the Sheriff's Office offered?

22  A     Yes, we did.

23  Q     And what was the role of Crime Stoppers?

24  A     We would go in and -- the home safety course it was on

25  Mondays and Tuesdays.  On the first day we would go in and talk

Flores - Cross / By Ms. Gutierrez                    44

1   about crime prevention, what to look out at your residence,

2   what to -- to make sure you saw your surroundings and educate

3   the community on crime prevention.

4   Q    Let's say the Crime Stoppers Division received a tip of

5   suspicious activities or a break-in or -- well, I guess that

6   would be different.  The Crime Stoppers' line would be only

7   for, what, anonymous tips about someone knowing that there's

8   wrongdoing occur -- that wrongdoing is happening or --

9   A    Well, sometimes there's anonymous tips, anything dealing

10  with fugitives, drugs.  The majority of the tips coming in

11  through Crime Stoppers is drugs.

12  Q    Okay.  So we're not talking about someone who's broken

13  into my house.  That would be a phone call made to a different

14  line within the county, correct?

15  A    Yes.  But at times we would still get calls.  People from

16  the community would still call Crime Stoppers and want to

17  report suspicious vehicles, want to report there's a break-in.

18  To my belief if you call information, the sheriff's number is

19  not listed in information; the Crime Stoppers number is listed.

20  So we would get a lot of calls is, "I need a deputy at my house

21  because I had a burglary."  So we would give them the Sheriff's

22  Office number when, in turn, they would call, you know, the

23  Sheriff's Office.

24  Q    Okay, the -- in that case when you received a call that

25  there's a suspicious vehicle, then you would then send somebody

Flores - Cross / By Ms. Gutierrez                    45

1   out to take a look at that; wasn't that correct?

2   A    That's correct.

3   Q    Okay.  And my point is that you would take action.  You

4   wouldn't just jot down these tips for either someone else to

5   look at them or --

6   A    We would take action.  Sometimes we would call the

7   Sheriff's Office and let them know that there was a call or

8   something.  We would have the person call back the Sheriff's

9   Office and give them the Sheriff's Office number.

10  Q    Okay.  And so when you say that you would call the

11  Sheriff's Office, since I understand that you are part of the

12  Sheriff's Office, are you talking about Sheriff Trevino's

13  office or --

14  A    No.  We would call the Sheriff's Office to get transferred

15  to dispatch.

16  Q    Okay.

17           **THE COURT:**  All right, let's re-focus here.  It seems

18  like we've gone a little afield.

19  **BY MS. GUTIERREZ:**

20  Q    At what point -- or actually did Jerry Del Angel remain

21  with Crime Stoppers up until the time that you retired?

22  A    That's correct.

23  Q    So when you retired who was in Crime Stoppers?

24  A    Jerry Del Angel.

25  Q    And that was it.

Flores - Cross / By Ms. Gutierrez                    46

1  A    Yes.

2  Q    Do you recall when Fabian Rodriguez was transferred to the

3  Panama Unit?

4  A    Approximately maybe October, September.  The exact month I

5  don't recall, but it was prior to me retiring.  September,

6  October.

7  Q    Oh, of 2012?

8  A    Of 2012, yes.

9  Q    So Fabian Rodriguez -- and I'm sorry, do you all refer to

10  him as Făbian or Fābian?

11  A    Fābian.

12  Q    Fabian, okay.  Fabian Rodriguez was only with Panama Unit

13  for about four months before you retired?

14  A    Yes, approximately.

15  Q    Did you have anything to do with getting Fabian Rodriguez

16  into the Panama Unit?

17  A    No.

18  Q    Did he express his desires to you to join the Panama Unit?

19  A    Yes, he did.

20  Q    And what was the purpose for him wanting to go into the

21  Panama Unit?

22  A    He wanted to go to the Panama Unit to be with his friends.

23  Q    His friends were who?

24  A    His friends were everybody in the Panama Unit, which was

25  Jonathan Trevino, Alexis Espinoza, Eric Alcantar, Sal Arguello

1    and Claudio Mata.

2    Q    Was Alexis Espinoza part of the Hidalgo County Sheriff's

3    Office?

4    A    No, he wasn't.

5    Q    Who did he work for?

6    A    He worked for Mission PD.

7    Q    As did Jonathan Trevino, right?

8    A    Yes.

9    Q    So Eric Alcantar and Sal Arguello, Claudio Mata, they were

10   all Hidalgo County sheriff's deputies?

11   A    Yes, ma'am.

12   Q    And when we add Fabian Rodriguez, did that comprise all of

13   the Panama Unit?

14   A    Yes.

15   Q    Was there ever any change in the Panama Unit as far as

16   there was someone there at some point who left the Panama Unit

17   that's not mentioned here?

18   A    Yes.

19   Q    Who is that?

20   A    Her name was Linda -- Linda Chavez, I believe.

21   Q    During the time period that Fabian Rodriguez worked with

22   the Crime Stoppers you developed a friendship, correct?

23   A    Yes.

24   Q    When he came to Crime Stoppers is that the first time

25   you've met him?

Flores - Cross / By Ms. Gutierrez                    48

1   A    Not the first time.  I knew who he was, but that was the

2   time we got closer.

3   Q    So you knew who he was but you weren't friends with him

4   prior to him joining the Crime Stoppers.

5   A    Yes.  And I was friends with him prior to him joining

6   Crime Stoppers.

7   Q    Okay.  So would you all do things together?

8   A    No, we wouldn't -- we wouldn't hang out but we were

9   friends.  And I knew prior to him coming to Crime Stoppers he

10  was working the courthouse security detail.

11  Q    That was still within the Hidalgo County Sheriff's Office.

12  A    Yes, ma'am.

13  Q    Did you request Fabian Rodriguez to be transferred to

14  Crime Stoppers?

15  A    Yes, I did.

16  Q    Why did you do that?

17  A    Because we became friends when he was working at the

18  courthouse, and he showed interest that he wanted to come to

19  Crime Stoppers.

20  Q    Why?

21  A    He wanted to get out of the courthouse.  It was too slow

22  for him and he just wanted to come to Crime Stoppers and be a

23  little bit more active with the community.  He started doing

24  presentations.

25  Q    And so then you got close during your -- the time that you

Flores - Cross / By Ms. Gutierrez                         49

1   all worked together at Crime Stoppers.

2   A     Yes.

3   Q     While you were in charge of Crime Stoppers, Joe Padilla

4   would also use you to give out direction and instruction to the

5   deputies that were beneath you, correct?  Well, I'm not going

6   to say beneath you, but who worked with you.

7   A     Yes, that's correct.

8   Q     And as a matter of fact, he also entrusted you with giving

9   direction and instruction to even other deputies that were not

10  working with you, correct?

11  A     Yes.

12  Q     And you were also entrusted with giving instruction and

13  direction from Joe Padilla to other lieutenants and sergeants,

14  correct?

15  A     Yes.

16  Q     And you weren't a lieutenant or a sergeant, right?

17  A     No, I wasn't.

18  Q     What were you considered at that time?

19  A     A senior deputy.

20  Q     A senior deputy.  Because you had been a deputy for more

21  than two years.

22  A     That's correct.

23  Q     And so the normal chain of command doesn't allow for a

24  deputy to give direction to a sergeant or a lieutenant,

25  correct?

Flores - Cross / By Ms. Gutierrez                    50

1   A    That's correct.

2   Q    And so through Joe Padilla you were given authority to go

3   around the chain of command in order to execute his

4   instructions and directions, correct?

5   A    Yes.

6   Q    Joe Padilla is a tough commander isn't he?

7   A    Yes, he is.

8   Q    And no one talked back to him, correct?

9   A    No.

10  Q    And there were consequences if ever anyone did, correct?

11  A    That's correct.

12  Q    And the consequences were job related where you could be

13  demoted, you could be fired, correct?

14  A    Yeah, fired, transferred.  It was insubordination.

15  Q    That's what it was considered, right?

16  A    Yes.  That's what actually -- he would say that all the

17  time.

18  Q    What would he say?

19  A    He would say whatever -- he would say, "Make sure it gets

20  done.  If not, it's insubordination."

21  Q    And he wouldn't say it in such a nice way as you just said

22  it, right?

23  A    No, he wouldn't.

24  Q    So he has a presence, a very intense presence; isn't that

25  correct?

Flores - Cross / By Ms. Gutierrez                    51

1   A    That's correct.

2   Q    And you could even go so far as to say that some people

3   feared him, correct?

4   A    Yes, that's correct.

5   Q    And when I say "some people," some of the deputies within

6   the county, correct?

7   A    Yes.

8   Q    Did you fear him?

9   A    Yes, at times I would.

10  Q    And while you were in charge of Crime Stoppers there were

11  times where you would ask Jorge to do you a favor and check on

12  a suspicious vehicle for a tip that had come -- from a tip that

13  had come in, correct?

14  A    Can you repeat that?

15  Q    There were times when you were in charge of Crime Stoppers

16  where you would ask Jorge to do you a favor and if he was in

17  the area to check on a suspicious vehicle that had been called

18  in on a tip, correct?

19  A    Yes, that's correct.

20  Q    And you also would have Jorge pick up sponsorship money

21  and your contributions that were coming into the Sheriff's

22  Office, correct?

23  A    Yes, that's correct.

24  Q    And you would also ask Jorge to pick up toys when you all

25  would have the toy drive or turkeys when you were doing turkey

Flores - Cross / By Ms. Gutierrez                    52

1    drives for the county, correct?

2    A    Yes.

3    Q    And when you all would pick up turkeys, you then would

4    deliver them and sometimes you would ask Jorge to deliver those

5    turkeys for you, correct?

6    A    That's correct.

7    Q    And there was one instance where you had Mr. Garza go out

8    to A & A Printing (phonetic) to pick up a package for the

9    Hidalgo County Sheriff's Office.  Do you remember that?

10   A    Yes, I do.

11   Q    And as a matter of fact, you even had Jorge sometimes pick

12   you up when you were having your vehicle washed so that you

13   wouldn't have to wait there while your vehicle was being

14   washed, correct?

15   A    Yes.

16   Q    And you had Jorge Garza deejay at some of the fundraisers

17   and political functions for the county, correct?

18   A    Yes.

19   Q    And also you had him be master of ceremonies -- I

20   understand he was good at that -- and he was a master of

21   ceremonies for some of these political functions, correct?

22   A    Yes, he was.

23   Q    And there's something called the National Night Out that

24   was hosted by the county.  Do you recall that?

25   A    Yes.

Flores - Cross / By Ms. Gutierrez                    53

1    Q    And you would have Jorge participate in the event,

2    correct?

3    A    Yes.  He would participate every year.

4    Q    Every year.  And pretty much every year the county had

5    different fundraising or political functions where Jorge

6    participated in one way or another, correct?

7    A    Yes.

8    Q    Okay.  And that participation came at your request,

9    correct?

10   A    Yes.

11   Q    And sometimes that request wasn't necessarily yours but

12   was Commander Padilla's, correct?

13   A    It all the time was coming from Commander Padilla.

14   Q    And from Sheriff Trevino himself, correct?

15   A    Yes.

16   Q    Isn't it true that the county had somewhere around four to

17   six towers, those towers that we see in parking lots where it

18   appears that somebody is in there and there's lights and do you

19   recall -- do you know what I'm talking about?

20   A    Yes.  The sky watch towers, yes.

21   Q    Okay.  Sky watch towers?

22   A    Yes.  Sky watch towers.

23   Q    Sky watch towers.  And those towers were the

24   responsibility of Commander Padilla, correct?

25   A    Yes, it was -- it fell under the community -- or to

Flores - Cross / By Ms. Gutierrez                        54

1   policing, which were under Commander Padilla.

2   Q    And, however, he delegated that responsibility to you and

3   had you be in charge of them, correct?

4   A    That's correct.

5   Q    And there were times where you would ask Jorge to go out

6   and look at some of these towers and make sure that everything

7   was okay with them, correct?

8   A    Right.

9   Q    And Jorge never said no to you, correct?

10  A    No.

11  Q    No, he didn't say no to you.

12  A    No.  Yeah, I mean most of the time he would always say --

13  he would agree and say yes.

14  Q    Most of the time.  Do you recall a time he said no?

15  A    No.  I don't recall a time.

16  Q    Okay.  Because that would be saying no not only to you but

17  to Padilla, correct?

18  A    Yes.

19  Q    And ultimately the sheriff.

20  A    Right.

21  Q    Now, there was different times when there were fundraisers

22  or there were drives where the Sheriff's Office was trying to

23  collect money.  There were either raffles or tickets involved

24  that had to be sold, correct?

25  A    Yes, that's correct.

Flores - Cross / By Ms. Gutierrez                    55

1   Q    And these tickets came straight from the top as far as

2   Lupe Trevino and Joe Padilla, correct?

3   A    Yes.

4   Q    And these tickets were given to you to hand out to other

5   deputies so that they could go out and sell them, correct?

6   A    That's correct.  They would call it, do you have your

7   contacts within the Sheriff's Office.  So we would get the

8   tickets or any fundraiser items and we would distribute them

9   among our friends within the Sheriff's Office.

10            **THE COURT:**  What fundraisers?  What is the Sheriff's

11   Office raising funds from private --

12            **THE WITNESS:**  They were fundraisers for actually the

13   sheriff's campaign, for his campaign, political campaign.

14            **THE COURT:**  So he would give Padilla a stack of

15   tickets to sell?  Maybe, what, several thousand dollars worth

16   and distribute it to deputies and told "go out and sell these

17   for my campaign"?

18            **THE WITNESS:**  Yes, sir, he would.

19   **BY MS. GUTIERREZ:**

20   Q    And those tickets sometimes ranged in the amount of $100 a

21   ticket, correct?

22   A    Yes, a hundred dollars.

23   Q    And so the understanding was pretty much sell them or buy

24   them, we don't want them back, correct?

25   A    That's correct.

Flores - Cross / By Ms. Gutierrez                    56

1   Q    So the deputies were in a position where if I can't sell

2   these, I have to pay a thousand dollars because I can't return

3   them, correct?

4   A    That's correct.  And most of the time it was we want cash,

5   not checks.

6   Q    Okay.  And there would be consequences to the deputies if,

7   in fact, they returned these tickets, correct?

8   A    Yes.

9   Q    And a lot of deputies complained about this; they didn't

10  want to do this, correct?

11  A    Yes, that's correct.

12  Q    And, of course, they complained to you; they didn't

13  complain to Padilla or Lupe Trevino, correct?

14  A    Right.

15  Q    And you, in fact, gave Jorge Garza on different occasions

16  tickets as well as -- along with all the other deputies to sell

17  for these fundraisers, correct?

18  A    Yes, that's correct.

19  Q    Sheriff Trevino ran for re-election in 2010; is that

20  right?

21  A    Yes.

22  Q    And during this time the deputies were required to go out

23  to the polling stations and campaign for the sheriff, correct?

24  A    Yes.

25  Q    And you had Mr. Garza go out to some polling station in

Flores - Cross / By Ms. Gutierrez                    57

1    Mercedes, Texas; is that correct?

2    A    Yes, that's correct.

3    Q    And there was also an issue where you wanted him --

4    A    Excuse me.  It was in Donna.

5    Q    In Donna, okay.  I apologize.  And there was also an issue

6    where you wanted him also to campaign at -- is it Tierra Santa,

7    the golf course?

8    A    Yes.

9    Q    Okay.  And there was an issue there because he couldn't be

10   at two places at one time, correct?

11   A    Right.  He had a community event going on in Hargill, and

12   the sheriff was having a fundraiser at the golf course there in

13   Weslaco.

14   Q    Okay.  But he did do one of the two, right?  He did still

15   campaign for Trevino, and he just couldn't do both, correct?

16   A    That's correct.

17   Q    And I'm sorry.  You mentioned something with the issue of

18   the tickets; you mentioned do you have your contacts within the

19   department.  What do you mean by that?

20   A    They would require us to get our contacts, you know, our

21   closest friends.  Instead of them going -- meaning them,

22   meaning Commander Padilla -- instead of him going to each

23   single deputy, he wanted me to get my contacts within the

24   deputy and give them out the tickets.  They would always also

25   ask us to get our contacts from the outside business people so

Flores - Cross / By Ms. Gutierrez                    58

1   we could sell to, to be able to sell this contribution, the

2   political tickets.

3   Q    You were also tasked with getting political contributions

4   or sponsorships from people in the community.

5   A    Yes, I was.

6   Q    And to that effect you used people that you knew.  I mean

7   you wouldn't go knock on strangers' doors and say, "Hey, would

8   you like to, you know, donate some money for the sheriff's

9   re-election campaign."

10  A    That's correct.

11  Q    Okay.  And so it was important for you to know people who

12  had money, correct?

13  A    Yes.

14  Q    And the more money that you could collect for the

15  sheriff's re-election campaign the better it would go for you

16  in the eyes of the sheriff and the commander, Commander

17  Padilla, correct?

18  A    Yes, that's correct.

19  Q    And so to some extent the more money you could collect the

20  happier the sheriff and Padilla would be with you, correct?

21  A    Yes.  They would just make our working environment a lot

22  easier, happier with us.

23  Q    Okay.  And if something like that wouldn't happen, what

24  kind of working environment would you have?  For example, what

25  sort of consequence would you have from either Commander

Flores - Cross / By Ms. Gutierrez                    59

1    Padilla or Lupe Trevino that would make you uncomfortable?

2    A    As far as me getting transferred out of Crime Stoppers.

3    Q    Okay.  Because being in Crime Stoppers was pretty

4    comfortable, correct?

5    A    Yes, it was.

6    Q    And there were instances where people were transferred or

7    demoted because they didn't follow directions or instructions

8    of Fabian and Sheriff Trevino, correct?

9    A    Yes, that's correct.

10   Q    So it was common knowledge within the county that you do

11   what the sheriff and Commander Padilla say, correct?

12   A    Yes, that's correct.  If I can just go back to that -- the

13   question you asked me earlier about Eddie Rodriguez?

14   Q    Uh-huh.

15   A    I remember because we're talking about this.  He didn't

16   sell tickets and I remember Joe telling me specifically, "You

17   know what?  I'm going to get him moved because he didn't help."

18   Q    Okay.  And so that was the reason why Eddie Rodriguez was

19   kicked out of Crime Stoppers.

20   A    That's correct.

21   Q    And that's why you remained at Crime Stoppers from 2001

22   through the time that you retired because it was comfortable

23   there, right?

24   A    Yes.

25   Q    You had no desire to go back on patrol, right?

Flores - Cross / By Ms. Gutierrez                    60

1    A    No.

2    Q    Isn't it common knowledge that Joe Padilla is the

3    commander who does Lupe Trevino's dirty work?

4    A    It's common knowledge that -- well, people talk about

5    that.

6    Q    Okay.  And Commander Padilla is very brutal how he treats

7    people; isn't that correct?  And I'm not talking physically.

8    I'm talking about how he speaks to them.

9    A    Extremely brutal.

10   Q    And that's another reason why people fear him, correct?

11   A    That's correct.

12   Q    And he carries his weight around in that department; isn't

13   that true?

14   A    Yes, it is.

15   Q    And you can even say he relished being in the position he

16   was in; is that correct?

17   A    He loved that power.

18   Q    Okay.  And that power was given to him by Lupe Trevino,

19   correct?

20   A    Yes.

21   Q    I mean he wasn't equal to the sheriff I guess is my point.

22   A    He wasn't equal, no.

23   Q    And so in order for him to have that power, that would

24   require the sheriff to allow it, correct?

25   A    That's correct.

Flores - Cross / By Ms. Gutierrez                    61

1    Q    And, in turn, for you to be able to go outside of the

2    chain of command and give direction and instructions to higher

3    ups like sergeants and lieutenants, it had to be authorized by

4    Padilla as well, correct?

5    A    That's correct.

6    Q    You on your own couldn't go out and make -- tell a

7    sergeant what to do, correct?

8    A    Yes, that's correct.

9    Q    However, at some point it was common knowledge also that

10   the directions that you were giving out were coming from

11   Padilla, correct?

12   A    Yes.  At some points they would even question me.  Even

13   captains, you know, you're just a deputy; you're telling me

14   what to do.  And at that point I would just say, "I'm just

15   relating what I've been told to tell you by the commander."

16   Q    However, at some point the questions stopped because it

17   was just understood that you were merely passing along

18   information from Padilla, correct?

19   A    That's correct.

20   Q    So no one -- at some point no one was surprised that a

21   senior deputy was handing out these instructions and

22   directions, correct?

23   A    That's correct.

24   Q    And at some occasions you also would use deputies that you

25   needed out of like the narcotics unit if you needed them for

Flores - Cross / By Ms. Gutierrez                        62

1   one of you tips, correct?

2   A    Yes.

3   Q    And you could do that without even going through the

4   proper protocol of getting the okay from the supervisor because

5   you had this authority from Padilla, correct?

6   A    Yes.

7   Q    And you did that pretty much without any road blocks, any

8   obstruction, any objection, correct?

9   A    That's correct.

10  Q    You testified that you went to school with Julio Davila.

11       **THE COURT:**  Since you're changing subjects, let's

12  take our mid morning recess.  It's 10:15.  We'll take a

13  15-minute recess, 10 to 15 minutes, and then we'll go until the

14  noon hour.  All right.  So the jury is excused at this time.

15       **THE MARSHAL:**  All rise for the jury.

16       **(Jurors exit courtroom at 10:16 a.m.)**

17       **THE COURT:**  All right, you may be seated.  Timing,

18  again we still have Mr. Jarvis on standby.  Are we going to

19  need him here this morning?  We told him he's on standby for

20  this morning for Fabian Rodriguez.

21       **MS. GUTIERREZ:**  Your Honor, I'll probably go to lunch

22  with this witness.

23       **THE COURT:**  All right.  And I did answer the

24  question.  The name of the two Hidalgo County Sheriff Office

25  investigators that were previously sentenced for stealing drugs

1    were Heriberto Diaz and Omar Salazar.  And it was October of

2    2009 that they were involved in that incident in Mission.  So I

3    don't need you to provide that information to the Court.  I

4    can't tell whether it was related or not.  The timing, October

5    2009, if you need that.

6           All right.  So I'm going to take a ten-minute recess.

7    Do you all need to address anything in the interim?

8           **MS. GUTIERREZ:**  No, your Honor.  But did you say

9    Umberto or Heriberto?

10          **THE COURT:**  Heriberto Diaz was sentenced to almost

11    eleven years in prison for his role in the theft of 355 pounds

12    of marijuana from a Mission home, along with investigator Omar

13    Salazar, who received a lesser sentence.  I don't know what his

14    sentence was.  The case number is 11CR1088 is Mr. Diaz's.  His

15    actually went to trial.  Omar Salazar for some reason was

16    separately indicted under 11CR15.  And Mr. Salazar testified in

17    the trial against his colleague, Investigator Diaz, and as a

18    consequence received a lesser sentence.

19           All right.  Anything else?

20          **MS. GUTIERREZ:**  No.

21          **THE COURT:**  We'll be in recess then for ten minutes.

22          **THE CLERK:**  All rise.

23      **(A recess was taken from 10:18 a.m. to 10:35 a.m.; parties**

24    **present; jurors present)**

25    *//*

Flores - Cross / By Ms. Gutierrez                64

1        **(Jurors enter courtroom at 10:35 a.m.)**

2                **THE CLERK:**  All rise.

3                **THE COURT:**  All right.  Good morning again.  Please

4    be seated.

5                All right.  Ms. Gutierrez, you may resume your

6    examination.

7                **MS. GUTIERREZ:**  Thank you.

8                        **CROSS EXAMINATION (RESUMED)**

9    **BY MS. GUTIERREZ:**

10   Q    Okay.  I started asking you about Julio Davila, and you

11   testified that you went to school together, correct?

12   A    Yes, that's correct.

13   Q    And Julio Davila was an individual who was in your benefit

14   to associate with because he was a sponsor for the sheriff,

15   correct?

16   A    Yes, he was.  He was a contributor.  He was a go-to person

17   if we needed to get any donations from other individuals.

18   Q    He knew a lot of other people who could then donate,

19   correct?

20   A    Yes.

21   Q    And, of course, that was something you were interested in,

22   because that's something that the sheriff and Padilla were

23   interested in, correct?

24   A    Yes, that's correct.

25   Q    And did -- the sheriff and Padilla were aware of the

Flores - Cross / By Ms. Gutierrez                    65

1    individuals that were substantial contributors, weren't they?

2    A    Yes, they were.

3    Q    They knew who was contributing what, correct?

4    A    Yes.

5    Q    I want to ask you about this incident, if you recall,

6    where a deputy by the name of Noe Canales couldn't sell his

7    tickets, so he had to go out and get a loan.

8         Do you recall that?

9    A    Yes, well, he had a bunch of hundred dollar tickets, and

10   he was told, "You either sell them or don't return them."  And

11   he actually took out a loan to be able to pay those tickets so

12   he wouldn't look bad.

13   Q    And there was one incident where you and Jorge Garza were

14   stuck with about a hundred tickets, each $100, that you guys

15   had to scramble to sell, correct?

16   A    Yes, at one point I was given a hundred tickets to give

17   out, like, they said my contacts within the sheriff's office,

18   and people from the outside.  And it was hard to try to sell

19   those hundred dollar tickets, a hundred tickets at a hundred

20   dollars apiece.

21   Q    That's $10,000, right?

22   A    Yes, that's correct.

23   Q    And there was one incident where Mr. Garza had seven

24   tickets left over and he had to pay $700 out of his own pocket

25   to make, to pay for those tickets, correct?

Flores - Cross / By Ms. Gutierrez                    66

1    A    Yes, that's correct.

2              THE COURT:  This Mr. Garza?

3              MS. GUTIERREZ:  Yes.

4              THE COURT:  Yes.

5              THE WITNESS:  Yes, yes.  Yes, your Honor.

6    BY MS. GUTIERREZ:

7    Q    With respect to -- I had asked you earlier about how you

8    asked Mr. Garza for favors with respect to participating in

9    deejaying or be master of ceremonies in different fundraisers.

10             You did that because you had knowledge, through your

11   friendship with him, that he, outside of the Hidalgo County

12   Sheriff's Office, he did this for different churches and

13   fundraisers, and -- like the Rio Grande Valley Council, right?

14   A    Yes, that's correct.

15   Q    And so you knew that he was familiar with doing those

16   things and he enjoyed doing those things, so that's why you

17   asked him to participate in that capacity with the county,

18   correct?

19   A    Yes.

20   Q    And he was good at it, right?

21   A    He was very good at it.

22   Q    In some occasions, he was an auctioneer, right, even, for

23   some of these functions?

24   A    Yes, some of those functions, he was an auctioneer.  He

25   was an auctioneer for the sheriff's office when they would have

Flores - Cross / By Ms. Gutierrez                    67

1   their auctions at the courthouse front door.

2   Q    Oh, but that was work related?

3   A    Work related, yes.

4   Q    Okay.  And isn't it also true that there was a system

5   where you could play with your schedule so that you would have

6   comp time in order to do some of the campaigning for the

7   sheriff and get paid for it, correct?

8   A    Yes, that's correct.

9   Q    How would that work?

10  A    We would have -- well, usually if we had a presentation in

11  the afternoon, we would get -- we would come in late to get out

12  late, so we wouldn't get compensated.

13            We weren't allowed to earn comp time.

14            In the bureau under Joe Padilla, he wanted all his

15  books with me and our boys to have zero comp time.  That's what

16  was asked by the sheriff, and he was probably the only one that

17  kept that at zero.

18            For the campaign, we just accumulated comp time.

19            **THE COURT:**  Well, I'm not following that.  "For the

20  campaign, we accumulated comp time."

21            **THE WITNESS:**  During the campaign, that was the only

22  time we were allowed to accumulate our comp time.

23            **THE COURT:**  All right.  So before that is when you

24  had zero comp time?

25            **THE WITNESS:**  Zero.

Flores - Cross / By Ms. Gutierrez                    68

1          **THE COURT:**  And then when the sheriff was running for

2    reelection, Padilla would permit you to accumulate comp time?

3          **THE WITNESS:**  Right.

4          **THE COURT:**  And the purpose of that is?

5          **THE WITNESS:**  To be able to assist in the fund -- in

6    the polls, the political polls.

7          **THE COURT:**  But comp time is paid?  It's paid leave,

8    correct?

9          **THE WITNESS:**  Yes, it's --

10         **THE COURT:**  Your --

11         **THE WITNESS:**  Comp time, in our work, comp time was,

12   we would -- not paid leave, correct.  It was we would take time

13   off and not get our vacation time.

14         **THE COURT:**  All right.  So in working ten hours one

15   day, you would the next day work six on the clock so that the

16   other two hours, you would have to campaign?  Is that how it

17   would work if you had a typical eight-hour day?

18         **THE WITNESS:**  Yes.

19         **THE COURT:**  Okay.

20   **BY MS. GUTIERREZ:**

21   Q    And so what that means, really, is that the county was

22   paying the deputies, or the employees of the sheriff's

23   department to campaign for the sheriff, correct?

24   A    Well, we were -- we would take our comp time.  If I came

25   into work, if I worked 12 hours today, tomorrow I would do, on

Flores - Cross / By Ms. Gutierrez                              69

1    those four extra hours, I would campaign and then come to work,

2    or, you know, have four hours of campaign, and then work four

3    hours.

4              I would -- I was taking off my four hours.

5              **THE COURT:**  All right.  So it was during your

6    vacation or comp time that you were campaigning?

7              **THE WITNESS:**  Yes.

8              **THE COURT:**  So you were off the clock?  You had just

9    sort of earned those extra hours by working overtime the day

10   before?

11             **THE WITNESS:**  That's correct.

12             **THE COURT:**  I understand.

13   **BY MS. GUTIERREZ:**

14   Q    Well, doesn't it -- isn't it accurate that what you were

15   doing was volunteering your vacation time to -- not

16   volunteering it, because you were kind of asked to do it.  You

17   couldn't say no.

18             But you were using your own time that you had with

19   the county to do county business that -- well, not county

20   business, but campaigning?

21   A    Our comp time hours, yes.

22   Q    Okay.

23   A    For example, I would come in to work, if my schedule was

24   working 8:00 to 5:00, I would come in to work at 6:00 and not

25   take a lunch hour.

Flores - Cross / By Ms. Gutierrez                    70

1    Q    Okay.

2    A    So that would add a few hours --

3    Q    Three hours.

4    A    Three hours to my books.  At a later time, I would take

5    that time, that comp time was only allowed to be taken for our,

6    to do campaign.

7    Q    Okay.  So you were generating time that you then could

8    later use for sheriff, the sheriff's campaigning?

9    A    That's correct.

10   Q    Okay.  You couldn't use that time to go to the Bahamas?

11   A    No.

12   Q    Okay.  It was for the purpose of the sheriff's campaign?

13   A    It was the purpose -- right.  What we were told by

14   Commander Padilla is, "Vacation is your time.  You can take

15   vacation when you want.  Sick leave, of course, it's your time.

16   And after three days, you need a doctor's excuse.  Comp time is

17   my time.  I tell you when to use it."

18   Q    So he would tell you how and when to use your comp time?

19   A    Right.

20   Q    Okay.  And this also falls under those things that

21   deputies could not say no to, correct?

22   A    That's correct.

23        **THE COURT:**  So you would be specifically told, for

24   example, "You're going to work this poll at this location

25   during your comp time"?

1          THE WITNESS:  Yes.

2          THE COURT:  Was it that specific?  And were you told,

3    "I need you to earn some comp time, because we need you for

4    four hours in one afternoon at a poll," for example?

5          THE WITNESS:  Right.  In other words, during early

6    voting -- it's two weeks usually, the early voting.  We needed

7    to earn 80 hours to be able to work two weeks on the early

8    voting polls.

9          THE COURT:  All right.

10         MS. GUTIERREZ:  Okay.

11   BY MS. GUTIERREZ:

12   Q    And this isn't something that you all wanted to do?  I

13   mean, you had other things that you could have been doing with

14   your time instead of polling for the sheriff, correct?

15   A    Yes, that's correct.  It was -- some of us wanted to do

16   it.  Some were, felt they were obligated and felt that if they

17   didn't do it, it will -- consequences could happen.

18   Q    And this was basically the environment that the sheriff

19   and Padilla perpetuated within the department, which kept

20   people pretty much in check, under control, correct?

21   A    Yes.

22   Q    So that their objectives could be met, correct?

23   A    Right.

24   Q    And so to the -- to that end, anyone within the county who

25   was in a power of position pretty much had to fall in line with

Flores - Cross / By Ms. Gutierrez                    72

1  the objectives of the higher-ups, correct?

2  A    Yes, that's correct.

3  Q    Because if you didn't, you would be at odds with them, and

4  that could cause problems for you?

5  A    Yes.

6  Q    So, now, this is where Julio Davila became a person who

7  could benefit you in terms of how your, how Padilla and Sheriff

8  Trevino looked at you, because you were bringing in some

9  donations, correct?

10 A    Yes.

11 Q    You testified that you went to high school with Davila,

12 but did you maintain a contact, a friendship all throughout

13 high school up until this point?

14 A    No.

15 Q    So you lost contact at some --

16 A    We lost contact at one point.  We started getting close

17 together and being better friends.

18 Q    Okay.  When did you reconnect?

19 A    The year, I don't recall.  But it was after -- pretty much

20 after 2005.

21 Q    After 2005?

22 A    Yes, ma'am.

23 Q    And when you met him, was Davila already contributing to

24 Sheriff Trevino, or did he start contributing through you?

25 A    He started contributing through me.

Flores - Cross / By Ms. Gutierrez                    73

1   Q    Okay.  So how is it that you reconnected?  Facebook?

2   A    No, no.  We just -- I guess I would see him at a party or

3   something and we started connecting, and our relationship grew

4   stronger.  But it was definitely after 2005, because it -- I

5   never recall him donating anything to Henry Escalon prior to

6   the, Sheriff Lupe Trevino being there.

7   Q    Okay.  Do you know if Davila, if Julio Davila had any

8   independent relationship with the sheriff before you

9   reconnected with him?

10  A    No.

11  Q    Okay.

12  A    We started using Julio Davila in -- when the sheriff came

13  on, we -- he wanted to do community projects in the pan de

14  campo cook-offs.  So we started using Julio Davila as a

15  contributor for buying the fajitas and the meats, because

16  nothing was provided.  We had to purchase everything ourselves

17  to be able to be out there with the community.  We had to go

18  out there and get contacts and get donations from people to be

19  able to have these cook-offs.

20       And we would set up as the sheriff's office, but be

21  able to provide chicken, barbeque chicken, and just have a

22  community orientation with the community out there.

23       But this is when we started using Julio Davila and

24  his brother, Arnold Davila.

25  Q    Okay.  So what you're saying is that you would have a,

Flores - Cross / By Ms. Gutierrez                          74

1   like, a public service-type of event --

2   A    Right.

3   Q    -- for people to come and you could interact with them,

4   and talk to them about, what, safety?

5   A    Any questions they might have.  It was just so they could

6   come in and feel comfortable with the sheriff's office and, you

7   know, us deputies, and just get involved with the community.

8   Q    Okay.  And within that event, you provided food and drinks

9   for the people?  I'm not talking alcoholic beverages.  I'm just

10  saying some --

11  A    Right, it was food, fajitas, chicken, sausage.  We would

12  have somebody cooking beans, and, of course, soft drinks and

13  water.

14  Q    Were you all, as deputies, ever required to provide some

15  of these items, like the food or the drinks?

16  A    Yes, we were.

17  Q    Out of your own pocket?

18  A    They would ask us to go out and get donations, but, you

19  know, you can only go to a well a certain, you know, certain

20  part of the time.

21       So at some points, it was hard.  So for us not to

22  just, you know, hear about it, we would just purchase it from

23  our own pockets.

24  Q    And when you say "hear about it," you're talking about so

25  you wouldn't get in trouble?

Flores - Cross / By Ms. Gutierrez                    75

1    A    That's correct.

2    Q    Okay.  And these events, it wasn't like it was one event a

3    year.  There was several events in the year, and that's why you

4    would exhaust -- like, let's say one person would contribute

5    one time.  You couldn't go to that person four times in a year,

6    because it's kind of excessive, right?

7    A    Right, it was about four to five times a year that we

8    would have these events.

9    Q    And then when political season would come in, or when the

10   sheriff was running for reelection, it probably shot up to even

11   more times than that, right?

12   A    That's correct.

13   Q    And the sheriff himself never put in any of his own money

14   for these events, did he?

15   A    No.

16   Q    So you talked about Julio Davila being that person who was

17   able to provide this, these contributions, the food, the

18   drinks.  That -- Julio Davila did that with the expectation of

19   receiving something in return; isn't that correct?

20   A    Yes, I believe so.

21   Q    Okay.  Unfortunately, in the political nature, no one

22   really does something for nothing, correct?

23   A    Right.

24   Q    Okay.

25   A    And that's the -- from there is when I started developing

Flores - Cross / By Ms. Gutierrez                          76

1   other contacts, and that's where I met Mr. Guerra, Sr., and

2   asking for the same thing.  And that's where the favors start

3   coming along.

4   Q    Okay.  The -- before we get there, Julio Davila was very

5   involved in the political system with, of Hidalgo County; isn't

6   that correct?

7   A    Yes, it is correct.

8   Q    So he had a lot of connections with political people who

9   had money, correct?

10  A    Yes.

11  Q    Okay.  And so -- and that's how you mean that you were

12  then able to make other connections through Julio Davila of

13  people who could contribute to the sheriff's office, correct?

14  A    That's correct.

15  Q    And then he was also familiar with people who may not have

16  been political, but had money, correct?

17  A    Yes.

18  Q    And that's where the Guerras fit in, right?

19  A    Yes.

20  Q    Okay.  Because you're not -- the Guerras weren't political

21  in any way other than donating for their own purposes, correct?

22  A    Right, I felt they were political, because they would

23  donate in whatever we asked for our, for politics.  If we

24  needed chicken, fajitas -- at one point, I was calling him

25  directly and asking him for chicken, fajitas, drinks, or he

Flores - Cross / By Ms. Gutierrez                    77

1  would help us buy some of these fundraiser tickets.

2  Q    Okay.  But what I mean -- what I mean when I say that the

3  Guerras weren't political, I'm just simply saying you didn't

4  know the Guerras to be commissioners, or running for any type

5  of office, or even supporting anyone else that was running for

6  office, correct?

7  A    That's correct.  Yes.

8  Q    Okay.  Let's talk about at what point -- you say that you

9  met Davila -- or you reconnected with Davila in 2005, when

10 Sheriff Lupe Trevino was already in office, right?

11 A    Right.

12 Q    And so from 2005, how long after -- well, how long after

13 you reconnected did Julio Davila begin to sponsor events or

14 contribute to Sheriff Trevino's campaign?

15 A    It was -- once I connected with him, it was right away.

16 Q    Okay.

17 A    And that probably was the reason I connected with him.

18 Q    Okay.  So you had a motive to some extent in reconnecting

19 with Davila, correct?

20 A    Of course, yes.

21 Q    At that time, Davila was an individual who seemed to do,

22 to be doing financially well, correct?

23 A    Yes.

24 Q    And so he was an individual that, to you, had the means to

25 accomplish what you wanted to in terms of getting contributions

Flores - Cross / By Ms. Gutierrez                    78

1    for the county?

2    A    Right.  That's correct.

3    Q    And he was willing to do that, too, right?  I mean, you

4    didn't take advantage of him.  He was willing to contribute?

5    A    Yeah, he would offer himself willing to, you know, buy

6    whatever he needed.  He would actually ask, "What do you need?

7    I'll take care of everything."

8    Q    And let me ask you this.  What did he ask you in return?

9    A    At one point, at some points, he started asking me, "Oh,

10   hey, can you run this license plate for me?"

11   Q    Okay.  And you did that -- you agreed to do that, correct?

12   A    Yes.

13   Q    And you did that as a favor in exchange for the fact that

14   he was a contributor, correct?

15   A    Right.

16   Q    You didn't ask for any money initially, correct?

17   A    No, I never asked for any money.

18   Q    Okay.  So you never got paid by Julio Davila for running

19   any plates?

20   A    At the beginning, I never got paid for -- it was a favor.

21   And as it started progressing, he was like, "Oh, here's some

22   money for the plate you ran."

23   Q    So it wasn't something that you asked.  It was just

24   something that he gave you --

25   A    Right, for doing that favor for him.

Flores - Cross / By Ms. Gutierrez                    79

1   Q    And so in reality what was going on is that he was a

2   contributor to the county and, in exchange for that --

3            **THE COURT:**  Not to the county.  Please be --

4            **MS. GUTIERREZ:**  I'm sorry.

5            **THE COURT:**  -- correct.

6   **BY MS. GUTIERREZ:**

7   Q    To the Hidalgo County Sheriff's Office --

8   A    Campaign.  Or --

9   Q    Well, the sheriff's campaign.  And in exchange for that,

10  he was able to approach you to use your, well, the county's

11  services in running registrations; and then paid you for that

12  service, correct?

13  A    Yes, what is -- happened is I, we -- I felt that, you

14  know, he was helping us, I was using him; but, in all reality,

15  he was using us also for his gain.

16  Q    Okay.  And that's the classic scratch my back and I'll

17  scratch yours, something like that, but that saying?

18  A    It could be.

19  Q    How long would you say that it took from the time that

20  Julio Davila became a sponsor, or was contributing to Sheriff

21  Trevino's campaign, to when you first, when he first asked you

22  to run a plate for you -- for him?

23  A    I don't recall the time.

24  Q    Would you say that it happened as quickly as he became a

25  sponsor?

Flores - Cross / By Ms. Gutierrez                    80

1   A    No, I wouldn't say that.

2   Q    Some time passed?

3   A    Yes.

4   Q    And he was a sponsor for certain events, and then he

5   approached you with requests, the request to run a plate,

6   correct?

7   A    That's correct.

8   Q    Would you say a year passed, more than that?

9   A    I wouldn't.  I don't know.

10  Q    Okay.  And when he asked you -- when he initially asked

11  you to run a plate for him, because of your relationship with

12  him, you didn't really question him.  You just said, "Okay,

13  I'll do it," correct?

14  A    Right.

15  Q    And it didn't take much for you to just run a plate,

16  right?  I mean, it didn't take a lot of work for you?

17  A    No.

18  Q    And as a matter of fact, it didn't take much time also,

19  correct?

20  A    That's correct.

21  Q    And did you run that by Commander Padilla and get an okay

22  to do that?

23  A    No, I didn't.

24  Q    So there were some things that you could make, could make

25  your own decisions about; is that correct?

Flores - Cross / By Ms. Gutierrez                                    81

1    A    Right, that's correct.

2    Q    Could you tell me how much time passed from when -- how

3    much time you were running plates for Julio Davila before you

4    met the Guerras?

5    A    No, I met the Guerras about, approximately three years

6    ago.  So, which is -- that's 2010.

7    Q    Do you know -- could you give me a time period in 2010?

8    Was it the beginning, summer, late 2010?

9    A    It was probably mid-2010.  I don't recall the exact time.

10   Q    Okay.  And wasn't 2010 when Sheriff Trevino ran his

11   reelection campaign?

12   A    I believe so.

13   Q    Okay.  And so were -- had the sheriff already been

14   reelected, or were you still campaigning and that's how he was

15   able to contribute?  How did that, you -- did that help?

16   A    It was prior to him -- it was while he was campaigning for

17   that.

18   Q    And so you were able to utilize the Guerras for that 2010

19   campaign as sponsors or campaign contributors, correct?

20   A    Yes.

21   Q    Okay.  How is it that you met the Guerras?

22   A    I met the Guerras through Julio Davila.

23   Q    Okay.  And how is it that you met them?

24   A    During this campaign.  We actually would go -- Julio and I

25   would go to the Guerras' business and ask for contributions.

Flores - Cross / By Ms. Gutierrez                    82

1    And he was always willing to give to the campaign, to the

2    sheriff's campaign and whatever we needed.

3            So that, to me, was another contact that I developed

4    besides Julio Davila.

5    Q    So now it's Julio Davila, through his contact, allowed you

6    to now have two sponsors, or two contributors versus just Julio

7    Davila?

8    A    Right, but most of the time I would go through Julio

9    Davila.  I wouldn't go directly to Fernando Guerra, Sr.

10   Q    Well, right.  But that was the objective that, to some

11   extent, you were -- your hopes were that eventually you would

12   have several Julio Davilas who would be able to contribute,

13   correct?

14   A    That's correct.  Yes.

15   Q    Okay.  And at some point you were able to get different

16   people to --

17   A    Yes.

18   Q    -- contribute?  Okay.  And when you say that you went to

19   the Guerras, you're talking about the Astro Transport, or

20   Trucking?

21   A    Yes.

22   Q    Tell me about the time that you first were introduced to

23   the Guerras.  Where were you?

24   A    There, in their business.

25   Q    Okay.  So you were taken to their business?

Flores - Cross / By Ms. Gutierrez                    83

1   A     Yes.

2   Q     Oh, okay.  And Julio Davila is the person who took you?

3   A     Yes.

4   Q     And so he did the introductions there?

5   A     Right.

6   Q     And when you were introduced to the Guerras, what were you

7   introduced as, an employee of the Hidalgo County Sheriff's

8   Office, or, "This is just a buddy of mine"?

9   A     No, he would introduce me as, that I worked there at the

10  sheriff's office, and that whatever he needed, he would go

11  through me to get whatever he needed.

12  Q     Who would go through who?  That --

13  A     That --

14  Q     -- Guerra would go through you?

15  A     That Guerra could -- whatever he needed, he could go

16  through me to be able to get what he needed.

17        He would always tell people, Julio Davila would

18  always tell people, "He's the sheriff's right-hand man.  And,

19  you know, he's the commander's right-hand man."

20  Q     Okay.  And so what was happening is that, with this

21  introduction by Julio Davila, you were being hooked up with a

22  sponsor for the sheriff's campaign; but, at the same time,

23  Guerra was being hooked up with a connect at the Hidalgo County

24  Sheriff's Office; is that right?

25  A     Right.  Julio Davila would say that, you know, again, that

Flores - Cross / By Ms. Gutierrez                    84

1   I was the right-hand man, and, you know, he would boost a lot,

2   you know, even that it wasn't true; but they didn't know that.

3   Q    He would say you were the sheriff's right-hand man or --

4   A    The --

5   Q    -- Padilla's right-hand man?

6   A    Both.  Either --

7   Q    Both.

8   A    -- the sheriff's or Padilla's.

9   Q    And he would say that because you told him?

10  A    No, he would just say that.  He would just say that and I

11  would in turn tell them, "No, no.  I just work there.  I'm not

12  his right-hand man."  But he would try to boost about that;

13  that I had a lot of connections there at the sheriff's office.

14  Q    Well, I mean, and that part of it was true, right?

15  A    Well, connections being that I had been there for a long

16  time, but not that I was their right-hand man.

17  Q    Right.  But to some extent, you were close with Padilla?

18  A    Yes.  Yes.

19  Q    Okay.  Within your, the -- being in charge of Crime

20  Stoppers, through this authority that was given to you because

21  Padilla, you were Padilla's go-to person to give his directions

22  and instructions, you had access to pretty much all the

23  deputies there at the Hidalgo County Sheriff's Office, right?

24  A    Yes.

25  Q    And you probably -- and you had also access to the entire

Flores - Cross / By Ms. Gutierrez                    85

1   department; isn't that correct?

2   A    Mostly everything in the criminal enforcement part.

3   Q    In criminal enforcement, okay.  And did -- criminal

4   enforcement included the patrol --

5   A    Criminal enforcement and the special services were, that's

6   where we're at.

7   Q    Oh, special --

8   A    Yeah.

9   Q    So you had access to patrol units as well, correct?

10  A    No, I didn't have access to --

11  Q    Okay.  But you had access to deputies who had patrol

12  units, correct?

13  A    No, I don't know what you're trying to say.

14  Q    Okay.  Well, I asked you, you had access to deputies in

15  terms of doing the things that needed to get done, correct?

16  A    Oh, yes, ma'am.  Yes.

17  Q    Okay.  And within that, you also had access to patrol

18  units in getting the things that you needed to get done,

19  correct?

20  A    Right, I would have to ask -- I couldn't just go into the

21  captain or the lieutenant's office and just getting a key.  I

22  still would have to ask permission to be able to use a unit.

23       If I needed to use a unit, or anybody needed to use a

24  unit, I would have to ask permission that, "Commander Padilla,

25  you know, told me to ask you that I needed the unit."

Flores - Cross / By Ms. Gutierrez                              86

1            I couldn't just go in there and grab it.

2   Q    Well, right.  But when you say that you needed to get

3   permission, it was just more -- it was just pretty much to go

4   through the protocol?

5   A    Right.

6   Q    They never told you no, correct?

7   A    Yes, sometimes they did say no, that we didn't have --

8   they didn't have enough units to go to another -- patrol would

9   tell me, "We don't have enough, we don't have spare units, so

10  use civil warrants' units.

11  Q    Okay.  So maybe they would say no, but they --

12  A    They would --

13  Q    -- would direct you somewhere --

14  A    Right.

15  Q    -- else?

16  A    Right.

17  Q    Okay.  So pretty much whenever you needed it, it was

18  available to you?

19  A    Yes.  Yes, ma'am.

20  Q    Okay.  When you first met the Guerras, was that the first

21  time they contributed to Lupe Trevino's campaign?

22  A    Yes, ma'am.

23  Q    Okay.  So then from the first meeting, when Julio Davila

24  took you out there, you left Astro Trucking with some money in

25  your hands from the Davilas, or --

Flores - Cross / By Ms. Gutierrez                    87

1   A    No, no.  Not that -- that was the first time -- when I met

2   them, I didn't meet them and get a contribution right there and

3   then.

4   Q    Okay.

5   A    That was a later time.

6   Q    Okay.

7   A    That was just a meet, get to know them, and then, you

8   know, that's when I started asking for stuff.

9   Q    At your first meeting, did you exchange phone numbers?

10  A    Yes.

11  Q    Okay.  So the contact itself, the connection, the link was

12  definitively established at the first meeting, correct?

13  A    Right.

14  Q    Okay.  So from that point on, you could contact Guerra if

15  you wanted to, and Guerra could contact you if he wanted to;

16  however, you went through Davila?

17  A    That's correct.

18  Q    Okay.  And you went through Davila for the reason that

19  Davila is the one that introduced you; is that right?

20  A    That's right.

21  Q    Okay.  So tell me about the first time that the Guerras

22  contributed to Lupe Trevino.  How did that come about?

23  A    The first time, it was through some of these cook-offs

24  that we had.  Nandy, of course, would ask them to donate some

25  stuff.

Flores - Cross / By Ms. Gutierrez                88

1  Q    And for clarification purposes, "Nandy" is Julio Davila?

2  A    I'm sorry, is Julio --

3  Q    And that's --

4  A    -- Davila.

5  Q    And that's okay, but you might --

6  A    Every -- we knew him as "Nandy," but that's Julio Davila.

7  Q    So "Nandy" is a nickname that is --

8  A    For -- yes.

9  Q    -- for Julio Davila?  Okay.  Okay.  I'm sorry.  Go ahead.

10 Continue.

11 A    So he would ask them to also contribute, and ask them --

12 they need so many fajitas or three boxes of chicken, and that's

13 when Fernando Guerra would donate it.

14 Q    Would it be fair to say that, at the time -- at that

15 point, since prior to that, Julio Davila was the one that was

16 contributing, when the Guerras came into the picture, Julio

17 Davila was not the one that was contributing, but he was now

18 using the Guerras' contribution?

19 A    He was using other contacts.

20 Q    Okay.

21 A    The Guerras, and maybe among others.

22 Q    Okay.  Okay.  So what you're saying is that when Julio

23 Davila would contribute, you didn't really know where the money

24 was coming from?

25 A    No.

Flores - Cross / By Ms. Gutierrez                    89

1   Q     Okay.

2   A     Sometimes we would and sometimes we wouldn't.  He would

3   say, "Oh, I called Fernando and asked him for the" -- that's

4   why I know on this particular case.

5   Q     Okay.  And that information was relayed back to Padilla

6   and Sheriff Trevino, correct?

7   A     To Commander -- to Joe Padilla.

8   Q     Okay.  And so when Julio Davila would contribute money, at

9   the very least, Joe Padilla was aware of who it was that was

10  contributing the money, correct?

11  A     Yeah, definitely on that, he was.

12  Q     Okay.  And when the Guerras contributed money, at the very

13  least, Joe Padilla was aware of that it was the Guerras that

14  were contributing the money, correct?

15  A     Yes.

16  Q     And Lupe Trevino would also know, correct?

17  A     As per Joe Padilla, yes, he would.

18  Q     Okay.  And so the Guerras started contributing to Lupe

19  Trevino's reelection campaign by donating, what, money or

20  actual products like chicken, and fajitas, and stuff?

21  A     Both.  At a particular point, it was Joe Padilla, meaning

22  that Fernando Guerra, Sr., was a contact, or Julio Davila's

23  contact.  That's when he asked me, "Go directly to him and get

24  donations," which I was asked to go to and get whatever

25  donations that I could from them.

Flores - Cross / By Ms. Gutierrez                          90

1    Q    Okay.  So at this point, you were directly instructed by

2    Padilla to go to the Guerras and seek --

3    A    Right.

4    Q    -- some sort of financial --

5    A    He would say --

6    Q    -- contribution?

7    A    -- "Go to your contact," meaning the Guerras, because he

8    would say, "Go to your contact there on 2812 and see what

9    donation you could get from him."

10   Q    And this was in anticipation of some event or it was just

11   to start collecting money for the reelection campaigns?

12   A    Well, it was actually both.  Not at the same time --

13   Q    Uh-huh.

14   A    -- but there was events, and probably events took place

15   first.  He would ask me, "See whatever you can get from him,

16   chicken or fajitas.  And see what you can get from Julio."

17        And it was the more, the better, basically.

18   Q    Right.

19   A    And after that, it was for any type of political campaign

20   for the sheriff.

21        At one point, you know, he asked me, "Ask him for, go

22   ask your contact at 2812" -- he was referred to as "2812," and

23   I'm talking about Fernando, Sr. -- "Go to 2812 and get a

24   contribution for the sheriff.  He needs" -- this is prior for,

25   prior to him running.  He wanted to, I guess, get some money,

1    getting prepared for his campaign.  "Go ask, go get some

2    donations -- go get a donation from him.  See how much we can

3    get.  And try to get it cash."

4    Q    Would he indicate to you how much money he would like?

5    A    He always wanted anything over a thousand dollars.

6    Q    Okay.  Isn't it true that, on one occasion, Guerra, Sr.,

7    gave you $40,000 to give to Padilla for Lupe Trevino's

8    reelection campaign?

9    A    How much was that?

10   Q    Forty thousand dollars?

11   A    No, that's not true.

12   Q    Okay.  Isn't it true that there was -- there was one time

13   that you delivered from Guerra, Sr., $40,000 to Joe Padilla

14   that both Velma and Orlando Cantu counted to make sure that it

15   was $40,000?

16   A    No, that's not true.

17   Q    Okay.

18          **THE COURT:**  Was it a similar amount?  I mean, is it

19   the amount that you don't remember, or this whole --

20          **THE WITNESS:**  No.

21          **THE COURT:**  -- event you don't remember?

22          **THE WITNESS:**  No, that amount never existed.  The

23   most I got from Fernando, Sr., in cash was a thousand dollars

24   at a time.  And a check, he also contributed one time on a

25   check from Master Trucking for a thousand dollars.

Flores - Cross / By Ms. Gutierrez                    92

1          But nothing ever went over $2,000 at one particular

2    time.

3    **BY MS. GUTIERREZ:**

4    Q    Okay.  Isn't it true that you approached Guerra, Sr., at

5    -- and I'm not sure if you directly contacted Junior, or it was

6    through Guerra, but because you needed a contribution for

7    Sheriff Trevino because he needed a boat?

8    A    Yes, Joe Padilla informed me to get ahold of my contacts,

9    and he informed me and others there at the sheriff's office,

10   which is Orly Cantu, Fabian Rodriguez, "Make contact with your

11   contacts out there.  The sheriff is going to buy a boat.  And

12   we need to make a -- ask them if they can make a donation to

13   purchase his boat."

14          And he told us, you know, "The sheriff just wanted me

15   to tell you, tell you all, just the ones that are the main

16   contributors, but this is going to be for the boat.  Don't tell

17   anybody else, but go out there and try to get money for the

18   boat."

19          So I went and contacted Fernando Guerra, Sr., and at

20   that time he gave me a thousand dollars cash to give to Joe

21   Padilla.

22   Q    And that was all he gave you?

23   A    That was all he gave me for the boat.  Yes, ma'am.

24   Q    Didn't his son, Junior, also contribute to that boat?

25   A    No, ma'am.

Flores - Cross / By Ms. Gutierrez                          93

1  Q    Okay.  So you never received $5,000 from Fernando Guerra,

2  Jr., for that boat?

3  A    No.

4  Q    Did you help the sheriff buy his boat?

5  A    No, the only way I helped him is trying to get monies from

6  our contacts.

7  Q    Did the sheriff ever buy a, that boat he wanted?

8  A    Yes, he did.

9  Q    He did.  So you guys were successful in getting the money

10 he needed for that boat, correct?

11 A    As far as we know, yes.  We gave that money to Joe

12 Padilla, and it -- Joe Padilla gave -- I saw an envelope that

13 said "boat," and the money was kept by Velma Martinez on, who

14 was contributing.  He wanted to make sure who helped, so he

15 could tell the sheriff, "These are the people that are

16 helping."

17          THE COURT:  How much total cash did you raise for the

18 purchase of the sheriff's boat?

19          THE WITNESS:  Myself --

20          THE COURT:  Just --

21          THE WITNESS:  -- your Honor, it was a thousand

22 dollars.  And --

23          THE COURT:  So you only had one request to

24 Mr. Guerra, and that's --

25          THE WITNESS:  That was it.

1          **THE COURT:**  -- all you raised was a thousand?

2          **THE WITNESS:**  Because I felt that -- I mean, it's

3    hard to go ask -- how can you go ask somebody, "Can I have a

4    thousand dollars to, so the sheriff can buy a boat?"  I

5    couldn't do that.  And I did ask Mr. Guerra.

6          And that was -- I didn't want to ask somebody else.

7    **BY MS. GUTIERREZ:**

8    Q    You didn't ask Julio Davila?

9    A    No, I didn't ask Julio Davila.

10   Q    Why not?

11   A    At that point, Julio Davila wasn't -- I mean, they were,

12   with Joe and Julio Davila, they weren't talking, and I don't

13   think he was talking to the sheriff.  So I didn't even ask -- I

14   didn't even want to ask anybody else.  I asked Fernando,

15   because I just needed to come up with some money to be okay

16   with Joe.

17         Of course, he said, "Whoever doesn't help, I'm going

18   to make sure that the sheriff knows who's helping," and, of

19   course, I wanted them to know that I was helping.

20   Q    And you, in turn, would relay that information to Fernando

21   Guerra, Sr., and you let him know that, "If you contribute, the

22   sheriff will know that you contribute," correct?

23   A    Right.  Right.  That's what we were told, "If you

24   contribute, I mean, the sheriff is going to know that you're

25   contributing.  I'm going to give your information to Joe

Flores - Cross / By Ms. Gutierrez                    95

1   Padilla."

2           And at that time, that's what was done.  I told Joe,

3   "Fernando sent you this for the sheriff, a thousand dollars."

4   Q    And the reason for that, to -- the reason that message was

5   relayed in that way, whether it came from Padilla or you, but

6   eventually to the contributor -- in this case being Guerra, Sr.

7   -- was that Guerra had an expectation of favors from the

8   sheriff, correct?

9   A    Yes, I would assume that yes.  I mean, it's back to

10  helping out, scratch my back, I scratch yours.  Helping out,

11  the contributions, that's how it started.  That's where all

12  this, Julio and Fernando Guerra started favors, why they were

13  contributing.  And, of course, we wanted more.  And they

14  started asking for a little bit more favors.

15          Then from that, it went to illegal activity.

16  Q    That, when you say, "They started asking for more favors,"

17  you're talking about the Guerra, Sr.?

18  A    The Guerra, Sr. --

19  Q    I mean Guerra, the Guerras?

20  A    The Guerras and Julio Davila.

21  Q    And Julio Davila.  And, generally, that's the way it

22  happens, right?  On the one side, you've got the sheriff and

23  Padilla, who increasingly want more, and more, and more; and on

24  the other end, you've got the Guerras, or the contributors,

25  who, in exchange for what they're giving, will also want more

Flores - Cross / By Ms. Gutierrez                    96

1   and more of what they want, correct?

2   A    Right.

3   Q    Okay.

4   A    It's like we're, they're -- we're using them for a

5   contribution, but, in return, they're using us for other stuff.

6   Q    Well, I mean --

7   A    Other favors.

8   Q    If we wanted to put it in market terms, you're basically

9   selling your services and so are they, correct?

10  A    I guess so.

11  Q    Okay.

12       MR. STURGIS:  Judge, could we approach for a second?

13       (Begin bench conference)

14       MR. STURGIS:  And this has really nothing to do --

15  this is a housekeeping.

16       I don't know what the Court's schedule is as this

17  case is, but is there any way we could off about 11:40 so I can

18  make a --

19       THE COURT:  At --

20       MR. STURGIS:  -- quick run?

21       THE COURT:  -- 11:40?

22       MR. STURGIS:  Yeah, somewhere in that neighborhood so

23  I can make a quick run and --

24       THE COURT:  All right.

25       MR. STURGIS:  -- (indiscernible).

1      **MS. GUTIERREZ:**  So you want a favor, is that what

2  you're talking about?  I'm just kidding.

3          **THE COURT:**  You wanted a 20-minute continuance and --

4          **MR. STURGIS:**  Yeah --

5          **THE COURT:**  -- I wouldn't give her --

6          **MS. GUTIERREZ:**  Yeah, exactly.

7          **THE COURT:**  It's not a problem.  I have a 1:00 -- I

8  have a noon docket and a 1:00 o'clock docket.  But I don't

9  think I'll finish until, like, 1:30.

10          So if I cut out 20 minutes early, it just means an

11  extra-long lunch hour for the jury, because I can't really

12  start any earlier than 1:30, given the Court's docket.

13          **MR. STURGIS:**  It would just (indiscernible).

14          **THE COURT:**  Sure.  No, not a problem.

15          **MS. GUTIERREZ:**  You have to pick up a dollar?

16          **MR. STURGIS:**  A daughter.

17          **MS. GUTIERREZ:**  (Indiscernible).

18          **THE COURT:**  How much (indiscernible), how much is --

19  has he ever seen all the cash that's in there, that's on the

20  desk?  Is that the 40,000 that you think was counted, because

21  that's about what a nice boat costs, if you've ever seen the

22  sheriff's (indiscernible) --

23          **MR. STURGIS:**  I don't, yeah, I don't know.  I've

24  never heard of him collecting $40,000 from anybody to get -- or

25  anything like that.  I don't --

Flores - Cross / By Ms. Gutierrez                98

1        **MS. GUTIERREZ:**  No, because --

2        **THE COURT:**  (Indiscernible).

3        **MR. STURGIS:**  It could be the total.  I don't know.

4        **MS. GUTIERREZ:**  Guerra testified that it was 10,000

5  -- well, he didn't want to go above $10,000.

6        **MR. STURGIS:**  Yeah, he says -- he said the same

7  thing, though.  He said it was always 1,000, 2,000.  Then the

8  total amount, you might --

9        **MS. GUTIERREZ:**  Well, for the boat, though.  For the

10  boat.

11        **MR. STURGIS:**  Right, but if I remember --

12        **MS. GUTIERREZ:**  Guerra said he doesn't --

13        **MR. STURGIS:**  -- his testimony, it was it was always

14  1,000, 2,000.  I never gave 10,000 or anything like that.

15        **MS. GUTIERREZ:**  He said there was three individuals

16  who --

17        **THE COURT:**  The son said 5,000 once --

18        **MS. GUTIERREZ:**  -- and (indiscernible) said there was

19  three of them --

20        **MR. STURGIS:**  This --

21        **MS. GUTIERREZ:**  -- that contributed that money, and

22  he in Spanish said it was (indiscernible), meaning it was a

23  heavy amount.

24        **THE COURT:**  Yeah, right.  He remembers -- I remember

25  him saying that it was a lot --

1          **MR. STURGIS:**  Right, but, and -- but I think if you

2    go back and look at it, the money isn't going from Junior to

3    him.  You got to remember that dad is in the middle, so Junior

4    may have given dad 5,000 --

5          **MS. GUTIERREZ:**  But dad doesn't --

6          **MR. STURGIS:**  -- and dad gets --

7          **MS. GUTIERREZ:**  -- disrespect protocol.

8          **THE COURT:**  No, but I wonder if -- was he skimming

9    some ever?

10         **MR. STURGIS:**  I would imagine, but I don't --

11         **MS. GUTIERREZ:**  Well, that's --

12         **MR. STURGIS:**  -- know (indiscernible).

13         **THE COURT:**  All right.  Let's go back on the record.

14      **(End bench conference)**

15         **THE COURT:**  All right.  You may continue with your

16   examination.

17   **BY MS. GUTIERREZ:**

18   Q    Let me ask you this.  Did you have access to this boat

19   that the sheriff purchased?

20   A    No, I didn't.

21   Q    Well, at the very least I would think that you would have

22   access to it if you assisted in getting the money to help him

23   buy it.

24   A    No, I don't.

25   Q    What would you get in exchange for going out there and

Flores - Cross / By Ms. Gutierrez                    100

1    getting all this money?

2    A    Nothing.  Basically, just being able to have a happy work

3    environment.  You know, have the commander not get on our

4    backs.

5    Q    Was it almost an unspoken duty of yours to go out and get

6    these financial contributions?

7    A    Yes, it was something that I did quite a bit.  I went and

8    got donations, and whatever else that was, you know, needed as

9    from any type of projects.

10        That's, our crime prevention, we started doing, even

11   on the National Night Outs, we had to go get donations to buy

12   the hotdogs, to get the drinks.  Everything was donated.

13   Nothing was bought through the county.

14        On school supplies, we had to buy the school

15   supplies, get donations.  At times, we would use our own money

16   to do this.  There's -- it was hard to get donations so many

17   times.

18        And the National Night Outs, I said, and the, again,

19   pan de campos, it was just hard to just go out there and ask,

20   so we would just pay from our own pockets.

21        But it was mostly going and getting donations.

22   That's what it was.

23   Q    So in some cases, you were out there buying school

24   supplies for your own children, but then also had to buy school

25   supplies for the county to donate some --

Flores - Cross / By Ms. Gutierrez                    101

1    A    Right.

2    Q    -- down the road?

3    A    Right.  You know, even in the turkey drives, we'd go out

4    and get donations to pass out turkeys.  But, you know, it's

5    hard to get the donations from the same people all the time;

6    so, I mean, there was times that we were purchasing turkeys or

7    gift cards to be able to buy turkeys.

8    Q    Excuse me.  How did you end up with this task of going out

9    and getting donations?  Not every deputy was tasked with that,

10   correct?

11   A    That's correct.

12   Q    So how did -- how were you the lucky one?

13   A    Because of the contacts to the community that I had.  Joe

14   knew that I knew a lot of people there in the community.

15        The first time that I sold those hundred dollar

16   tickets, which we talked about, it was -- there was a hundred

17   of them given to me.  So that was a big task to be able to

18   raise $10,000.

19        I didn't do it by myself.  I didn't borrow $10,000,

20   but I had different contacts, including my friends from the

21   office, but I was ultimately in charge of getting back the

22   money.  And we -- I turned in $10,000.

23        The next year, they wanted to do the same thing, and

24   it was harder.  So I started trying to -- the first year, my --

25   I went, I exceeded, so they wanted more.  So I went lower and

Flores - Cross / By Ms. Gutierrez                    102

1   maybe sold 50 the next time around.

2            And, you know, there was the times that I went down

3   to 20.  But it was very hard.

4   Q    And did you have any negative consequences from having

5   gone from a hundred tickets that you sold to the following

6   event, only 50?

7   A    Well, yes.  I mean, they wanted, "No, I know you can do

8   more."  Joe would push.  "I know you can do more.  You can sell

9   more, because you've done it before.  You just need to get your

10  contacts."

11  Q    At that time, did Padilla and Sheriff Trevino know that

12  the Guerras were drug trafficking?

13  A    I'm not sure.

14  Q    Okay.  Because you testified that, at that point with the

15  boat incident, that Julio Davila -- you didn't go to Julio

16  Davila because he was no longer talking to Commander Padilla?

17  A    Right.

18  Q    So at some point, Julio Davila had a direct relationship

19  with both Joe Padilla and Sheriff Trevino, correct?

20  A    That's correct.  Yes.

21  Q    Okay.  Excuse me.  And so it's -- is it possible that,

22  apart from the donations that you got from Julio Davila, that

23  Joe Padilla and the sheriff were also getting, making their own

24  requests of Julio Davila?

25  A    That's possible, yes.

Flores - Cross / By Ms. Gutierrez                    103

1   Q    Because you didn't know -- you weren't privy to

2   communication that existed between Davila and either Padilla or

3   Sheriff Trevino, correct?

4   A    No.

5   Q    At some point Guerra, Sr., also had direct communication

6   with Joe Padilla, correct?

7   A    No.

8   Q    Joe Padilla was aware of who Guerra, Sr., was, correct?

9   A    That's correct.

10  Q    Okay.  And that was through you?

11  A    Through me, yes.

12  Q    Okay.  So then is it fair to say that you were in the

13  middle between Joe Padilla and Sheriff Trevino on one hand and

14  the Guerras?

15  A    I was a between person.

16  Q    Okay.  And so nothing happened if it didn't go through

17  you; is that correct?

18            Well, let me rephrase that.

19            Nothing happened between the Guerras, no

20  communication occurred between the Guerras and Padilla and

21  Sheriff Trevino if it didn't go through you; is that correct?

22  A    That's correct.

23  Q    And nothing happened as far as donations or favors that

24  was, were passed back and forth between the Guerras and Padilla

25  and the sheriff if it didn't go through you; is that correct?

Flores - Cross / By Ms. Gutierrez                              104

1    A    Yes, that's correct.

2    Q    Okay.  Do you know if Joe Padilla and Sheriff Trevino

3    were, already knew the Guerras through Julio Davila?

4    A    No.

5    Q    So as far as you know, you're the reason that Padilla and

6    Sheriff Trevino became aware of the Guerras' existence was

7    through you?

8    A    No, at one point, Julio Davila -- we were eating at a

9    restaurant, or at a, like, a drive-through there in Edinburgh.

10   Fernando Guerra arrived, but didn't get out of his vehicle.

11   That's when Julio Davila introduced Guerra to Joe Padilla.

12   Q    Okay.  Well, tell me who was eating.  Who --

13   A    It was myself and Julio Davila.

14   Q    Okay.  So you and Julio Davila are sitting --

15   A    And -- sorry -- and Joe Padilla.

16   Q    Okay.  So you, Joe Padilla, and Julio Davila, all three of

17   you are sitting at a drive-through restaurant --

18   A    Right.

19   Q    -- eating?

20   A    With tables outside, yes.

21   Q    Okay.  And Guerra, Sr., drives up?

22   A    Right.

23   Q    Was he alone?

24   A    I didn't approach the vehicle.  I don't know.

25   Q    Okay.  So you don't know.  You just know it was Guerra,

Flores - Cross / By Ms. Gutierrez                    105

1    Sr. -- and how do you know that?

2    A    Because he, Julio, said, "Look, there's Fernando is

3    getting here."

4    Q    Okay.  Were you expecting him?

5    A    No.

6    Q    Okay.  So this was new to you?

7    A    Right.

8    Q    Okay.  And so you say that Guerra, Sr., didn't exit his

9    vehicle.  What kind of vehicle was he driving?

10   A    I believe it was a black SUV.  I don't recall.

11   Q    Okay.  And he doesn't get out the SUV?

12   A    Right.

13   Q    What happens next?

14   A    Padilla and Julio approach him.  They introduce each

15   other, say hi, and that was it.  He took off.

16   Q    Okay.  And you witnessed all that?

17   A    Yes.

18   Q    Okay.  And so did you walk over -- I mean, did they walk

19   over to the SUV?

20   A    Yes, they did.

21   Q    Did you walk with them?

22   A    No.

23   Q    Were they at a distance enough were you could see what was

24   going on?

25   A    They were at a distance that I saw that they said hi.

Flores - Cross / By Ms. Gutierrez                    106

1    That was it.  I didn't -- there was no other conversation.  It

2    was just an introduction.

3    Q    Okay.  But from what you could see?

4    A    Yes.

5    Q    You couldn't hear?

6    A    No, I couldn't hear.

7    Q    Okay.  And at this time, you already knew Guerra, Sr.?

8    A    Yes.

9    Q    Okay.  And were -- was he already a contributor at the

10   time?

11   A    Yes, he was.

12   Q    Okay.  Do you know if that was the first time that Padilla

13   met Guerra, Sr.?

14   A    That was the first time.

15   Q    Okay.  And so Padilla had an interest in meeting one of

16   his main contributors, correct?

17   A    That's correct.

18   Q    Okay.  And Padilla wanted to meet Guerra, Sr., correct?

19   A    Yes.

20   Q    Okay.  And so Guerra, Sr., was called over by Julio Davila

21   for that purpose, correct?

22   A    I'm not sure why.

23   Q    But that was all that happened?  Julio Davila didn't stay,

24   talking to Guerra, Sr.?

25   A    No.

Flores - Cross / By Ms. Gutierrez                         107

1   Q    It was just the introduction, correct?

2   A    That's correct.

3   Q    And so from that point on, is that when Padilla referred

4   to Guerra, Sr., as 2812?

5   A    Yes, "your contact in 2812."  That's what he was always

6   referred to.

7   Q    So not only did he know that you had a contact on 2812,

8   but he actually had met that individual?

9   A    Yes.

10  Q    Okay.  And he also knew that that individual was willing

11  to give up money for the need, for Padilla's needs, correct?

12  A    That's correct.

13  Q    So the Guerras were considered good sponsors, correct?

14  A    Yes, they were.

15  Q    And pretty much every time that you needed something from

16  them, they helped, correct?

17  A    Yes, he was very willing to help in whatever we needed.

18  From one point, from tables to chairs, lending us tables,

19  chairs on any type of function we needed.  Ice chests.

20  Q    Okay.  And money?

21  A    And money, yes.

22  Q    What was the most amount of money that you collected from

23  Guerra for the sheriff and Padilla?

24  A    Two thousand dollars.

25  Q    That was the most in one collection, correct?

Flores - Cross / By Ms. Gutierrez                    108

1   A    The most in one collection was $2,000.

2   Q    So at no time did you ever receive more than $2,000, the

3   -- sorry.

4        At no time did you ever go and pick up more than

5   $2,000 for Padilla and Lupe Trevino from Guerra, Sr.?

6   A    No.

7   Q    Okay.  And did you ever approach Guerra, Jr., yourself for

8   contributions?

9   A    No, I didn't.

10  Q    So any contributions that Guerra, Jr., may have made would

11  have gone through his father?

12  A    That's correct.

13  Q    Okay.  And how many times would you say that you picked up

14  contributions from Guerra, Sr.?

15  A    Three times.

16  Q    A total of three times?

17  A    A total of three times.

18  Q    Okay.  And this occurred during the period --

19  A    This is contributions for the campaign.  This is not

20  including money to buy chicken, to buy fajitas.  This is for a

21  contribution.

22  Q    Okay.  And that's fine.  But what I'm asking you is, in

23  total, how many times did you pick anything up, any cash, from

24  the Guerras for something that was being done or was needed at

25  the county, including Lupe Trevino's campaign?

Flores - Cross / By Ms. Gutierrez                    109

1    A    I -- it was quite a bit of times.  I don't recall a

2    specific number.

3    Q    And it was constant, right, throughout the entire time

4    that you -- from the time that you met the Guerras up until the

5    time that you were arrested, correct?

6    A    Yes, it was --

7    Q    Okay.  It was ongoing?

8    A    -- consistent.  Yes, ma'am.

9    Q    And there was no period where it ended?

10   A    No.

11   Q    Okay.  What ended that was the arrests, correct?

12   A    That's correct.

13   Q    And it's possible that, if you had not been arrested, you

14   or Guerra, Sr., that you would still be collecting

15   contributions to this day, correct?

16   A    Right.

17   Q    Okay.  So even after you retired, you were still involved

18   with the county to some extent, at least to the extent of

19   collecting contributions, correct?

20   A    After I retired?

21   Q    Yes.

22   A    No.

23   Q    Okay.  Well, you retired -- how long were you retired

24   before you were arrested?

25   A    I was -- I retired December 31st of 2012 and I was

Flores - Cross / By Ms. Gutierrez                    110

1    arrested on March 20th, two thousand -- March 21st of 2013.

2    Q    So somewhat close to three months?

3    A    Yes, ma'am.

4    Q    Isn't it true that Padilla informed Guerra through you,

5    Guerra, Sr., that whatever he needed, you know, just let him

6    know; that they were available?

7    A    Yes.

8    Q    And you were the person that relayed that message,

9    correct?

10   A    That's correct.

11   Q    And the reason that Padilla said that was because he was a

12   contributor, correct?

13   A    Yes.

14   Q    And the individuals that didn't contribute didn't get

15   messages like that from Padilla, correct?

16   A    Not to my knowledge.

17   Q    Okay.  And so because of that, the Guerras' issues,

18   whatever issues they may have had, were always addressed

19   quickly and with attention, correct?

20   A    Yes, that's correct.

21   Q    And so the contributions that they were giving were put,

22   securing them a nice, comfortable place within the attention

23   that they received from the Hidalgo County Sheriff's Office,

24   correct?

25   A    Right.  That's correct.

Flores - Cross / By Ms. Gutierrez                   111

1  Q    Okay.  And it went so far as to the point where they

2  received extra attention with respect to their properties and

3  patrolling, correct?

4  A    Yes.

5  Q    And, also, at some point, it became -- the relationship

6  with Guerra, Sr., evolved to where he had a ranch where

7  deputies would go and hunt at, correct?

8  A    I'm not sure of who would go, but I can tell you that

9  myself and Jorge went out there hunting.

10 Q    Okay.  And he had parties, though, also, where deputies

11 were, attended and were invited, correct?

12 A    Not to my knowledge.

13 Q    Okay.  Did you attend Guerra's, some of Guerra, Sr.'s,

14 parties?

15 A    I attended one of his parties.

16 Q    Okay.  And was that for his birthday?

17 A    It was for his birthday, yes.

18 Q    Okay.  And weren't there other deputies at that party?

19 A    There was two other deputies.  They were hired for, like,

20 an off-duty detail.

21 Q    Okay.  So it was security, correct?

22 A    It was security, yes.

23 Q    Okay.  So there were Hidalgo County Sheriff's Office

24 deputies doing -- performing security at Guerra, Sr.'s,

25 birthday party, correct?

Flores - Cross / By Ms. Gutierrez                    112

1   A     Yes, that's correct.

2   Q     Okay.  And who paid them?

3   A     Fernando Guerra, Sr.

4   Q     Okay.  Who secured their services?  Was that through you?

5   A     Though me, yes.

6   Q     Okay.

7   A     In order for them to get secured services to work there,

8   they had to submit a letter saying where they were going to be

9   working at.  And that letter was turned over to Joe Padilla.

10          The supervisors from whoever was working had to

11  approve it before working, because that was, you know, we could

12  work off-duty details.

13  Q     But the person who said yes or no was Padilla, correct?

14  A     Yes.

15  Q     And when it was made -- when Padilla was made aware of it

16  through that letter, he knew where they were going to be

17  working, correct?

18  A     That's correct.

19  Q     Okay.  So had he said no, he would be saying no to his

20  contributors, correct?

21  A     Yes.

22  Q     And he -- in other words, he was aware of that?  He wasn't

23  in the dark about --

24  A     He was aware where these deputies were going to be working

25  at.

Flores - Cross / By Ms. Gutierrez                          113

1   Q    Okay.

2   A    Which was there at Astro Trucking.

3              THE COURT:  Are you at a breaking point?  Are we --

4              MS. GUTIERREZ:  It's 11:00, well, yeah, it's 11:40.

5   I think that's --

6              THE COURT:  All right.  We have a little scheduling

7   issue.  I have a number of case I've had to all compress into

8   the noon hour that it's going to take me a while to get

9   through.

10             So I'm going to recess you a little bit early today,

11  but you don't have to come back until 1:30.

12             Again, I think I need all this time to take care of

13  the rest of my docket.

14             So I'm excusing you until 1:30, and just remind you

15  again not to discuss the case with anyone, or read anything, or

16  listen to anything about the case.

17             Please keep your juror badges on while you're in the

18  building.

19             All right.  Thank you for being here this morning.

20  You're in recess until 1:30.

21             THE CLERK:  All rise for the jury.

22        (Jurors exit courtroom at 11:39 a.m.)

23             THE COURT:  All right.  You may be seated.

24             MR. STURGIS:  May I be excused?

25             THE COURT:  You're excused, yes.  Anything I need to

1    address during this recess?

2         **MS. GUTIERREZ:**  Did they hold up Jarvis?

3         **THE COURT:**  I don't know.  We told him 1:30.

4         **MS. GUTIERREZ:**  Okay.

5         **THE COURT:**  But we can push him back to 3:00, or -- I

6    don't know if we're --

7         **MS. GUTIERREZ:**  Yeah --

8         **THE COURT:**  -- done or if we're going to start

9    talking about the --

10         **MS. GUTIERREZ:**  Yes, we are.  Yes.

11         **THE COURT:**  -- Delta Lake house next and --

12         **MS. GUTIERREZ:**  Yes.

13         **THE COURT:**  We're almost done or we're going to --

14         **MS. GUTIERREZ:**  No, we're going to continue.  I think

15    that it will probably be another --

16         **THE COURT:**  I mean, we haven't even gotten to sort

17    of, what I'll call --

18         **MS. GUTIERREZ:**  Yeah.

19         **THE COURT:**  -- the "Panama Unit."

20         **MS. GUTIERREZ:**  And that's --

21         **THE COURT:**  Or any of the actual transactions --

22         **MS. GUTIERREZ:**  And that's what we're, and that's

23    what --

24         **THE COURT:**  -- at issue.

25         **MS. GUTIERREZ:**  Yeah.

1          **THE COURT:**  All right.  So we'll contact Mr. Jarvis

2    and tell him 3:00 at the earliest.

3          **MS. GUTIERREZ:**  Yes.

4          **THE COURT:**  All right.  All right.  Thank you for

5    being here this morning.

6          **MR. STURGIS:**  One --

7          **THE COURT:**  1:30.

8          **MR. STURGIS:**  One other issue, though, now that we've

9    gone on this route.

10         Do we need Del Angel anymore?

11         **MS. GUTIERREZ:**  Can I think about it?  Are --

12         **THE COURT:**  Do we need Del --

13         **MS. GUTIERREZ:**  Del Angel.

14         **MR. STURGIS:**  Do we need --

15         **MS. GUTIERREZ:**  Del --

16         **THE COURT:**  Okay.

17         **MR. STURGIS:**  -- Mr. Del Angel.

18         **THE COURT:**  Del Angel.

19         **MR. STURGIS:**  Excuse me.  Del Angel anymore that, now

20   that we're gone down this road --

21         **MS. GUTIERREZ:**  Can I, can I just think about it --

22         **THE COURT:**  Sure.

23         **MS. GUTIERREZ:**  -- over lunch and cross this, this --

24         **THE COURT:**  All right.  Would you let Mr. Steindel

25   know he doesn't need to be here until 3:00 either?  We told him

116

1     1:30 as well.

2              **MS. GUTIERREZ:**  Yes, yes.  And that way, when we come

3     back, if it turns out that we don't need him at all, then --

4              **THE COURT:**  Right.  Okay.  So will you take care of

5     calling Mr. Steindel?

6              **MS. GUTIERREZ:**  Well, if I can get a phone number for

7     him?  I'll --

8              **MR. STURGIS:**  I don't have one.

9              **THE CLERK:**  I have it.

10             **THE COURT:**  We have it.

11             **MS. GUTIERREZ:**  Okay.  Great.

12             **THE COURT:**  But we're going to be tied up here in

13    court, so --

14             **MS. GUTIERREZ:**  Yes, I'll call.  3:00 o'clock, right?

15             **THE COURT:**  At the earliest for him, yes, unless we

16    tell him otherwise.

17             All right.

18        **(A recess was taken from 11:40 a.m. to 1:31 p.m.)**

19        **(Portion omitted from 1:31 p.m. to 1:48 p.m.)**

20        **(A recess was taken from 1:48 p.m. to 2:00 p.m.)**

21        **(Jurors enter courtroom at 2:00 p.m.)**

22             **THE COURT:**  Good afternoon.  Please be seated.

23    Everybody was here when I stepped out momentarily, but maybe

24    everybody had a quick comfort break.  See if we can get started

25    now.

Flores - Cross / By Ms. Gutierrez          117

1     **(Pause)**

2          **THE COURT:**  All right.  We all here, ready to go?

3          **MS. GUTIERREZ:**  Yes, your Honor.

4          **THE COURT:**  Yes.  All right.  You may proceed

5     whenever you're ready.

6                    **CROSS EXAMINATION (CONTINUED)**

7     **BY MS. GUTIERREZ:**

8     Q    Okay.  Mr. Flores, at some point, Mr. Guerra directly

9     asked you to run some plates or registration for him, correct?

10    A    Yes, ma'am.

11    Q    And were you aware that prior to him asking you to --

12    coming to you directly, that he was having you check plates

13    through Julio Davila?

14    A    Yes.  I was.

15    Q    And so you knew you were already doing that for

16    Mr. Guerra, but you were never doing it directly, correct?

17    A    That's correct.

18    Q    And at the time that you were running plates for

19    Mr. Guerra through Julio, you were also running plates for

20    Julio Davila, correct?

21    A    Yes.  That's correct.

22    Q    So there was a period of time where you knew you were

23    checking plates for two individuals?

24    A    Yes.

25    Q    And at some point, Julio Davila wasn't necessary in order

Flores - Cross / By Ms. Gutierrez                              118

1   for you and Guerra to communicate, correct?

2   A    Yes.  That's correct.

3   Q    And you testified earlier that you wouldn't contact Guerra

4   directly, you would contact him through Julio Davila.  But at

5   some point, that changed.  Can you tell me why?

6   A    At that point, it was -- Mr. Guerra had sent some money

7   over to -- I believe it was on a plate -- it was $500.  And

8   when Julio Davila gave it to me, he gave me $300.  At one

9   point, Mr. Guerra, we talked, and he asked, "Did you get the

10  money I sent you, which was the $500?"  I said, "No.  I got the

11  $300."  At that point, he says, "I gave him five.  Let me meet

12  with you so I can give you the other two.  That's not right

13  that he stayed with it."  And I told him, "No, no, that's fine,

14  that's fine."  And at that point, that's when we started

15  talking directly.

16  Q    Isn't it true that in that incident, you're the one that

17  contacted Guerra, Senior to inquire about whether he had sent

18  the $300 -- if that was all he had sent?

19  A    I don't remember that.

20  Q    Is it possible that you're the one that called Guerra,

21  Senior to ask him, "Hey, did you just send me $300?  Is that

22  the only amount that you sent me?"

23  A    That is possible.

24  Q    And isn't it true that you were complaining about not

25  having received the full amount?

Flores - Cross / By Ms. Gutierrez                                119

1    A    No.  I wasn't -- I never complained about it.

2    Q    Isn't it true that you wanted the full amount from Julio

3    Davila?

4    A    No.  I never confronted Julio and -- to tell him that I --

5    there was more money.  I never confronted him with it.

6    Q    But in your conversations with Guerra, Senior, isn't it

7    true that you indicated to Guerra, Senior that you wanted the

8    full amount?

9    A    No.  Because he asked me -- he told me, "Well, let me meet

10   with you so I can give you the other amount due," and I told

11   him, "No, no.  That's no need.  That's fine.  Let's leave it

12   like that."

13   Q    Okay.  And whose idea was it to no longer communicate

14   through Davila?

15   A    I'm not sure if there's any one of us idea.  I just --

16   that's the way it happened.

17   Q    So what really happened was that you and Guerra, Senior

18   cut Davila out of the loop, correct?

19   A    That's correct.

20   Q    And you still maintained communication with Davila.  It

21   wasn't like you were mad at him.  You were still friendly with

22   him, correct?

23   A    Right, that's correct.

24   Q    And Guerra, Senior, as well, was still friendly with Julio

25   Davila.  It's not like they were mad at -- Guerra, Senior got

Flores - Cross / By Ms. Gutierrez                    120

1    mad at Davila because he hadn't paid you the full amount.

2    A    That's correct.

3    Q    And so about for how long had you been running plates for

4    Davila and Guerra, Senior at the time that you cut Julio Davila

5    out and it was now you and Guerra, Senior directly

6    communicating?

7    A    The exact amount of time, I'm not sure.

8    Q    Well, was it more than a year?

9    A    Possibility, but I can't give a specific time.

10   Q    And how many times would you say that you ran plates?

11   Would it be a hundred times?

12   A    I would say between ten and 20 times.

13   Q    And this includes the time that you ran -- this includes

14   both for Julio Davila and Guerra, Senior?

15   A    Yes.

16   Q    So you're saying that together with -- both -- for both

17   men, you ran plates a total of -- maximum of 20 times.

18   A    That's correct.

19   Q    And you would receive an average of $500 per check?

20   A    No, ma'am.

21   Q    Well, how much would you receive?

22   A    Sometimes it was -- it started as a favor, so sometimes I

23   wouldn't receive any.

24   Q    Sometimes you did it for zero?

25   A    Yes.  I never actually asked him, "This is how much it's

Flores - Cross / By Ms. Gutierrez                    121

1    going to cost."  I never charged for it.  It just -- it was a

2    favor.

3    Q    And so this money that was coming your way was kind of on

4    -- it was on their own behalf, like, "Hey, thanks for the

5    favor?"

6    A    Yes.

7    Q    It was never anything you expected either.

8    A    That's correct.

9    Q    Okay.  And so from running the plates, what is -- because

10   you testified that it would -- it started with that, favors,

11   and then it evolved into criminal activity.  What was the next

12   thing that was done after the plates?

13   A    Well, running the plates, the next thing that was done is

14   basically ID stops.

15   Q    And at this point, were you still engaging in running

16   plates?

17   A    Yes, ma'am.

18   Q    And how many ID stops would you say you did?

19   A    I didn't do any ID stops.

20   Q    Well --

21   A    That's when I asked Jorge to do the ID stops.

22   Q    Well, right.  But you're not saying that Guerra, Senior

23   would call Jorge and have him stop anyone, right?

24   A    No.  He would call me and he would say a suspicious

25   vehicle was exiting or that somebody was bothering him and for

Flores - Cross / By Ms. Gutierrez                    122

1   me to -- if I could have my friend do a stop on that vehicle to

2   ID that person.

3   Q    And so Guerra, Senior would contact you about those

4   issues, and then you in turn would contact Jorge, correct?

5   A    That's correct.

6   Q    And so how many of these identification stops would you

7   say were done?

8   A    I would say maybe about eight to ten.

9   Q    And this is in a period of how long?

10  A    This is in a period, I would think, starting early 2012.

11  Q    Okay.  And so we're talking about early 2012 up until when

12  you retired, or when you got arrested?

13  A    Until actually December the 11th.

14  Q    December the 11th is when you're stating that these stops

15  occurred?

16  A    That's --

17  Q    That there was -- there's no possibility that any stops

18  were done after this date, correct?

19  A    That's correct.

20  Q    Okay.  And why is -- why does December 11, 2012, ring a

21  bell to you?

22  A    Because that was the last time we did a -- or Jorge and I

23  did that stop on the vehicle that was supposedly have drugs on

24  it.  And the reason I remember that day, it was a Tuesday,

25  because Wednesday, December the 12th, was my daughter's

Flores - Cross / By Ms. Gutierrez                    123

1   birthday.

2   Q    Okay.  The -- how much were you paid for the

3   identification stops?

4   A    Sometimes we would get paid, sometimes we wouldn't, but it

5   varied between 500 to a thousand dollars.

6   Q    So, again, sometimes you did it as a favor and received

7   nothing, correct?

8   A    Yes, ma'am, that's correct.

9   Q    Well, I guess maybe the more accurate way to say it is

10  that every time was a favor; sometimes you received something,

11  sometimes you wouldn't, correct?

12  A    Yes.  We wouldn't actually say, "I'm going to charge you

13  this amount."  It just -- that's what they would give us.

14  Q    It wasn't like you were -- not necessarily advertising,

15  but stating to Guerra, Senior, "I can do identification stops

16  for 'X' amount of money."  Correct?

17  A    That's correct.

18  Q    And when you say, "We would get paid," you really mean you

19  would get paid, because there was no communication or

20  interaction between Guerra, Senior and Jorge Garza, correct?

21  A    That's correct.  The reason I say "we" is because I would

22  get paid and, in turn, I would give the money to Jorge.

23  Q    And you wouldn't give all the money to Jorge, would you?

24  A    No.  I wouldn't.

25  Q    Okay.  So then at some point, these identification stops

Flores - Cross / By Ms. Gutierrez                    124

1   evolved even further into something more, correct?

2   A    Yes.  That's correct.

3   Q    And when would you say that occurred?  And you're saying

4   that the identification stops started sometime in early 2012.

5   At what point would you say that the -- that they stopped being

6   identification stops and became something more?

7   A    It was around the same time.

8   Q    So, is it your testimony that you -- that the

9   identification stops and the fake traffic stops were being done

10  at the same time?

11  A    Yes.

12  Q    Okay.  And so the identification stops evolved into fake

13  traffic stops, correct?

14  A    It was -- they were two difference incidents.

15  Q    Well, right.  But initially --

16  A    Yes.

17  Q    -- you were only doing identification stops.

18  A    Right.

19  Q    Okay.  And at some point, you added fake traffic stops to

20  that.

21  A    That's correct.

22  Q    And the reason -- and the way that the fake traffic stops

23  -- well, let me just ask you this.  The fake traffic stops

24  comprised of there being a vehicle that was supposed -- or

25  there were individuals who were to believe that there was a

Flores - Cross / By Ms. Gutierrez                    125

1   vehicle that had drugs in it, correct?

2   A    Yes.  That's correct.

3   Q    But, in fact, it had no drugs in it, correct?

4   A    We had no knowledge it had drugs, no.

5   Q    Okay.  And so that vehicle was stopped in order to deceive

6   the owner into thinking that the drugs had been seized?

7   A    Yes.

8   Q    Okay.  When, in fact, there were no drugs to be seized,

9   correct?

10  A    Not to our knowledge.  Not in the vehicle.

11  Q    And when you say "our," what are you talking about?

12  A    Myself and Jorge.

13  Q    And the reality is that the only information that anyone

14  else would have, either Jorge or anyone else that you talked

15  to, would come from you, because no one else was talking to

16  Guerra, Senior except for you, correct?

17  A    That's correct.

18  Q    And so we will -- I'll be referring to those as the fake

19  traffic stops, okay?

20  A    Yes, ma'am.

21  Q    Those fake traffic stops came about because they were your

22  creation, right?  You invented that in order to assist Guerra,

23  Senior with some problems he was having, correct?

24  A    No, ma'am.  That's not correct.

25  Q    Isn't it true that you were the one that came to Guerra,

Flores - Cross / By Ms. Gutierrez                    126

1    Senior with that idea?

2    A    No.  It's not true.

3    Q    Are you saying that Guerra, Senior had that idea already?

4    A    Guerra, Senior contacted me and asked me that there were

5    some drugs that had been -- they had kept and for us to -- if I

6    could get somebody to do a traffic stop on the vehicle.  He

7    suggested to me that the vehicle -- we could pick any location

8    we wanted in the county, in the rural area, and that there

9    would be no drugs in the vehicle, that the driver would get out

10   and run, and once the officer would take chase, he would have

11   one of his workers get in the vehicle and take off.  And after

12   that, I told him there's too many parts into that, the best way

13   would be if there's really nothing that any -- nobody has to

14   run.  It's just the officer would turn on the lights, once the

15   vehicle stops and the owners pass, the vehicle could take off.

16   Q    You thought that Guerra, Senior's plan was too elaborate;

17   is that right?

18   A    It was just -- there were too many parts into it.  A lot

19   of things could happen.

20   Q    So then you did create the idea that kind of streamlined

21   it, correct?

22   A    If you're trying to say if on just the lights, yes.

23   Q    I'm sorry?

24   A    If you're saying that I brought it to his attention that

25   just to use the lights and not have somebody run, it was my

Flores - Cross / By Ms. Gutierrez                    127

1   idea, yes.

2   Q    Okay.  So, yeah, you brought that idea to the table.

3   A    Yes.

4   Q    And that idea was implemented, correct?

5   A    Right.

6   Q    So would it be incorrect to say that Guerra, Senior

7   informed you that he was having some issues with the owners of

8   some drugs that he had stolen, and then at that point you said,

9   "Well, you should do some fake traffic stops?"

10  A    No.  That's not correct.

11  Q    Now, you told me -- or you told the jury that Guerra --

12  that Guerra, Senior told you, "I have some drugs that I stole."

13  I want to know at what point in your relationship did you -- or

14  were you made aware that Guerra, Senior was trafficking drugs.

15  A    I'm not sure.  During our relationships -- our

16  relationship with him, I knew he was dealing drugs.  And he

17  flat forward asked me that he needed this favor.

18  Q    Okay.  When Julio Davila introduced you to Guerra, Senior,

19  did he introduce him as a drug dealer?

20  A    No.  He didn't.

21  Q    At that time, you didn't have any knowledge that Guerra,

22  Senior was a drug dealer, correct?

23  A    Not -- maybe kind of, because he was so giving.  But not

24  to the full extent that I knew he was a drug dealer, no.

25  Q    Okay.  And that -- the fact that you found it odd that he

Flores - Cross / By Ms. Gutierrez                    128

1   was so giving, but there was no direct confirmation to you that

2   he was a drug dealer, that occurred for a few months into your

3   relationship, correct?

4   A    That's correct.  The only thing I knew was, I mean, I

5   would run license plates for him.

6   Q    And it wasn't right away that you were -- that it was

7   confirmed to you that he was a drug dealer, correct?

8   A    That is correct.

9   Q    At the time that Guerra, Senior came to you about him

10  having stolen some drugs and with this idea of the traffic

11  stop, at that point did you already know that he was a drug

12  dealer?

13  A    Yes.  I did at that point.

14  Q    Okay.  So that -- when he informed you of the drugs that

15  he had stolen, that wasn't surprising to you because you

16  already knew he was a drug dealer, correct?

17  A    Right.

18  Q    So prior to that incident, something or -- something had

19  confirmed to you already that Guerra, Senior was a drug dealer?

20  A    Yes.  Running license plates or calling suspicious

21  vehicles.  There was always suspicious vehicles in around his

22  business, so he would want -- he was really paranoid to see who

23  it was.

24  Q    And that led you to believe that he was a drug dealer,

25  correct?

Flores - Cross / By Ms. Gutierrez                    129

1    A    Yes.

2    Q    So it wasn't that Guerra, Senior said, "Hey, can you run a

3    license plate for me because I'm dealing in drugs and these are

4    individuals that are giving me a hard time."  He just told you

5    to run the plate, correct?

6    A    That's correct.

7    Q    So you, on your own, suspected and believed that the

8    running of the plates confirmed to you more so that he was a

9    drug dealer, correct?

10   A    That's correct.  But at one point, when we were doing

11   those ID stops, he said, "These people are bothering us,

12   bothering me, my son.  We -- my son owes some stuff to them,

13   some past drugs, and we just need to know who they are or just

14   try to scare them away."

15   Q    Okay.  And so that was the first time that --

16   A    Yes.

17   Q    -- Guerra, Senior confirmed to you with his words --

18   A    Yes.

19   Q    -- that he was a drug dealer?

20   A    Yes.

21   Q    Or at the very least, that his son was a drug dealer.

22   A    Right.  Both of them.

23   Q    Both of them.  And so when you began to engage in these

24   fake traffic stops, that happened for a period of less than a

25   year, correct?

Flores - Cross / By Ms. Gutierrez                    130

1   A    It was early 2012, approximately, until December 11th,

2   2012.

3   Q    So it was for less than a year, correct?

4   A    Yes, ma'am.

5        **(Pause)**

6   Q    And how much were you paid for these fake traffic stops?

7   A    It would all depend.  It varied on the amounts.  So it was

8   from a thousand dollars to $3,000.

9   Q    You never received more than $3,000?

10  A    Not at one time, no, ma'am.

11  Q    Well, I'm not asking you about in one time, but for a job.

12  Did you ever receive more than $3,000 for one of these fake

13  traffic stops?

14  A    No.

15  Q    Do you recall an incident in early 2012 where there was an

16  identification stop, or a scare stop -- I mean, those were kind

17  of similar, right?  Those were in --

18  A    Right.

19  Q    -- the same category.  Those were not the fake traffic

20  stops.

21  A    Yes, ma'am.

22  Q    Where you were paid $40,000 to identify someone?

23  A    No.  That's not correct.

24  Q    Are you saying you never received $40,000 to stop -- to

25  identify anyone?

Flores - Cross / By Ms. Gutierrez                    131

1    A     Never.

2    Q     Are you saying you never received $40,000 in order to

3    scare anyone away?

4    A     We never did, no.  I never did.

5    Q     Okay.  And the money that you received, you received from

6    Guerra, Senior; is that correct?

7    A     That's correct.

8    Q     So if Guerra, Junior has indicated that he gave -- paid

9    $40,000 for this stop, that would be incorrect?

10          **MR. STURGIS:**  Objection, your Honor, that's a --

11          **THE COURT:**  It calls for speculation.  He wouldn't

12   know.  Sustained.

13   **BY MS. GUTIERREZ:**

14   Q     There was another incident where in early 2012 again 2012

15   -- well, let -- before we get there, were you ever given any

16   background information as to why those individuals needed to be

17   stopped, other than, "They're bothering my son?"

18   A     No.  Basically, "They're bothering my son.  It was some

19   drugs that he stole," or that they had stolen, and that was the

20   only information we were -- I was given.

21   Q     Okay.  Were you ever informed, "My son" -- or we, being

22   Guerra, Senior and Junior -- "stole two thousand pounds of

23   marijuana that was supposed to be going up to North Carolina

24   and those individuals are the ones that are bothering us?"

25   A     No.

1   Q    So you didn't get details; is that correct?

2   A    That's correct.

3   Q    And you didn't ask either, correct?

4   A    No.  I didn't ask.

5   Q    Do you recall an incident where some individuals were

6   stopped who were coming out of Astro Transport because they

7   were stopped because they were bothering the Guerras?

8   A    Yes.  I do.

9   Q    And on that incident, isn't it true that you received

10  between 30 and $40,000?

11  A    No.  That's not true.

12  Q    How much did you receive for that incident?

13  A    I don't -- we -- I didn't receive anything that I recall.

14          **THE COURT:**  Were you the one that personally did the

15  stop?

16          **THE WITNESS:**  No, your Honor.

17          **THE COURT:**  All right.

18  **BY MS. GUTIERREZ:**

19  Q    But regardless of who did the stop, you were the person

20  who would get the money, correct?

21  A    That's correct.

22  Q    And you're saying that on that incident, you didn't

23  receive any money?

24  A    No.  I didn't.

25  Q    And so then that means that there is no possibility that

Flores - Cross / By Ms. Gutierrez                    133

1  the person who conducted the stop received money either,

2  correct?

3  A    That's correct.  Not from me.

4  Q    Okay.  Because you would have known that, correct?

5  A    Yes.

6  Q    Isn't it true that by the end of 2012, you were a full on

7  drug trafficker as Guerra, Senior was?

8  A    Yes.

9  Q    Okay.  And the reason for that was that, at that point,

10  for the fake traffic stops, you were receiving a third of the

11  cut; isn't that correct?

12  A    On the fake traffic stops?

13  Q    Yes.

14  A    That's correct.

15  Q    How many fake traffic stops did you conduct where you were

16  an equal partner of the drugs?

17  A    Equal meaning?

18  Q    Well, meaning that you received an equal share of the

19  proceeds of the drugs that were stolen.

20  A    It was always divided by three.

21  Q    Okay.  And what I'm asking you is how many traffic stops

22  were conducted where you received a third, or an equal amount,

23  of the proceeds?

24  A    Approximately probably eight to ten.

25  Q    And so in those incidents, are you saying that your third

Flores - Cross / By Ms. Gutierrez                    134

1   was never more than $3,000?

2   A     That's correct.

3   Q     And isn't it true that the way that you -- the third that

4   you were receiving was a third from the proceeds of the sale of

5   the marijuana, correct?

6   A     That's correct.  We never -- but we never knew how much it

7   really was.

8   Q     Okay.  And so then if you were receiving a third and you

9   were receiving $3,000, that would mean that the total value of

10  the marijuana that was stolen was $9,000, correct?

11  A     That's correct.

12  Q     Wasn't there times where you received a third of $150,000?

13  A     No.

14  Q     Isn't -- wasn't there times when you received a third of a

15  hundred thousand dollars?

16  A     No, never.

17  Q     Weren't there times when you received a third of $50,000?

18  A     No.

19  Q     Wasn't there times that you received a third of $30,000?

20  A     No.

21  Q     Okay.  So I'm going to leave the traffic stops for a

22  little bit, and I want to touch on this relationship that you

23  had with Fabian Rodriguez --

24  A     Okay.

25  Q     -- because you became friends, or became close -- closer

Flores - Cross / By Ms. Gutierrez                    135

1    friends when he joined the Crime Stoppers division, correct?

2    A    That's correct.  Can I just touch back on -- clarify

3    something?

4    Q    Absolutely.

5    A    When you're referring to $3,000, yes, I had received maybe

6    not more than 3,000, but that was my part.  At times, it was

7    less, but at times, that's -- $3,000 that Jorge received also,

8    $2,000.  So I can't say $3,000 was divided in half.  I got

9    3,000 and Jorge might have gotten 2,000 or a thousand, so --

10   but I got 3,000.

11   Q    Okay.  But you're -- okay.  You testified, though, that

12   you were an equal partner in these schemes with Mr. Guerra,

13   Senior and Guerra, Junior, right?

14   A    Right, right.

15   Q    And the proceeds were split in three, correct?

16   A    Yes.

17   Q    Okay.  And so, if it was in three, that takes care of

18   Guerra, Senior, Guerra, Junior, and J. P. Flores, right?

19   A    Right.

20   Q    So --

21   A    Well, and Jorge.  That was also -- so when it was Jorge,

22   it was also -- part of it was his.

23   Q    And from what I understand, based on your testimony, is

24   that if proceeds are split in three, there's three individuals

25   that get that money.  That those individuals then paid somebody

Flores - Cross / By Ms. Gutierrez                    136

1   else is something apart and distinct.  Would you agree with me?

2   A    Right.

3   Q    Okay.  And so your third was for you.  And what you did

4   with that is another issue, correct?

5   A    My third and Mr. Guerra, Senior's third, we would divide

6   and give part to Jorge.

7   Q    I'm sorry.  I don't understand that.

8   A    What would happen is if I got $3,000 and Fernando Guerra

9   got $3,000, we would both give him $1,500.

10  Q    Together, or each?

11  A    Each of us, if that's the amount it was.  If there was the

12  amount that was $2,000, we would divide whatever 2,000 that I

13  got, 2,000 that Fernando Guerra got, and give Jorge each a

14  thousand.

15  Q    Okay.  So what you're telling me is that if you received

16  $2,000 and Guerra, Senior received $2,000, you would each give

17  him a thousand dollars, which would mean that you received --

18  you ended up with a thousand, Guerra, Senior ended up with a

19  thousand, and Jorge ended up with 2,000?  That's not accurate,

20  correct?

21  A    No.  That's not.  It would be that it was all equal,

22  that's what it would end up as being.

23  Q    Well, right.  But, you know, when you're telling me that

24  if you receive 3,000 and Guerra, Senior received 3,000, you

25  would each give Jorge $1,500, which means that you would end up

Flores - Cross / By Ms. Gutierrez                    137

1   with $1,500, Guerra, Senior would end up with $1,500, and Jorge

2   would end up with $3,000.  And it -- the math doesn't fit --

3   A    Right.

4   Q    -- with what you're testifying.

5   A    No.  And it could have been -- I'm not saying it always

6   happened.  We could have given a thousand depending -- but we

7   would give him -- he would give him from his part and I would

8   give him from my part.

9   Q    Okay.  So now you're not sure of what was given, but each

10  of you gave, correct?  Each --

11  A    Each of us gave, yeah.

12  Q    -- you and Guerra, Senior?

13  A    Right.

14  Q    And, again, everything went through you, correct?

15  A    That's correct.

16  Q    So in reality, Guerra, Senior can't speak to whether you

17  kept the money that Guerra, Senior gave you, correct?

18  A    That's correct.

19  Q    And before I continue with Fabian Rodriguez, there were --

20  there was an incident in November of 2012 where you worked with

21  Guerra, Junior on 22 kilograms of cocaine that he stole.  Do

22  you recall that?

23  A    Yes.

24  Q    And on that incident, Guerra, Junior created fake bricks

25  of cocaine to make it appear like the cocaine that he had

Flores - Cross / By Ms. Gutierrez                    138

1   stolen, correct?

2   A    That's correct.

3   Q    And in that case, you all communicated directly, correct?

4   A    Yes.

5   Q    Okay.  And you assisted Guerra, Junior by providing the

6   deputies from the Hidalgo County Sheriff's Office who would

7   come up on the vehicle that had the fake drugs, seize them,

8   test them, and then prepare a report that that fake marijuana

9   was, in fact, marijuana that had been seized, correct?

10          **THE COURT:**  You mean cocaine.

11  Q    I'm sorry.  Cocaine, that it had been seized, correct?

12  A    Yes.  That's correct.

13  Q    So in that -- and in that case, you used a deputy by the

14  name of Jerry Del Angel, correct?

15  A    Yes.  That's correct.

16  Q    And isn't it true that Jerry Del Angel you had approached

17  about doing fake traffic stops also, correct?

18  A    Yes.  That's correct.

19  Q    And isn't it true that within the scheme that we're

20  talking about right now with the fake cocaine, you essentially

21  deceived the deputies that seized and tested the marijuana,

22  correct?

23  A    Yes.  That's correct.

24          **THE COURT:**  Cocaine.

25  Q    I'm sorry, cocaine, the cocaine.  With respect to Guerra,

Flores - Cross / By Ms. Gutierrez                          139

1    Senior and Junior, you mainly dealt with marijuana; is that

2    right?

3    A     Yes.  That's correct.

4    Q     On some occasions you dealt with cocaine, correct?

5    A     Yes.  That's correct.

6    Q     On the incident with the 22 bricks of cocaine, your cut of

7    the remaining -- the cocaine that Junior stayed with was

8    $40,000; isn't that correct?

9    A     No.  That's not correct.

10   Q     Well, isn't it true that you were receiving an equal share

11   at this point?

12   A     No.  There was a lot of other players involved, so this

13   wasn't half or one third.  It was like fourth.  I believe I

14   received -- I got like $10,000.

15   Q     Who were the other players involved?

16   A     I'm not sure.

17   Q     Well, you're saying there were four players, right?

18   A     Yeah.  The -- Junior and Senior had other people involved

19   in -- I wouldn't ask them who it was or anything.

20   Q     And so basically they would tell you something and you

21   just accepted it?

22   A     Yes.  I had -- I mean, I had no way of knowing if it was

23   true or not.

24   Q     Well, right.  But you didn't have to participate in

25   assisting them in their schemes without confirmation.  You

Flores - Cross / By Ms. Gutierrez                    140

1   could have demanded confirmation.

2   A    That's correct.

3   Q    I mean, you were providing a huge resource for them to be

4   able to accomplish their schemes.

5   A    That's correct.

6   Q    And you didn't ask -- you didn't bother to ask for any

7   confirmation?

8   A    No.

9   Q    Jose Padilla was aware of these schemes that were going

10  on, correct?

11  A    No.  That's not correct.

12  Q    Well, Jose Padilla was aware that you had this

13  relationship with Guerra, Senior, correct?

14  A    Yes.  That's correct.

15  Q    And Padilla knew that Guerra, Senior was a drug

16  trafficker, correct?

17  A    I'm assuming he did.

18  Q    And you made Padilla aware of the use of the county -- or

19  the county deputies for these schemes; isn't that correct?

20  A    No.  That's not.

21  Q    Are you telling the jury that these schemes that you did

22  with the Guerras were something that you did behind Padilla's

23  back?

24  A    Yes.

25  Q    And these schemes that you did were done behind Lupe

Flores - Cross / By Ms. Gutierrez                    141

1   Trevino's back?

2   A    Yes.

3   Q    All this time, however, you were still receiving campaign

4   donations and contributions, correct?

5   A    That's correct.

6   Q    Isn't it true that Padilla provided you with information

7   to give to the Guerras about law enforcement investigating

8   their business and for them to be careful?

9   A    That's correct.

10  Q    And in exchange for that, Guerra, Senior paid Padilla

11  $3,000, correct?

12  A    No.  That's not correct.  It was a thousand dollars.

13  Q    Okay.  And that thousand dollars was paid to Padilla

14  through you, correct?

15  A    Yes.  That's correct.

16  Q    So, in effect, Padilla was doing his own doings with the

17  Guerra, Seniors (sic) for money, correct?

18  A    Yes.

19  Q    Okay.  And you -- both you and Padilla were essentially

20  engaging in the same type of activity in -- with respect to

21  providing services for money to the Guerras, correct?

22  A    Yes.

23  Q    There was another incident involving cocaine where you

24  dealt with Guerra, Junior that was very similar to the incident

25  we just talked to with the 22 kilos of cocaine, correct?

Flores - Cross / By Ms. Gutierrez                    142

1    A    Yes.  That's correct.

2    Q    And on that incident again, you used that same deputy,

3    Jerry Del Angel, correct?

4    A    Yes.  That's correct.

5    Q    And on that incident, isn't it true that you received

6    $20,000?

7    A    No.  That's not correct.

8    Q    How much did you receive on that deal?

9    A    I don't remember, but I believe it was almost the same

10   amount or less.  I don't remember the amount of --

11   Q    You don't remember, but you think it's the same amount or

12   less --

13   A    Yes.

14   Q    -- than the last time?

15   A    Same or less, yes.

16   Q    Okay.  So if it's the same, you received $10,000 for

17   assisting in a fake scam on 22 kilograms, and you received

18   $10,000 for assisting in a fake cocaine scam dealing with five

19   kilograms of cocaine.

20   A    That's correct.

21   Q    How much was Del Angel paid for the first incident?

22   A    Two thousand dollars.

23   Q    And that wasn't paid entirely by you, correct?

24   A    Yes.  It was.

25   Q    In this case, Guerra, Senior didn't contribute anything to

Flores - Cross / By Ms. Gutierrez                    143

1  that.

2  A    No.  It was from me.

3  Q    Actually, Guerra, Senior wasn't involved in that deal,

4  correct?

5  A    Pay Jerry, or --

6  Q    I'm sorry?

7  A    Involved in what way?

8  Q    In the deal with the 22 kilograms of cocaine.

9  A    Yes.  He was.

10  Q    Oh.  Because you --

11  A    Well, he was aware of it.

12  Q    Okay.  But he wasn't involved with him.  You were dealing

13  with Junior, correct?

14  A    I was dealing with Junior because Mr. Guerra was -- Senior

15  was out of town.

16  Q    Okay.  Now, we're going to go back to Fabian Rodriguez --

17  A    Yes.

18  Q    -- and how you assisted him in transferring to the Panama

19  Unit.  Do you recall testifying about that?

20  A    Yes.

21  Q    Okay.  And you --

22  A    Assisted him to transfer to the Panama Unit?

23  Q    Well, you testified earlier that you helped him, you

24  requested that he be transferred.

25  A    No, ma'am.  I requested him to come to Crime Stoppers, not

1    to the Panama Unit.

2    Q    Okay.  That -- you may be right.  I might be confused.

3    When he wanted to move to Panama Unit, what was your

4    involvement in that?

5    A    I had no involvement.

6    Q    How did he go about doing that?

7    A    It was a letter of intent.  There was a posting and there

8    was a letter of intent done that he wanted to get transferred

9    to the Panama Unit.

10   Q    And that letter went through who?

11   A    That gets turned over to the supervisors, which is

12   Commander Joe Padilla.

13   Q    So he -- Padilla was the one who approved it or rejected

14   it, correct?

15   A    Well, yes.  Once he gets a letter, he forwards it up his

16   chain, I imagine, to the Sheriff.

17   Q    so ultimately the Sheriff is the one that makes those

18   decisions.

19   A    Yes.  On the Panama Unit, yes.

20   Q    And we're talking right now about the identification stops

21   and the fake traffic stops and how that occurred for a period

22   of less than a year in 2012.  Compared to that, I mean, in time

23   wise, when -- during that time, was Fabian Rodriguez already

24   with the Panama Unit?

25   A    No, ma'am.

Flores - Cross / By Ms. Gutierrez                    145

1   Q    Okay.  So at what point did Fabian Rodriguez go to Panama?

2   A    I believe it was September or October of 2012.

3   Q    Well -- oh, so you're -- and I think that you may have

4   testified about this.  Fabian Rodriguez was a Panama Unit

5   member for a total of --

6   A    Three --

7   Q    -- three or four months?

8   A    -- or four months, yes, ma'am.

9   Q    Okay.  And during that period of time, they got to deal a

10  lot of drugs with Guerra, Senior, correct?

11       Yes, ma'am.

12  Q    Okay.  And the reason that you know that is because you

13  were the middle man between the Panama Unit and Guerra, Senior,

14  correct?

15  A    I was the between person, yes.  Through just -- it was

16  between me and Fabian.  I didn't talk to any other of the

17  Panama Unit.

18  Q    Well, right.  But actually, you held a more important role

19  than just talking to Fabian.  Guerra, Senior had to get the

20  okay from you to use Panama Unit, correct?

21  A    He would run it through me, yes, that's correct.

22  Q    So you -- if you said no, he wouldn't use the Panama Unit,

23  correct?

24  A    That's correct.

25  Q    Okay.  So you were kind of in the Padilla position in this

Flores - Cross / By Ms. Gutierrez                146

1  case where if you said no, nothing was done.  If you said yes,

2  it went forward, correct?

3  A    Right, correct.

4  Q    And you would also be paid for that, correct?

5  A    Yes.  That's correct.

6  Q    How many dealings would you say that the Panama Unit

7  engaged in with Guerra, Senior?

8  A    I have no idea.  I don't recall the numbers.

9  Q    Okay.  Is it more than 50?

10 A    I wouldn't know.  I don't have that number.

11 Q    So it's possible that it could have been 50 or more,

12 correct?

13 A    I wouldn't be able to say that.

14 Q    Well, because you can't say that, it's possible, correct?

15        **THE COURT:**  Well, you're asking him to speculate.

16 Next question.

17 **BY MS. GUTIERREZ:**

18 Q    When did you -- what was the first deal that you engaged

19 in with Guerra, Senior and the Panama Unit?

20 A    I believe it was -- I'm not sure of the exact date or

21 month it was, but it was an incident in Mercedes that

22 Mr. Guerra provided me information that there were some drugs

23 in that -- at that residence.

24 Q    Okay.  And what did you do with that information?

25 A    I gave that to Fabian so he could run the investigation

Flores - Cross / By Ms. Gutierrez                    147

1    with the Panama Unit.

2    Q    Okay.  So there was a period of time, though, where your

3    relationship with Fabian Rodriguez did not include any illegal

4    drug activity, correct?

5    A    That's correct.  During that time, Fabian was still not in

6    the Panama Unit.

7    Q    So is it fair to say that as soon as he went into the

8    Panama Unit, he began with his illegal drug activities?

9    A    I'm not sure on that.  It could have been before that.

10   Q    Well, you're saying that before he joined the Panama Unit,

11   he wasn't -- your relationship had nothing to do with drug

12   activities.

13   A    No.  I'm not saying that.

14   Q    Okay.

15   A    He was already part -- he would -- these Panama Unit guys

16   were his friends, so he would hang out with them.  So this

17   incident with -- that happened in Mercedes, I think it was

18   prior -- I'm thinking it was June of 2012, happened before

19   Fabian went into the Panama Unit.  He was already -- he was in

20   Crime Stoppers at that time.

21   Q    Okay.  So then Guerra, Senior gives you a tip about some

22   drugs being in a house in Mercedes.

23   A    Right.

24   Q    Fabian Rodriguez is still Crime Stoppers.

25   A    That's correct.

Flores - Cross / By Ms. Gutierrez                    148

1   Q    You give him this tip, so what, so that he can give it to

2   his buddies?

3   A    So he can give it to his buddies, the Panama Unit.

4   Q    Okay.  So then Guerra, Senior dealt with Panama Unit even

5   before Fabian Rodriguez was part of it.

6   A    Yes.

7   Q    And how many times would you say that occurred?

8   A    I'm not -- that -- I believe that was the first time.  I'm

9   not sure on the number of times.

10  Q    Well, but -- okay.  I'm not asking the number of times,

11  but you're the person that was in the middle of it --

12  A    Right.

13  Q    -- so you would know is that the first time?

14  A    I believe that was the first time.

15  Q    There were also -- apart from -- there were two ways that

16  Guerra, Senior used the Panama Unit.  One way was where he

17  would provide the tip for the Panama Unit of the location where

18  there was drugs, correct?

19  A    Yes.  That's correct.

20  Q    And the other way that Guerra, Senior dealt with the

21  Panama Unit is that he was a potential buyer of drugs that they

22  stole independently, correct?

23  A    Yes.  That's correct.

24  Q    And so, if Panama Unit was trying to sell drugs to Guerra,

25  Senior, that required Fabian Rodriguez to come to you; isn't

Flores - Cross / By Ms. Gutierrez                    149

1   that correct?

2   A    Yes.

3   Q    And so Fabian Rodriguez never went directly to Guerra,

4   Senior, correct?

5   A    Sometimes he would just say, "Look, I need to talk to" --

6   which we referred to him to 28-12 -- and he would talk to him

7   directly.

8   Q    Well, isn't it true that he called him "Delta?"

9   A    He also called him "Delta," yes.  The Panama Unit called

10  him "Delta," and Fabian Rodriguez and myself called him 28-12.

11  Q    But it went through you, correct?

12  A    Yes.  It -- sometimes it did and other times he would just

13  tell me, you know, "Just so you know, I'm going to call 28-12."

14  So he would call him directly.

15  Q    Well, right.  But I guess --

16  A    Yeah.  It would -- it's -- yeah, I still got the initial

17  call from Fabian.

18  Q    And if you told Fabian no, he wouldn't do it, correct?

19  A    Not that I know of, no.

20  Q    What do you mean not that you know of?

21  A    Well, I don't know if he would still do it, you know,

22  still call him directly.  I wouldn't be able to say.  But I

23  don't think he would.

24  Q    Well, you don't know of any drug deals that went on

25  between the Panama Unit and Guerra, Senior that happened

Flores - Cross / By Ms. Gutierrez                                    150

1    without going through you, correct?

2    A    I don't know if there was or not.

3    Q    And you never told Fabian no, also, right?

4    A    No.

5    Q    Okay.  So every time Fabian approached you about having

6    some drugs from the Panama Unit to sell to Guerra, Senior, you

7    said -- you gave the green light.

8    A    Yes.

9    Q    Okay.  And at some point -- sometimes you were there

10   present when the drugs were brought or the money was paid,

11   correct?

12   A    Just one time.

13   Q    What time was that?

14   A    I believe it was that incident from Mercedes -- June, I

15   think it was June.

16   Q    Is that the incident where there was methamphetamines that

17   were stolen?

18   A    I just saw a bag, but I don't know what it contained.  I

19   don't know if it was methamphetamines.  I thought it was

20   cocaine.

21   Q    You thought it was cocaine because you saw it or because

22   of what was told to you?

23   A    No, because I saw it.  But I wouldn't even know what I

24   guess methamphetamines looks like.

25   Q    How much were you paid for that deal?

Flores - Cross / By Ms. Gutierrez                    151

1   A    I don't recall.

2   Q    At that point, you were an equal shareholder of that

3   enterprise, correct, of that operation?

4   A    Yes.

5   Q    So you received an equal share as Senior did and as Panama

6   did, correct?

7   A    Right.  Senior and I would divide whatever we would get.

8   It wasn't always thirds when it was involved with the Panama

9   Unit.  It could have been the Panama you got two parts of it

10  and we would get one, and that's what Senior and I would

11  divide.

12  Q    So Senior and you were one unit?

13  A    Yes.

14  Q    And so what was the average that you would receive for

15  these Panama Unit deals?

16  A    It was a lot of money, but I can't -- I don't remember the

17  exact amount.

18  Q    Well, I'm not asking you for the exact amount.

19  A    I just -- everyone was different.  I don't know.

20  Q    What's the most that you received?

21  A    I would say ten, $12,000.

22  Q    What's the least that you received?

23  A    A thousand dollars.  Are you talking about everything, or

24  just this particular incident?

25  Q    I'm talking about dealings that you did with the -- that

Flores - Cross / By Ms. Gutierrez                        152

1   were done between Panama --

2   A    With the Panama Units?

3   Q    -- and Senior.

4   A    The least would probably be 3,000, two to $3,000.

5   Q    Isn't it true that apart from your cut, Fabian Rodriguez

6   would give you some money from (speaks Spanish)?

7   A    No.  That's not true.

8        **(Pause)**

9   Q    On the fake traffic stops, you testified that you would

10  pick up Guerra, Senior in preparation for the stop, correct?

11  A    Yes.  That's correct.

12  Q    So you would drive him around, correct?

13  A    Yes.

14  Q    You also drove around the Sheriff whenever he needed it,

15  correct?

16  A    Yes.  That's correct.

17  Q    You would take the Sheriff to the airport and pick him up

18  and take him to different places, correct?

19  A    It was mostly to the airport.

20  Q    But that was something that you were available for,

21  correct?

22  A    Yes.

23  Q    And to some extent it was part of your job; isn't that

24  right?

25  A    Yes.

Flores - Cross / By Ms. Gutierrez                                   153

1   Q    Sheriff Trevino was aware that Guerra, Senior was using

2   the Panama Unit to steal drugs; isn't that correct?

3   A    I wouldn't be able to tell you that.  I don't know.

4   Q    Joe Padilla was aware that Guerra, Senior was using the

5   Panama Unit; isn't that correct?

6   A    I'm not sure.

7   Q    Didn't you have any communication with him with respect to

8   that?

9   A    No.  I never communicated with Joe Padilla in reference to

10  that.

11  Q    Okay.  Based on the testimony that you've given, Padilla

12  runs a pretty tight ship, correct?

13  A    Yes.

14  Q    And the things that were being done by the Panama Unit

15  were common knowledge amongst law enforcement; isn't that

16  correct?

17  A    Yes.  That's correct.

18  Q    And the fact that the Guerra, Seniors (sic) and the -- the

19  Guerras and what they were doing was also information that was

20  trickling around to law enforcement; isn't that correct?

21  A    Yes.  That's correct.

22  Q    Okay.  And so the fact that the Guerras were working with

23  the Panama Unit on some occasions, that information was

24  trickling around law enforcement, correct?

25  A    Yes.

Flores - Cross / By Ms. Gutierrez                    154

1   Q    And isn't it true that you were the person that was looked

2   at as far as getting information or confirmation about what the

3   Guerras were up to because of your connection with them?

4   A    From who?

5   Q    From either Padilla or the Sheriff.

6   A    To get information from?

7   Q    To get confirmation about what the Guerras were -- the

8   dealings that the Guerras were doing?

9   A    No.  I was never asked by them.

10  Q    But Padilla did know that Guerra, Senior was a drug

11  dealer, correct?

12  A    Yes.

13  Q    Did you review any documentation in preparation for your

14  testimony?

15  A    Yes.

16  Q    What did you review?

17  A    Just the -- what is it?  Whatever the files is, part of

18  the files.  I don't -- evidence.  Not the evidence.  It's

19  called -- just the files that the Government has.

20  Q    Okay.  Well, who provided that to you?

21  A    It was myself and my attorney were there present in the

22  prosecutor's office.

23  Q    Okay.  And --

24         MR. STURGIS:  I believe he may, Judge, be referring

25  to discovery that --

Flores - Cross / By Ms. Gutierrez                    155

1          **THE WITNESS:**  Discovery.

2          **MR. STURGIS:**  -- that Mr. Garcia reviewed.  Not --

3    there weren't any documents in preparation of testifying.  He's

4    referring to the discovery that they conducted for his case.

5          **THE COURT:**  Right.  I think maybe the question was

6    meant did you review any documents immediately preceding your

7    testimony or in preparation for your actual testimony here that

8    commenced yesterday?

9          **THE WITNESS:**  No, sir.

10         **THE COURT:**  All right.  Next question.

11   Clarification.

12         **MS. GUTIERREZ:**  I'd like his reports, please.

13         **MR. STURGIS:**  Yes, your Honor.  May we approach?

14         **THE COURT:**  You may.  I mean, we're going to take a

15   recess here in seven minutes.

16         **MR. STURGIS:**  Go ahead and --

17         **MS. GUTIERREZ:**  I'll go ahead and ask him a question.

18         **THE COURT:**  Okay.

19   **BY MS. GUTIERREZ:**

20   Q    You had some dealings with Julio Davila and Guerra,

21   Senior, correct?  Drugs dealings, I'm sorry.

22   A    No.  Not with Julio Davila.

23   Q    You were aware that Julio Davila would -- and along with

24   Aida Palacios was creating fake documentation that was provided

25   to the Guerras, correct?

Flores - Cross / By Ms. Gutierrez                    156

1   A    Yes, I was.

2   Q    And creating fake documentation for other people.  I'm not

3   saying that it was only for the Guerra, Seniors (sic), but you

4   were aware that that was happening, correct?

5   A    Yes.  By Julio Davila.

6   Q    And you got that information through Julio Davila,

7   correct?

8   A    Yes.  That's correct.

9   Q    And you were aware that Aida Palacios worked at the

10  Hidalgo County District Attorney's Office, correct?

11  A    Yes.  That's correct.

12  Q    And Aida Palacios -- you were aware that Aida Palacios's

13  boss, Rene Guerra, is cousins through marriage to Lupe Trevino,

14  correct?

15  A    Yes.

16  Q    Did you have any discussions with Rene Guerra?

17  A    No.  I haven't.

18       **(Pause)**

19  Q    Did you -- isn't it true that you contacted Guerra, Senior

20  -- or you were in contact with Guerra, Senior after he was

21  arrested?

22  A    Yes.  It is.

23  Q    Okay.  And -- well, in your report, you indicate that he

24  informed you that the Government was inquiring about whether

25  you had run any plates, correct?

Flores - Cross / By Ms. Gutierrez                    157

1   A    Yes.  That's correct.

2   Q    And you were concerned at that time because you were

3   afraid that you were going to get arrested, correct?

4   A    Yes.  That's correct.

5   Q    Isn't it true, though, that prior to that time, you had

6   already interviewed with the Government?

7   A    One time prior to it was on December 17th.

8   Q    Okay.  And that was before Guerra, Senior was arrested,

9   correct?

10  A    Yes.

11  Q    And at that time, when you were done with your interview

12  with the Government, sometime after that, you informed Guerra,

13  Senior of what the Government was inquiring about him, correct?

14  A    At that time, the Government never inquired on Fernando

15  Guerra.  It was -- the nature was if I had ever run license

16  plates for Julio Davila.

17  Q    And you informed Guerra, Senior about this, correct?

18  A    That's correct.

19  Q    So to some extent you were warning Guerra, Senior that

20  they may be onto some of the things that you all were doing,

21  correct?

22  A    Things that myself and Julio Davila were doing which

23  probably involved him.

24  Q    Well, right.  But the --

25  A    Yes.

Flores - Cross / By Ms. Gutierrez                    158

1   Q     -- things that you and Julio were doing were --

2   A     License.

3   Q     -- identical to the things that you and Senior were doing

4   to some extent.

5   A     Yes.

6   Q     Okay.  And isn't it true that at that interview, you told

7   the Government that you never ran any plates for anyone,

8   correct?

9   A     Yes.  That's correct.  I --

10  Q     And you also told the Government at that interview that

11  you never gave anyone any law enforcement sensitive data for

12  payment, correct?

13  A     Yes.  That's correct.

14  Q     You also told the Government at that time -- the

15  investigators at that time that you never received payment --

16  first, that you never ran any plates and that you didn't

17  receive payment for running plates, correct?

18  A     That's correct.

19  Q     So basically you denied any wrongdoing; is that right?

20  A     Yes.  I was actually scared, and I denied everything.

21  Q     Okay.  Well, you were hoping to get away with it, right?

22  A     Right.  I was scared and I didn't want to get in trouble.

23  Q     Well, you were scared of getting in trouble, correct?

24  A     Right.  I didn't want to -- right.

25        **(Pause)**

Flores - Cross / By Ms. Gutierrez                    159

1  Q    You were aware of an operation that was done out in La

2  Homa Road in Mission, Texas, where the Panama Unit was sent by

3  a tip from you that you received from Guerra, Senior about some

4  dope in that location?

5  A    I don't recall that.

6  Q    Do you recall an instance where the Panama Unit was not

7  able to get consent and they searched the residence anyway and

8  --

9  A    Yes.

10 Q    And that incident came from information that you provided

11 to the Panama Unit, correct?

12 A    Right.

13 Q    And that information you received from Guerra, Senior?

14 A    That's correct.

15 Q    In that incident, the owners of the resident -- of the

16 residence made a complaint to Sheriff Trevino, correct?

17 A    Yes.  To my knowledge, yes.

18 Q    Okay.  And nothing was done about that; isn't that

19 correct?

20 A    That's -- I believe so.

21 Q    And the complaint was about the Sheriff's son, right?

22 That Jonathan Trevino had gone into that residence with --

23 after he had been denied consent, correct?

24 A    Yes.  That's correct.

25 Q    When you mentioned something about hunting, white wing

Flores - Cross / By Ms. Gutierrez                           160

1   hunting, are you talking about having gone to Guerra, Senior's

2   20-acre ranch?

3   A   I'm not sure exactly how many acres there was, but it's

4   the ranch he had in Willacy County right off of FM 490.

5   Q   Guerra, Senior wasn't there, right?

6   A   Yes.  He was.

7   Q   So you hunted with Guerra, Senior?

8   A   We actually did barbecue and we shot some birds.  I mean,

9   maybe shot once or twice, but it was mostly a barbecue.

10  Q   You had your wife or girlfriend or -- I'm not sure --

11  A   Yes.

12  Q   -- what the status is.  Okay.  It was a social event,

13  correct?

14  A   Yes.

15  Q   Okay.  You also testified about how Guerra, Senior had met

16  Jorge Garza while at the Love's Truck Stop.

17  A   Right.

18  Q   Do you remember that?

19  A   Yes.

20  Q   Okay.  And isn't it true that it wasn't just you and Jorge

21  Garza who were there, but it was the *Reguladores* (phonetic)

22  that were there, correct?

23  A   Right.  It was a group of us.  We were getting ready to go

24  up north somewhere -- I don't recall where -- when we saw him

25  in the gas pumps.

Flores - Cross / By Ms. Gutierrez                      161

1   Q    Okay.  So it was a chance meeting.  It wasn't a planned

2   meeting, correct?

3   A    That's correct.

4   Q    And it wasn't like you and Jorge were there -- only you

5   and Jorge were there and met up with Guerra, Senior, correct?

6   A    That's correct.

7   Q    Okay.  And, as a matter of fact, there were no words

8   exchanged between Senior and Garza, correct?

9   A    Just an introduction.

10  Q    Okay.  And that introduction was done by you, correct?

11  A    Yes.

12  Q    There was no discussions of any criminal activity at the

13  time, correct?

14  A    No.

15  Q    There were no discussions of any preparation for any fake

16  traffic stops, correct?

17  A    No.

18  Q    And there were no discussions of any stops -- traffic

19  stops for identification purposes, correct?

20  A    No.

21           **THE COURT:**  All right.  Why don't we take our mid-

22  afternoon recess.  I apologize.  I have other cases I have to

23  hear, so give you all a recess while the Court continues its

24  business.  Fifteen minutes, hopefully we'll get started

25  shortly.  All right.  You're --

1          **THE CLERK:**  All rise for the jury.

2      **(Jurors exit courtroom at 3:04 p.m.)**

3      **(Portion omitted from 3:04 p.m. to 3:34 p.m.)**

4          **THE COURT:**  All right.  Let's bring in the jury.

5          **THE CLERK:**  All rise for the jury.

6      **(Jurors enter courtroom at 3:34 p.m.)**

7          **THE COURT:**  Good afternoon.  Please be seated.  All

8   right.  You may -- Ms. Gutierrez, you may proceed.

9                  **CROSS EXAMINATION (CONTINUED)**

10  **BY MS. GUTIERREZ:**

11  Q    Mr. Flores, you testified that Mr. Garza was assigned a

12  particular vehicle unit within the county -- within the Hidalgo

13  County Sheriff's Office, correct?

14  A    Yes.  That's correct.

15  Q    And you stated it was an expedition; is that correct?

16  A    Yes.  It's a white Expedition.

17  Q    And there are several -- or multiple Expeditions exactly

18  like that that are owned by the Hidalgo County Sheriff's

19  Office, correct?

20  A    Yes.  That's correct.

21  Q    So there -- that means that there are numerous deputies

22  who drive the similar -- the same vehicle -- the same kind of

23  vehicle?

24  A    Yes.  That's correct.

25  Q    Now Mr. Flores, can you tell me about a -- can you tell me

Flores - Cross / By Ms. Gutierrez                              163

1   about the A-P-E operation that was implemented not long ago

2   with respect to high crime areas?

3   A    The APE -- yes, ma'am.

4   Q    Okay.  And that stands for what?

5   A    I don't recall at this time.

6   Q    But it's called APE Operation, correct?

7   A    APE, right.

8   Q    And that APE Operation was implemented for the purpose of

9   reducing crime in high crime areas, correct?

10  A    Yes.  That's correct.

11  Q    Okay.  And within that operation the county, through

12  Padilla -- well, Padilla was in charge of this operation,

13  correct?

14  A    Yes.

15  Q    Okay.  And he utilized civil warrants units to patrol

16  those high crime areas, correct?

17  A    Yes.

18  Q    Okay.  And those civil patrol units, civil warrant units,

19  were conducting traffic stops for the purpose of that APE

20  operation, correct?

21  A    Yes.  That's correct.

22  Q    Okay.  And the Sheriff actually won an award for this APE

23  Operation, correct?

24  A    Yes.  That's correct.

25  Q    Indicating that there was some success with it, correct?

Flores - Cross / By Ms. Gutierrez                          164

1    A    Yes.  That's correct.

2    Q    Mr. Flores, do you own property?

3    A    Yes.  I do.

4    Q    And where is that property located?

5    A    It's located at 6001 North Seminary Road.

6    Q    And that's your home, correct?

7    A    Yes.

8    Q    And on your property you have, I believe, your parents'

9    home as well?

10   A    It's actually my parents' house, then my brother, and then

11   our house.  My house where I live in actually belongs to my

12   parents.

13   Q    So how large is your property?

14   A    The total, where my parents live and everything?

15   Q    Yes.

16   A    Approximately nine acres.

17   Q    Any other property that you own?

18   A    No.

19   Q    And I think that Mr. Sturgis went over this already, but

20   you pled guilty to this conspiracy, correct?

21   A    Yes.  I have.

22   Q    And as a matter of fact, you pled guilty not long ago,

23   sometime last month, correct?

24   A    In July, yes.

25   Q    And up until that time, you were preparing to go to trial,

Flores - Cross / By Ms. Gutierrez                    165

1  correct?

2  A     Yes.  I was.

3  Q     And when you entered your guilty plea, you entered into a

4  plea agreement with the Government, correct?

5  A     That's correct.

6  Q     And that plea agreement indicated that the Government

7  would reduce -- would recommend a reduction of two levels for

8  acceptance of responsibility, correct?

9  A     Yes.  That's correct.

10         **(Pause)**

11         **MS. GUTIERREZ:**  Your Honor, may I approach the

12  witness?

13         **MR. STURGIS:**  Judge, assuming she's offering the plea

14  agreement, we have no objection.

15         **MS. GUTIERREZ:**  I'd ask that it be admitted.

16         **THE COURT:**  All right.  This is which of your exhibit

17  numbers?

18         **MS. GUTIERREZ:**  It's Number 8, your Honor.

19         **THE COURT:**  All right.  Number -- Defense 8 is

20  admitted.  You may publish it for the jury.

21         **(Defendant's Exhibit Number 8 was received in evidence)**

22         **MS. GUTIERREZ:**  Thank you.

23  BY MS. GUTIERREZ:

24  Q     Do you recognize this document, Mr. Flores?

25  A     Yes, ma'am, I do.

Flores - Cross / By Ms. Gutierrez                    166

1   Q    And is that your signature?

2   A    Yes.  It is.

3   Q    And so apart from the two level reduction at the time of

4   sentencing through your plea agreement, you're also receiving a

5   benefit for testifying today against Jorge Garza, correct?

6   A    It's all up to the Court, yes, ma'am.

7   Q    Right.  But I mean -- but that's your understanding and

8   that's why you're --

9   A    Yes.

10  Q    -- here, correct?

11  A    That's correct.

12  Q    Okay.  And it's clear that at this point, it's not --

13  nothing is certain, but you -- your understanding is that

14  you're going to receive somewhere -- you're hoping to receive

15  somewhere around a third of your sentence reduced in exchange

16  for testifying against Jorge Garza, correct?

17  A    Yes.  That's correct.

18  Q    And at the time that you entered your guilty plea, Jorge

19  Garza was really the only person that you -- was left for you

20  to testify against, correct?

21  A    No.  There was actually three of us.  It was myself,

22  Alexis Espinoza, and Jorge Garza.  I asked my attorney in what

23  way I could get my sentence reduced because I was looking at a

24  lot of time, and that's when he advised me there was three

25  conditions:  to accept responsibility, plea out, to help the

Flores - Redirect / By Mr. Sturgis          167

1   Government, and not to lie.

2   Q    But the objective was for you to try to reduce your

3   sentence as much as possible, correct?

4   A    That's correct.

5   Q    And so you were looking for a benefit in exchange for your

6   plea agreement, correct?

7   A    Yes.  That's correct.

8   Q    And the only benefit other than the standard acceptance

9   for responsibility, the two-level reduction, was to testify

10  against Jorge Garza, correct?

11  A    Yes.  That's correct.

12  Q    And your -- the property that you live on, they're not --

13  the Government is not taking that from you, correct?

14  A    That's correct.

15          **MS. GUTIERREZ:**  I pass the witness, your Honor.

16          **THE COURT:**  Redirect?

17          **MR. STURGIS:**  Yes, your Honor, just briefly.

18                    **REDIRECT EXAMINATION**

19  **BY MR. STURGIS:**

20  Q    The property is owned by your parents, and it had nothing

21  to do with any of this stuff that we're talking about; is that

22  correct?

23  A    That's correct, sir.

24  Q    I want to go back just a little bit.  You stated that

25  you've been friends with the Defendant, Mr. Garza, for 20 some

1    odd years, correct?

2    A    Yes, sir.

3    Q    Okay.  And you described your friendship as being a close

4    friendship.

5    A    Yes.  It is.

6    Q    Would you say he was one of your best friends.

7    A    I would say he was like a brother.

8    Q    And so you were asked a minute ago about your only option

9    was to cooperate and possibly testify against Mr. Garza; is

10   that correct?

11   A    Yes.  That's correct.

12   Q    And you were also asked earlier about the first time that

13   you came over to talk to the Government and that you denied

14   everything; is that correct?

15   A    Yes.  That's correct.

16   Q    And at that time, you were actually asked about Mr. Garza

17   and you denied all of that; is that correct?

18   A    No.  At that time, his name wasn't brought up.

19   Q    Okay.  Subsequently it was brought up; is that correct?

20   A    That's correct, yes.

21   Q    And when it was initially brought up, you were reluctant

22   to talk about your friend; isn't that correct?

23        **MS. GUTIERREZ:**  Objection, your Honor, leading.

24        **THE COURT:**  Sustained.

25   //

Flores - Redirect / By Mr. Sturgis                          169

1   **BY MR. STURGIS:**

2   Q    Did you want to talk about Mr. Garza initially?

3   A    No.  I didn't.

4   Q    And why not?

5   A    Because he is my friend and I wanted to protect him.

6   Q    You were asked a lot of questions about Mr. Padilla.

7   Would you consider him your friend?

8   A    No.

9   Q    Okay.  When you initially -- would you consider him

10  someone you somewhat dislike, based on what I've heard?

11  A    Yes.

12  Q    When you initially came in and talked to the Government

13  when you denied everything, did you talk about Mr. Padilla?

14  A    No.

15  Q    Did you talk about Mr. Rodriguez?

16  A    No.

17  Q    When you decided after talking to your attorney to

18  cooperate --

19          **MS. GUTIERREZ:**  I apologize, your Honor.

20  Mr. Rodriguez, I'm not sure who he's --

21          **MR. STURGIS:**  Excuse me, your Honor, Fabian

22  Rodriguez.

23          **THE COURT:**  All right.

24  //

25  //

1   **BY MR. STURGIS:**

2   Q    When you decided to cooperate and your attorney told you

3   those options and to tell the truth, did you tell the

4   Government about Mr. Rodriguez?

5   A    Did I what?

6   Q    Did you tell the Government, the agents, about

7   Mr. Rodriguez, Fabian Rodriguez?

8   A    Yes, sir.

9   Q    Okay.  And did you talk to them about what had happened

10  with Mr. Guerra and his son and the other people?

11  A    Yes.

12  Q    Okay.  And by doing that, Mr. Garza came up; is that

13  correct?

14  A    That's correct.

15  Q    Now, you testified earlier this all started with little

16  favors, running the license plate.

17  A    Yes, sir.

18  Q    You remember that?

19  A    Yes, sir.

20  Q    Okay.  And then it grew into bigger things.

21  A    That's correct.

22  Q    When you initially started running the license plates, you

23  stated you got paid sometimes you didn't get paid.  Did you

24  know it was wrong?

25  A    Yes.  I did.

Flores - Redirect / By Mr. Sturgis                    171

1    Q    Okay.  When you first asked Mr. Garza to conduct the

2    traffic stops to identify people, did you know that was wrong?

3    A    Yes.  I did.

4    Q    When it developed into stopping cars so that it could

5    assist the Guerras as far as the fake drug loads, did you know

6    that was wrong?

7    A    Yes.

8    Q    You testified you didn't know how much marijuana was being

9    dealt with, but you understood that it was marijuana.

10   A    Yes.

11   Q    So on any given load, you didn't know how much the Guerras

12   were dealing with?

13   A    That's correct.

14   Q    Now, you stated initially Mr. Guerra developed a plan

15   where someone was going to run.  The car was going to be

16   stopped, the driver was going to get out and run.  And counsel

17   asked you if it was your ideal (sic), did you develop the ideal

18   (sic) to narrow it down, just turn on the lights and have it

19   fake stop rather than anybody getting out.  And you said yes,

20   it was your ideal (sic), correct?

21   A    Yes.

22   Q    You testified that you asked Mr. Del Angel to help you

23   with this scenario; is that correct?

24   A    Yes.

25   Q    And did he agree to help you with this?

1   A    On this -- the traffic stop?

2   Q    On the fake traffic stops.

3   A    Yes.  No, he didn't agree.

4   Q    He had helped you on the other, the cocaine part that you

5   testified he got paid 2,000, but you asked him to do this and

6   he said no.

7   A    Right.  And this was a week prior to this.

8   Q    Okay.  And then was it prior to asking Mr. Del Angel or

9   after that you then asked your friend Mr. Garza?

10  A    It was after asking Del Angel.

11  Q    Okay.  After he told you no, then you asked Mr. Garza?

12  A    Yes.

13  Q    Okay.  And he agreed to do this?

14  A    Yes, sir.

15  Q    Okay.  Did you tell him what was going on, why you wanted

16  these fake traffic stops conducted?

17  A    Yes, sir.  I did.

18  Q    Okay.  And what did you tell him?

19  A    I told him that there -- the Guerras had stolen some

20  drugs, and if he could do a traffic stop, that there was no way

21  there was going to be any drugs in the vehicle he was going to

22  stop, that drugs had already been left somewhere else.

23  Q    Okay.  And why was he concerned if the drugs were going to

24  be in the vehicle at that time?

25            MS. GUTIERREZ:  Objection, your Honor.  It --

1          **THE COURT:**  Would call for speculation.

2          **MS. GUTIERREZ:**  It would call for speculation, and

3    also talks -- there's evidence not in --

4          **THE COURT:**  Sustained.

5    **BY MR. STURGIS:**

6    Q    Did you discuss with him any concerns that he may have on

7    him doing this?

8    A    Yes.

9    Q    And what were his concerns?

10   A    The location, the amount of -- the visibility, the amount

11   of people around the location, and who -- if the driver was

12   actually going to see who he was.

13   Q    Okay.  And you took care of those concerns for him?

14   A    Yes.

15   Q    You've pled guilty, as counsel asked you, to Count One,

16   conspiracy to possess with intent to distribute cocaine,

17   methamphetamine, and marijuana, correct?

18   A    Yes.  That's correct.

19   Q    Okay.  And as you've testified, there were several things

20   going on, one being the Panama Unit that had to deal with

21   cocaine and methamphetamine.

22   A    That's correct.

23   Q    And you also testified about the cocaine deals that you

24   helped Guerra, Junior do with Mr. Del Angel and those cocaine

25   deals, correct?

1    A     Right.

2    Q     The stuff that you and Mr. Garza helped the Guerras with,

3    that was purely marijuana.

4    A     That's correct.

5    Q     And is that the reason that you pled guilty to conspiracy

6    of more than 1,000 kilograms of marijuana --

7    A     That's correct.

8    Q     -- the stuff that you did with Mr. Garza and Guerra,

9    Senior?

10   A     Yes.  That's correct.

11   Q     Now, at any time -- you testified that you -- after you

12   did the initial one, then you and Mr. Garza and Mr. Guerra,

13   Senior did several of these, correct?

14   A     Yes.

15   Q     And you said that the last one you did was December the

16   11th of 2012.

17   A     That's correct.

18   Q     And you remember that because the next day was your

19   daughter's birthday.

20   A     Yes.  That's correct.

21   Q     After that, do -- was it also your daughter's birthday the

22   next day that the -- some of the members of the Panama Unit

23   were arrested?

24   A     Yes.  That's correct.

25   Q     After that, was there ever any discussion of doing another

1    one with you and Mr. Garza on the fake traffic stops?

2    A    Yes.  There was.

3    Q    And roughly when was that?

4    A    That was, I would say, maybe a week or two weeks after

5    that, that Fernando, Senior asked me that he had already

6    planned another one, if I could tell -- ask Jorge if he could

7    help us out.  At that point, I asked Jorge.  He even offered to

8    give him $5,000, which that was an amount usually that wasn't

9    provided.

10   Q    So Mr. Guerra was offering a larger amount than normal?

11   A    Yes, sir.

12   Q    Okay.  And did you -- you're talking with Mr. Guerra at

13   this time -- Senior, correct?

14   A    Right.

15   Q    Okay.  Did you relay this offer to Mr. Garza?

16   A    Yes.

17   Q    And how did Mr. Garza respond?

18   A    He said at no -- no, because there was -- he thought it

19   was -- he was being set up.

20   Q    Okay.  So he thought he was being set up.  Did he say why

21   he was -- thought he was being set up?

22   A    I guess because everything that was going on.

23           MS. GUTIERREZ:  Objection, your Honor, it sounds like

24   he's speculating.

25           MR. STURGIS:  If he said why.

Flores - Redirect / By Mr. Sturgis                   176

1        **THE COURT:**  Yeah.

2        **MS. GUTIERREZ:**  He said --

3        **THE COURT:**  Did he say why?

4        **MS. GUTIERREZ:**  He said, "I guess."

5        **THE COURT:**  Did he say --

6        **MS. GUTIERREZ:**  His answer was, "I guess."

7        **THE COURT:**  Okay.

8    **BY MR. STURGIS:**

9    Q    Did he say why or give an indication to you as to why he

10   didn't -- why he thought he was being set up?

11   A    Because of everything that had happened with the Panama

12   Unit on December the 12th.

13   Q    So there was never another one done?

14   A    No, sir.

15   Q    Mr. Flores, there was a lot of questions and testimony

16   regarding campaign contributions and money given by the Guerras

17   to Mr. Padilla and the Sheriff's Office through you; is that

18   correct?

19   A    Yes.  That's correct.

20   Q    And I -- if I got it right, you said that it was usually a

21   thousand or two thousand dollars cash all the time, except for

22   one check.

23   A    That's correct.

24   Q    The money that was given to you by Mr. Guerra, Senior for

25   campaign contributions, as they were called, did you keep any

Flores - Redirect / By Mr. Sturgis                    177

1   of that money?

2   A    No, sir.  I didn't.

3   Q    And why not?

4   A    I just needed to -- I needed to turn in money to the

5   contribution, so, I mean, there was no way I would keep

6   anything.  I just wanted to give it to Commander Padilla and

7   keep him happy.

8   Q    Okay.  And what do you think Commander Padilla would do if

9   he found out you took some of the money that was supposed to go

10  to the campaign contributions?

11  A    He would probably tell the Sheriff.

12  Q    That money is totally separate and different than the

13  money you received and Mr. Garza received for helping the

14  Guerras with the fake traffic stop; is that correct?

15  A    That's correct.

16  Q    Okay.  That money you and Mr. Garza spent on your own.

17  A    Yes.

18          **MR. STURGIS:**  I pass the witness.

19          **THE COURT:**  All right.  Do we need to go over this

20  redaction one last time?

21          **MS. GUTIERREZ:**  Yes, your Honor.

22          **THE COURT:**  Can you all approach real quick?

23          **(Sealed bench conference omitted from 3:54 p.m. to**

24  **3:56 p.m.)**

25  *//*

Flores - Recross / By Ms. Gutierrez          178

1          **THE COURT:**  All right.  So final redirect,

2    Ms. Gutierrez.

3          **MS. GUTIERREZ:**  Yes, your Honor.

4                    **RECROSS EXAMINATION**

5    **BY MS. GUTIERREZ:**

6    Q    Mr. Flores, isn't it true that the second -- that when you

7    interviewed with the Government and told them about what you

8    were doing, you indicated to the agent that you had not asked -

9    - approached any other deputy about conducting these fake

10   traffic stops, other than Jorge Garza?

11   A    Yes.  I didn't -- I wasn't sure.  I didn't remember.

12   Q    Okay.  But you didn't say you didn't remember.  You said

13   that you had not approached anyone, correct?  Any other deputy,

14   correct?

15   A    Probably is correct.

16   Q    Okay.  You testified right now about your plea agreement.

17   Did you plead to the conspiracy to the marijuana only?

18   A    No, ma'am.  I --

19          **MR. STURGIS:**  Judge, that's a misstatement.  He

20   testified that he pled guilty to the cocaine, the

21   methamphetamine, and the marijuana.

22          **THE COURT:**  All right.  Well, she can ask the

23   question --

24          **MS. GUTIERREZ:**  Yeah.

25          **THE COURT:**  -- what did you plead to.

Flores - Recross / By Ms. Gutierrez                    179

**BY MS. GUTIERREZ:**

1

2  Q    Did you plead to the marijuana only -- and I'm asking this

3  because I understood a question from Mr. Sturgis to state that

4  you pled to the conspiracy --

5            **THE COURT:**  Okay.

6  Q    -- of the marijuana of more than --

7            **THE COURT:**  Enough with the sidebar.  Just ask the

8  question.

9  **BY MS. GUTIERREZ:**

10 Q    Did you?

11 A    I pled guilty to Count One, which is conspiracy to

12 marijuana, cocaine, and methamphetamine.

13 Q    Okay.  So that includes all three drugs?

14 A    Yes.

15 Q    You testified also that you disliked Jose Padilla,

16 correct?

17 A    Yes.

18 Q    Yet you did become very close to him within your position

19 at the county, correct?

20 A    Right.  As work environment, yes, I was close to him.

21 Q    You also testified about not skimming any money off of the

22 contributions that Guerra had given you because it would be

23 very bad if Padilla found out, correct?

24 A    Yes.  That's correct.

25 Q    However, you were engaging in drug trafficking activities

Flores - Recross / By Ms. Gutierrez                    180

1   behind Padilla's back, and if he found out, wouldn't there be

2   bad consequences to that?

3   A    I'm not sure about that.

4   Q    Okay.  So you're saying that it's possible that Padilla

5   would not have a problem if he found out that you were drug

6   trafficking on the side.

7   A    I don't know about that.

8           **MR. STURGIS:**  Judge, it calls for speculation.

9           **THE COURT:**  All right.  Sustained.

10  **BY MS. GUTIERREZ:**

11  Q    Now, isn't it true that Guerra, Senior knew the -- the

12  individual that you told Guerra, Senior would be conducting the

13  stops was called "Amigo."  Isn't that --

14  A    Yes, "El Amigo."

15  Q    Okay.  And so you testified just a bit ago that Senior

16  told you to ask Jorge.  In fact, Senior told you, "Let's do a

17  traffic stop.  Why don't you ask Amigo?"  Right?

18  A    Right.  He knew that "Amigo" was Jorge.

19  Q    But "amigo" is pretty much a very general term that you

20  can use with anyone, correct?

21  A    That's correct.

22          **MS. GUTIERREZ:**  No further questions, your Honor.

23          **THE COURT:**  All right.  Mr. Flores, that concludes

24  your testimony.  Thank you for being here.  You are excused at

25  this time.

(Witness excused)

(Transcription concluded at 4:00 p.m.; proceeding continued)


## CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____          October 18, 2013
        Signed                           Dated



*TONI HUDSON, TRANSCRIBER*